**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>MATTHEW T. SCHULER, in his official capacity as Executive Director of the Ohio Casino Control Commission; THOMAS J. STICKRATH, in his official capacity as Chair and Commissioner of the Ohio Casino Control Commission; SHEETAL BAJORIA, in her official capacity as Commissioner of the Ohio Casino Control Commission; SCOTT BORGEMENKE, in his official capacity as Commissioner of the Ohio Casino Control Commission; KEITH CHENEY, in his official capacity as Commissioner of the Ohio Casino Control Commission; PENELOPE CUNNINGHAM, in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission; CHRISTOPHER SMITHERMAN, in his official capacity as Commissioner of the Ohio Casino Control Commission; TRIFFON CALLOS, in his official capacity as Commissioner of the Ohio Casino Control Commission; OHIO CASINO CONTROL COMMISSION; and DAVE YOST, in his official capacity as Attorney General of Ohio,<br><br>*Defendant*s. | Case No.: _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

## <u>INTRODUCTION</u>

1.    This action challenges the State of Ohio's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC").  7 U.S.C. § 2(a)(1)(A).  Two Ohio agencies seek to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering event contracts for trading on its federally regulated exchange.  They do so both by threatening Kalshi with imminent criminal

penalties for offering these contracts, and by threatening to revoke the license of any entity that partners with Kalshi anywhere in the United States. Ohio's attempt to regulate Kalshi intrudes upon the federal regulatory framework that Congress established for regulating derivatives on designated exchanges. The state's efforts to regulate Kalshi are both field-preempted and conflict-preempted. This Court should therefore issue both a preliminary and a permanent injunction, as well as declaratory relief.

2.      Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.

3.      Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

4.      The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs." The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the drafting process of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). As the conference report to the 1974 amendments explained, they were designed "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf.

Rep.).  And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

5.    For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995). The CFTC itself agrees.  It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi.  Appellant Br. *27, *KalshiEx LLC v. CFTC*, 119 F.4th 48 (D.C. Cir. 2024) (emphasis added).

6.    Earlier this year, federal courts in Nevada and New Jersey granted Kalshi preliminary injunctions to prevent similar—but less extreme—state overreach.  These courts enjoined state officials from attempting to prohibit Kalshi's event contracts, explaining that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025); *see also KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi); *but see KalshiEX LLC v. Martin*, No. 25-cv-1283, 2025 WL 2194908, at *13 (D. Md. Aug. 1, 2025), *appeal docketed*, No. 25-1892 (4th Cir. 2025).

7.    The district courts in Nevada and New Jersey both also found that Kalshi faced irreparable harm because it

> faces a 'Hobson's choice': if it does not comply with the defendants' demand to cease it faces civil and criminal liability, but if it does comply it will incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles if Kalshi disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange.

*Hendrick*, 2025 WL 1073495, at *6; *Flaherty*, 2025 WL 1218313, at *7 ("This is virtually the same 'Hobson's choice' discussed in *Hendrick*.").

8.      In ruling for Kalshi, the district court in Nevada pointed out that other states—like Ohio here—"have sent or intend to send Kalshi cease-and-desist letters," which "highlights the problem of allowing the States to regulate a national exchange" because it "raises the possibility that another State would have different rules than not only [] the CFTC, but other States." *Hendrick*, 2025 WL 1073495, at *7.  As the court explained, "[p]reventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id*.

9.      Defendants' actions have confirmed the Nevada district court's warning.  Two Ohio agencies—the Ohio Casino Control Commission and the Ohio Attorney General's Office—and their officers (the "Individual Defendants") seek to intrude on the comprehensive federal scheme for regulating designated exchanges by attempting to prohibit Kalshi from offering contracts that federal law permits.  Defendants' unlawful threats have taken two distinct forms.

10.     *First*, even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have threatened Kalshi with criminal penalties unless it shuts down these contracts in Ohio *less than two weeks from today*.  Defendants thus seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and to interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

11.     *Second*, Defendants have also threatened to revoke the Ohio gaming licenses of *anyone* who partners with Kalshi, *even if this partnership occurs exclusively in other states*.  These threats are designed to regulate Kalshi through intermediaries who have strong incentives to comply with Defendants' threats even though they are unlawful.  The threats are just as unlawful as Defendants' threats to regulate Kalshi directly.  *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly[.]").

12.     Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating futures trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law.  Kalshi is entitled to declaratory and injunctive relief to prevent Ohio authorities from enforcing their preempted state laws against Kalshi.

13.     Defendants' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers and commercial counterparties.  Shutting down its event contracts in Ohio would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear.  Defendants' acts also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange.  For that reason, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution.  The federal question presented is whether Ohio law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

15.     The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials.  The Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "permits a private party to seek prospective injunctive relief against state officials in their official capacity before those officials violate the plaintiff's federal constitutional or statutory rights."  *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023).

16. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties in and thus reside in this District. The Ohio Casino Control Commission is subject to this Court's personal jurisdiction and thus resides in this district. A substantial part of the events giving rise to the claim occurred in this District.

## **<u>PARTIES</u>**

17. Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

18. Defendant Matthew T. Schuler is sued in his official capacity as the Executive Director of the Ohio Casino Control Commission.

19. Defendant Thomas J. Stickrath is sued in his official capacity as the Chair and Commissioner of the Ohio Casino Control Commission.

20. Defendant Sheetal Bajoria is sued in her official capacity as Commissioner of the Ohio Casino Control Commission.

21. Defendant Scott Borgemenke is sued in his official capacity as Commissioner of the Ohio Casino Control Commission.

22. Defendant Keith Cheney is sued in his official capacity as Commissioner of the Ohio Casino Control Commission.

23. Defendant Penelope Cunningham is sued in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission.

24. Defendant Christopher Smitherman is sued in his official capacity as Commissioner of the Ohio Casino Control Commission.

25. Defendant Triffon Callos is sued in his official capacity as Commissioner of the Ohio Casino Control Commission.

26. Defendant Ohio Casino Control Commission is sued as the state agency that regulates legal gambling in the State of Ohio by conducting licensing, permitting, collecting,

auditing, testing, programming, inspecting, investigating, prosecuting, and reporting activities with respect to covered entities. The Casino Commission oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in Ohio. As the state's gaming regulator, the Casino Commission has jurisdiction over all persons participating in casino gaming.

27.    Defendant Dave Yost is sued in his official capacity as Attorney General of Ohio.

28.    Together, defendants Matthew T. Schuler, Thomas J. Stickrath, Sheetal Bajoria, Scott Borgemenke, Keith Cheney, Penelope Cunningham, Christopher Smitherman, Triffon Callos, Ohio Casino Control Commission, and Dave Yost would be responsible for enforcing any demand for Kalshi to comply with Ohio state law that is preempted by federal law.

<u>**FACTUAL ALLEGATIONS**</u>

**A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.**

29.    Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

30.    Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures

contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

31.     The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

32.     Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

33.     Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with potential economic consequences.

34.     Sports events can have significant economic consequences for a broad ecosystem of stakeholders. Advertisers, sponsors, television networks, local communities, and state-based sportsbooks all stand to gain or lose substantial sums depending on the outcomes of sports events. Sports-event contracts thus offer these entities opportunities to hedge their exposure. For example,

sponsors of a particular team or athlete can use event contracts to hedge against the risk that the team or athlete underperforms. Or sportsbooks, which take on significant financial risk related to sporting events, can use sports-event contracts to reduce their exposure.

35. Event contracts are a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders— including businesses, individuals, governments, and educational institutions. Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

## B. Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.

36. Futures contracts have long been regulated by the federal government. In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

37. In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA. Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156. One Senator remarked that "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark). As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states'

authority over futures trading.  *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

38.    The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a).  An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA.  17 C.F.R. § 38.3(a)(2).  Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation.  17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.  Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA.  17 C.F.R. § 38.3(a)(2).  The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission.  17 C.F.R. § 38.3(a)(1).

39.    Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market.  Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  This exclusive jurisdiction extends to "event" contracts.  *See id.* § 1a(47)(A)(ii), (iv), (vi).

40.    Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight.  Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA.  Exchanges must meet detailed requirements to maintain their designations as DCMs.  17 C.F.R. pt. 38.  Among other things, DCMs must abide by recordkeeping requirements

that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

41.     The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

42.     Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

43.     The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

44.     The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats." 7 U.S.C. § 1a(9)  The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).  The CFTC regulates event contracts as a type of "swap" contract.  *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024).  "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

45.     In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*

**C. After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.**

46.     Kalshi is a regulated exchange and prediction market where users can trade on the outcome of real-world events.  In 2020, the CFTC unanimously designated Kalshi as a contract market, affirming that its platform complied with the CEA.  Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

47.     Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

48.     Kalshi offers many kinds of event contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics.  For example, Kalshi's

platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

49.     Among its menu of event contracts, Kalshi offers sports-event contracts. On January 22, 2025, Kalshi self-certified, pursuant to section 7a-2(c)(1) of the CEA, the first of a number of sports contracts that are now available on its exchange. Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review. *See, e.g.*, Ex. 7. Kalshi's sports-related contracts allow users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship. While the CEA allows the CFTC to subject these contracts to a 90-day public interest review if the CFTC determines these contracts involve "gaming," the CFTC has declined to review any of Kalshi's sports-event contracts. Unless and until the CFTC takes action on Kalshi's sports-event contracts—all of which have been self-certified under the CEA—they are authorized under federal law. 7 U.S.C. § 7a-2(c)(5).

**D. The Ohio Casino Control Commission Threatens Kalshi with State Criminal Action with Regard to Its Sports-Event Contracts.**

50.     On March 31, 2025, the Ohio Casino Control Commission (the "Casino Commission") sent Kalshi a cease-and-desist letter claiming that offering event contracts based on sporting events to "citizens located within the State of Ohio" without a sports gaming license violated Ohio law. The letter directed Kalshi to "immediately cease offering these sports wagering products unlawfully in Ohio." Ex. 1 at 2.

51.     The Casino Commission warned that offering sports gaming in Ohio "in a manner that does not comply with Chapter 3775 of the Ohio Revised Code" constitutes a "felony." *Id.* (citing R.C. 3775.99(B)(9)). Noting that an "unlicensed sportsbook operating within Ohio is also facilitating bookmaking in violation of the Ohio Criminal Code[,]" the Casino Commission

identified Kalshi's "March Madness and other sporting event offerings" as "clearly facilitating bookmaking in violation of Ohio civil and criminal law, exposing Kalshi to civil and criminal penalties." *Id*. at 2-3 (citing R.C. 2915.02, R.C. 3775.02, R.C. 3775.99).

52.     The Casino Commission added that Kalshi's website "constitutes a nuisance under Ohio law that is subject to abatement under R.C. Chapter 3767." *Id*. at 3 (citing R.C. 3775.99(B)(9)). Consequently, the Casino Commission claimed that it had "the power to impose a civil penalty or fine in an amount equal to the money or value of the property that Kalshi has unlawfully obtained or retained" from its sports-event contracts offered in Ohio, and warned that it could "pursue additional civil and administrative remedies against Kalshi, its officers, directors, [and] holding or parent companies[.]" *Id*. (citing Ohio Admin. Code 3775-1-08).

53.     The Casino Commission declared that Kalshi's "unlicensed and unlawful offering of sports gaming" to individuals under 21 years of age conflicted with Ohio state law. *Id*. (citing R.C. 3775.99(A)(2)).

54.     The Casino Commission further stated that Kalshi was acting "like a regulated, licensed sportsbook" by hiring a compliance vendor and rolling out its "Consumer Protection Hub" featuring "voluntary opt-outs and other self-exclusion tools." *Id*.

55.     The Casino Commission demanded that Kalshi certify in writing by April 14, 2025, that it had complied with the cease-and-desist letter and halted its offerings of sports-event contracts in Ohio. *Id*. The Casino Commission warned that "Kalshi's failure to abide by this notice may result in the Commission pursuing all legal remedies and actions against Kalshi, including, but not limited to, administrative, civil, or criminal sanctions pursuant to R.C. Chapters 2915 and 3775, and any rules adopted thereunder." *Id.*

56.     On April 9, 2025, the U.S. District Court for the District of Nevada preliminarily enjoined the Nevada Gaming Commission and the Nevada Gaming Control Board from pursuing legal action against Kalshi for offering event contracts in Nevada in a substantially similar case. *Hendrick*, 2025 WL 1073495, at *8. The court found that federal law preempts the "field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Id.*

at *6.  Kalshi's contracts are thus "legal under federal law[,]" Nevada's threats to prosecute Kalshi establish a likelihood of irreparable harm, and any state that objects to Kalshi's sports and election event contracts "must take that up with the CFTC and Congress."  *Id*. at *6-8.

57.     Kalshi's counsel spoke with representatives from the Casino Commission on April 18, 2025.  Following that discussion, representatives of the Casino Commission agreed to defer any enforcement action pending Kalshi's response to the cease-and-desist letter.

58.     On April 28, 2025, the U.S. District Court for the District of New Jersey similarly entered a preliminary injunction against state efforts to regulate Kalshi's sports-event contracts on the ground that "at the very least field preemption applies."  *Flaherty*, 2025 WL 1218313, at *6.

59.     On May 15, 2025, Kalshi responded in writing to the cease-and-desist letter.  Ex. 2.  Citing the decisions from Nevada and New Jersey, Kalshi explained that it cannot be regulated by Ohio or any other state because it is federally authorized to operate in all states.  Kalshi explained that it is regulated by the CEA and CFTC regulations promulgated thereunder in part because Kalshi is not a sportsbook or a casino, and its contracts are not wagers based on house odds.  Rather, Kalshi explained, its contracts are "swaps" as defined by the CEA, and its approach to running a federally regulated DCM is premised on complying with the CEA and CFTC regulations rather than the varying and conflicting laws of 50 different states.  *Id.*

60.     On August 19, 2025, the Casino Commission replied to Kalshi by ordering Kalshi to respond to multiple factfinding demands, including demands for information about Kalshi's communications with the CFTC.  Ex. 3.  The Casino Commission also referenced a decision issued on August 1, 2025, by the U.S. District Court for the District of Maryland on denying Kalshi a preliminary injunction—*KalshiEX LLC v. Martin*, No. 1:25-cv-1283-ABA, 2025 WL 2194908, ECF No. 86 (D. Md. Aug. 19, 2025).  Ex. 3 at 2.  The Casino Commission demanded that Kalshi respond within 30 days—no later than September 18, 2025.  *Id*. at 6.

**E. The Ohio Casino Control Commission Threatens All Sports Gaming Licensees with Revocation of Their Licenses for Partnering with DCMs Like Kalshi Inside or Outside Ohio.**

61.     On August 25, 2025, the Casino Commission sent a letter to sportsbooks licensed in Ohio, warning them against doing business with DCMs that offer sports-event contracts (the "Sports Gaming Licensee Letter").  Ex. 5.

62.     The Sports Gaming Licensee Letter noted that entities with a sports-gaming license in Ohio have been considering entry into the "prediction market landscape" by associating or partnering with a DCM.  *Id.* at 2.  It threatened that "any business relationship between an Ohio sports gaming licensee . . . with any entit(ies) offering or facilitating the offering of unlicensed sports gaming in Ohio calls into question the reputation of the licensee and the integrity of sports gaming in Ohio."  *Id.* at 3.  The Commission promised to "consider a licensee's choices to associate" with such a DCM "and may take administrative action against any licensee that does." *Id*. at 5.  The letter's clear implication is that sportsbooks that partner with DCMs like Kalshi risk having their licenses revoked.

63.     The letter clarified that its threat applied even if the licensee's business relationship with a DCM offering sports-event contracts was walled off from Ohioans.  The letter declared: "[E]ven if a sports-gaming licensee in Ohio geofences or takes other actions to restrict Ohioans from accessing sporting event contracts in the prediction markets that are otherwise offered to their patrons outside Ohio, this may not alleviate the suitability concern if the licensee associates, coordinates or partners with a company offering or facilitating the offering" these contracts outside of Ohio.  *Id.* at 4-5.  According to the letter, any partnership with a DCM that offers sports-event contracts, even entirely outside of Ohio, "calls into question the reputation of the licensee and the integrity of sports gaming in Ohio" and may result in revocation of a license.  *Id.* at 5.

64.     The upshot of this threat is that any Ohio licensee that partners with Kalshi not just in Ohio, but in any other state around the country, and even through an affiliate, threatens to lose their license.  This includes Ohio licensees who partner with Kalshi to offer sports contracts in

Nevada and New Jersey, where federal courts have enjoined state attempts to prohibit Kalshi's sports-event contract offerings, as well as in the many states in which no such enforcement has even been attempted.

65. The Casino Commission's message to its gaming licensees has been clear: ***If you or your affiliates do business with Kalshi anywhere in the country, we will retaliate***.

66. The Casino Commission's threat to its licensees interferes with Kalshi's business and subjects it to extraordinary harm. Several prospective partners who hold gaming licenses in Ohio have contacted Kalshi with concerns about their ability to partner with Kalshi moving forward and indicated their view that Ohio is an important market for their businesses. These prospective partners expressed reluctance to put their Ohio license at risk by challenging the Casino Commission.

67. Though some prospective business partners have executed term sheets with Kalshi, the term sheets permit the prospective partners to withdraw from the agreements where regulatory changes make the terms of the agreement infeasible. These prospective partners have now expressed that they are reconsidering whether to move forward with their planned offering of Kalshi's federally regulated event contracts on their platforms, even those outside of Ohio.

68. Some of these prospective business partners have millions of active users. The loss of these users, should the business partners acquiesce to the Casino Commission's unlawful threat, would present a massive disruption for Kalshi financially and reputationally.

69. The Casino Commission is misusing its regulatory authority over its gaming licensees, including the authority to evaluate those licensees' suitability under Ohio law. The Casino Commission may not lawfully leverage its authority to regulate the affiliates of the Ohio licensees that operate in other states. *See Vullo*, 602 U.S. at 190 ("[A] government official cannot do indirectly what she is barred from doing directly[.]"). Yet, that is exactly what the Casino Commission is threatening. Because the Commission recognizes that it cannot lawfully regulate Kalshi directly, it has instead sought to indirectly undermine Kalshi's business by chilling its business relations—both in and out of Ohio.

70.    Among the affiliates of the Ohio licensees that operate outside of Ohio are commodities brokers.   DCMs like Kalshi rely on commodities brokers to act as intermediaries between traders and exchanges.   Brokers solicit and/or accept orders from customers for derivatives transactions, including event contracts, and some may take custody of the assets necessary to secure such trades.   *See, e.g.*, 7 U.S.C. § 1a(28) (describing the role of "futures commission[s] merchant[s]" (or "FCMs"), a type of commodities broker); *id.* § 1a(31)(A) (describing the role of "introducing broker[s]" (or "IBs"), another type of commodities broker).

71.    Increasingly, event contracts, including those offered on Kalshi, are traded through brokers.   Some brokers reach millions of customers, representing large portions of Kalshi's customer base—both in and outside of Ohio.   These brokers also have relationships with many gaming operators—again, many outside of Ohio.

72.    Therefore, brokers are a primary market access point for traders and key to ensuring a deep and liquid market.   And such liquid markets are essential for DCMs like Kalshi to fulfill their role as an instrument for price discovery.   *See Curran,* 456 U.S. at 360 (commodities brokers "are essential participants [in futures trading], and they have an interest in maximizing the activity on the exchange").   Put differently, Kalshi's relationships with brokers and their customers are critical to its operations.

73.    The Casino Commission is impermissibly jeopardizing those relationships.   By threatening to retaliate against licensees operating in Ohio if they, *or their affiliates*, enter into a business relationship with Kalshi in *any jurisdiction*, the Casino Commission is making an extraterritorial grab at out-of-state brokers who work with Ohio licensees and, worse, out-of-state brokers who work with out-of-state affiliates of the Ohio licensees.

74.    If effectuated, the Casino Commission's threat to these brokers would cut off Kalshi's access to millions of users and key operators, and compound the extraordinary harm Kalshi would suffer as a result of the Casino Commission's unlawful attempts at regulation.

**F. The Ohio Casino Commission Refuses to Provide Assurances of Non-Enforcement and to Withdraw Its Unlawful Threat Against Kalshi's Partners.**

75.     Kalshi has endeavored in good faith to reach an accommodation with the Casino Commission.  Upon receipt of the Casino Commission's August 19 letter, Kalshi, on August 26, 2025, informed the Casino Commission that Kalshi "intend[s] to provide a written response to the Commission within the requested 30-day time period."  Ex. 4 at 5-6.

76.     On September 18, Kalshi responded to the Casino Commission's August 19 letter and confirmed its understanding that "the Commission will continue not to seek enforcement of its Cease-and-Desist Letter ahead of" the parties meeting and conferring concerning Kalshi's response.  Ex. 4 at 2; Ex. 6.  Kalshi provided further information responsive to the Casino Commission's inquiries, while noting the Casino Commission's lack of regulatory jurisdiction over Kalshi.  Kalshi also noted its grave concerns with the Casino Commission's threats to Kalshi's current and potential partners, and explained that those threats were subjecting Kalshi to substantial irreparable harm.  Kalshi requested that "the Commission immediately clarify that sports gaming licensees will not suffer adverse consequences if their affiliates partner with Kalshi."  Ex. 6 at 4.

77.     At Kalshi's initiative, on September 25, 2025, Kalshi's counsel participated in a call with representatives of the Casino Commission, the Ohio Attorney General's Office, and an outside litigation law firm retained by Ohio, to discuss Kalshi's September 18 response letter.  On that call, a representative for the Casino Commission indicated that the Casino Commission would respond to Kalshi's letter in writing but that it was unlikely to further extend the deadline for compliance with the cease-and-desist letter.

78.     The Casino Commission sent Kalshi a letter on October 6, 2025.  In that letter, the Casino Commission noted that it "is unpersuaded that Ohio law is preempted by federal law as Kalshi contends," and that if "Kalshi chooses to continue to offer unlicensed and unregulated sports gaming in the form of sporting event contracts within Ohio, Kalshi will be violating Ohio law."  Ex. 8 at 1.  The letter also refused to withdraw the Sports Gaming Licensee Letter

threatening Kalshi's partners. *Id.* at 2. The letter demanded that Kalshi comply with the Casino Commission's cease-and-desist letter "by no later than October 20, 2025," and threatened that if Kalshi declines, "the Commission will be forced to address such violation of law directly." *Id.* at 1-2.

79. On the morning of October 7, counsel for Kalshi informed counsel for the Casino Commission of Kalshi's intent to file this complaint and to seek preliminary relief.

80. Ohio's adherence to its cease-and-desist letter is particularly unjustifiable given that Ohio's criminal gambling statute, Section 2915.02, "does not prohibit conduct in connection with gambling expressly permitted by law." R.C. 2915.02(C). Thus, even if the Commission had regulatory jurisdiction over Kalshi, its threats of criminal penalties would be impermissible under Section 2915.02. Ohio law does not prohibit Kalshi's contracts because those contracts are expressly authorized under federal law. Notably, Section 2915.02(C) also insulates the licensees that the Casino Commission has threatened because their relationships with Kalshi constitute "conduct in connection with" allegedly unlawful gambling "expressly permitted by" federal law.

## REQUISITES FOR RELIEF

81. As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions, including, but not limited to, the enforcement of preempted state law threatened by the cease-and-desist letter, will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

82. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including the threats directly to Kalshi and the threats to Kalshi's prospective business partners, has already and will continue to result in irreparable injury to Plaintiff, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

83. Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants

from enforcing Ohio law that interferes with the operation and function of Plaintiff's futures market described herein.

## COUNT I

### (Supremacy Clause—Preemption by Commodity Exchange Act)

84.     Plaintiff incorporates all prior paragraphs by reference.

85.     The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

86.     The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

87.     Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, at 685 (statement of Sen. Clark).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges.  *See, e.g., Am. Agric. Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F. Supp. 733, 737 (N.D. Cal. 1978).

88.     In threatening to enforce R.C. Chapters 2915, 3767, 3775, and any rules adopted thereunder against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes

the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter. Likewise, Defendants' threats to abate Kalshi's website for supposedly constituting a nuisance and to revoke the license of an entity that partners with a DCM intrudes on the field that Congress has preempted. Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

89. In addition, Defendants' threatened actions conflict with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. In addition, complying with Defendants' demand to immediately cease offering event contracts in Ohio could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

90. Defendants have also threatened to revoke the Ohio licenses of current and prospective Kalshi business partners that offer event contracts on Kalshi—even if this activity occurs entirely outside of Ohio. This strong-arm tactic conflicts with the CEA no less than if the Casino Commission attempted to regulate the DCMs directly. It is well settled that "a government official cannot do indirectly what she is barred from doing directly." *Vullo*, 602 U.S. at 190. The Casino Commission is no less preempted from attempting to regulate Kalshi through its oversight of Kalshi's business partners than it would be from its direct attempts to regulate Kalshi. These threatened actions on Kalshi's prospective business partners are similarly conflict-preempted under the Supremacy Clause. These threatened actions also constitute an impermissible effort to regulate commerce extraterritorially in violation of the dormant Commerce Clause. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (state conduct "that directly controls commerce

occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority").

91.     Defendants may not enforce Ohio's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.  Enter a judgment declaring that R.C. Chapters 2915, 3767, 3775, any rules adopted thereunder, and any other Ohio law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.  Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing R.C. Chapters 2915, 3767, 3775, any rules adopted thereunder, or any other Ohio law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff;

3.  Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing R.C. Chapters 2915, 3767, 3775, any rules adopted thereunder, or any other Ohio law that attempts to effectively regulate Plaintiff's designated contract market, from threatening Plaintiff's business partners with the loss of their gaming licenses in Ohio on account of their dealings with Plaintiff.

4.  Any other relief within this Court's discretion that it deems just and proper.

Dated this 7th day of October, 2025.

Respectfully submitted,

  /s/ Shawn J. Organ
Shawn J. Organ, Esq. (0042052)
   *Trial Attorney*
Connor A. Organ, Esq. (0097995)
**ORGAN LAW LLP**
1330 Dublin Road
Columbus, OH 43215
614.481.0900 (T)
614.481.0904 (F)
sjorgan@organlegal.com
corgan@organlegal.com

and

Neal Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (pro hac vice pending)
Andrew L. Porter (pro hac vice pending)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff*