# Exhibit 2



# Milbank

**JOSHUA B. STERLING**
*Partner*
1850 K Street, NW, Suite 1100 | Washington, DC 20006
T: +1 (202) 835-7535
jsterling@milbank.com | milbank.com

May 15, 2025

Executive Director Matthew T. Schuler
Ohio Casino Control Commission
100 East Broad Street, 20th Floor
Columbus, OH 43215

Re:     Response to Cease-and Desist Letter dated March 31, 2025

Executive Director Schuler:

We write on behalf of our client, KalshiEX LLC ("Kalshi"), in response to your cease-and-desist letter dated March 31, 2025. This letter responds to a request from your staff to provide additional information about Kalshi and to explain that Kalshi's event contracts do not violate Ohio law. In a nutshell, it can't—federal law preempts all state law in this area, as two federal courts have recently ruled.

Kalshi operates a federally licensed derivatives exchange on which users buy and sell event contracts. Event contracts are federally regulated derivatives contracts that provide users the ability to hedge or seek to profit from the outcome of the events referenced in those contracts. By buying a contract, a Kalshi user takes a "Yes" or "No" position on whether the identified event will occur. In this way, Kalshi's contracts give users the ability to profit from, or manage their risk associated with, whether an event will occur. This ability—to manage and profit from the risk of an event occurring—distinguishes event contracts from insurance (which hedges the risk of loss) or other bespoke financial instruments that are only available to Wall Street firms and their institutional or high-net-worth clients. Kalshi makes this unique opportunity available to all on a federally licensed exchange.

The Commodity Futures Trading Commission ("CFTC") is the federal financial regulator that licenses and regulates Kalshi and all other derivatives markets under the Commodity Exchange Act ("CEA"). Like those other markets, Kalshi is not only required to operate in compliance with 23 core principles specified in the CEA and the CFTC's related implementing regulations, known as the Part 38 Rules, but is also subject to regular CFTC examination. We provide an index of those core principles in Appendix A. Kalshi has been registered with the CFTC since November 2020. As a federally licensed exchange, Kalshi is authorized to operate its market in all 50 states. In this way, it is no different from the Chicago Mercantile Exchange, the Intercontinental Exchange, or other more established derivatives markets.

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | HONG KONG | SEOUL | SINGAPORE | TOKYO

Executive Director Schuler
May 15, 2025                                                                                              Page 2

Kalshi recognizes and appreciates the interest of the Ohio Casino Control Commission ("Casino Commission") in protecting Ohio residents. Kalshi cares too, which is why it is federally regulated—to provide both the same protections under federal law and the same opportunities to trade to residents of all 50 states and the District of Columbia. In addition, Kalshi has voluntarily adopted some user safeguards, like self-exclusion, that are common under state gaming law regimes.

Kalshi cannot, however, be regulated by Ohio or any other state, because it is authorized to operate in all states. Therefore, the issue is not whether Kalshi is regulated—many of its competitors, like Polymarket, are not—but which regulations apply to it. As we explain below, the right rule set for Kalshi is the federal one. Kalshi is not a sportsbook or a casino; neither are its contracts wagers based on house odds. In fact, Kalshi's contracts are "swaps" as defined by the CEA and CFTC regulations. Kalshi's entire approach to running a comprehensively federally regulated, examined, and supervised designated contract market ("DCM") is premised on these foundational points, which have been confirmed by multiple federal courts, and the CFTC itself.

This letter follows in three parts: *first*, we provide background on Kalshi's business, including how its operations differ from traditional sportsbooks and the federal regulations that apply to Kalshi as a DCM; *second*, we explain why the federal regulatory framework governing Kalshi's operations preempts Ohio law, making Kalshi's event contracts—including its sport-event contracts—lawful in Ohio and nationwide; and *third*, we address our understanding of the Casino Commission's concerns under Ohio gaming law.

## I.     BACKGROUND ON KALSHI AND THE CFTC'S EXCLUSIVE JURISDICTION OVER FEDERALLY DESIGNATED EXCHANGES

A.     Kalshi's Founding

Kalshi was founded by Tarek Mansour and Luana Lopes Lara, who are both first-generation Americans and graduates of the Massachusetts Institute of Technology. Tarek was raised in Lebanon, and Luana in Brazil. They both chose to come to the United States and build an American company from the ground up—one that has sought to play by the rules from its founding. After spending time at prestigious financial institutions after college, they put everything on the line to build Kalshi.

In 2019, Kalshi was accepted to Y Combinator, arguably the most prestigious startup accelerator in the world. With regulatory approval as a driving force behind the company, Kalshi made history in 2020 by receiving DCM status, becoming the first fully regulated financial exchange in the U.S. specifically for event contracts. In the years since, Kalshi has raised over $100 million from players in the venture capital industry, including Sequoia Capital, SV Angel, and notable figures such as Charles "Chuck" Schwab and Henry Kravis.

Executive Director Schuler
May 15, 2025                                                                                           Page 3

    B.      Event Contracts

    Kalshi's exchange permits users to trade event contracts, which are a type of derivative. Derivatives are financial tools that traders use to mitigate risk. Event contracts, specifically, are financial instruments that identify a future event with several possible outcomes, a payment schedule tied to those outcomes, and an expiration date. The notional value of each event contract listed on Kalshi is one dollar. Investors take a "yes" or "no" position on whether an identified event will occur. For example, a property owner on the Gulf Coast may take a position indicating their belief that a hurricane will strike the area in 2025. If a hurricane strikes, the property owner will receive the ultimate value of the contract and can thereby hedge risk by offsetting losses incurred due to the hurricane.

    Each event contract trade affects prices and offers insights into public sentiment. Traders price event contracts based on information available at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the hurricane example, if a "yes" contract trades at 30 cents, it reflects the market's belief that there is a 30% chance of the hurricane striking the Gulf Coast in 2025. In other words, an event contract's price is determined by market forces and may fluctuate between the time the contract was created and its expiration depending on changing perceptions of the likelihood of the event's occurrence. Because the prices of Kalshi's contracts are driven by market forces, they have significant predictive value and help combat misinformation. Kalshi's contract on the outcome of the 2024 U.S. presidential election, for example, was more accurate than contemporaneous polling.[1]

    C.      Designated Contract Markets

    Event contracts are typically traded on a prediction market, which operates as an exchange. These exchanges match one trader's bid to enter an event contract with another trader's offer.[2] To offer event contracts for public trading, an exchange must seek and receive CFTC recognition as a DCM. To obtain and maintain DCM status, an exchange must initially, and on an ongoing basis, comply with 23 "core principles" specified by statute and CFTC regulations.[3] For example, CFTC Core Principle 2 requires that designated contract markets provide "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services."[4] Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the

---

[1] Michael J. de la Merced, *Kalshi, an Online Prediction Market, Will Open Its Bets to Brokerages*, N.Y. TIMES (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/business/dealbook/kalshi-prediction-market-brokerages.html.
[2] Kalshi's trading affiliate participates in some markets, often as a market maker. However, unlike a house where there is 100% participation by the house, and no competition, Kalshi's affiliate trader only takes a minority of trades, all trading is competitive, and the CFTC is aware of the affiliate's activities.
[3] 17 C.F.R. § 38.3(a)(2).
[4] 17 C.F.R. §38.151(b).

Executive Director Schuler
May 15, 2025                                                                       Page 4

delivery or cash-settlement processes."[5] And Core Principle 21 requires that the DCM maintain "adequate financial, operations, and managerial resources to discharge each responsibility of the board of trade,"[6] which means the exchange must keep sufficient financial resources in reserves to cover operating costs for one year.

An exchange's violation of any of these principles jeopardizes its DCM status. CFTC enforcement is not a mere theoretical risk. Rather, in the past, the CFTC has actively pursued civil enforcement action against regulated exchanges, including those offering sport-event contracts in particular, when it perceived those contracts to violate CEA and CFTC regulations.[7] Thus, failure to comply with CFTC regulations subjects Kalshi to the very real risk of federal enforcement and the potential loss of its DCM status.

       D.       Clearinghouses

DCMs do not handle customer funds and must rely on CFTC-registered clearinghouses to hold customer funds and clear transactions. Clearinghouses are firms that are registered with the CFTC as Derivatives Clearing Organizations ("DCOs"). DCOs are also regulated by the CFTC and subject to numerous requirements outlined in the CEA and CFTC regulations. For instance, DCOs must comply with a set of 17 core principles specific to DCOs.[8] Just like the core principles enumerated for DCMs, these core principles are designed to promote market integrity, transparency, and innovation, and to ensure consumer protection.

Not only is Kalshi subject to the strict regulatory requirements of the CFTC for its exchange, but it also has an affiliated clearinghouse that must satisfy the CFTC's regulatory requirements for DCOs. If a trader purchases a position on a given contract listed on Kalshi, the funds used to establish and maintain that position are held by Kalshi's affiliated clearinghouse, Kalshi Klear. Kalshi Klear novates each event contract, which means that once two counterparties match and an event contract is executed and submitted to Kalshi Klear, Kalshi Klear steps into the middle of each event contract, holds the collateral, and takes on an obligation to release the collateral in accordance with the contract's terms. While the positions are open, funds held by Kalshi Klear collect interest that is passed on directly to the trader. Then, once the contracts resolve—in other words, once the event contemplated by the contract takes place—they settle, which finalizes the allocation of the profits and losses from the contract. The clearinghouse disburses funds to traders accordingly.

---

[5] 17 C.F.R. § 38.250.
[6] 17 C.F.R. § 38.1100.
[7] *See, e.g.*, Statement of Commissioner Dan M. Berkovitz (Apr. 7, 2021) (link here) (DCM's proposal to limit trading on certain sport-event contracts "is the very kind of discrimination based on net worth that the Commission has prohibited.").
[8] 17 C.F.R. §§ 39.11–39.27.

Executive Director Schuler
May 15, 2025                                                                              Page 5

      E.      Futures Commission Merchants

Increasingly, event contracts are traded through CFTC-regulated derivatives brokers, known as "futures commission merchants" ("FCMs"). Certain Kalshi event contracts are traded on FCMs such as Robinhood and Webull. FCMs act as intermediaries between traders and exchanges. They are also subject to CFTC regulation as well as regulations for brokers, including NFA rules. Among other requirements, FCMs must satisfy minimum standards for minimum net capital, custody of customer funds, disclosure and other requirements for customers, and financial and other filings.[9] Where a trader purchases an event contract through an FCM, the trader submits instructions for their order to the FCM and, in turn, the FCM executes the order on the DCM.

      F.      Kalshi's Event Contracts

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto, popular culture, sports, politics, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals and whether the market share for electric vehicles will be above 50% in 2030. Kalshi's event contracts are small—as mentioned above, the notional value of each contract is one dollar. Kalshi's event contracts are also fully collateralized. In other words, if a user wants to trade $100 in event contracts, he or she must provide $100 to do so.

Kalshi's sport-event contracts involve the outcomes of sporting events. There are, however, real differences between Kalshi's exchange and a sportsbook that justify the different regulatory models applicable to each.

*First*, Kalshi is not the counterparty to traders' contracts. As a financial exchange, Kalshi operates a marketplace where traders enter contracts with one another—not with Kalshi acting as the "house."

*Second*, Kalshi does not set contract prices. A position on a contract is determined by market forces that reflect the public's understanding of the likelihood of the outcome of a given occurrence.

*Third*, and relatedly, Kalshi does not lay odds for any given contract, and therefore lacks any incentive to stack the odds in its own favor. Instead, contract prices are determined by traders' transactions on the exchange over the course of the contract's lifetime.

*Fourth*, Kalshi does not offer the myriad bets available through sportsbooks, such as bets on whether a pre-game coin flip will be heads or tails. Kalshi users may only purchase contracts on "Yes" or "No" positions on whether a referenced event will occur.

---

[9] *See, e.g.*, 17 C.F.R. §§ 1.17(a)(1)(i), 1.20, 1.10.

Executive Director Schuler
May 15, 2025                                                                                    Page 6

## II.     KALSHI'S EVENT CONTRACTS ARE LAWFUL UNDER THE "EXCLUSIVE" FEDERAL LAW THAT GOVERNS THESE CONTRACTS

### A.     Kalshi Is a Federally Regulated Exchange

As a DCM, Kalshi is subject to comprehensive federal regulation by the CFTC.  In 2020, the CFTC unanimously certified Kalshi as a DCM offering event contracts, affirming that Kalshi's platform complied with the CEA's regulatory requirements.  To maintain its DCM status, Kalshi must continue to comply with the CEA's 23 core principles.  Thus, Kalshi must show that it will:  (1) comply with all CFTC requirements imposed by rule or regulation; (2) establish, monitor, and enforce compliance with the rules; (3) offer impartial access to its contracts; (4) list only contracts not readily susceptible to manipulation; (5) have the capacity and responsibility to prevent market manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement; and (6) adopt position limitations for each contract to reduce the threat of market manipulation.[10]

Additionally, Kalshi maintains comprehensive internal policies to assure market and customer protections.  Kalshi's policies mandate Know Your Customer practices, which are procedures that require the identification and verification of customers' identities, and the risks associated with their businesses to protect against financial crimes, such as money laundering or illicit financing.  Kalshi has also adopted Anti-Money Laundering protocols that include suspicious activity reporting.  Kalshi has further implemented risk management protocols for market participants.  For instance, participants can set a cooling-off period during which they cannot enter event contracts on the DCM, can set deposit limits on their accounts, and can even self-exclude from the DCM.

### B.     The CFTC's Regulatory Framework is Extensive, Comprehensive, and Exclusive

Congress adopted the CEA in 1936 and, in 1974, created the CFTC to regulate and oversee exchanges.  The 1974 amendments to the CEA were prompted in part by concerns that states might seek to regulate futures markets, resulting in a patchwork of conflicting regulatory requirements.[11]  DCMs are thus subject to the CFTC's regulatory framework as set out in Section 7 of Title 7 of the U.S. Code and in Part 38 of Title 17 of the CFTC's regulations. Together, these provisions establish a comprehensive scheme for regulating DCMs that leaves no room for state enforcement.

Congress built federal preemption into the CEA itself.  Section 2(a) of the CEA gives the CFTC "exclusive jurisdiction" over the listing and trading of derivatives on DCMs such as

---

[10] 17 C.F.R. §§ 38.100, 30.150, 38.200, 38.250, 38.300.

[11] *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see also Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590–91 (D.C. Cir. 2001) ("[T]he statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets.*'") (quoting S. Rep. No. 93–1131, at 23 (1974)).

Executive Director Schuler
May 15, 2025                                                                                           Page 7

Kalshi.[12]  By contrast, Congress allowed states to regulate certain derivatives not traded on DCMs.[13]  Congress therefore wanted the CFTC to be the exclusive regulator of trading on the DCMs it oversees, while allowing states to regulate trading outside of that context.

After an exchange is approved as a DCM, the CEA sets forth a detailed scheme for the CFTC to approve new contracts on the exchange.  A DCM may seek the CFTC's affirmative approval for a new contract.[14]  Alternatively, a DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.[15]  The contracts are immediately effective, but the CFTC has the authority to initiate review of any contract.[16]  Kalshi self-certified and began listing sports-event contracts on January 24, 2025.  Despite having the opportunity, the CFTC declined to restrict Kalshi's sports-event contracts.

The CEA also contains a "Special Rule" addressing event contracts.  The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest."[17]  Under this Rule, the CFTC may, but need not, deem event contracts contrary to the public interest if they involve, among other categories, gaming or activities that are unlawful under any federal or state law.  Regarding this latter category, the focus is not on whether a governing body determines it unlawful to stake a position on the event, but rather whether the underlying event itself is unlawful.[18]  The CFTC has not prohibited Kalshi's sports-related contracts despite possessing the authority to do so.

Congress designed the CEA to grant the CFTC discretion as to how to police and enforce violations of the CEA against DCMs.  For instance, the CFTC includes the Division of Market Oversight ("DMO"), which maintains an active regulatory relationship with DCMs like Kalshi, routinely assessing their filings and conducting general oversight in addition to periodic calls, sweep exams, and for-cause reviews.  More specifically, DMO's Examinations Branch and Market Compliance Section conduct regular reviews to ensure each DCM's ongoing compliance with the core principles and CFTC regulations.  Similarly, the CFTC includes an Enforcement Division, whose staff may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or through administrative proceedings.  If the Enforcement Division concludes that a DCM has violated the CEA, it may recommend that the CFTC seek a wide range of enforcement measures, including civil monetary penalties; restitution; disgorgement; the suspension, denial, revocation, or restriction of registration and

---

[12] 7 U.S.C. § 2(a)(1)(A), §§ 1a(47)(A)(ii), (iv), (vi).
[13] *See* 7 U.S.C. § 16(e).
[14] 7 U.S.C. § 7a-(c)(4) and (5); 17 C.F.R. 40.3.
[15] 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).
[16] *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).
[17] 7 U.S.C. § 7a-2(c)(5)(C)(i).
[18] *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *12 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024).

Executive Director Schuler
May 15, 2025                                                                                              Page 8

trading privileges; and injunctions or cease-and-desist orders.  The Enforcement Division may also refer matters to the Department of Justice for criminal investigation and prosecution.

        C.      Kalshi's Contracts Are Lawful Under Federal Law

Two federal courts recently entered preliminary injunctions in Kalshi's favor in the face of threatened state enforcement.  As the U.S. District Court for the District of Nevada explained, "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted."[19]  The court noted that Kalshi's contracts are "legal under federal law," and that under the CEA, states that object to Kalshi's sport-event contracts "must take that up with the CFTC and Congress," rather than seeking to subject Kalshi to preempted state law.[20]  Just weeks later, the U.S. District Court for the District of New Jersey noted that "Kalshi's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its direction and implicit decision to permit them."[21]

Kalshi's event contracts have also been found lawful when analyzed under the Special Rule.  In 2023, the CFTC decided to review Kalshi's event contracts related to congressional control—that is, predictions as to which political party would control the House of Representatives or the Senate following the 2024 federal elections.  The CFTC issued an order purporting to prohibit Kalshi from listing these contracts, finding that they "involve[d]" "gaming" and "unlawful" activity in violation of the Special Rule.  Kalshi challenged the CFTC's determination in federal court, and the U.S. District Court for the District of Columbia agreed with Kalshi.  The court held that elections "do not involve unlawful activity under any Federal or State law" or "bear any relation to any game."[22]  Thus, it found that Kalshi's congressional control contracts—which depend on the outcome of elections—do not violate the Special Rule.[23]  The CFTC initially appealed that judgment to the D.C. Circuit, which denied a stay pending appeal in a published opinion in October 2024.[24]  On May 5, 2025, the CFTC moved to voluntarily dismiss its appeal, and on May 7, the D.C. Circuit dismissed the appeal, making the D.D.C.'s decision final.[25]

Requiring Kalshi to comply with state gaming laws would conflict with the exclusive federal regulation to which Kalshi is subject.  States have different rules for permitting sports betting, and some states prohibit it altogether.[26]  If state laws governed Kalshi's operations,

---

[19] *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025).

[20] *Id.*, at *6-8.

[21] *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 12118313, at *6 (D.N.J. Apr. 28, 2025).

[22] *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-CV-3257, 2024 WL 4164694, at *13 (D.D.C. Sept. 12, 2024).

[23] *Id.*

[24] *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024).

[25] *See* Order, *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 24-5205 (D.C. Cir. May 7, 2025).

[26] *State of Play Map*, AMERICAN GAMING ASSOCIATION (last accessed May 15, 2025), https://www.americangaming.org/research/state-of-play-map/.

Executive Director Schuler
May 15, 2025                                                                                                              Page 9

complying with that patchwork of disparate (if not contradictory) laws would be completely untenable for a nationwide exchange.[27]  And if Kalshi were forced to comply with different state laws bearing on market access and trading operations, it would face a serious risk of being held out of compliance with the obligations imposed by the CFTC's core principles that Kalshi offer impartial access to users and prevent market disruptions.  This impartiality requirement also distinguishes Kalshi from the various FCMs with which it interacts.  The Casino Commission may be familiar with, for example, Robinhood's decision to withdraw from offering sports event contracts in several states.  Robinhood's decision to "geofence" traders in these states is not an avenue available to Kalshi, legally or logistically.  The system only works if Kalshi is subject to one set of rules, not 51.

## III.    KALSHI'S ACTIONS ARE NOT UNLAWFUL UNDER OHIO LAW

Because state laws interfering with the operations of DCMs are preempted, Ohio's gambling laws are simply not applicable to Kalshi's exchange.  Kalshi is not a sportsbook or a casino—instead, like other derivative exchanges such as the Chicago Mercantile Exchange, it brings together counterparties to a trade.  Nor are Kalshi's event contracts "wagers" or "nuisances" as defined by Ohio law.  There is a fundamental mismatch between how Ohio regulates sports gaming and how federal law regulates Kalshi's exchange.

The Casino Commission's cease-and-desist letter informed Kalshi that offering event contracts based on sporting events to "citizens located within the State of Ohio" without a sports gaming license violated Ohio law, and directed Kalshi to "immediately cease offering these sports wagering products unlawfully in Ohio."  Appendix B, at 1.  Noting that an "unlicensed sportsbook operating within Ohio is also facilitating bookmaking in violation of the Ohio Criminal Code[,]" the Casino Commission identified Kalshi's "March Madness and other sporting event offerings" as "clearly facilitating bookmaking in violation of Ohio civil and criminal law, exposing Kalshi to civil and criminal penalties."  *Id*. at 1-2 (citing R.C. 2915.02, R.C. 3775.02, R.C. 3775.99).

But Kalshi is not operating a sportsbook.  Even setting aside the crucial differences between Kalshi and sportsbooks identified above, Section 3775.01(I) of the Ohio Revised Code describes "[o]nline sports pools" where "wager[s]" on sporting events are accepted through licensed "gaming proprietor[s]" or "mobile management services provider[s]."  More generally, "sports gaming"—which is unlawful in Ohio unless permitted by the Casino Commission—is defined as the "business of accepting wagers on sporting events."  R.C. 3775.01(O)(1).  To "wager," in turn, is "to risk a sum of money or thing of value on an uncertain occurrence."  Yet a host of financial instruments on which traders can take positions, including event contracts

---

[27] *See Dayton Power & Light Co. v. Fed. Energy Regul. Comm'n*, 126 F.4d 1107, 1129 (6th Cir. 2025) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)) (state law conflicts with federal law if "it is impossible for a private party to comply with both state and federal law" or if the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

Executive Director Schuler
May 15, 2025                                                                 Page 10

traded on DCMs, are predicated on uncertain occurrences. Applying Ohio's definition of "wager" to these instruments would dramatically expand state authority over financial instruments that have long been understood to be subject to exclusive federal regulation. And there is no basis to conclude that Ohio retains authority to regulate event contracts involving sporting events but not event contracts or other financial instruments involving other uncertain occurrences.

The cease-and-desist letter suggested that Kalshi's website "constitutes a nuisance under Ohio law that is subject to abatement under R.C. Chapter 3767." Appendix B, at 2 (citing R.C. 3775.99(B)(9)). But, as Ohio courts have recognized, "[w]hat the law sanctions cannot be held to be a public nuisance." *Allen Freight Lines, Inc. v. Consol. Rail Corp.*, 64 Ohio St. 3d 274, 277 (1992) (quoting *Mingo Junction v. Sheline*, 130 Ohio St. 34 (1935)). Kalshi's event contracts are lawful federally, which means they cannot be a nuisance under state law.

The cease-and-desist letter asserted that Kalshi's "unlicensed and unlawful offering of sports gaming" to individuals under 21 years old conflicts with Ohio state law. *Id.* (citing R.C. 3775.99(A)(2)). Noting that Ohio's legislature "intentionally shielded" 18- to 21-year-olds from sports gambling, the Casino Commission claimed that individuals in that age group have "unfettered access to sports wagering because of Kalshi." *Id.* However, federal law allows adults to place trades on DCMs, and permitting states to impose different age requirements would again constitute a conflict and risk interference with traders' impartial access to Kalshi's platform, in contravention of the CFTC's core principles.

The cease-and-desist letter added that Kalshi is acting "like a regulated, licensed sportsbook" by hiring a compliance vendor and rolling out its "Consumer Protection Hub" featuring "voluntary opt-outs and other self-exclusion tools." *Id.* Yet the fact that Kalshi is voluntarily taking steps to protect consumers against some of the very same harms that are a concern for the Casino Commission shows that Kalshi is a responsible actor, not that it has subjected itself to state law. Kalshi seeks to comply with federal law and the CFTC's core principles, and compliance with those rules cannot reasonably be seen as submitting to state-level regulation instead.

## V. CONCLUSION

Kalshi wishes to ensure that market participants and state regulators like the Casino Commission are equipped with an understanding of Kalshi's business and operations. Kalshi hopes that this letter provides helpful information about Kalshi's business and operations, the relevant market, the regulatory requirements applicable to Kalshi, and how Kalshi's compliance with the extensive federal requirements to which it is subject allows it to operate as a fully legal, innovative, and consumer-friendly market in Ohio.

The issues raised in the Commission's cease-and-desist letter resemble issues being litigated in multiple federal courts, where Kalshi has been successful so far in establishing

Executive Director Schuler
May 15, 2025                                                                                          Page 11

federal preemption of state law.  The cases are likely to provide relevant guidance to Kalshi and
to state regulators as they progress.  Kalshi therefore respectfully requests that, even if the
Commission does not withdraw its cease-and-desist letter, the Commission defer any
enforcement pending the outcome of all ongoing litigation.


                                                                    Kind regards,

                                                                    /s/ Josh Sterling

                                                                    Josh Sterling
                                                                    Partner

cc:     Neal Katyal
        Gurbir Grewal
        Will Havemann