# Exhibit 6

# Milbank

**JOSHUA STERLING**

*Partner*

1850 K Street, NW, Suite 1100 | Washington, DC 20006
T: 202.835.7535
jsterling@milbank.com | milbank.com

September 18, 2025
Executive Director Matthew T. Schuler
Ohio Casino Control Commission
100 East Broad Street, 20th Floor
Columbus, OH 43215

      Re: Response to Reply Letter dated August 19, 2025

Executive Director Shuler:

      We write on behalf of our client, KalshiEX LLC ("Kalshi") in response to the Ohio Casino Control Commission's (the "Commission") August 25, 2025 letter to certain sports gaming licensees (the "Sports Gaming Licensee Letter") regarding their business relationships with federally registered Designated Contract Markets ("DCMs") such as Kalshi, and in response to various requests outlined in your letter dated August 19, 2025 (the "August 19 Letter").[1]

**The Sports Gaming Licensee Letter**

      It has been reported that the Commission sent the Sports Gaming Licensee Letter to sports gaming licensees operating in Ohio on August 25, 2025. Dustin Gouker, *News: Ohio Regulator Warns Sportsbooks About Offering Prediction Markets*, The Closing Line Substack (Aug. 25, 2025) (available here). The publicly reported text of the Sports Gaming Licensee Letter includes an assertion by the Commission that "[o]ffering 'event contracts' on sporting events ('sporting event contracts') to citizens located within the State of Ohio without a sports gaming license violates Ohio law," and that "companies that are offering sporting event contracts are operating online sports gaming. Sports gaming cannot be offered in Ohio without a license issued by the Commission." *Id*.

      The Sports Gaming Licensee Letter continues:

> If an Ohio sports gaming licensee chooses to offer sporting event contracts in Ohio through their own DCM or FCM (or those under common ownership or operated by a related entity), ***or decides to associate,***

---

[1] The August 19 letter was in reply to Kalshi's May 15, 2025 letter (the "May 15 Letter"), which responded to the Commission's March 31, 2025 cease-and-desist letter (the "Cease-and-Desist Letter").

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | HONG KONG | SEOUL | SINGAPORE | TOKYO

Executive Director Schuler
September 18, 2025
Page 2

> *coordinate, or otherwise partner directly or indirectly with entities offering or facilitating the offering of sporting event contracts in Ohio*, the Commission will consider these choices as it evaluates the continued suitability of a sports gaming licensee, including key employee licensees, to maintain a license.

> Furthermore, even if a sports-gaming licensee in Ohio geofences or takes other actions to restrict Ohioans from accessing sporting event contracts in the prediction markets, that are otherwise offered to their patrons outside Ohio, this may not alleviate the suitability concern if the licensee associates, coordinates, or partners with a company offering or facilitating the offering of these sporting event contracts in Ohio. *Any business relationship between an Ohio sports gaming licensee (including its related entities or those under common ownership) with any entit(ies) offering or facilitating the offering of unlicensed sports gaming in Ohio calls into question the reputation of the licensee and the integrity of sports gaming in Ohio*. The Commission will consider a licensee's choices to associate with a company operating illegally in this State and may take administrative action against any licensee that does.

*Id*. (emphasis added).

Kalshi objects to this letter in the strongest possible terms. Although the letter does not mention Kalshi by name, its clear implication is that the Commission will retaliate against any sports gaming licensee operating in Ohio if it, or an affiliate, enters into a business relationship with Kalshi, whether in Ohio **or in any other jurisdiction**. This is a clear attempt by the Commission to limit Kalshi's ability to conduct its business and enter into business relationships—including those with no impact on Ohio—because of the Commission's mistaken view that Kalshi is engaged in "online sports gaming."

This effort to throttle Kalshi by threatening its business partners is deeply troubling, especially as Kalshi continues to engage in good faith with the Commission to address its concerns and misunderstandings about Kalshi's business. As explained in the May 15 Letter, the Commission lacks jurisdiction to regulate Kalshi directly. The Commission cannot now make an end-run around this restriction by threatening to prohibit Kalshi's current or potential business partners from doing business in Ohio. As the Supreme Court has explained, "a government official cannot do indirectly what she is barred from doing directly." *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012); *City of Eugene, Or. v. Fed. Commc'ns Comm'n*, 998 F.3d 701, 715 (6th Cir. 2021); *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (Posner, J.). Just as the Commission may not regulate trading on Kalshi directly, the Commission may not regulate trading on Kalshi by threatening third parties that do business with Kalshi—even if affiliates of those third parties hold Commission licenses. The Commission's threats are all the more improper because they are extraterritorial—they would punish Kalshi's partners for conduct that occurs entirely outside of Ohio, even in states that have no objection to

Executive Director Schuler
September 18, 2025
Page 3

Kalshi's operations or where federal courts have granted Kalshi preliminary injunctions on the ground that the CFTC alone has the authority to regulate trading on DCMs.

It is unfortunate that the Commission sought out this means of circumventing federal preemption when Kalshi has engaged constructively with the Commission about the lawfulness of its event contracts over several months. At the time the Commission issued its letter, Kalshi was in the midst of litigating multiple actions in federal courts addressing the lawfulness of its event contracts, and Kalshi had been working with the Commission for months to provide it information relevant to its inquiry.

If Ohio sports gaming licensees succumb to the Commission's threats, Kalshi would suffer serious and irreparable harm to its business. And because the Commission's threats interfere with Kalshi's ability to conduct its business nationwide, this harm would occur not just in Ohio, but across the country. In fact, Kalshi has spoken with several potential business partners, including affiliates of Ohio sports gaming licensees, that have expressed a strong desire to partner with Kalshi, but are now afraid to do so—or even to challenge the Commission's guidance—because of the prospect of retaliation by the Commission. As such, Kalshi requests that the Commission immediately clarify that sports gaming licensees will not suffer adverse consequences if their affiliates partner with Kalshi.

### Responses to August 19 Letter

In response to the August 19 Letter, Kalshi requested that the Commission confirm that Kalshi would be afforded an opportunity to confer with the Commission following the submission of this response letter, prior to the Commission taking any action with respect to the Cease-and-Desist Letter. The Commission confirmed that request on September 4, 2025. On September 17, 2025 Kalshi requested a meeting with the Commission to discuss this response letter on Monday, September 22, 2025, or as soon thereafter as the Commission is available. The Commission agreed to speak on Thursday, September 25, 2025. We look forward to that discussion, which we hope will be helpful to the Commission.

We now turn to the various inquiries related to Kalshi's sports event contracts included in the August 19 Letter. We reiterate that Kalshi is not required to respond to the Commission's inquiries because the Commission lacks jurisdiction to regulate Kalshi. But in the spirit of cooperation we nonetheless respond to each question below:

### *Kalshiex LLC v. Martin* Decision

The August 19 Letter asked Kalshi to address Judge Abelson's denial of Kalshi's motion for temporary injunctive relief in *Kalshiex LLC v. Martin*, No. 1:25-cv-1283, 2025 WL 2194908 (D. Md. Aug. 1, 2025), ECF No. 70. Judge Abelson's decision is inconsistent with those of district courts in New Jersey, and Nevada, both of which granted Kalshi preliminary injunctive relief. *See* Order, *KalshiEx LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev. Apr. 9, 2025), ECF No. 45; Opinion, *KalshiEx LLC v. Flaherty*, No. 1:25-cv-02152 (D.N.J. Apr. 28, 2025), ECF No. 21. Those two decisions are well-supported by the plain text of the Commodity Exchange Act (the "CEA")

Executive Director Schuler
September 18, 2025
Page 4

and the relevant legislative history. And they are further supported by case law from several circuit courts of appeal that underscore the preemptive scope of the CEA.

Kalshi respectfully disagrees with Judge Abelson's decision and has appealed it to the Fourth Circuit Court of Appeals. *See KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Aug. 6, 2025). Defendants in the *Martin* action have assured Kalshi they will forgo enforcement of the Maryland laws Kalshi asserts are preempted pending the outcome of Kalshi's appeal, and the *Martin* action is stayed pending resolution of the appeal. *See* Joint Motion to Stay Proceedings, *Kalshiex LLC v. Martin*, 1:25-cv-1283 (D. Md. Aug. 19, 2025), ECF No. 86 at 1, 87; *see also* Order, *Kalshiex LLC v. Martin*, 1:25-cv-1283 (D. Md. Aug. 21, 2025), ECF No. 87.

Kalshi will address the deficiencies in the *Martin* decision in forthcoming briefing to the Fourth Circuit. Kalshi's opening brief is due to be filed on October 15, 2025, and it will provide the Commission with a courtesy copy of that brief once it is filed.

### (1) Communications with the CFTC

As Kalshi has previously explained (May 15 Letter at 1-2), Kalshi is a DCM. As a DCM, Kalshi is subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC") and the comprehensive regulatory scheme prescribed for DCMs under the CEA. 7 U.S.C. § 2(a)(1)(A). Because Kalshi's regulation and oversight fall within the CFTC's jurisdiction, Kalshi communicates with the CFTC on a regular basis. As the Commission has requested certain communications between Kalshi and the CFTC, Kalshi notes that it makes a wide variety of its communications with the CFTC publicly available, including both notices Kalshi has filed with the CFTC and product certifications Kalshi has submitted to the CFTC.

The Commission can access those communications through Kalshi's website at: https://kalshi.com/regulatory/notices and  https://kalshi.com/regulatory/product-certification.[2]

### (2) Self-Certification

As the Commission noted in the August 19 Letter, Kalshi is able to list sporting event contracts using the CFTC's self-certification process. That process is governed by CFTC Regulation 40.2(a). 17 C.F.R. § 40.2(a). Kalshi takes seriously its obligations as a DCM, and makes extensive efforts to ensure that all contracts offered by Kalshi comply with applicable law.

---

[2] The Commission may also find copies of production filings on the CFTC website at: https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Category=&Date_From=&Date_To=&Organization=KEX&Show_All=0&Status=Certified&Subcategory=&Type=&page=24. In addition, the CFTC maintains a full inventory of Kalshi's rule filings: https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationRules?Organization=KEX&Receipt_Date_From=&Receipt_Date_To=&Status=&Date_From=&Date_To=&Show_All=1.

Executive Director Schuler
September 18, 2025
Page 5

Kalshi's Rulebook, a copy of which is attached to this letter as Exhibit A[3] provides a comprehensive description of how Kalshi's exchange operates. *See, e.g.*, Rulebook R. 3.6(a), Ch. 12, R. 13.1(h). In addition, Kalshi makes its self-certifications of event contracts—including sports-event contracts—publicly available on its website at https://kalshi.com/regulatory/product-certifications. These certifications provide information required under applicable provisions of the CEA and CFTC regulations, and reflect Kalshi's determination that its contracts comply with federal law. Together, these materials will provide the Commission with the relevant regulatory framework relevant to Kalshi's self-certification processes.

### (3) Hedging

Traders on Kalshi have the ability to hedge or profit from event outcomes as well as the risk of an event occurring. May 15 Letter at 1, 3. However, while trades on Kalshi can be used for hedging purposes, there is no requirement that market participants state, or substantiate, whether a particular transaction is undertaken for hedging or speculative purposes. Rather, users are required only to comply with applicable laws and regulations in accessing a DCM. The CEA and CFTC regulations do not require DCMs to collect such information, and Kalshi does not require its users—whether located in Ohio or elsewhere—to disclose their intended purpose in entering into transactions.

As such, Kalshi cannot provide the percentage of sporting event contracts executed on its platform that are entered into for hedging purposes. Nor does Kalshi have information as to whether the outcome of a sporting event contract has any "financial, economic, or commercial consequence" for any particular trader beyond the risk inherent to the event specified in the contract itself. Market participants may choose to enter into event contracts for a variety of reasons, but Kalshi has no obligation—and no practical ability—to verify or categorize those reasons. This is by design. The CEA "does not limit its protection to hedging transactions; rather, its protection encompasses every contract that is or may be used for (a) hedging or (b) determining the price basis of any transaction in such commodity," regardless of whether the parties to the contract are hedgers or speculators. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 389 (1982) (cleaned up). Indeed, as the Supreme Court has explained, "hedging" on DCMs "is facilitated by the availability of speculators willing to assume the market risk that the hedging [party] wants to avoid," which means that a trader's "ability to engage in hedging depends on the availability of investors willing to assume or to share the hedger's risk in the hope of making a profit." *Id.* at 358, 390. Kalshi is therefore unable to provide the Commission with the requested information.

### (4) Voluntary Exclusion

Kalshi cares about providing protections to its users and the integrity of its market. Unlike some of its competitors Kalshi, from the outset, registered as a federally regulated DCM to ensure that all of its users are afforded the same protections and trading opportunities. That is also why

---

[3] Kalshi's rulebook is also publicly available on its website at https://kalshi-public-docs.s3.amazonaws.com/regulatory/rulebook/Kalshi%20Rulebook%20v1.19.pdf.

Executive Director Schuler
September 18, 2025
Page 6

Kalshi has voluntarily adopted its own user safeguards, including its choice to provide all users with access to responsible risk management tools, even though the implementation of such tools is voluntary and not required by the CEA or CFTC regulations. Kalshi is not aware of any other DCM who takes such measures as to the contracts that they list, whether events contracts or otherwise.

Kalshi's safeguards include voluntary opt-outs, personalized funding caps, and self-imposed trading breaks.[4] Kalshi users may enable such safeguards at their discretion and for a prefixed amount of time. Information about Kalshi's safeguards and responsible risk management tools is available at https://help.kalshi.com/account/responsible-risk-management.

The Reply Letter also requested that Kalshi provide the total number of trades of sporting event contracts that involve at least one party from Ohio. As described above, Kalshi's status as a DCM subject to the exclusive jurisdiction of the CFTC ensures that all of its users are afforded the same protections and equal access to Kalshi's markets. *See* 7 U.S.C. § 2(a)(1)(A). As such, Kalshi does not track and categorize trading activity by user location, nor does it have the means to do so with certainty, because neither the CEA nor CFTC regulations require such information to be precisely tracked or reported as a matter of routine.

That said, Kalshi has conducted such a review in order to be responsive to the Commission. Based on that review, the number of sporting event contracts involving at least one party with KYC information related to Ohio is approximately 22.35 million contracts through September 1, 2025. Those contracts represent approximately 0.33% of all Kalshi contracts traded between Kalshi's initial self-certification of sporting event contracts and September 1, 2025. The total purchase prices of Ohio traders' positions was approximately $12.6 million.

### (5) Market Makers

As explained in the May 15 Letter, Kalshi, like all DCMs, is required by the CEA and the CFTC regulations promulgated thereunder to comply with the Core Principles to maintain its registration status as a DCM. May 15 Letter at 3-4. These Core Principles include Core Principle 8, which requires DCMs to make public daily data for contracts traded on Kalshi. 7 U.S.C. § 7(d)(9); 17 C.F.R. § 38.450. In accordance with Core Principle 8, Kalshi diligently tracks and publicly reports such daily trading data, including information on settlement prices, volume, open interest, and opening and closing ranges for all actively traded contracts. Thus, to the extent the Commission would like more information related to any trading activity on Kalshi's platform, Kalshi's trading information is available at https://kalshi.com/trade-data.

Kalshi is a DCM and its clearing organization, Kalshi Klear LLC ("Kalshi Klear"), is a CFTC-registered derivates clearing organization ("DCO"). To become a licensed DCM and DCO, Kalshi and Kalshi Klear were required to submit detailed applications to the CFTC, in which each entity provided the CFTC with documentation establishing that it satisfied all of the federal regulatory requirements. As part of that application, Kalshi Klear provided an organization chart

---

[4] Kalshi provides users with an option to self-impose a "lifetime" ban. Such a ban can only be reversed after 10 years have lapsed, upon written petition to Kalshi.

Executive Director Schuler
September 18, 2025
Page 7

that outlines all Kalshi's affiliate entities.  The Commission may access that chart at: https://www.cftc.gov/IndustryOversight/IndustryFilings/ClearingOrganizations/53075.  Further, Kalshi Klear's rulebook may be accessed at: https://kalshi-public-docs.s3.amazonaws.com/regulatory/rulebook/Kalshi%20Klear%20Rulebook%20v1.3%20.pdf.

The CFTC does not require Kalshi or Kalshi Klear to issue disclosures beyond what is explained above in order to maintain their regulatory compliance.  Kalshi is therefore not obligated to collect or disclose to the Commission any trading information beyond what is compiled in its trade data center, linked above.  In the interest of cooperation, Kalshi has already conducted a discretionary review of the total number of trades of sporting event contracts that involve at least one party from Ohio, as discussed above.

Kalshi provides the CFTC and the public with substantial information about its market maker program.  The Commission can access that information through the following resources:

- Kalshi's Help Center Webpage at: https://help.kalshi.com/markets/market-maker-program;
- Chapter 4 of Kalshi's rulebook at, attached hereto as Exhibit A; and
- Kalshi's related filings, available to the public at kalshi.com/regulatory/notices

Agreements with individual market makers in sporting event contracts, including with Susquehanna Government Products, LLP, contain proprietary and competitively sensitive information.  Kalshi is not obligated to—and does not—disclose them publicly.

With respect to the Commission's inquiry regarding total contract value, Kalshi permits users to buy "Yes" or "No" positions on event outcomes.  Based on Kalshi's market structure, the purchase of "Yes" and "No" positions are interconnected.  The combined value of "Yes" and "No" positions on Kalshi's event contracts add up to $1.00 to maintain a state of market equilibrium. Buying a "Yes" contract is the equivalent to selling a "No" contract, and vice versa, as every trade requires a matching opposite position from another trader.  Trades on an event contract are processed by Kalshi as a single contract, not two separate "Yes" and "No" contracts.  When a trade occurs, the total cost of the "Yes" and the "No" contracts always equals $1.00 (e.g., $0.70 for a "Yes" plus $0.30 for a "No").  This structure ensures that all trades are fully collateralized, and the market remains balanced without margin or short-selling complexities.

Where the publicly displayed "Yes" and "No" positions for a given contract amounts to more (or less) than $1.00, that is because the prices displayed on Kalshi's website reflect the best available offers and bids in the order book, not the actual trade prices.  In other words, the displayed prices are unmatched offers, not executed trades that equal $1.00 when matched.  For example, if the highest bid for a "Yes" contract is $0.70, the corresponding "No" contract is shown at $0.30. However, if, at the same time, a user is looking to sell a "No" contract at $0.29, the corresponding "Yes" contract is shown at $0.71.  This creates a situation where the best available *unmatched* offer displayed is a "Yes" at $0.71 and a "No" at $0.30, which totals $1.01.  The $0.01 difference is referred to as the "spread."  However, to prevent arbitrage, when matching orders, Kalshi ensures that the total cost of a given "Yes" and "No" contract always equals $1.00.

Executive Director Schuler
September 18, 2025
Page 8

To the extent the Commission seeks additional information on this process, Kalshi directs the Commission to Rule 6.3 of its Rulebook, attached hereto as Exhibit A.

### (6) Licensure to Offer Sports Gaming in Ohio

The Commission has inquired as to whether there are obstacles under the CEA that prevent Kalshi from offering sporting event contracts under the Commission's regulatory regime in Ohio. As a federally licensed DCM, Kalshi is legally authorized to operate in all 50 states and does not need any state license to offer swap transactions in the form of event contracts, including those related to sporting events.

The legality of Kalshi's operations in all 50 states is supported both in the plain language and purpose of the CEA. The CEA states that "transactions subject to [the CEA]"—including swaps—"are entered into regularly in *interstate* and international commerce and are affected with a *national* public interest." 7 U.S.C. § 5(a) (emphasis added). To serve those national interests, the express purpose of the CEA is to create "a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [Commodity Futures Trading] Commission." *Id.* § 5(b).

Furthermore, Kalshi is required by the CEA and the CFTC regulations promulgated thereunder to comply with the Core Principles applicable to DCMs, which include the obligation under Core Principle 2 to "provide its members, persons with trading privileges, and independent software vendors with *impartial access*" to its national market and services. 17 C.F.R. § 38.150, 38.151(b) (emphasis added). This "impartial access" requirement provides that DCMs must not restrict access based on factors that would "result in discriminatory access or act as a barrier to entry." *Core Principles and Other Requirements for Designated Contract Markets*, 77 Fed. Reg. 36612, 36625 (June 19, 2012). Thus, federal law mandates that Kalshi may not restrict access to its nationwide market based on a non-neutral factor such as where a user lives, a requirement that conflicts with Ohio Revised Code Sections 3775.11(A) and 3775.12(A), which require, respectively, online sports pool operators and sports gaming facility operators to accept wagers only from individuals who are physically present in Ohio. This is just one example of how Kalshi cannot simultaneously comply with applicable federal regulatory requirements and the Commission's regulatory scheme.

Relatedly, pulling Kalshi's contracts would also risk running afoul of Core Principle 3, which requires DCMs to ensure that contracts "are not readily susceptible to manipulation." 17 C.F.R. § 38.200. And Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions." *Id.* § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to anyone located in Ohio could constitute exactly this sort of market disruption. DCMs are obligated to "promote fair and equitable trading on the contract market." *Id.* at § 38.650. Nationwide markets complying with requirements cannot simultaneously adhere—50 times over—to divergent state regulations attempting to dictate which event contracts may be offered within their jurisdiction or requiring that certain contracts be unwound once a market participant crosses state lines.

Executive Director Schuler
September 18, 2025
Page 9

The majority of courts that have considered the issue agree that Kalshi's contracts are legal under federal law and that any attempt by state regulators to regulate Kalshi or prohibit Kalshi from offering any of its event contracts on its DCM is preempted under federal law. *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG, 2025 WL 1073495, at *6-8 (D. Nev. Apr. 9, 2025) (finding Kalshi's event contracts legal under federal law); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 12118313, at *6 (D.N.J. Apr. 28, 2025) (recognizing the CFTC's exercise of discretion in permitting Kalshi's event contracts).

### (7) Integrity Concerns

Kalshi is committed to ensuring that all participants on its market enjoy all the protections afford by the CEA, CFTC regulations, and its own rulebook. As such, Kalshi has various procedures and processes in place to prevent market manipulation, price distortion, and disruptions through real-time monitoring, trade surveillance, compliance functions, and enforcement of its rulebook. Kalshi is also subject to routine, sweep and other examinations by the CFTC Division of Market Oversight.

For instance, Core Principle 4 alone requires that DCMs "prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures." 17 C.F.R § 38.250. Additionally, the remaining Core Principles are also designed to prevent market manipulation and protect the integrity of the market by requiring DCMs to, among other things, make certain information public, implement monitoring and disciplinary procedures, and to implement position limits, controls, and other safeguards to ensure the financial integrity of the market. *See generally* 17 C.F.R. Part 38. In order to become a registered DCM, Kalshi had to precisely lay out how it satisfied each of the CFTC's 23 Core Principles in its DCM application. That information can be accessed in Kalshi's Form DCM Exhibit L Regulatory Compliance chart, available at: https://www.cftc.gov/sites/default/files/filings/documents/2024/orgdcmkexkalshiexhl240709.pdf

Kalshi also points the Commission to its Rulebook, attached hereto as Exhibit A, which lays out Kalshi's processes and procedures in greater detail, including its mechanisms for ensuring that its rules are followed. For example, Chapter 9 of the Rulebook describes Kalshi's surveillance and monitoring of markets and the disciplinary procedures available to Kalshi, including the ability to fine members for violating rules (including market conduct rules) and to publish sanctions. And Rules 5.17(y) and (z) specifically prohibit traders from trading on the market for a contract if they have material nonpublic information concerning the event underlying the contract or have influence on the outcome of the underlying event, "no matter the scale and importance of the influence." Kalshi reemphasizes the restriction in the individualized rules it publishes for sporting event contracts where it explicitly states that "[i]n addition to the general prohibition against trading on material nonpublic information," the following are additionally prohibited from trading sporting event contracts: (i) "[c]urrent and former players, coaches, and staff of the league, association, or organization(s) governing [the event]," (ii) "[p]aid employees of the league and league participants," (iii) "[u]ltimate beneficial owners of teams and the league," and (iv) "household members and immediate family of all above." A form example of these supplemental rules for sporting event contracts is attached Kalshi hereto as Exhibit B at Appendix B.

Executive Director Schuler
September 18, 2025
Page 10

Kalshi partners with Integrity Compliance 360 to monitor suspicious activity as it relates to trading sporting event contracts by scouting for prohibited bettors in real time. Press Release, Kalshi/IC360, *Kalshi Boosts Compliance Infrastructure by Partnering with IC360* (Mar. 24, 2025) (available here). Kalshi also takes seriously the nature of the contracts it offers on its DCM and takes steps to avoid offering markets easily susceptible to manipulation. For instance, certain Kalshi competitors were criticized earlier this year for offering contracts related to the throwing of objects onto the court at WNBA games. *See* Jacob Feldman, *Sex Toys Thrown at WNBA Games Pay Off For Polymarket Traders*, Sportico (Aug. 6, 2025) (available here). Kalshi offered no such contracts.

### (8) Parlay Betting

In the Reply letter, the Commission also requested information relating to whether Kalshi has taken any action to expand its offering to include prediction contracts consisting of multiple underlying events in one contract ("parlays"). As the Commission referenced, Kalshi previously offered event contracts related to Oscar winners that could be considered parlays. For instance, Kalshi offered a contract that combined the results of multiple Oscar award categories, including Best Picture, Best Actor, Best Actress, and others. Information related to that contract is available at https://kalshi.com/markets/kxoscarwinners/oscar-winners/kxoscarwinners-25c0ce5. This was a "pre-built" contract, meaning that traders on Kalshi were able to select from a set number of possible results, and could not select their own unique combination of results to combine. As previously explained in Kalshi's May 15, 2025 letter, the CEA contains a "Special Rule" addressing event contracts, which grants the CFTC discretion to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC declined to exercise such discretion and challenge Kalshi's event contracts related to Oscar winners.

In order to offer its users the best experience and most robust market, Kalshi is constantly evaluating its offerings. On September 2, 2025, Kalshi self-certified to offer contracts involving multiple results related to sporting events in a single contract. A copy of that self-certification is available at https://www.cftc.gov/sites/default/files/filings/ptc/25/09/ptc09022529868.pdf. To date Kalshi has not offered any sports contracts combining the results of multiple underlying sporting events.

Kalshi is constantly evaluating its offerings. To the extent it offers additional or different contracts in the future, it will do so consistent with the CFTC's self-certification process. Kalshi's aim is always to ensure that market participants and the public understand Kalshi's business and the regulatory requirements applicable to Kalshi, and how Kalshi's registration as a DCM and compliance with the federal regulatory requirements allows Kalshi to operate a fully legal market nationwide, including in Ohio.

\*     \*     \*

Executive Director Schuler
September 18, 2025
Page 11

     We hope that the information laid out in this letter has been helpful in providing the Commission with such an understanding.  We look forward to the opportunity to confer with the Commission on September 25, 2025, and reiterate our request that the Commission promptly clarify that sports gaming licensees will not suffer adverse consequences from partnering with Kalshi.

     Kind regards,

Joshua Sterling

# EXHIBIT A

# KalshiEX LLC
# Rulebook

**Version:** 1.19

CHAPTER 1 DEFINITIONS     6
CHAPTER 2 MARKET GOVERNANCE     12
    RULE 2.1 OWNERSHIP     12
    RULE 2.2 BOARD OF DIRECTORS     12
    RULE 2.3 OFFICERS     14
    RULE 2.4 RESTRICTIONS ON WHO MAY BE MEMBERS OF THE BOARD, MEMBERS OF COMMITTEES , OR TEN PERCENT OR GREATER OWNERS     14
    RULE 2.5 COMMITTEES AND SUBCOMMITTEES     16
    RULE 2.6 REGULATORY OVERSIGHT COMMITTEE     16
    RULE 2.7 DISCIPLINARY PANEL, APPEALS COMMITTEE, AND OUTCOME REVIEW COMMITTEE     17
    RULE 2.8 EMERGENCY RULES     18
    RULE 2.9 VOTING BY INTERESTED BOARD MEMBERS     20
    RULE 2.10 INDEMNIFICATION OF DIRECTORS, OFFICERS, AND OTHERS     20
    RULE 2.11 PROHIBITION ON USE OF MATERIAL, NON-PUBLIC INFORMATION     21
    RULE 2.12 LIMITATION ON TRADING BY AFFILIATES     22
    RULE 2.13 CONSENT TO JURISDICTION     23
    RULE 2.14 RECORDKEEPING     23
    RULE 2.15 INFORMATION-SHARING AGREEMENTS     24
    RULE 2.16 RECORDKEEPING AND REPORTING REQUIREMENTS     24
    RULE 2.17 PUBLIC INFORMATION     25
CHAPTER 3 MEMBERS AND PARTICIPANTS     25
    RULE 3.1 SELF-CLEARING MEMBERS - APPLICATIONS, AGREEMENTS, ELIGIBILITY CRITERIA, CLASSIFICATIONS, AND PRIVILEGES     25
    RULE 3.2 FCMs     28
    RULE 3.3 FCM CUSTOMERS     29
    RULE 3.4 INTRODUCING BROKERS     30
    RULE 3.5 IB CUSTOMERS     31
    RULE 3.6 OBLIGATIONS APPLICABLE TO ALL PARTICIPANTS     32
    RULE 3.7 OBLIGATIONS APPLICABLE TO ALL MEMBERS     33
    RULE 3.8 FCM OBLIGATIONS     34
    RULE 3.9 IB OBLIGATIONS     36
    RULE 3.10 AUTHORIZED TRADERS     38
    RULE 3.11 REJECTION OF APPLICANT AND LIMITATIONS OF TRADING PRIVILEGES     38
    RULE 3.12 COMMUNICATIONS BETWEEN KALSHI AND MEMBERS     39
    RULE 3.13 DUES, FEES, AND EXPENSES PAYABLE BY MEMBERS     39
CHAPTER 4 MARKET MAKERS     40

RULE 4.1 ELIGIBILITY TO BE DESIGNATED AS A MARKET MAKER　　　　40

RULE 4.2 DESIGNATION AS A MARKET MAKER　　　　41

RULE 4.3 MARKET MAKER BENEFITS　　　　41

RULE 4.4 MARKET MAKER OBLIGATIONS　　　　41

RULE 4.5 MARKET MAKER POSITION ACCOUNTABILITY LEVELS　　　　41

CHAPTER 5 METHOD FOR MEMBERS TO TRADE CONTRACTS　　　　42

RULE 5.1 PRIOR REVIEW OF THESE RULES AND ACCEPTANCE OF TERMS OF MEMBER
AGREEMENT　　　　42

RULE 5.2 SELF-CLEARING MEMBER ACCESS TO KALSHI　　　　42

RULE 5.3 TRADING CONTRACTS　　　　43

RULE 5.4 SELF-CLEARING MEMBER ORDER AND CANCELLATION　　　　46

RULE 5.5 FCM CUSTOMER ORDERS, CANCELLATIONS, AND TRADING　　　　47

RULE 5.6 IB CUSTOMER ORDERS, CANCELLATIONS, AND TRADING　　　　48

RULE 5.7 HANDLING OF ORDERS　　　　49

RULE 5.8 DISPUTED ORDERS　　　　49

RULE 5.9 PRIORITY OF ORDERS　　　　50

RULE 5.10 FILLING ORDERS TO TRADE CONTRACTS　　　　50

RULE 5.11 TRADE CANCELLATIONS　　　　51

RULE 5.12 INVALIDATION OF ORDERS AND TRADES UPON SUSPENSION OR
REVOCATION OF FCM STATUS　　　　52

RULE 5.13 RECORDKEEPING OF FCM CUSTOMERS' ORDERS　　　　53

RULE 5.14 RECORDKEEPING OF IB CUSTOMERS' ORDERS　　　　53

RULE 5.15 VIEWING THE MARKET AND EXECUTED ORDERS　　　　53

RULE 5.16 HOURS FOR TRADING CONTRACTS　　　　53

RULE 5.17 PROHIBITED TRANSACTIONS AND ACTIVITIES　　　　53

RULE 5.18 POSITION ACCOUNTABILITY　　　　57

RULE 5.19 POSITION LIMITS　　　　57

CHAPTER 6 CLEARING AND SETTLING CONTRACT TRADES, SETTLEMENT, AND
WITHDRAWAL REQUESTS　　　　58

RULE 6.1 CLEARANCE　　　　58

RULE 6.2 SETTLING CONTRACT TRADES　　　　59

RULE 6.3 SETTLEMENT　　　　59

RULE 6.4 SETTLING MEMBER WITHDRAWAL REQUESTS　　　　61

CHAPTER 7 MARKET OUTCOME REVIEW AND ADJUSTMENTS NECESSITATED BY
MATERIAL CHANGES IN THE UNDERLYING　　　　61

RULE 7.1 THE MARKET OUTCOME REVIEW PROCESS　　　　61

RULE 7.2 CONTRACT MODIFICATIONS　　　　62

CHAPTER 8 INVESTMENT OF PARTICIPANT FUNDS　　　　62

RULE 8.1 INVESTMENT OF PARTICIPANT FUNDS                                    62

CHAPTER 9 DISCIPLINE AND RULE ENFORCEMENT                                   63

RULE 9.1 MONITORING THE MARKET                                             63

RULE 9.2 INVESTIGATIONS, HEARINGS, AND APPEALS                             63

RULE 9.3 SETTLEMENT OF INVESTIGATIONS                                      67

RULE 9.4 NOTICE AND PUBLICATION OF DISCIPLINARY ACTION                     68

RULE 9.5 PENALTIES                                                         68

RULE 9.6 SUMMARY SUSPENSION                                                69

RULE 9.7 REPRESENTATION BY COUNSEL                                         70

RULE 9.8 REPORTING VIOLATIONS TO THE COMMISSION                            70

CHAPTER 10 - ARBITRATION                                                   71

RULE 10.1 GENERAL                                                          71

RULE 10.2 FAIR AND EQUITABLE ARBITRATION PROCEDURES                        71

RULE 10.3 WITHDRAWAL OF ARBITRATION CLAIM                                  72

RULE 10.4 PENALTIES                                                        73

RULE 10.5 ARBITRATION PANEL                                                73

CHAPTER 11 LIMITATION OF LIABILITY; TIME PERIOD IN WHICH TO BRING ACTIONS;
GOVERNING LAW                                                              74

RULE 11.1 PROPERTY RIGHTS                                                  74

RULE 11.2 SIGNATURES                                                       75

RULE 11.3 LIMITATION OF LIABILITY                                          75

CHAPTER 12 COMMISSION REGULATIONS THAT HAVE BEEN ADAPTED TO BE PART OF THE
RULES                                                                      76

RULE 12.1 ACTIVITIES OF SELF-REGULATORY ORGANIZATION EMPLOYEES AND
GOVERNING MEMBERS WHO POSSESS MATERIAL, NON-PUBLIC INFORMATION
(ADAPTED FROM COMMISSION REGULATION 1.59)                                  76

RULE 12.2 SERVICE ON SELF-REGULATORY ORGANIZATION GOVERNING BOARDS OR
COMMITTEES BY PERSONS WITH DISCIPLINARY HISTORIES (ADAPTED FROM
COMMISSION REGULATION 1.63)                                                78

RULE 12.3 VOTING BY INTERESTED MEMBERS OF SELF-REGULATORY ORGANIZATION
GOVERNING BOARDS AND VARIOUS COMMITTEES (ADAPTED FROM COMMISSION
REGULATION 1.69)                                                           79

CHAPTER 13 TERMS OF CONTRACTS TRADED ON KALSHI                             81

RULE 13.1 TERMS THAT ARE UNIFORM ACROSS CONTRACTS                          81

4

# CHAPTER 1 DEFINITIONS

When used in this Rulebook the following terms shall have the respective meanings as follows:

"Affiliate" means, with respect to any Person, any Person who, directly or indirectly, Controls, is Controlled by, or is under common Control with, such other Person.

"Anti-Money Laundering" or "AML" means all laws, regulations and guidance relating to the prevention of money-laundering and terrorist financing, including without limitation, the Bank Secrecy Act, the PATRIOT Act, and all regulations and orders issued by the U.S. Department of the Treasury or the CFTC.

"Appeal Committee" means a committee of the Board to consider appeals under Chapter 9 .

"Applicable Law" means, with respect to any Person, any statute, law, regulation, rule or ordinance of any governmental or self-regulatory authority applicable to such Person, including the CEA and CFTC Regulations, and state regulations where applicable.

"Authorized Trader" means a natural person who is either employed by or is an agent of a Member and who is authorized by the Exchange as an Authorized Trader in accordance with Chapter 3.

"Binary Contract" means a Contract that typically settles with two potential Market Outcomes (typically YES or NO).

"Board" means the Board of Directors of Kalshi, which manages the Company and is constituted from time to time in accordance with the Operating Agreement.

"CFTC" or "Commission" means the U.S. Commodity Futures Trading Commission or any successor regulatory body.

"CFTC Regulations" means the rules and regulations promulgated by the CFTC, as amended.

"Clearing House" means any clearing house registered with the CFTC as a Derivatives Clearing Organization ("DCO") that the Exchange designates to provide clearing services with respect to any or all Contracts. To the extent that the Exchange designates multiple DCOs to provide clearing services at any given time, the term Clearing House shall refer to any DCO designated to provide such services with respect to the Contract in question.

"Commodity Exchange Act" or "CEA" means the Commodity Exchange Act, as amended from time to time.

"Contract" means any contract, agreement, or transaction approved for trading on Kalshi pursuant to these Rules.

"Contract Market" has the meaning set forth in CFTC Regulation 1.3.

"Contract Specifications" means, with respect to any Contract, the rules or other trading protocols containing specifications for such Contract, as adopted, amended, supplemented or otherwise modified from time to time by the Company.

"Customer Due Diligence" or "CDD" means the ongoing monitoring and documentation related to each Member's activities and risk profile in accordance with Applicable Laws.

"Customer" or "Customer Funds" have the meanings set forth in CFTC Regulation 1.3.

"Derivatives Clearing Organization" has the meaning set forth in Section 1a(15) of the CEA.

"Director" means any member of the Board.

"Disciplinary Panel" means the panel appointed by the Board at the recommendation of the Chief Compliance Officer to act in an adjudicative role and fulfill various adjudicative responsibilities and duties described in Chapter 9.

"Emergency" means the occurrences or circumstances which, in the opinion of the Board, require immediate action, and which threaten, or may threaten, the fair and orderly trading in, or the settlement or integrity of, any Contract, including, without limitation, the following:

    (1) any activity that manipulates or attempts to manipulate a Contract on Kalshi

    (2) any circumstance that may materially affect the performance of a Contract, including failure to clear and any failure of the payment systems;

    (3) any action taken by any domestic or foreign regulatory, self-regulatory, judicial, arbitral, or governmental (whether national, state or municipal) or quasi-governmental authority, or any agency, department, instrumentality, or sub-division thereof; or other Person exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; or any other Contract Market, Derivatives Clearing Organization, board of trade, or other exchange or trade association (foreign or domestic) that may have a direct impact on trading on Kalshi or the settlement legality or enforceability of any Contract;

    (4) any actual, attempted or threatened corner, squeeze, congestion, manipulative activity or undue concentration of positions in a Contract;

(5) any circumstance that may have a severe, adverse effect upon the functions and facilities of Kalshi, including, but not limited to, acts of God, fire, flood or other natural disasters, bomb threats, acts of terrorism or war, severely inclement weather, or failure or malfunction of all or a portion of the Kalshi Platform, or other system breakdowns or interruptions such as power, computer, communication or transportation systems or the Internet;

(6) the bankruptcy or insolvency of any Derivatives Clearing Organization or the imposition of any injunction or other restraint by any government agency, clearing house, court or arbitrator upon a Derivatives Clearing Organization which may affect the ability of a Derivatives Clearing Organization to trade in or perform on a Contract;

(7) any circumstance in which it appears to the Board that a Derivatives Clearing Organization or any other Person:

(i) has failed to perform on a Contract;

(ii) is insolvent; or

(iii) is in a financial or operational condition or is conducting business such that the Derivatives Clearing Organization or Person cannot be permitted to continue in business without jeopardizing the safety of FCM Customer funds, Members, Kalshi or the Derivatives Clearing Organization;

(8) any circumstance which may have a material impact on the reliability or transparency of the Underlying related to a Contract; or

(9) any other unusual, unforeseeable or adverse circumstance as determined by the Company.

"Expiration" means the time on the Expiration Date established pursuant to these Rules at which a Contract expires and the Expiration Value of that Contract is determined.

"Expiration Date" means the date established by these Rules on which the Expiration Value of each Contract is determined.

"Expiration Value" means the rate, level, amount, measure, or other value of the Underlying at Expiration.

"FCM" means a Person that is registered with the Commission as a futures commission merchant that has entered into an FCM Member Agreement with Kalshi and is authorized by Kalshi to intermediate Customer Orders on Kalshi and clear the resulting contracts at the Clearing House.

"FCM Customer" means a Customer of an FCM Member that trades on Kalshi according to the procedures of the FCM Member and these Rules.

"FCM Customer Account" means a Member Account established and maintained by the Clearing House for an FCM for its FCM Customers.

"Government Agency" means any governmental entity (including the United States, a State, or a foreign government).

"Introducing Broker" or "IB" means a Person that has entered into an IB Member Agreement with Kalshi and is authorized by Kalshi to intermediate Customer Orders on Kalshi and is either a registered (i) Introducing Broker that may solicit or accept Orders from IB Customers for execution on a Platform and then routes those orders for clearing or (ii) futures commission merchant engaged in such activity but not clearing any such resulting contracts (i.e., a futures commission merchant acting solely in an IB capacity).

"IB Customer" means a Customer of an IB that is also a Self-Clearing Member or clearing through an FCM Member and that trades on Kalshi according to the procedures of the IB Member and these Rules.

"Kalshi" or "Company" means KalshiEX LLC, or any successor thereto.

"Kalshi Account" means an account established with Clearing House for the purpose of trading contracts on Kalshi.

"Know Your Customer" or "KYC" means the policies and procedures required to obtain and retain a record of the essential facts concerning a Participant.

"Market Maker" means a Member that is designated as a Market Maker and granted certain privileges in exchange for maintaining certain requirements as set forth in Chapter 4 of these Rules.

"Market Outcome" means the result of the Contract. For a Binary Contract, if the Expiration Value is encompassed within the Payout Criterion, then the "Market Outcome" is YES. Otherwise, the "Market Outcome" is NO, unless otherwise specified in the contract terms. For a Scalar Contract, the "Market Outcome" will be one of three or more options, as detailed by the Contract terms.

"Material Relationship" has the meaning attributed to such term in Rule 2.2(g).

"Member" means an FCM, IB, and/or a Self-Clearing Member.

"Member Account" means an account carried by Clearing House on behalf of a Member.

"Member Agreement" means the agreement between the Company and any Person that the Person must agree to prior to the Person becoming a Member (FCMs, IBs, and Self-Clearing Members each have a specific Member Agreement).

"NFA" means the National Futures Association or any successor regulatory body.

9

"Officer" has the meaning attributed to such term in Rule 2.3.

"Order" means either a bid or an offer for a Contract.

"Outcome Review Committee" means a committee of the Board to determine Market Outcomes in accordance with Chapter 7.

"Oversight Panel" means any panel, or any subcommittee thereof, authorized by Kalshi to recommend or establish policies or procedures with respect to Kalshi's surveillance, compliance, rule enforcement, or disciplinary responsibilities.

"Participant" means a Self-Clearing Member, an FCM, an IB, an FCM Customer, and/or an IB Customer.

"Payout Criterion" of a Contract means the Expiration Value or set of Expiration Values that will cause that Contract to pay a Settlement Value (or proportion thereof) to positionholders. The holder of a position in a Contract that receives a Settlement Value (or proportion thereof) is considered to be "in-the-money" while the holder of a position in a Contract that does not receive a Settlement Value is considered to be "out-of-the-money". For a Binary Contract, the Payout Criterion defines the Expiration Value(s) that will cause a Settlement Value to be paid to the holder of a long position in such Contract, or as specified in a Contract's terms and conditions. For a Scalar Contract, the Payout Criterion will determine the proportion of the Settlement Value to be distributed to holders of long and short positions.

"Person" means an entity as defined in Section 1a(38) of the CEA and in CFTC Regulation 1.3.

"Platform" means the Kalshi electronic trade execution system that is used for trading Contracts, including any licensed software that is a part thereof from time to time, and any successor electronic trading system thereto.

"Position Accountability Level" means the level of loss that can be incurred as a result of a position in a Contract that is held or controlled by a Member, above which Kalshi may impose restrictions or obligations on the Member as set forth in Chapter 4 and Chapter 5.

"Position Limit" means the maximum loss that can be incurred as a result of a position in a Contract that is allowed to be held or controlled by one Member or FCM Customer as prescribed by Kalshi and/or the Commission.

"Public Director" means an individual with the qualifications set forth in Rule 2.2(g).

"Regulatory Agency" means any governmental or self-regulatory authority applicable to Kalshi, including the CFTC and applicable foreign regulators.

"Regulatory Oversight Committee" means the committee of the Board constituted in accordance with Rule 2.6.

"Rulebook" or "Rules" means the Kalshi Rulebook, interpretations, orders, resolutions, advisories, notices, statements of policy, decisions, manuals, and directives of the Company or Clearing House.

"Scalar Contract" means a Contract that has three or more potential Market Outcomes and can result in a payout to both counterparties to the contract.

"Self-Clearing Member" means a Person, other than an FCM, that has entered into the Self-Clearing Member agreement with Kalshi or an FCM Member clearing for its own proprietary account (as defined by CFTC Regulation 1.3).

"Self-Clearing Member Account" means a Member Account established and maintained by Clearing House for a Self-Clearing Member for itself, which includes a Member Account for an FCM Member clearing for its proprietary account (as defined by CFTC Regulation 1.3).

"Self-Regulatory Organization" shall, unless otherwise provided, have the meaning set forth in CFTC Regulation § 1.3(ee) and, in addition, shall include a Contract Market, Derivatives Clearing Organization, and registered futures association.

"Settlement" means payment to Traders who have the right to receive money pursuant to a Contract, held until Expiration.

"Settlement Date" means the date on which Settlement occurs.

"Settlement Value" means the amount which the holder of a Contract may receive for a Contract held until Expiration.

"Source Agency" means the agency that publishes the Underlying and/or Expiration Value for any Contract.

"Source Agency Prohibition" means the list of Source Agencies which may implicate trading prohibitions under Chapter 5 of these Rules such as if a Trader has access to material non-public information or is a decision maker. The particular trading violations are set forth in detail in Chapter 5.

"Sub-Account" means a distinct account segment maintained by a Self-Clearing Member at Clearinghouse, each with a unique identification code for the separate recording of details of Transactions based on the manner in which the Transactions were executed (*e.g.*, through a particular Introducing Broker or Authorized Trader), for which margin and collateral are calculated separately.

"Trade" or "Transaction" means any purchase or sale of any Contract on Kalshi, either directly or indirectly.

"Trader" means an IB Customer, FCM Customer, a Self-Clearing Member, IB, and/or an FCM that is trading on a Platform through one of the permitted types of accounts specified in these Rules.

"Underlying" means the index, rate, risk, measure, instrument, differential, indicator, value, contingency, occurrence, or extent of an occurrence the Expiration Value of which determines whether a Contract is in-the-money.

# CHAPTER 2 MARKET GOVERNANCE

## RULE 2.1 OWNERSHIP

KalshiEX LLC ("Kalshi" or the "Company") is a Delaware limited liability company. The management and operation of Kalshi is governed by the Operating Agreement and the Rules. Member status does not confer any equity interest or voting rights in the Company.

## RULE 2.2 BOARD OF DIRECTORS

The Board has the power to manage and direct Kalshi including but not limited to the power to define the standards for membership in Kalshi and the power to amend, adopt, or repeal these Rules, and the power to oversee the business conduct of Participants and impose penalties for violation of these Rules.

(a) The Board shall manage the day to day business operations of the Company. The Board has the power and authority to call for review, and to affirm, modify, suspend or overrule, any and all decisions and actions of standing committees or special committees of the Board or any panel of the Officers related to the day to day business operations of the Company.

(b) The chief executive officer of Kalshi shall serve as chairman of the Board.

(c) Any authority or discretion by the Rules vested in any Officer or delegated to any committee or subcommittee shall not be construed to deprive the Board of such authority or discretion and, in the

event of a conflict, the determination of the matter by the Board shall prevail. This does not apply to the Outcome Review Committee.

(d) A majority of the Directors serving on the Board, including at least one Public Director, shall constitute a quorum for the transaction of business of the Board. At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting, and the Board may act only by the decision of a majority of the Directors constituting a quorum of the Board by vote at a meeting, by unanimous written consent without a meeting, or as otherwise set forth in the Operating Agreement.

(e) The Board shall comprise the number of Directors set forth in the Operating Agreement and shall include Public Directors as no less than 35% of the Board, at all times. Each Director (including Public Directors) shall be appointed in accordance with the Operating Agreement and shall serve until his or her successor is duly appointed, or until his or her earlier resignation or removal, with or without cause.

(f) Each Director is entitled to indemnification pursuant to the Operating Agreement with respect to matters relating to the Company.

(g) To qualify as a Public Director, an individual must be found, by the Board and on the record, to have no Material Relationship, as defined below, with the Company. The Board must make such a finding at the time the Public Director is elected and as often as necessary in light of all circumstances relevant to such Public Director, but in no case less than annually. A Material Relationship is one that reasonably could affect the independent judgment or decision-making of the Director. The Board need not consider previous service as a Director of the Company to constitute a Material Relationship. A Director shall be considered to have a Material Relationship with the Company if any of the following circumstances exist or have existed within the past year:

   (1) Such Director is or was an Officer or an employee of the Company, or an officer or an employee of an Affiliate of the Company;
   (2) Such Director is or was a Participants, or an officer or director of a Participants; or
   (3) Such Director, or a firm with which the Director is an officer, director, or partner, receives more than $100,000 in combined annual payments from Kalshi, or any Affiliate thereof, for legal, accounting, or consulting services.

(h) If any immediate family of a Director are found to have a Material Relationship, then such Material Relationship will be determined to apply to the Director.

13

(i) The Board shall have procedures, as may be adopted by the Board from time to time, to remove a Director where the conduct of such Director is likely to be prejudicial to the sound and prudent management of the Company.

(j) The Board shall review its performance and that of its individual directors annually.

### RULE 2.3 OFFICERS

(a) The Board shall appoint a Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, and other such officers of Kalshi as it may deem necessary or appropriate from time to time (collectively, the "Officers").

(b) Any Officer may also be a director, officer, partner or employee of the Company or of any of its Affiliates, subject to disclosure and resolution of conflicts of interest.

(c) The Officers shall have such powers and duties in the management of the Company as the Board may prescribe from time to time, subject to any limitations set forth in the Operating Agreement.

(d) Each Officer is entitled to indemnification pursuant to the Operating Agreement with respect to matters relating to the Company.

### RULE 2.4 RESTRICTIONS ON WHO MAY BE MEMBERS OF THE BOARD, MEMBERS OF COMMITTEES , OR TEN PERCENT OR GREATER OWNERS

(a) An individual may not serve as a Director or Officer, serve on a committee or subcommittee established by the Board, including the Disciplinary Panel, or hold a 10% or greater ownership interest in the Company, if the individual:

  (1) Within the prior three years has been found, by a final decision of a court of competent jurisdiction, an administrative law judge, the CFTC, or any Self-Regulatory Organization, to have committed a disciplinary offense;
  (2) Within the prior three years has entered into a settlement agreement in which any of the findings or, in the absence of such findings, any of the acts charged included a disciplinary offense;
  (3) Is currently suspended from trading on a Designated Contract Market or a Swap Execution Facility, is suspended or expelled from membership in a Self-Regulatory Organization, is serving any sentence of probation, or owes any portion of a fine or penalty imposed pursuant to either: a finding by final decision of a court of competent jurisdiction, an administrative law judge, the CFTC or any Self-Regulatory Organization that such person committed a disciplinary offense; or a settlement agreement in which any of the findings or, in the absence of such findings, any of the acts charged included a disciplinary offense;

14

(4) Is currently subject to an agreement with the CFTC or Self-Regulatory Organization not to apply for registration with the CFTC or for membership in the Self-Regulatory Organization;

(5) Is currently, or within the past three years has been, subject to a revocation or suspension of registration by the CFTC, or has been convicted within the past three years of any of the felonies listed in Section 8a(2)(D)(ii) through (iv) of the CEA;

(6) Is currently subject to a denial, suspension or disqualification from serving on a disciplinary panel, arbitration panel or governing board of any self-regulatory organization as that term is defined in Section 3(a)(26) of the Securities Exchange Act of 1934; or

(7) Is subject to a statutory disqualification pursuant to Section 8a(2) of the CEA.

For purposes of this Rule 2.4(a), the terms "disciplinary offense," "final decision" and "settlement agreement" have the meaning given those terms in CFTC Regulation 1.63(a).

(b) Any Director, Officer, member of a committee established by the Board and any individual nominated to serve in any such role, shall immediately notify the Chief Executive Officer if such individual is subject to one or more of the criteria in Rule 2.4(a). Prior to nomination to the Board, each individual shall certify that he or she is not disqualified pursuant to Rule 2.4(a). Upon appointment, each Director, Officer, and a member of a committee shall provide to the Company, where applicable, changes in registration information within 30 days and certification of compliance accordingly. The Company shall verify information supporting Board compliance with eligibility criteria.

(c) To serve as a Director, an individual must possess the ability to contribute to the effective oversight and management of the Company, taking into account the needs of the Company and such factors as the individual's experience, perspective, skills and knowledge of the industry in which the Company operates.

(d) A Director or Officer must meet any qualifications set forth from time to time in the Operating Agreement and these Rules.

(e) An individual may not serve on any Disciplinary Panel, arbitration panel, or the Appeals Committee during any proceeding affecting or concerning such individual, to be determined in a reasonable manner by the Company.

(f) If the Company determines that an individual subject to this Rule 2.4 no longer meets the criteria set forth in Rule 2.4(a), the Company shall inform the CFTC of such determination. The Company shall provide to the CFTC, upon request, an individual's certification of compliance with the criteria set forth in Rule 2.4(a).

### RULE 2.5 COMMITTEES AND SUBCOMMITTEES

(a) The Board may create, appoint Directors to serve on, and delegate powers to, committees and subcommittees. There shall be a Regulatory Oversight Committee, Disciplinary Panel, Outcome Review Committee, and Appeals Committee. The Board shall designate the chairperson of each such committee.

(b) Each committee and subcommittee shall assist in the supervision, management and control of the affairs of the Company within its particular area of responsibility, subject to the authority of the Board.

(c) Subject to the authority of the Board, each committee and subcommittee shall determine the manner and form in which its proceedings shall be conducted. A majority of the members serving on a committee or subcommittee, including at least one Public Director, shall constitute a quorum for the transaction of business of a committee or subcommittee. Each committee and subcommittee may act only by the decision of a quorum, by vote at a meeting or by unanimous written consent without a meeting.

### RULE 2.6 REGULATORY OVERSIGHT COMMITTEE

(a) The Regulatory Oversight Committee shall be a standing committee of the Board consisting of only Public Directors, as appointed from time to time. No less than two Public Directors shall serve on the Regulatory Oversight Committee.

(b) Each member of the Regulatory Oversight Committee shall serve for a term of one calendar year from the date of his or her appointment or for the remainder of his or her term as a Public Director, and until the due appointment of his or her successor, or until his or her earlier resignation or removal, with or without cause, as a member of the Regulatory Oversight Committee or as a Public Director. A member of the Regulatory Oversight Committee may serve multiple terms.

(c) The Regulatory Oversight Committee shall oversee the Company's regulatory program on behalf of the Board. The Board shall delegate sufficient authority, dedicate sufficient resources, and allow sufficient time for the Regulatory Oversight Committee to fulfill its mandate. The Regulatory Oversight Committee shall make such recommendations to the Board that will, in its judgment, best promote the interests of the Company. The Regulatory Oversight Committee shall also have such other powers and perform such other duties as set forth in the Rules and as the Board may delegate to it from time to time.

(d) The Regulatory Oversight Committee shall appoint individuals to the Disciplinary Panel in accordance with these Rules, Applicable Law and the composition requirements of the Disciplinary Panel. The Committee shall appoint at least one person who would not be disqualified from serving as

16

a Public Director.

(e) The Regulatory Oversight Committee shall prepare an annual report that assesses the Company's self-regulatory program for the Board and the CFTC. The annual report sets forth the regulatory program's expenses, describes its staffing and structure, catalogues disciplinary actions taken during the year, and reviews the performance of the Disciplinary Panel, as provided in Exhibit B to Part 38 of the CFTC Regulations

(f) Without limiting the generality of the foregoing, the Regulatory Oversight Committee shall have the authority to:

    (1) Monitor the regulatory program of the Company for sufficiency, effectiveness, and independence;

    (2) Oversee all facets of the regulatory program, including trade practice and market surveillance; audits, examinations, and other regulatory responsibilities with respect to Participants (including ensuring compliance with financial integrity, financial reporting, sales practice, recordkeeping, and other requirements); and the conduct of investigations;

    (3) Review the size and allocation of the regulatory budget and resources; and the number, hiring, termination, and compensation of regulatory personnel;

    (4) Supervise the Chief Compliance Officer of the Company, who will report directly to the Regulatory Oversight Committee;

    (5) Recommend changes that would ensure fair, vigorous, and effective regulation; and

    (6) Review all regulatory proposals prior to implementation and advise the Board as to whether and how such changes may impact regulation.

## RULE 2.7 DISCIPLINARY PANEL, APPEALS COMMITTEE, AND OUTCOME REVIEW COMMITTEE

(a) The Disciplinary Panel shall be:

    (1) A standing committee consisting of at least three members, including at least one person who would not be disqualified from serving as a Public Director. No member of the Disciplinary Panel shall also be a member of the Company's compliance staff or any person involved in adjudicating any other stage of the same proceeding. The Board may establish more than one Disciplinary Panel. The Regulatory Oversight Committee will appoint individuals for membership on the Disciplinary Panel. Each Disciplinary Panel shall include members with sufficient differing experience and Participant interests so as to ensure fairness and to prevent special treatment or preference for any Person.

    (2) Responsible for conducting hearings, rendering decisions, and imposing sanctions with respect to any Disciplinary Action. The Disciplinary Panel shall also have such other powers and perform such other duties as set forth in the Rules and as the Board may determine from time to time.

(b) Each member of the Disciplinary Panel shall serve for a term of one calendar year from the date of his or her appointment, and until the due appointment of his or her successor, or until his or her earlier resignation or removal, with or without cause, as a member of the Disciplinary Panel. A member of the Disciplinary Panel may serve for multiple terms.

(c) The Appeals Committee shall be:

    (1) A standing committee consisting of at least three members of the Board. The members of the Appeals Committee and its Chairperson shall be appointed by the Chairperson of the Board, provided that, at all times the Appeals Committee shall include at least one Public Director.

    (2) Responsible for conducting hearings of appeals of decisions of the Disciplinary Panel, rendering decisions of such appeals, and imposing sanctions with respect to such appeals. The Appeals Committee shall also have such other powers and perform such other duties as set forth in these Rules and as the Board may determine from time to time.

(d) Each member of the Appeals Committee shall serve for a term of one calendar year from the date of his or her appointment or, if shorter, for the remainder of his or her term as a Public Director, as applicable, until the due appointment of his or her successor, or until his or her earlier resignation or removal, with or without cause, as a member of the Appeals Committee or as a Public Director. A member of the Appeals Committee may serve multiple terms.

(e) The Outcome Review Committee shall be:
    a. A standing committee consisting of three members who are appointed by the Regulatory Oversight Committee. At least two of the members must be Public Directors. Members of the Regulatory Oversight Committee may also concurrently serve on the Outcome Review Committee.
    b. Responsible for determining Market Outcomes as provided in Rule 7.1.

(f) Each member of the Outcome Review Committee shall serve for a term of one calendar year from the date of his or her appointment or, if shorter, for the remainder of his or her term as a Public Director, as applicable, until the due appointment of his or her successor, or until his or her earlier resignation or removal, with or without cause, as a member of the Outcome Review Committee or as a Public Director. A member of the Outcome Review Committee may serve multiple terms.

## RULE 2.8 EMERGENCY RULES

(a) Kalshi may adopt emergency Rules in response to the emergencies that are described in paragraph (c) of this Rule. In the event of one of those emergencies, the Board or at least two members of the management team may, without giving prior notice to, or securing prior approval from the Commission, adopt a temporary emergency rule to address the emergency. Adoption of a temporary emergency rule requires the CEO's approval. Adoption of a temporary emergency rule by the

management team requires the written authorization and acknowledgement of two members of the management team, indicating the emergency action to be taken and the reasons for that action, before the action is taken.

(b) Any temporary emergency rule adopted under this Rule may authorize Kalshi to act as the Board or management team deems necessary or appropriate to meet the emergency, and those actions may adversely affect the ability to trade on the Platform. Therefore, the chance of an emergency is one of the risks that Participants should consider when deciding whether to trade on the Platform.

(c) For the purposes of this Rule, an "emergency" is:

    a. Any activity that manipulates or attempts to manipulate a Contract on the Platform;

    b. Any circumstance that may materially affect the performance of the Contracts traded on Kalshi;

    c. Any action taken by the United States, any foreign government, any state or local governmental body, any other contract market or board of trade, or any other exchange, market, facility, or trade association (foreign or domestic) that may have a direct impact on trading on Kalshi;

    d. Any circumstances that may have a severe, adverse impact upon the physical functions of Kalshi including, for example, natural disasters such as fire or flood, terrorist acts such as bomb threats, physical plant breakdowns such as plumbing, heating, or air conditioning problems, system breakdowns such as power, telephony, cable, trading systems, or computer systems failures or interruptions to communications, the network, or the Internet;

    e. The imposition of any injunction or other restraint by any government agency, court, or arbitrator that may affect the ability of a Trader to perform on Contracts;

    f. Any circumstance in which it appears that a Participant or any other person is in such operational condition, or is conducting business in such a manner, that such person cannot be permitted to continue in business without jeopardizing the safety of Participants or Kalshi itself; and

    g. Any other unusual, unforeseeable, and adverse circumstance which, in the opinion of the governing board, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of or delivery pursuant to Contracts traded on Kalshi.

(d) If deemed necessary to combat perceived market threats caused by an emergency, a Kalshi official authorized to do so may suspend trading on the Platform during the duration of the emergency or take any other action that the official thinks is necessary or appropriate. The official will order an end to the action taken in response to the emergency as soon as the official determines that the emergency has sufficiently abated to permit the Platform to function properly. Reasonable actions resulting under this Rule include but are not limited to:

a. Modification to limits on positions;

b. Reduction of positions and exposure by participating Traders to certain Contracts;

c. Cancellation of a Contract and the return of any funds paid to enter Trades on the Contract;

d. Extension/shortening of expiration and/or closing date;

e. Suspension and curtailing of trading; and

f. Changing a Contract's terms and conditions and/or specifications.

(e) Kalshi will make every effort practicable to notify the Director of the Division of Market Oversight, his delegates, and/or other persons designated by the Commission's Regulations that Kalshi intends to implement, modify, or terminate a temporary emergency rule pursuant to Rule 2.4(a) or an action in response to an emergency pursuant to Rule 2.4(d) prior to the implementation, modification, or termination of the rule or action. If it is not possible to notify the Commission prior to the implementation, modification, or termination of the rule or action, Kalshi will notify the Commission of the implementation, modification, or termination of the rule or action at the earliest possible time, and in no event more than 24 hours after implementation, modification, or termination.

(f) Any time that Kalshi takes action in response to an emergency, either under Rule 2.4(a) or Rule 2.4(d), Kalshi shall publish a notice of such action on its website, notify Members through the API, and notify Members via email. Kalshi will likewise document its decision-making process and reasons for taking emergency action.

## RULE 2.9 VOTING BY INTERESTED BOARD MEMBERS

Core Principle 16 of Section 5(d) of the Commodity Exchange Act ("CEA") requires that contract markets have adequate procedures to prevent conflicts of interest. In this regard, Kalshi has adopted provisions of Commission Regulation 1.69 as Rules provided herein. Commission Regulation 1.69 prohibits a member of the Board or any disciplinary or oversight committee or subcommittee from taking part in any deliberations or voting on any matter in which the board, committee, or subcommittee member has an interest or has a relationship with a named party in interest. Regulation 1.69 also requires disclosure by Board, committee, or subcommittee members of interests and relationships in certain circumstances. Consequently, Board, committee, and subcommittee members shall not deliberate or vote on any matter in which the Board, committee, or subcommittee member has an interest or has a relationship with a named party in interest and shall disclose such interests in accordance with Regulation 1.69.

## RULE 2.10 INDEMNIFICATION OF DIRECTORS, OFFICERS, AND OTHERS

(a) Kalshi will indemnify, to the full extent authorized by law, any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative in nature, by reason of the fact that such

person is or was a director, officer, employee, or agent of Kalshi or is or was serving at the request of Kalshi as a director, officer, employee, or agent of Kalshi against expenses, including attorneys' fees, judgments, fines, and amounts paid in connection with such action, suit, or proceeding.

(b) Indemnification shall not be deemed exclusive of any other rights to which a person may be entitled under any agreement or as a matter of law or otherwise.

(c) Kalshi may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, or agent of Kalshi against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not Kalshi would have the power to indemnify such person against such liability under the provisions of this Rule.

(d) Notwithstanding the above, no person shall be indemnified from liability for fraud, bad faith, willful misconduct, or gross negligence. Further, no person shall be indemnified against a civil penalty imposed by the Commission under Section 6b of the CEA.

## RULE 2.11 PROHIBITION ON USE OF MATERIAL, NON-PUBLIC INFORMATION

(a) Commission Regulation 1.59 prohibits employees and members of the Board from using or disclosing material, nonpublic information gained through their employment or board service in certain circumstances. This Rule prohibits the use and disclosure forbidden by Commission Regulation 1.59. In this regard, Kalshi has adopted provisions of Regulation 1.59 as a Rule of Kalshi in Chapter 11 of these Rules.

(b) No member of the Board or any committee established by the Board or these Rules will use or disclose material, nonpublic information obtained as a result of participation on the Board or such committee for any purpose other than the performance of official duties as a board or committee member.

(c) No employee, consultant, or member of the Board or any committee of Kalshi will disclose to any other person material, nonpublic information obtained as a result of such person's employment for purposes inconsistent with such person's official duties.

(d) No employee, consultant, or member of the Board or any committee of Kalshi will trade for such person's account, or for or on behalf of any other account, in any commodity interest on the basis of any material, non-public information obtained through special access related to the performance of such person's duties as an employee, consultant, or member of the Board or committee.

21

(e) No Participant who inadvertently or otherwise comes into possession of any material, non-public information held by Kalshi or any employee, consultant, or member of the Board or any committee of Kalshi gained through their employment by or service to Kalshi will disclose to anyone such material, non-public information or trade for such person's account, or for or on behalf of any other account, in any commodity interest on the basis of such material, nonpublic information.

(f) For purposes of this Rule, the terms "material information," "nonpublic information," "linked exchange", "commodity interest," and "related commodity interest" have the same meanings as they do in Commission Regulation 1.59.

(g) Any director, officer, or employee of Kalshi who violates any provision of this Rule will be required to indemnify Kalshi for any losses, damages, or costs caused by that violation.

### RULE 2.12 LIMITATION ON TRADING BY AFFILIATES

The Company, pursuant to approval by the Board, permits an affiliated entity (the "Affiliate") to participate on its Platform, subject to the following provisions:

(a) The Affiliate is a Member of the Platform.

(b) The Company has ensured the Affiliate does not have access to the Company's material non-public information, and the Company ensures the Affiliate's access to information is limited to public information available to all Members. (The provision of information to common directors of the Company, any affiliate or the holding company shall not constitute a violation of this proscription.) The Company ensures the Affiliate maintains operational independence from the Company. Operational independence means that the Affiliate member must:
   a. Have and maintain operations, including servers, databases, accounts, tools, software, and development tooling, separate from the Company;
   b. Have no access to Company operations;
   c. Be subject to all of the rules in this Rulebook, including the rules regarding Membership (see Chapter 3);
   d. Have access to the Platform limited to that set forth in the rules in this Rulebook (see Chapter 5);
   e. Not have access to material non-public information, including but not limited to information regarding order flow, trading, settlement, contracts, and compliance; and
   f. Have and maintain physical separation from the Company.

(c) All capital underlying trading by an affiliate will not originate from sources the Company.

(d) Any algorithms employed by any affiliate(s) must not be readily exploitable (e.g., be not readily subject to manipulation, hacking).

(e) Affiliate entities trading on the Platform as Members may have multiple purposes, and there may be multiple affiliate entities trading as Members on the Platform.

    a. The Affiliate participates on the Platform and provides liquidity to the Platform by placing orders on either (or both) sides of a market at competitive price levels. The Affiliate's trading activity includes aggressing and/or passive trading. The Affiliate's business purpose is profitability, and liquidity provision is a significant part of its business model. The Affiliate's capitalization derives from the holding company that owns the Company and Entity, and one or more employees of the Company serve on the board of directors of the Company, the Affiliate, and the holding company that owns both.

    b. The Affiliate has no obligation to trade all or even any contracts at any time, and other Participants should not rely on the potential presence of the Affiliate to make markets or otherwise augment or provide liquidity in any contract.

    c. If additional affiliates of the Company commence trading on the Platform, or if the information about the trading activities of the Affiliate changes materially, the Company has put in place necessary controls to ensure that it updates this Rulebook and notifies the marketplace promptly to disclose any affiliate's purpose in trading on the Platform, and provides a summary of the procedures in place to manage and disclose actual or potential conflicts of interest and effects on trading to ensure market integrity and fairness are preserved.

## RULE 2.13 CONSENT TO JURISDICTION

Any Person initiating or executing a transaction subject to these Rules, directly or indirectly, and any Person for whose benefit such a transaction has been initiated or executed, expressly consents to the jurisdiction of Kalshi and agrees to be bound by and comply with the Rules of the Company in relation to such transactions, including, but not limited to, Rules requiring cooperation and participation in investigatory and disciplinary processes.

## RULE 2.14 RECORDKEEPING

(a) Kalshi shall keep, or cause to be kept, complete and accurate books and records of accounts and activities of the Company, including all books, records and other documentation required to be maintained pursuant to the CEA and CFTC Regulations. This includes, among other things, all trade records and investigatory or disciplinary files, in accordance with the requirements of Commission Regulation 1.31.

(b) Kalshi shall retain all such books and records in accordance with the CEA and CFTC Regulations.

(c) Kalshi will provide information required to be maintained or provided pursuant to the CEA and CFTC Regulations to the Commission, the U.S. Securities and Exchange Commission, the U.S. Department of Justice or any representative of a prudential regulator as authorized by the Commission, upon request, in each case in the form and manner required under these Rules, and/or the CEA and CFTC Regulations. This shall include any records relating to swaps defined in section 1a(47)(A)(v) of the Act open to inspection and examination by the U.S. Securities and Exchange Commission.

## RULE 2.15 INFORMATION-SHARING AGREEMENTS

(a) Kalshi may enter into any information-sharing agreements or other arrangements or procedures, including an information-sharing agreement or other arrangement or procedure with any Person or body (including but not limited to a Regulatory Agency) if the Company considers such agreement, arrangement or procedures to be in furtherance of the Company's purpose or duties under these Rules or Applicable Law.

(b) Kalshi may provide information to a duly authorized foreign governmental authority, as directed by the CFTC, in accordance with an information-sharing agreement or other arrangements or procedures executed with such foreign governmental authority or the CFTC.

## RULE 2.16 RECORDKEEPING AND REPORTING REQUIREMENTS

(a) In the event the Board rejects a recommendation or supersedes an action of the Regulatory Oversight Committee or the Chief Compliance Officer, Kalshi shall maintain documentation detailing:

    a. The recommendation or action of the Regulatory Oversight Committee or the Chief Compliance Officer as the case may be;
    b. The rationale for such recommendation or action;
    c. The rationale of the Board for rejecting such recommendation or superseding such action; and
    d. The course of action that the Board decided to take contrary to such recommendation or action.

(b) Kalshi shall record and report to the CFTC all data required to be reported to the CFTC under Part 16 of CFTC Regulations, in the form and manner required by CFTC Regulations.

(c) Kalshi shall keep and maintain books and records identifying each Order submitted to the Company and each Transaction effected pursuant to these Rules, including the identification of the execution method (e.g., central limit order book) with respect to each such Order and Transaction. These books and records shall be kept and maintained in accordance with the CEA and CFTC Regulations.

(d) Kalshi shall submit to the CFTC within thirty days after each Board election a list of the Board's Directors, the Participant interests they represent, and how the composition of the Board meets the requirements of CFTC Regulation 1.64(b) and the Company's Rules and procedures.

(e) In accordance with the CFTC Letter No 25-02 ("Letter") issued on January 31, 2025, Kalshi relies upon no-action relief with respect to various swap data reporting requirements under Parts 43 and 45 of the Commission's regulations for contracts traded on or pursuant to the rules of the Company. Kalshi will comply with all conditions of such relief as set forth in that Letter.

### RULE 2.17 PUBLIC INFORMATION

(a) Accurate, complete and current copies of these Rules and Contract Specifications will be published on the Company website.

(b) Kalshi shall make public on a daily basis information on settlement prices, volume, open interest, and opening and closing ranges for actively traded Contracts.

(c) Except as provided herein, Kalshi shall publish on its Website a Notice with respect to each addition to, modification of, or clarification of, the Rules, the Matching Engine, and any Company Contract Specification prior to the earlier of:

(1) The effective date thereof; and
(2) The filing of such change with the Commission.

(d) If confidential treatment is sought with respect to any information the Company submits to a Regulatory Agency, only the public version of such filing shall be disclosed.

(e) Any Notice shall be deemed to have been made to all Members and any other such Person as may be required by the following:
   a. For Members, by sending such Notice to the email address on file with the Company;
   b. For FCM Customers or IB Customers, by sending such Notice to the FCM or IB, as applicable.
   c. For all Participants, and by posting the Member Notice on the Company website.

## CHAPTER 3 MEMBERS AND PARTICIPANTS

### RULE 3.1 SELF-CLEARING MEMBERS - APPLICATIONS, AGREEMENTS, ELIGIBILITY CRITERIA, CLASSIFICATIONS, AND PRIVILEGES

(a) Self-Clearing Members' accounts are not carried by an FCM.

(b) If a Self-Clearing Member application is approved by Kalshi, the applicant will be a Self-Clearing Member and will have the following privileges, which Kalshi may revoke, amend, or expand in accordance with, or by amending, these Rules:

    a. To maintain a Kalshi Account;

    b. To buy Contracts on the Platform using the funds in its Kalshi Account;

    c. To sell Contracts on the Platform using the funds in its Kalshi Account;

    d. To view "real-time" the same best bids to buy and offers to sell the Contracts traded on the Platform as are available to all other Members;

    e. To view the current trading volume and open interest for the Contracts traded on the Platform; and

    f. To view all non-secure parts of the Kalshi website.

(c) Kalshi will provide access to the Platform (including but not limited to the central limit order book) and related services in an impartial, transparent, fair and non-discriminatory manner.

(d) To be eligible to become a Self-Clearing Member, an applicant must:

    a. Be a Person;

    b. Provide Kalshi with any information or documentation Kalshi deems necessary in order to verify the applicant's identity, perform a criminal background check, or otherwise review information provided on an application or by a third-party provider;

    c. Maintain an account, or accounts, in the Self-Clearing Member's name with a U.S. Financial Institution that the Self-Clearing Member will use to fund its Kalshi Account at Clearing House, and to receive funds from its Kalshi Account, or, if the Self-Clearing Member is a non-United States resident, have an account or accounts in the Self-Clearing Member's name with either a US Financial Institution or a Foreign Bank capable of transacting with Clearing House either directly, through a correspondent account, or other acceptable intermediary that the Self-Clearing Member will use to fund its Kalshi Account at Clearing House, and to receive funds from its Kalshi Account via one of the acceptable methods as stated on the Kalshi website;

    d. Not be subject to any economic or trade sanctions programs administered by OFAC or other relevant U.S. or non-U.S. authority; and must not be listed on OFAC's List of Specially Designated Nationals and Blocked Persons; and

    e. Certify the following:

        1. The applicant is old enough to enter into a legally enforceable contract and has reached the required age as stated on the Self-Clearing Member Agreement;

        2. The applicant has read, understands and agrees to comply with the Kalshi Rulebook, Terms of Use, Privacy Policy, and Self-Clearing Member Agreement; and

3. The applicant will trade in its Self-Clearing Member Account only for itself and will not serve as an intermediary for any other Person.

(e) In order to become a Self-Clearing Member, an applicant must complete an online member application (the "Self-Clearing Member Application") and provide Kalshi with any other relevant information upon request. Kalshi may return any account balance and terminate any account upon the discovery that the Self-Clearing Member Application was completed by anyone other than the Person identified on the Self-Clearing Member Application. All funds deposited by Self-Clearing Members shall constitute "Proprietary Funds" in accordance with CFTC Regulations.

(f) Submission of a Self-Clearing Member Application to Kalshi constitutes the applicant's agreement to be bound by these Rules and other policies of Kalshi. Among other things, this also includes the applicant's agreement to become a member of Clearing House, and be bound by Clearing House's Rules in its capacity as a Derivatives Clearing Organization.

(g) Kalshi may in its sole discretion approve, deny, or condition any Self-Clearing Member application as Kalshi deems necessary or appropriate.

    a. In the event that Company staff decides to decline or condition an application for admission as a Self-Clearing Member, or to terminate a Person's status as Self-Clearing Member, Company staff shall notify such Person thereof in a notice sent to the email address provided by the Person in the Self-Clearing Member Application and Agreement or maintained in the Company's registry of Members. The written notice will specify the basis for the Company's decision. Such Person may, within 28 business days, request in writing that the Company reconsider the determination.

    b. Within 28 business days of receiving a request for reconsideration, the Company shall confirm, reverse or modify the denial, condition or terminate the Self-Clearing Member status of such Person, and shall promptly notify such Person accordingly in writing. The Company may, in its sole discretion, schedule a hearing (in person or by teleconference), request additional information from such Person or establish any other process that it believes is necessary or appropriate to consider the request for reconsideration.

    c. The Company's decision is the final action of the Company and is not subject to appeal.

(h) A Self-Clearing Member may not maintain and/or trade more than one Self-Clearing Member account, although Clearing House may establish multiple Sub-Accounts for a Self-Clearing Member.

(i) Applicants for Self-Clearing Member status of the Company may withdraw their applications at any time without prejudice or without losing their right to apply at a future time.

**RULE 3.2 FCMs**

(a) Kalshi will allow FCMs access to the Platform and related services in an impartial, transparent, fair and non-discriminatory manner to enable Customers of FCMs who are not Members of Kalshi to become FCM Customers. Kalshi may in its sole discretion approve, deny, or condition any FCM Member application as Kalshi deems necessary or appropriate, so long as such a denial is impartial, transparent, fair, and non-discriminatory.

(b) To be eligible to become an FCM, an applicant must:
   a. be validly organized, in good standing, in the United States;
   b. be registered as a futures commission merchant by the CFTC and a member of NFA;
   c. execute the FCM Member Agreement;
   d. have adequate financial resources and credit as required by CFTC Regulation 1.17;
   e. designate at least one person who is responsible for supervising all activities of its employees relating to transactions effected on Kalshi or subject to Kalshi Rules and provide any information Kalshi may request regarding such officer(s);
   f. submit to Kalshi a letter confirming that the applicant will maintain all Customer Funds deposited with it in appropriately labeled Customer segregated funds accounts separated from funds of non-Customers, as required by CFTC regulations;
   g. agree to be bound by these Rules;
   h. submit to Kalshi a guarantee agreement on a form prescribed by Kalshi defining the FCM's obligation to guarantee to Clearing House the applicant's transactions and those of the applicant's FCM Customers, signed by the FCM; and
   i. submit to Kalshi an agreement authorizing Kalshi to unilaterally instruct Clearing House to debit accounts in accordance with Kalshi's rules, policies, and procedures and in amounts solely determined by Kalshi.

(c) FCMs must adopt, adhere to and enforce risk management and other policies and procedures in accordance with CFTC Regulation 1.11 and promptly provide, upon request by the Company or the CFTC, information related to the risk management policies, procedures, and practices of the FCM.

(d) FCMs must, on an annual basis, submit their Business Continuity and Disaster Recovery plans to Kalshi's compliance team for review. FCMs must ensure that their plans coordinate with Kalshi's.

(e) FCMs must become clearing members (or equivalent term) of Clearing House, pursuant to the rules and obligations required by Clearing House.

(f) FCMs must provide their FCM Customers accurate information as listed below. Kalshi will assist the FCM with obtaining this information. Information required to be transmitted or made available must be provided to the best of the FCM's knowledge, must be accurate and complete, and must not omit material information. Information that must be provided includes but is not limited to the following:
   a. A copy of Kalshi's Rulebook that is accurate, complete, current and readily accessible;
   b. The terms and conditions of each Contract listed for trading on the Platform;
   c. Rules, regulations, and mechanisms for executing transaction;

28

    d.   Public information pertaining to new product listings, new rules, rule amendments, or other changes to previously disclosed information; and

    e.   Any other information relevant to the operation of Kalshi's Exchange or Contracts listed for trading.

(g) If an FCM application is approved by Kalshi, the applicant will be an FCM of Kalshi and will have the following privileges:

    a.   to intermediate Customer transactions on Kalshi;

    b.   to distribute Kalshi data to its FCM Customers pursuant to any data distribution agreement with Kalshi; and

    c.   to access Kalshi's trading systems electronically.

(h) Kalshi may in its sole discretion approve, deny, condition, or terminate any FCM Application as the Company deems necessary or appropriate. In the event that Company staff decides to decline or condition an application for admission as a FCM, or to terminate a Person's status as a FCM Member, Company staff shall notify such FCM thereof in a written notice sent to the email address provided by the FCM in the FCM Member Application and Agreement or maintained in the Company's registry of Members. The written notice will specify the basis for the Company's decision. Such FCM may, within 28 business days, request in writing that the Company reconsider the determination. Within 28 business days of receiving a request for reconsideration, the Company shall confirm, reverse or modify the denial, condition or termination of the FCM status of such FCM, and shall promptly notify such FCM accordingly in writing. The Company may, in its sole discretion, schedule a hearing (in person or by teleconference), request additional information from such FCM or establish any other process that it believes is necessary or appropriate to consider the request for reconsideration. The Company's decision is the final action of the Company and is not subject to appeal.


## RULE 3.3 FCM CUSTOMERS

(a) FCM Customers are subject to and required to adhere to all relevant procedures of the relevant FCM, as well as the relevant Kalshi rules. Prior to allowing FCM Customers to trade, FCMs are required to ensure and document that their FCM Customers are aware of and acknowledge this Rule and this Rulebook and Source Agency Prohibition.

(b) FCM Customers are allowed to have accounts with multiple FCMs. However, an FCM Customer must not intentionally match its own orders against each other. If an FCM Customer places orders that match each other, that may constitute a trading violation and subject the FCM Customer to discipline under these Rules, as well as violate the CEA and CFTC Regulations. Before an FCM Customer trades on Kalshi with multiple accounts, it must disclose the identity of each account to the Exchange by email (or as otherwise specified by Kalshi in lieu of sending an email).

(c) FCM Customers must access Kalshi through the FCM, unless the FCM Customer is also a Self-Clearing Member. A Self-Clearing Member may also be an FCM Customer, provided that the Self-Clearing Member:

29

    a. informs Kalshi of the FCM that it is a Customer of via email (or as otherwise specified by Kalshi in lieu of sending an email); and

    b. does not intentionally match its own orders against each other. If its own orders match each other, that may constitute a trading violation and incur discipline under these Rules, as well as violate the CEA and Commission Regulations.

(d) An FCM Customer who is closing its account with an FCM may request to move positions to the FCM Customer's own account with Kalshi and with Clearing House and to no longer have the positions in an account carried by the FCM.

(e) An FCM Customer must adhere to all relevant Position Limits. This includes if the FCM trades through multiple FCMs or IBs, or is also a Self-Clearing Member.

(f) If an FCM Customer's account with the FCM becomes negative due to the FCM Customer's activity on a Platform, with the result that the FCM Customer owes the FCM money, the FCM may liquidate some or all of the FCM Customer's positions.

## RULE 3.4 INTRODUCING BROKERS

(a) Kalshi will allow IBs access to the Platform and related services in an impartial, transparent, fair and non-discriminatory manner, including to enable the Customers of IBs who are not Members of Kalshi to become IB Customers. Kalshi may in its sole discretion approve, deny, or condition any IB application as Kalshi deems necessary or appropriate, so long as such a denial is impartial, transparent, fair, and non-discriminatory.

(b) To be eligible to become an IB, an applicant must:
    a. be validly organized, in good standing, in the United States;
    b. be registered as an Introducing Broker by the CFTC and a member of NFA;
    c. execute the IB Agreement;
    d. have adequate financial resources and credit as required by Commission Rule 1.17;
    e. designate at least one person who is responsible for supervising all activities of its employees relating to transactions effected on Kalshi or subject to Kalshi Rules and provide any information Kalshi may request regarding such officer(s); and
    f. agree to be bound by these Rules;

(c) IBs must adopt, adhere to and enforce written compliance and supervisory policies and procedures in accordance with NFA Compliance Rule 2-9 and promptly provide, upon request by the Company, the CFTC or NFA, information related to the compliance and supervisory policies, procedures, and practices of the IB.

(d) IBs must, on an annual basis, submit their Business Continuity and Disaster Recovery plans, as mandated by NFA Compliance Rule 2-38, to Kalshi's compliance team for review. IBs must ensure that their plans coordinate with Kalshi's.

(e) An IB may only submit Orders for an IB Customer if the IB Customer is a Self-Clearing Member at Clearing House or clearing at Clearing House through a futures commission merchant that is a clearing member (or equivalent term) of Clearing House.

(f) IBs must provide their IB Customers accurate information as listed below. Kalshi will assist the IB with obtaining this information. Information required to be transmitted or made available must be provided to the best of the IB's knowledge, must be accurate and complete, and must not omit material information. Information that must be provided includes but is not limited to the following:

    f. A copy of Kalshi's Rulebook that is accurate, complete, current and readily accessible;

    g. The terms and conditions of each Contract listed for trading on the Platform;

    h. Rules, regulations, and mechanisms for executing transaction;

    i. Public information pertaining to new product listings, new rules, rule amendments, or other changes to previously disclosed information; and

    j. Any other information relevant to the operation of Kalshi's Exchange or Contracts listed for trading.

(g) If an IB application is approved by Kalshi, the applicant will be an IB of Kalshi and will have the following privileges:

    d. to intermediate Customer transactions on Kalshi; and

    e. to distribute Kalshi data to its IB Customers pursuant to any data distribution agreement with Kalshi;

(h) Kalshi may in its sole discretion approve, deny, condition, or terminate any IB application as the Company deems necessary or appropriate. In the event that Company staff decides to decline or condition an application for admission as an IB, or to terminate a Person's status as an IB, Company staff shall notify such IB thereof in a written notice sent to the email address provided by the IB in the IB application and Member Agreement or maintained in the Company's registry of Members. The written notice will specify the basis for the Company's decision. Such IB may, within 28 business days, request in writing that the Company reconsider the determination. Within 28 business days of receiving a request for reconsideration, the Company shall confirm, reverse or modify the denial, condition or termination of the IB status of such IB, and shall promptly notify such IB accordingly in writing. The Company may, in its sole discretion, schedule a hearing (in person or by teleconference), request additional information from such IB or establish any other process that it believes is necessary or appropriate to consider the request for reconsideration. The Company's decision is the final action of the Company and is not subject to appeal.

## RULE 3.5 IB CUSTOMERS

(a) IB Customers are subject to and required to adhere to all relevant procedures of the relevant IB, as well as the relevant Kalshi rules. Prior to allowing IB Customers to place Orders, IBs are required to ensure and document that their IB Customers are aware of and acknowledge this Rule and this Rulebook and Source Agency Prohibition.

(b) IB Customers are allowed to place Orders with multiple IBs. However, an IB Customer must not intentionally match its own Orders against each other. If an IB Customer places Orders that match each other, that may constitute a trading violation and subject the IB Customer to discipline under these Rules, as well as violate the CEA and Commission Regulations. Before an IB Customer places Orders on Kalshi with multiple accounts, it must disclose the identity of each account to the Exchange by email (or as otherwise specified by Kalshi in lieu of sending an email).

(c) IB Customers must access Clearing House through a futures commission merchant, unless the IB Customer is also a Self-Clearing Member.

(d) An IB Customer must adhere to all relevant Position Limits. This includes if the IB Customer trades through multiple IBs or FCMs, or is also a Self-Clearing Member.

### RULE 3.6 OBLIGATIONS APPLICABLE TO ALL PARTICIPANTS

(a) Each Participant must comply with these Rules, applicable provisions of the CEA, and relevant CFTC regulations. Each Participant, upon a request of the Company or any Regulatory Agency, must promptly respond to any requests for information, including by providing any necessary information for the Company to perform any of the functions described in CEA Section 5(h). Each Member must also cooperate promptly and fully with Kalshi, its agents, and/or the Commission in any investigation, call for information, inquiry, audit, examination, or proceeding. Such cooperation shall include providing Kalshi with access to information on the activities of such Participant in any referenced market that provides the underlying prices for any Contract. Failure to cooperate with any request for information within 15 days of the request is determined to be a violation of this Rule and subject to the disciplinary proceedings described in Chapter 9 including but not limited to the revocation or suspension of the Member's privileges in full or in part or subject a Participant to civil or criminal prosecution.

(b) Each Participant consents to allow Kalshi to provide all information Kalshi has about the Participant, including the Participant's trading activity, to the Commission or any other Regulatory Agency, law enforcement authority, or judicial tribunal, including (as may be required by information sharing agreements or other contractual, regulatory, or legal provisions) foreign regulatory or self-regulatory bodies, law enforcement authorities, or judicial tribunals without notice to the Participant.

(c) Each Participant consents to Kalshi providing information related to Know Your Customer or Anti-Money Laundering to its Clearing House.

(d) Each Participant is required to review the "Notices" section of the Kalshi website to make itself aware of material changes to these Rules or other notices that may affect your rights and obligations as a Participant of Kalshi.

(e) Each Participant, upon a request of the Company or any Regulatory Agency, must promptly respond to any requests for information, including by providing any necessary information for the Company to perform any of the functions described in CEA Section 5(h).

(f) Each Participant shall maintain appropriate books and records of its trading, including records of any activity in the underlying commodity and related derivatives markets, and make such records available, upon request, to Kalshi.

### RULE 3.7 OBLIGATIONS APPLICABLE TO ALL MEMBERS

(a) Each Member consents to Kalshi providing information related to KYC or AML to its Clearing House and any relevant banking partner.

(b) Each Member must update its email address within 24 hours if the email address most recently provided to Kalshi becomes inactive. Each Member must update all other information provided in its relevant member application within five days after that information has changed. If any Member thereof fails to satisfy these obligations, Kalshi may revoke or suspend the Member's privileges in full or in part.

(c) Each Member must immediately notify Kalshi in writing upon becoming aware:

    a. That the Member has had access or trading privileges suspended, or membership denied, in any commodity, securities, or swaps exchange, brokerage, association, or Regulatory Agency;

    b. That the Member has been convicted of, pled guilty or no contest to, or entered a plea agreement to, any felony in any domestic, foreign or military court;

    c. That the Member has been convicted of, plead guilty or no contest to, or entered a plea agreement to a misdemeanor in any domestic, foreign or military court which involves:

        1. Embezzlement, theft, extortion, fraud, fraudulent conversion, forgery, tax evasion, counterfeiting, false pretenses, bribery, gambling, racketeering, or misappropriation of funds, securities or properties; or

        2. Any transaction in or advice concerning swaps, futures, options on futures, leveraged transactions or securities;

    d. That the Member has been subject to, or associated with a firm that was subject to regulatory proceedings before any governmental or Regulatory Agency;

    e. That the Member is currently a party to any investigation or proceeding, the resolution of which could result in an event described in Rule 3.3(d)(1)-(4);

    f. Of any other material change in any information contained in the Member Application;

    g. Of becoming subject to early warning reporting under Commission Regulation 1.12;

    h. Of becoming the subject of a bankruptcy petition, receivership proceeding, or the equivalent, or being unable to meet any financial obligation as it becomes due; or

      i.  Of information that concerns any financial or business developments that may materially affect the Members' ability to continue to comply with participation requirements.

(d)  A Member is not required to engage in trading activity or maintain a minimum balance in its account after initial funding.

## RULE 3.8 FCM OBLIGATIONS

(a)  FCMs shall comply with all Applicable Law, including but not limited to Commission Regulations 1.10, 1.12, 1.20 - 1.32, 155.3.

(b)  FCMs shall have obligations in addition to the obligations applicable to all Participants and to all Members. Each FCM shall receive an identification number that the FCM will use as appropriate when required to identify actions and activities of the FCM.

(c)  Each FCM must submit statements of financial condition at such times and in such manner as shall be prescribed from time to time.

(d)  Each FCM must maintain a separately identifiable position account for each FCM Customer and provide that account identifier with every order submitted to Kalshi.

(e)  Each FCM must use due diligence in receiving and handling Orders from FCM Customers, submitting such Orders onto Kalshi on behalf of such FCM Customers, responding to inquiries from FCM Customers about their Orders and reporting to FCM Customers the execution of such Orders. This specifically includes ensuring that FCM Customers adhere to all relevant Position Limits in their FCM accounts and establishing automated pre-trade risk controls.

(f)  Each FCM must maintain policies and procedures acceptable to Kalshi that:
    a.  with respect to each FCM Customer who is an individual, restricts access to any system through which such individual FCM Customer submits Orders to the FCM for transmission to Kalshi to that individual FCM Customer; and
    b.  with respect to each FCM Customer who is not an individual:
        1.  restricts access to any system through which the FCM Customer's Orders may be submitted to the FCM for transmission to Kalshi to such individuals authorized to enter orders on behalf of such FCM Customer;
        2.  when required to by Kalshi, requires each FCM Customer who is not an individual to have and maintain a Legal Entity Identifier deemed acceptable under CFTC regulations, which shall be provided to Kalshi; and
        3.  identifies each individual authorized to enter Orders on behalf of such FCM Customer by a distinct identification code, which shall be provided to the FCM and Kalshi with each order message submitted by such FCM Customer.

(g) FCMs must perform all required KYC, CDD and AML activities for their FCM Customers.

(h) Each FCM must maintain policies and procedures acceptable to Kalshi that identifies each of its FCM Customers by a distinct identification code, which shall be provided to Kalshi with each Order message submitted by such FCM Customers. Each FCM must provide to Kalshi upon request identifying information for FCM Customers, including but not limited to names, numbers, addresses, and contact information.

(i) Each FCM must maintain policies and procedures that require its FCM Customers to make the records that its FCM Customers are required to maintain under Rule 3.6 available to the FCM upon request, and the FCM must make that information available to Kalshi upon its request.

(j) FCMs may maintain a proprietary trading account for Kalshi contracts, as well as error accounts, test accounts, and an account used to liquidate FCM Customer positions as allowed under this Chapter, or equivalent accounts with similar purpose. Any proprietary trading by an FCM may only be done in accordance with CFTC Regulation 155.3 and any other Applicable Law.

(k) An employee of an FCM, including an associated person of the FCM, may trade Kalshi contracts for his or her personal account only under the following circumstances:
   a. All such trading of Kalshi contracts by an employee shall occur in a trading account held by the FCM with which he or she is registered or employed. No employee may be a Self-Clearing Member or maintain an interest in or control the trading in the account of any direct Self-Clearing Member of Kalshi.
   b. The FCM must notify Kalshi in a manner that Kalshi instructs, prior to permitting the FCM's employee to submit orders to Kalshi, of the employee's name and account identifier and identify that account as belonging to an employee.
   c. The FCM must notify Kalshi immediately, in a manner that Kalshi instructs, in the event that the FCM's AP/employee is no longer registered and/or employed by the FCM.

(l) Each FCM is responsible for supervising the FCM's employees and the FCM's compliance with all relevant laws, regulations, and rules. Each FCM shall be responsible for the acts or omissions of its employees, and may be liable for any fines imposed upon its employees by Kalshi. Any violation of Kalshi's rules by an FCM employee may be considered a violation by the FCM.

(m) Each FCM must make and file reports in accordance with CFTC Regulations and NFA rules in a manner and form and at such times as may be prescribed by the CFTC or NFA.

(n) Each FCM must make and file reports with Kalshi at such times, in such manner and form, and containing such information as Kalshi may prescribe from time to time.

(o) Each FCM, upon a request of Kalshi or any Regulatory Agency, must promptly respond to any requests for information. This includes but is not limited to any information requested by Kalshi in order to investigate a potential violation of these Rules by a FCM Customer or information relevant to the FCM's financial resources or Customer positions.

(p) Each FCM must certify to Kalshi that its system has the capacity to mitigate market disruptions or system anomalies associated with electronic trading.

(q) Each FCM must prepare, maintain and keep current those books and records required by the rules of Kalshi and Applicable Law. Such books and records shall be open to inspection and promptly provided to Kalshi, its Designated Self-Regulatory Organization ("DSRO"), the Commission and/or the U.S. Department of Justice, upon request.


## RULE 3.9 IB OBLIGATIONS

(a) IBs shall comply with all Applicable Law, including but not limited to CFTC Regulations 1.10, 1.12, and 155.4.

(b) IBs shall have obligations in addition to the obligations applicable to all Members. Each IB shall receive an identification number that the IB will use as appropriate when required to identify actions and activities of the IB.

(c) Each IB must submit statements of financial condition at such times and in such manner as shall be prescribed from time to time.

(d) Each IB must use due diligence in receiving and handling Orders from IB Customers, placing such Orders with the IB for submission onto Kalshi on behalf of such IB Customers, responding to inquiries from IB Customers about their Orders and reporting to IB Customers the execution of such Orders.

(e) Each IB must maintain policies and procedures acceptable to Kalshi that:
    a. with respect to each IB Customer who is an individual, restricts access to any system through which such individual IB Customer submits Orders to the IB for transmission to Kalshi to that individual IB Customer; and
    b. with respect to each IB Customer who is not an individual:
        1. restricts access to any system through which the IB Customer's Orders may be submitted to the IB for transmission to Kalshi to such individuals authorized to enter orders on behalf of such IB Customer;

    2.    when required to by Kalshi, requires each IB Customer who is not an individual to have and maintain a Legal Entity Identifier deemed acceptable under CFTC regulations, which shall be provided to Kalshi; and

    3.    identifies each individual authorized to enter orders on behalf of such IB Customer by a distinct identification code, which shall be provided to the IB and Kalshi with each order message submitted by such IB Customer.

(f)    IBs must perform all required KYC, CDD and AML activities for their IB Customers.

(e)    Each IB must maintain policies and procedures acceptable to Kalshi that identifies each of its IB Customers by a distinct identification code, which shall be provided to Kalshi with each order message submitted by such IB Customers. Each IB must provide to Kalshi upon request identifying information for IB Customers, including but not limited to names, numbers, addresses, and contact information.

(g)    Each IB must maintain policies and procedures that require its IB Customers to make the records that its IB Customers are required to maintain under Rule 3.6 available to the IB upon request, and the IB must make that information available to Kalshi upon its request.

(h)    Each IB is responsible for supervising the IB's employees and the IB's compliance with all relevant laws, regulations, and rules. Each IB shall be responsible for the acts or omissions of its employees, and may be liable for any fines imposed upon its employees by Kalshi. Any violation of Kalshi's rules by an IB employee may be considered a violation by the IB.

(i)    Each IB must make and file reports in accordance with CFTC Regulations and NFA rules in a manner and form and at such times as may be prescribed by the CFTC or NFA.

(j)    Each IB must make and file reports with Kalshi at such times, in such manner and form, and containing such information as Kalshi may prescribe from time to time.

(k)    Each IB, upon a request of Kalshi or any Regulatory Agency, must promptly respond to any requests for information. This includes but is not limited to any information requested by Kalshi in order to investigate a potential violation of these Rules by an IB Customer or information relevant to Customer positions.

(l)    Each IB must certify to Kalshi that its order‑entry and communications systems have adequate controls to detect and prevent the transmission of erroneous, duplicative, or disruptive orders. The IB must also maintain procedures to notify Kalshi promptly if any system anomaly or market disruption occurs on its order‑entry platform.

(m) Each IB must prepare, maintain and keep current those books and records required by the rules of Kalshi and Applicable Law. Such books and records shall be open to inspection and promptly provided to Kalshi, its DSRO, the Commission and/or the U.S. Department of Justice, upon request.

## RULE 3.10 AUTHORIZED TRADERS

(a) Each Self-Clearing Member who is not a natural Person shall designate one or more Authorized Trader(s) who will be responsible for exchange activity conducted on behalf of the Self-Clearing Member. An Authorized Trader may also be a Self-Clearing Member in his or her individual capacity, but may not knowingly act as a counterparty in any capacity to any Order that he or she has placed as an Authorized Trader on behalf of another Self-Clearing Member in his or her individual capacity. Any Authorized Trader must notify Kalshi prior to becoming a Self-Clearing Member, IB Customer, or an FCM Customer; and a Self-Clearing Member, IB Customer or FCM Customer must notify Kalshi prior to becoming an Authorized Trader, by email (or as otherwise specified by Kalshi in lieu of sending an email).

(b) By agreeing to become an Authorized Trader, an individual agrees to be bound by the duties and responsibilities of an Authorized Trader and to be subject to, and comply with, Kalshi's Rules and Obligations. Among other duties and responsibilities that Kalshi may impose, an Authorized Trader and the Member, as relevant, must:
   a. have the authority, at the Exchange's request, to adjust or withdraw any Order submitted under any unique identification code assigned to him or her;
   b. ensure that any exchange activity conducted under any unique identification assigned to him or her complies with all Kalshi Rules and obligations; and
   c. ensure that the Authorized Trader's unique identification code is provided to Kalshi with each order message submitted by the Authorized Trader.

(c) To designate an Authorized Trader, a Member must follow the procedures established by Kalshi. Kalshi may establish criteria that individuals must fulfill to become an Authorized Trader.

## RULE 3.11 REJECTION OF APPLICANT AND LIMITATIONS OF TRADING PRIVILEGES

(a) Notwithstanding Kalshi's authority granted under any other Rule, Kalshi may, in its sole discretion, deny any Member Application, or suspend, revoke, limit, condition, restrict, or qualify the trading privileges of any Trader) or Authorized Trader of a Member as it deems necessary or appropriate.

(b) Anyone who has had trading privileges limited pursuant to Section (a) of this Rule will be provided, in writing, the reason such action was taken.

(c) If Kalshi denies the Member Application of any Person or places limitations on trading privileges pursuant to this section, the Person may appeal the decision by filing with Kalshi a petition for review of such membership denial or trading limitation. The petition should describe in detail the reasons why the Member Application should be granted, or trading limitations removed. The petition must be filed within twenty-eight (28) calendar days from the date upon which notice of the denial of membership or limitation of trading privileges was provided by Kalshi. The decision of the Company will be final. A Person that has been denied membership by the Company will not be eligible for reapplication during the six months immediately following such denial.

(d) If trading privileges are limited pursuant to Section (a) of this Rule, Kalshi may initiate a transfer of the Trader's balance to the bank account on record, or cause for the same to be affected by Clearing House.

(e) Kalshi has full discretion to limit or restrict a Trader or Authorized Trader from trading in specific Contracts or categories of Contracts to mitigate risks of market manipulation

### RULE 3.12 COMMUNICATIONS BETWEEN KALSHI AND MEMBERS

(a) Each Member must provide Kalshi with its current electronic mail address and immediately notify the Company of any changes. All communications between Kalshi and its Members, including confirmation of all Transactions executed on a Member Account, may be transmitted by electronic mail on the Kalshi website or via the Kalshi API.

(b) A Member is responsible for promptly reviewing and, if necessary, responding to all electronic communications from Kalshi.

(c) Kalshi may record conversations and retain copies of electronic communications between the Company and Members. Any such recordings may be retained by the Company in such manner and for such periods of time as Kalshi may deem necessary or appropriate. Kalshi shall retain such records for the retention periods necessary to comply with CFTC Regulation 1.35 or such longer period as the Company deems appropriate.

### RULE 3.13 DUES, FEES, AND EXPENSES PAYABLE BY MEMBERS

(a) Members are not required to pay dues.

(b) Traders may be charged fees in connection with the trading of Contracts in such amounts as may be revised from time to time to be reflected on the Company's Website.

(c) Traders may be charged fees for Settlement of Contracts in an amount to be reflected from time to time on Kalshi's website.

(d) Kalshi may cause and/or instruct Clearing House to deduct from the Member Account fees or expenses incurred in connection with the trading or account activity or Kalshi's administration in connection with that activity, such as fees for wire transfer or other payment methods processing fees. All such fees will be charged in an amount to be reflected from time to time on the Company's Website. For Self-Clearing Members, such fees and expenses will be deducted from the Self-Clearing Members' Account, and for FCM Customers, from the relevant FCM Customer Account.

(e) If Kalshi determines in the future to impose dues or additional fees, the Participants will be provided notice of the change at the time the amended fees are filed with the Commission. The new fee structure will be implemented no earlier than on the first available trade date for which the change may be implemented according to the Commission's self-certification filing requirements as set forth in CFTC Regulation 40.6(a).

(f) Kalshi may from time to time establish incentive programs that provide participants with incentives that encourage membership and trading.

# CHAPTER 4 MARKET MAKERS

## RULE 4.1 ELIGIBILITY TO BE DESIGNATED AS A MARKET MAKER

(a) Only Members in good standing may become a Market Maker.

(b) Kalshi shall have sole discretion to allow a Member to become a Market Maker.

(c) Kalshi may set any specific requirements that the Member must abide by in order to become a Market Maker.

(d) A Member must complete and file a market maker agreement with Kalshi to be considered for Market Maker status.

(e) The designation of any Market Maker may be suspended, terminated or restricted by Kalshi at any time and for any reason.

(f) Kalshi may designate more than one Market Maker, and there may be more than one Market Maker participating on the Exchange.

(g) There may be more than one Market Maker program in place at Kalshi at any given time.

**RULE 4.2 DESIGNATION AS A MARKET MAKER**

(a) To determine whether a Member shall be designated as a Market Maker, Kalshi shall consider the Member's available financial resources, relevant experience, business reputation, and any other relevant factor.

(b) No Member shall be designated as a Market Maker without the Member's consent.

(c) Kalshi may periodically conduct an evaluation of any Market Maker to determine whether it has fulfilled performance standards relating to, among other things, quality of the markets, competitive market making, observance of ethical standards, and administrative soundness. If the Market Maker fails to meet minimum performance standards, Kalshi may, among other things, suspend, terminate or restrict the Market Maker's designation.

**RULE 4.3 MARKET MAKER BENEFITS**

Market Makers may receive benefits, including but not limited to financial benefits, reduced fees, differing Position Limits and Position Accountability Levels, and enhanced access, in accordance with any relevant Market Maker program in place at Kalshi for fulfilling the market maker obligations.

**RULE 4.4 MARKET MAKER OBLIGATIONS**

(a) A Market Maker's transactions must be reasonably calculated to contribute to the maintenance of a fair and orderly market, and a Market Maker shall not make bids or offers or enter into transactions that are inconsistent with this goal.

(b) A Market Maker is obligated to perform all requirements and obligations delineated in the relevant Market Maker agreement and in the relevant Market Maker program in place at Kalshi. These requirements and obligations include but are not limited to maintaining two-sided markets within a defined spread and with a minimum depth during trading.

**RULE 4.5 MARKET MAKER POSITION ACCOUNTABILITY LEVELS**

(a) Market Makers are generally subject to the Position Accountability rules set forth in Rule 5.14. However, Kalshi may establish higher Position Accountability Levels for Market Makers on Contracts where the Market Maker has quoting obligations. Unless otherwise specified, on these Contracts Market Makers will have Position Accountability Levels that are 10 times the Position Accountability Levels for non-Market Makers.

(b) For Contracts that a Market Maker is required to adhere to Market Maker Obligations set forth in Rule 4.4(b), Market Makers will not be subject to Position Limits imposed under Rule 5.15 in regard to such Contracts, and will be subject to Position Accountability Levels.

(c) In no instance may a Market Maker's position exceed any applicable limit established by the CFTC.

# CHAPTER 5 METHOD FOR MEMBERS TO TRADE CONTRACTS

## RULE 5.1 PRIOR REVIEW OF THESE RULES AND ACCEPTANCE OF TERMS OF MEMBER AGREEMENT

(a) No Person may become an IB, FCM or Self-Clearing Member of Kalshi or trade any Contracts on the Platform unless such Person has received, read, understood, and accepted the Kalshi Rulebook, Terms of Use, Privacy Policy, and Member Agreement, and has certified having done so.

(b) FCM Members may not allow their FCM Customers to enter orders or otherwise engage in any Kalshi trading activity as an FCM Customer of that FCM Member unless such FCM Member has obtained certification from the FCM Customers that the FCM Customers have received, read, understood, and accepted these Rules and the Source Agency Prohibition.

(c) IBs may not allow their IB Customers to enter orders or otherwise engage in any Kalshi trading activity as an IB Customer of that IB unless such IB has obtained certification from the IB Customers that the IB Customers have received, read, understood, and accepted these Rules and the Source Agency Prohibition.

## RULE 5.2 SELF-CLEARING MEMBER ACCESS TO KALSHI

(a) During the Kalshi Self-Clearing Member application process, an applicant to become a Self-Clearing Member will be required to choose a unique user identification ("ID") and password. The applicant will be required to enter the ID and password to log onto and access secure portions of the Kalshi website. Each time the applicant submits its ID and password to Kalshi in order to log onto Kalshi, the applicant affirms that it understands and agrees to be bound by these Rules and other policies of Kalshi, as amended.

(b) After a Self-Clearing Member Application has been approved by Kalshi, the applicant shall be notified of its designation as a Member. As a Self-Clearing Member, such Person will be able to access the Platform, execute Trades, and otherwise access information regarding, or perform functions in, such a Person's account using its ID and password.

(c) For account security and audit trail purposes, each Self-Clearing Member agrees that Kalshi may maintain logs of its IP address used to access the Kalshi website.

(d) Each Self-Clearing Member will be responsible for protecting its ID and password from improper disclosure. In addition, a Self-Clearing Member may not knowingly or negligently permit any Person not authorized by Kalshi and by the Self-Clearing Member to use the ID and password to access the secure portion of the Kalshi website. Each Self-Clearing Member is required to immediately notify Kalshi if it knows, or has reason to believe, that its ID or password have been disclosed to any Person not authorized by Kalshi and the Self-Clearing Member to use such ID and/or password.

(e) Each Self-Clearing Member will be liable for all costs and any losses that it may incur from Transactions executed on the Platform by any Person, authorized or not, using its ID and password. Kalshi will not be responsible in any way for unauthorized Transactions in a Member Account.

(f) Each Self-Clearing Member is responsible for contracting with an Internet service provider through which it will access the Kalshi website and for having a backup service provider if the Self-Clearing Member thinks it is necessary. Each Self-Clearing Member is also responsible for maintaining an Internet connection speed adequate for its needs. Kalshi will not be responsible in any way for any orders delayed or trades missed or not executed in a timely fashion because of failure of the Self-Clearing Member's Internet service provider or slowness of its Internet connection speed. No communication from a Self-Clearing Member will be deemed to have been received by Kalshi until that communication is logged by the Kalshi server.

(g) Kalshi in its discretion may place a Self-Clearing Member Account on hold (prohibiting any order activity) or on hold-liquidation only (allowing only orders to liquidate existing positions). In such circumstances, Kalshi will promptly notify the affected Self-Clearing Member of the nature of and reason for the action.

## RULE 5.3 TRADING CONTRACTS

(a) Members trade Contracts by entering Orders through Kalshi's secured channels. After logging into the secure portion of the Kalshi website, the Member will input its Orders into the Platform.

(b) Orders may result from using Kalshi's pre-execution communications system.
    a. A Member (referred to for the purpose of this Rule as the "Requester") may use Kalshi's pre-execution communications system to create a two-sided Request for Quote ("RFQ") message to express interest in a market. This message must contain the following information, which is public to all other Members:
        i. The market in which the Requester desires a quote;

43

      ii.     The size of quote desired by the Requester, measured in number of contracts or in total cost; and

      iii.    A unique ID code, pseudonymously identifying the Requester. This code will remain consistent for a single Member across different RFQs (e.g., MEMBER-A9BCD), but contains no information that would reveal the identity of the Member.

b.   Any other Member (referred to for the purpose of this Rule as the "Quoter") may choose to respond to the RFQ with a structured response ("Quote"). This Quote must be for the same size as the RFQ, contain the price that the Quoter is willing to offer to buy and and the price that the Quoter is willing to sell the contract, and contain a unique ID code, as described in the paragraph above, that identifies the Quoter. This Quote is private and visible only to the Requester. A Quoter may only respond with a Quote that the Quoter has sufficient collateral to match at the specified price and quantity and full execution would not result in any position limit violations.

c.   A Requester may choose to accept one side of a Quote, provided that the Requester has sufficient collateral to match at the specified price and quantity and full execution would not result in any position limit violations. A Requestor may either accept the Quote for its full size, or accept some number of contracts in the quote less than the full size. Upon acceptance, a message specifying the accepted side of the Quote and the number of contracts accepted will be sent back to the Quoter, who will have 30 seconds to confirm that the Quoter wishes to proceed. If the Quote is not confirmed by the Quoter within these 30 seconds, the Quote will be treated as void. In the event that multiple Quotes are sent in response to the RFQ, the Requester will only be able to accept the Quote with the best price. Quotes may also be rejected by the Requester.

d.   Upon the Quote's confirmation by the Quoter, the Platform will automatically begin a 15 second timer. At the end of this timer, the Platform will sequentially enter orders into the order book for the Quoter and Requester according to the direction, size, and price of the confirmed Quote. These orders will have time priority in the order book as though they were placed manually at the end of the timer (they will execute at a lower time priority than all existing resting orders). Once the Quote is confirmed and the 15 second timer begins, neither party can opt-out of this process. During this 15 second period, no public indication is given of the incoming orders, and the timer is visible only to the Quoter and Requester.

e.   Each of these orders behaves identically to a standard order in the order book at the price specified in the Quote. Each order will be evaluated against the best prices in the order book.

      i.      If the Quote price improves the best bid and the best offer in the order book or if there is no other bid or offer, the Quoter's order will match in its entirety against the entirety of the Requester's order.

44

    ii.   If the Quote price improves the best bid but there is a better, or equal, offer or offers resting in the order book, the buy side order will be executed first against such better, or equal, offer or offers and then subsequently against the sell side order produced by the Quote, if any residual quantity on the buy side remains.

    iii.   Similarly if the Quote improves the best offer but there is a better, or equal, bid or bids resting in the order book, the sell side order will be executed first against such better, or equal, bid or bids and then subsequently against the buy side order produced by the Quote, if any residual quantity on the sell side remains.

f.   A party to pre-execution communications shall not disclose the details of such communications to any Person who is not a party to the communications.

g.   A party to private pre-execution communications shall not enter, modify, or cancel orders on any market to take advantage of information conveyed during such communications, except in accordance with this Rule.

h.   Members may only create a Quote and/or a RFQ for the purpose of executing bona fide Transactions.

i.   The Exchange may identify certain markets to be High Volatility Markets ("HVM"). In a HVM, upon Quote acceptance, a Quoter will have only 3 seconds to confirm that they wish to proceed (rather than the usual 30). After a Quote is confirmed in a HMV, a 3 second timer begins before order execution (rather than the usual 15). The Exchange will indicate if a market is considered to be a HVM through its website and via the API.

j.   A Member may choose to make public their willingness to provide Quotes in a market. If a Member chooses to do so, the Exchange will add the Member's unique ID code to a list of "available Quoters" on that market. This list will be published by the Exchange on its website and via the API.

(c)  When a Self-Clearing Order is matched by an Order from another Trader:

a.   If the Self-Clearing Member's Order is to enter into one or more Contracts for which it does not have an offsetting position in its account, Kalshi will check the Self-Clearing Member's Self-Clearing Member Account to ensure it has enough funds to cover its maximum loss under the Contract(s) it is attempting to enter into. If the Self-Clearing Member does not have the necessary funds in its Self-Clearing Clearing Member Account, Kalshi will cancel its Order prior to trade execution. If the Self-Clearing Member does have the necessary funds in its Self-Clearing Clearing Member Account, Kalshi will execute the trade. Upon trade execution, Kalshi will cause and/or instruct Clearing House to:

1.   Debit the funds from the Self-Clearing Member's Member Account in an amount necessary to cover the maximum loss;

2.   Credit those funds towards the appropriate settlement account;

3.   Place the Contracts that were the subject of the Order into the Self-Clearing Member's Member Account; and

4.   Notify the Self-Clearing Member by electronic mail that the Trade has been executed.

b. If the Transaction involves entering into one or more Contracts for which a Self-Clearing Member has an offsetting position in its account, upon execution of the Trade Kalshi will cause and/or instruct Clearing House to:

1. Close the offsetting position in the Self-Clearing Member Account;
2. Debit the settlement account in the amount of any gains realized by the offsetting Transaction and any funds that were debited from the Self-Clearing Member Account at the time the Contract(s) that is being closed was entered into and that were not also used to pay any losses on such Contract(s);
3. Credit those amounts to the Self-Clearing Member Account; and
4. Notify the Member by electronic mail that the Trade has been executed.

(d) If a Self-Clearing Member's Order is placed on the Platform and not immediately matched by an Order from another Trader, unless otherwise specified it will rest on the Platform until it is matched and executed in accordance with the procedures outlined above in this Rule, until the Self-Clearing Member cancels it, or until it is canceled by Kalshi or Clearing House upon the Expiration of the Contract or otherwise in accordance with these Rules.

### RULE 5.4 SELF-CLEARING MEMBER ORDER AND CANCELLATION

(a) Entry:

a. A Self-Clearing Member will enter Orders to trade Contracts by electronic transmission over the Internet. Order rate limiter functionality will cap the maximum number of orders that may be submitted to the Exchange per second (or per a specific time period expressed in seconds) per Self-Clearing Member in order to prevent a risk of harm to the Company.

b. A Self-Clearing Member will enter an Order to trade one or more Contracts by indicating to Kalshi in the manner required by Kalshi:

1. Order direction (e.g., for a Binary Contract, buy/yes or sell/no, or for a Scalar Contract, buy/long or sell/short);
2. Price at which the Self-Clearing Member wants to buy or sell the Contract; and
3. Number of Contracts the Self-Clearing Member wants to buy or sell.

c. In order to enter an Order to trade one or more Contracts, a Self-Clearing Member will be required to submit the Order to Kalshi. Once the Order is accepted by Kalshi, Kalshi will assign to the Order an Order ID. This ID will appear next to the associated Order on the Self-Clearing Member's Order Ticket and Order History account pages. The Self-Clearing Member will be responsible for any and all Order entries confirmed for its account and accepted by Kalshi.

    d.  Any Self-Clearing Member submitting Orders, or any other messages directly to Kalshi, including but not limited to messages related to the cancellation or amendment of an Order, whether manually or via automated functionality, must ensure adequate controls are in place to prevent excessive messaging or other activity that may be deemed detrimental or disruptive to the Company.

(b) Kalshi's trading system will keep an electronic record of all Orders to trade Contracts, and all executed Contract trades. The records kept by Kalshi will include all of the terms identified in paragraph (a) of this Rule as well as the date and time that the Transaction was completed to the nearest thousandth of a second and the member ID, for all executed Contract trades and to the nearest thousandth of a second for all Orders to trade Contracts.

(c) A Kalshi Contract will not be void or voidable due to:
    a.  A violation by Kalshi of the provisions of sections 5 or 5h of the CEA or Part 38 of CFTC Regulations;
    b.  Any CFTC proceeding to alter or supplement a rule, term or condition under section 8a(7) of the CEA or to declare an emergency under section 8a(9) of the CEA; or
    c.  Any other proceeding where the effect of which is to alter or supplement a specific term or condition or trading rule or procedures, or requires Kalshi to adopt a specific term or condition, trading rule or procedure, or to take or refrain from taking a specific action.

(d) A Self-Clearing Member can submit instructions, via Kalshi's interface (website, mobile application) or the API, to cancel an Order which that Self-Clearing Member has placed on the Platform if that Order has not yet been executed. Upon submission of instructions to either cancel or modify an Order that has not been executed, the Kalshi system will withdraw the Order from the order book and confirm the cancellation of the Order.

## RULE 5.5 FCM CUSTOMER ORDERS, CANCELLATIONS, AND TRADING

(a) FCM Customers may enter Orders with an FCM. FCMs must submit FCM Customer Orders electronically. An FCM Customer that enters an Order with an FCM is considered to have entered an Order on the Platform.

(b) FCMs will submit an FCM Customer's Order to trade one or more Contracts by transmitting the Order to Kalshi in the manner required by Kalshi, that will include:
    a.  Order information;
    b.  Any other relevant identifiers, including the FCM Customer's unique account identifier; and
    c.  the FCM identifier.

(c) The Rules set forth in paragraphs (a) and (b) of this section also apply to order cancellations instructed by FCM Customers.

(d) Upon receipt of an Order to trade one or more Contracts from an FCM Customer, an FCM will be required to ensure that the FCM Customer has on deposit with the FCM enough funds to satisfy Kalshi's full collateralization requirement before the Order is submitted to Kalshi. The FCM will be responsible for any and all order entries confirmed for its orders accepted by Kalshi. If there is insufficient funds in the FCM Customer Account (or relevant Sub-Account, if any), the Order will not be accepted. If the Order results in a Trade, Kalshi will instruct Clearing House to debit the collateral for the trade from the FCM Customer Account (or relevant Sub-Account, if any).

(e) Kalshi in its discretion may instruct an FCM to place a FCM Customer Account on hold (prohibiting any order activity) or on hold-liquidation only (allowing only orders to liquidate existing positions), or may on its own place the FCM Customer's trading privileges on hold and will notify the FCM as soon as practicable afterwards. In all circumstances, the FCM will promptly notify the affected FCM Customer of the nature of and reason for the action.

## RULE 5.6 IB CUSTOMER ORDERS, CANCELLATIONS, AND TRADING

(a) IB Customers may enter Orders with an IB. Upon receiving an Order from an IB Customer, the IB must forward the Order to either the IB Customer itself, if it is a Self‑Clearing Member, or its FCM Member.

(b) IBs will submit an IB Customer's Order to trade one or more Contracts by transmitting the order to Kalshi in the manner required by Kalshi, that will include:
    a.  Order information;
    b.  Any other relevant identifiers, including the IB Customer's unique account identifier and the unique account identifier for the relevant Self-Clearing Member or FCM Member; and
    c.  the IB's identifier.

(c) The Rules set forth in paragraphs (a) and (b) of this section also apply to order cancellations instructed by IB Customers.

(d) Upon receiving an IB Customer's Order from the IB, the IB must ensure that the IB Customer has on deposit sufficient funds on deposit in the IB Customer's Self-Clearing Member Account (or relevant Sub-Account, if any) or its FCM's FCM Customer Account (or relevant Sub-Account, if any) to satisfy Kalshi's full collateralization requirement before the Order is submitted to Kalshi. The IB will be responsible for any and all order entries confirmed for its orders accepted by Kalshi. If there are insufficient funds in the IB Customer's Self-Clearing Member Account (or relevant Sub-Account, if any) or its FCM's FCM Customer Account (or relevant Sub-Account, if

any) , the Order will not be accepted. If the Order results in a Trade, Kalshi will instruct Clearing House to debit the collateral for the trade from the IB Customer's Self-Clearing Member Account (or relevant Sub-Account, if any) or its FCM's FCM Customer Account (or relevant Sub-Account, if any) .

## RULE 5.7 HANDLING OF ORDERS

(a)  All trading on Kalshi's Central Limit Order Book is conducted on a fully anonymous basis.

(b)  Disclosing Orders Prohibited:

    a.  It is a violation of this Rule 5.5 for any Person to disclose another Person's Order to buy or sell any Contracts except as may be requested by Kalshi or the Commission.
    b.  It is a violation of this Rule 5.5 for any Person to act or direct another Person to act based on non-public order information, however acquired.

(c)  No FCM or IB or employee thereof in possession of the FCM's FCM Customer's or IB's IB Customer's Order may enter into a transaction opposite such Order directly or indirectly.

(d)  No FCM or IB or employee thereof in possession of the FCM'S FCM Customer's or IB's IB Customer's Order shall enter an order to buy or sell in the same product for its/his own account or an account in which it/he has a direct or indirect financial interest.

(e)  Kalshi will attempt to cancel an existing Order as soon as possible. However, the Order may be executed before Kalshi is able to cancel it. If an Order has been filled in whole or in part, only that portion of the Order (if any) that has not been executed may be canceled.

## RULE 5.8 DISPUTED ORDERS

(a)  If a Trader believes that an Order to trade one or more Contracts was incorrectly executed or rejected by Kalshi that Trader may request a review of the Order by providing the confirmation number for the order and stating the grounds for its disagreement with the handling of the order. FCMs may make such requests on behalf of an FCM Customer. IBs may make such a request on behalf of an IB Customer.

(b)  Upon receipt of a request for review of an Order and the accompanying confirmation number, Kalshi will review its electronic audit trail to determine if the Kalshi trading system correctly interpreted and executed the Order.

(c) If the review described in paragraph (b) of this Rule reveals that the Kalshi trading system made a mistake, the Order will be canceled and the accounts of all Traders that were party to the Order will be returned to their state before the Trade was executed.

(d) If the review described in paragraph (b) of this Rule reveals that the Kalshi trading system did not make a mistake, Kalshi will inform the Trader who requested the review of its determination that the Order was properly handled, the evidence supporting that determination, and that an adjustment will not be made.

(e) A Trader, including an FCM on behalf of its FCM Customer or IB on behalf of its IB Customer, may appeal a determination under this Rule to a Kalshi compliance officer. The Person making the appeal will be required to provide a response to the evidence described in this Rule that the order was properly handled, and the Person may provide any other information it wishes to disclose. If the appeal does not contain a response to the evidence, it will be rejected. The compliance officer will decide on the appeal no later than 10 days after its receipt, and that decision will be final.

(f) Kalshi will document in writing all requests for review of orders received by Kalshi, the time and manner in which Kalshi reviewed its electronic audit trail in response to the request, the outcome of that review, and the action or actions taken by Kalshi in response to that review, including the results of any appeal filed under paragraph (e) of this Rule and the review conducted by the compliance officer in deciding that appeal.

## RULE 5.9 PRIORITY OF ORDERS

Kalshi's central limit order book matches Orders in an open and competitive manner. Subject to the provisions of Rule 5.10(b) regarding Orders, Kalshi's trading algorithms execute all trades by matching orders according first by price and then time priority. This means that Orders and quotes entered at different prices will be executed in order of price, from best to worst, regardless of what time they were placed on the Platform, and Orders and quotes placed on the Platform at the same price will be executed in order of time, from oldest to most recent.

## RULE 5.10 FILLING ORDERS TO TRADE CONTRACTS

(a) Subject to the provisions of Rule 5.10(b) regarding Orders, the Kalshi trading system will fill all Orders to trade Contracts on an "or better" basis. To illustrate, if a Trader places an Order to buy a Contract or Contracts at a price higher than the price of the best sell offer on the Platform, the system will fill that Order to buy at the better sell offer price(s) until all available sell offers under or equal to that buy Order's limit price are filled or until that buy order is completely filled. Likewise, if a Trader submits a sell Order at a price lower than the price of the best bid, the system will fill that sell Order at the better bid price(s) until all available bids over that sell Order's limit price are filled or that sell Order is completely filled. If an Order is only partially filled, the unfilled portion of that Order will

remain in the order book as a resting order at the limit price specified. Should an opposite Order at the same price or better than the original Order subsequently be placed on the system, the unfilled portion of the original Order will be executed opposite that new Order at the original Order's limit price.

(b) For Self-Clearing Members, a written record of all of the terms of each Trade entered into on Kalshi or pursuant to the Rules will be available immediately upon execution on the Kalshi interface on the Member's activity page. Such record shall legally supersede any previous agreement and serve as a confirmation of each such Trade. Kalshi will send confirmation messages to Self-Clearing Members upon execution of a Trade via the API, mobile application, and/or website, if such Self-Clearing Members are online at the time. However, please note that if any applicable Self-Clearing Member is not online at the time of execution, such Member will see the confirmation(s) when it next logs on to the interface. The contract type, size, execution time and execution method for each Trade will be made available on the website to all Participants after execution of the relevant Trade.

## RULE 5.11 TRADE CANCELLATIONS

(a) As a designated contract market, Kalshi has the authority to adjust Trade prices or cancel Trades when necessary to mitigate market-disrupting events caused by malfunctions on its Platform or errors in Orders submitted by Traders. However, due to the fully collateralized and short-term nature of trading on Kalshi, the circumstances in which this authority may be exercised are limited.

(b) Kalshi, in its discretion and in accordance with these Rules, may cancel or adjust a Trade that has been executed on the market at a price that is inconsistent with prevailing market conditions due to improper or erroneous orders or quotes being matched on the Platform. Likewise, because of the nature of Kalshi Contracts, there will generally be no cancellation or adjustment of an erroneous trade except in extraordinary circumstances as determined by the Company. An erroneous trade made due to Trader error, or caused by circumstances preventable in any way by a Trader, shall not constitute "extraordinary circumstances" except as described in Rule 5.11(d).

(c) In addition to a Contract adjustment raised under Chapter 7 of these Rules, Kalshi may review a Trade based on its own analysis of the market or pursuant to a request for review by a Trader. A request for a review by a Member or other third party must be received by Kalshi no later than fifteen (15) minutes after the trade has been executed on the Platform and before Expiration of the Contract. Upon requesting review, the requesting Trader shall remit a payment of $10,000 to compensate Kalshi for the operational costs of the review and any subsequent actions under this Rule (such payment to be reimbursed if Kalshi determines to cancel or adjust the trade(s) due to extraordinary circumstances wholly caused by a Platform malfunction). Kalshi will promptly determine whether the Trade will be subject to review and then promptly post notice indicating that the Trade is under review.

(i) During the review, Kalshi will calculate a fair market value for the Contract at the time of the questioned Trade by utilizing the last value or price of the Contract at the time of the Trade and/or any other relevant market information obtained or presented to the Company.

(ii) Once a fair market value has been calculated, a twenty (20) cent range will be added above and below such fair market value to determine the "No Cancellation Range".

(iii) If a Trade has been executed within the No Cancellation Range, the executed Trade will stand. If a Trade has not been executed within the No Cancellation Range, Kalshi shall have the authority, but not the obligation, to cancel or adjust such Trade. Once a Trade is determined to be canceled or adjusted, Kalshi will: 1. notify all interested parties to the Trade as soon as practicable following such determination; and 2. publish its decision on the Kalshi website.

(iv) When determining the value for a trade adjustment, Kalshi may in its discretion consider subsequent trades by the counterparties in order to ensure that the operation of this Rule is fair and equitable. Members shall be accountable to remit funds as necessary to effectuate any trade cancelation or adjustment under the Rule.

(v) The decisions of Kalshi regarding fair market value of the Contract, the No Cancellation Range, the cancellation of a Trade, or any other determination hereunder shall be final and not subject to appeal.

(d) Erroneous trades between Self-Clearing Members of Kalshi who are signatories to an active market maker agreement with Kalshi, or who have been granted access to an advanced tier of Kalshi's API, may, but need not, qualify as an "extraordinary circumstance" if, in Kalshi's sole discretion: (i) the erroneous trades were unmistakably and demonstrably made as a result of a Trader's automated trading system malfunction; (ii) such malfunction was despite reasonable safeguards, disaster recovery measures, and/or back-up capabilities; and (iii) the circumstances of any request for review do not indicate any attempt to game or manipulate the fair operation of this Rule.

## RULE 5.12 INVALIDATION OF ORDERS AND TRADES UPON SUSPENSION OR REVOCATION OF FCM STATUS

(a) Upon suspension or revocation of an FCM or IB by Kalshi, any open Order on the Market for such FCM's FCM Customers or IB's IB Customers shall be canceled by Kalshi.

(b) Upon suspension or revocation of an FCM or IB by Kalshi, any trade subsequently executed on the Market for such FCM's FCM Customers or IB's IB Customers shall be invalid. Kalshi shall cancel any transaction pursuant to this Rule by entering a counter Transaction onto the Market at the price at which the canceled Transaction was effected.

## RULE 5.13 RECORDKEEPING OF FCM CUSTOMERS' ORDERS

FCMs shall maintain an electronic record of all FCM Customers' Orders received by the FCM, and all order, trade and expiration confirmations received by the FCM regarding its FCM Customers' accounts.

## RULE 5.14 RECORDKEEPING OF IB CUSTOMERS' ORDERS

IBs shall maintain an electronic record of all IB Customers' Orders received by the IB, and all order, trade and expiration confirmations received by the IB regarding its IB Customers' accounts.

## RULE 5.15 VIEWING THE MARKET AND EXECUTED ORDERS

Kalshi will, at all times, allow its Members to view the current best bid and offer on the Platform, the open interest, the trade volume, as well as the depth of the order book up to the fifth level of prices. FCMs will, at all times, allow their FCM Customers to view the current best bid and offer on the Platform, the open interest, the trade volume, as well as the depth of the order book up to the fifth level of prices. IBs will, at all times, allow their IB Customers to view the current best bid and offer on the Platform, the open interest, the trade volume, as well as the depth of the order book up to the fifth level of prices.

## RULE 5.16 HOURS FOR TRADING CONTRACTS

Trading shall be available at all times outside of any maintenance windows, which may be announced from time to time.

## RULE 5.17 PROHIBITED TRANSACTIONS AND ACTIVITIES

Except as otherwise permitted by these rules:

(a) Members are prohibited from entering Orders on the Platform if there are insufficient funds or Contracts in the Member's Account to satisfy such Orders if they are executed. Kalshi may, in its discretion, take such action against a Member if the circumstances warrant, subject to Rule 9.2(f) and Rule 9.6.

(b) No Person shall enter into or attempt to enter into any non-competitive Trade on the Platform, including any accommodation Trade or any Trade that has been directly or indirectly prearranged except as allowed under these Rules. For example, a Trader may not agree in advance with another

Trader that one of the Traders will enter an Order and the other Trader will attempt to trade against that Order by timing the submission of orders or otherwise.

(c) No Person shall enter into or attempt to enter into any Trade on the Platform that:

    a. Does not result in a change in beneficial ownership;
    b. Is designed to unnaturally inflate trading volume;
    c. In any way attempts to circumvent the Platform's order processing, trade ordering, trade execution systems, or otherwise to circumvent exposure of the order to open and competitive bidding on the Platform; or
    d. That has some other illegitimate purpose.

(d) No Person shall enter into any Trade designed or used to cause any price for a Contract other than a true and bona fide price to be reported, registered, or recorded by the Platform.

(e) No Person shall trade in, transfer, assign, or otherwise dispose of Contracts other than as provided for in these Rules.

(f) No Person shall enter into or agree to transfer or transfer the benefit of any position in any Contract to another person other than through a transaction executed through the Platform.

(g) (1) No Person shall trade for a Person other than itself, unless so authorized under these Rules.

(2) No Member may deposit funds or allow funds to be deposited into their Kalshi Account unless the Member has the legal right to deposit those funds into their Kalshi Account.

(3) The Company may deposit funds into a Member's Kalshi Account, including but not limited to, in the event of an order cancellation, trade cancellation, expiration value adjustment, ledger adjustment, refund of wire transfer fees, or incentive program.

(h) No Person shall engage in any activity that presents a risk of harm to Kalshi, its Participants, or the public.

(i) No Person shall engage in any activity that adversely affects the integrity of the Platform or its underlying systems.

(j) No Person subject to arbitration under these rules shall fail to abide by an arbitration decision or award handed down under Chapter 10 of these Rules.

54

(k) No Person shall intentionally provide misleading, erroneous, or fraudulent information to Kalshi on a Member Application or otherwise.

(l) No Person shall create a false appearance of a partnership, agency, employment or affiliate relationship with Kalshi and no Person shall unlawfully solicit Customer Funds for deposit at Kalshi.

(m) No Person may operate or solicit in any capacity that may require registration with the CFTC without being properly registered.

(n) No Person shall engage in any activity that is intended to, or has the effect of, manipulating the market in violation of Sections 6(c) and 9(a)(2) of the CEA and no Person shall engage in any other activity that would violate the CEA or the Commission's Regulations.

(o) No FCM or IB shall enter any bids, offers or transactions on the Platform if it knows or should know that it is subject to early warning reporting requirements under Commission Regulation 1.12, is subject to a proceeding in bankruptcy or is otherwise unable to pay its obligations as they become due, without the prior written approval of Kalshi.

(p) No FCM shall knowingly carry an account for any employee of Kalshi without Kalshi's prior written consent, nor shall any FCM or IB enter any order or effect any transactions for such an account with respect to any Kalshi contracts.

(q) No Person shall engage in conduct or practices inconsistent with just and equitable principles of trade or conduct or practices detrimental to the best interests of the Exchange and its Participants.

(r) No FCM or IB that receives an Order to buy or sell a Contract for execution on Kalshi shall directly or indirectly guarantee the execution of the Order or any of its terms, including quantity or price. An FCM or IB may only report to an FCM Customer or IB Customer a Trade that has been executed or reported on Kalshi.

(s) No FCM or IB shall engage in any manipulative or disruptive trading practices prohibited by the Act or by the Commission pursuant to Commission regulation, including but not limited to any trading activity intended to accomplish a "money pass", "wash trade" or "front-running" as such terms are defined by the Commission and any regulations promulgated thereunder.

(t) No FCM or IB shall enter an Order to buy or sell a Contract for their own account or any account in which they have a proprietary interest when the FCM Member or IB has in hand an Order to buy or sell the same Contract for a FCM Customer or IB Customer at the same price or at the market price.

(u) No Member shall deposit funds into its Kalshi Account from an account which does not hold sufficient funds at the time of deposit, and at the time the deposit is presented by Kalshi for payment.

(v) No Member shall make a false representation to a third party regarding any deposit made into that Member's Kalshi account which would result in a chargeback or stop payment of funds to the Member Account.

(w) No Member shall allow its Member Account balance to become negative by any means. In the event that a Member's settlement account balance becomes negative, the Member must immediately deposit additional funds to correct the deficiency. Any Member whose settlement account carries a negative balance for 30 days or more is subject to summary termination of membership. Kalshi may, in its discretion, take such other action against a Member if the circumstances warrant, subject to Rule 9.2(f) and Rule 9.6.

(x) No Member shall engage in conduct or practices inconsistent with just and equitable principles of trade or conduct or practices detrimental to the best interests of the Company.

(y) If a Trader is an Insider that has access to material non-public information that is the subject of an Underlying of any Contract or that has the ability to exert any influence on the subject of an Underlying of any Contract, that Trader is prohibited from attempting to enter into any trade or entering into any trade, either directly or indirectly, on the market in such Contracts. An "Insider" means any person who has access to or is in a position to have access to material nonpublic information before such information is made publicly available. A Trader who is an employee or affiliate of a Source Agency for any Contract is prohibited from attempting to enter into any trade or entering into any trade, either directly or indirectly, on the market in such Contracts.

(z) If a Trader is a decision maker, either directly or indirectly, or has any influence, either directly or indirectly, no matter the scale and importance of the influence, on the outcome of the Underlying (event) of any Contract, that Trader is prohibited from attempting to enter into any trade or entering into any trade, either directly or indirectly, on the market in such Contracts.

(aa) No Person shall engage in any activity that constitutes fraudulent or abusive trading, including but not limited to violating bids or offers, demonstrating intentional or reckless disregard for the orderly execution of transactions during the closing period, or spoofing.

(bb) No Person shall engage in any trading activity intended to accomplish a "money pass", "wash trade" or "front-running" as such terms are defined by the Commission and any regulations promulgated thereunder.

(cc) No Person shall, directly or indirectly, intentionally or recklessly:

    a. Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

    b. Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or

    c. Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any Person.

### RULE 5.18 POSITION ACCOUNTABILITY

(a) Kalshi imposes Position Accountability Levels on all Contracts as specified in each contract's Terms and Conditions, except for those contracts where Kalshi imposes a Position Limit under Rule 5.15.

(b) Any Participant who exceeds a Position Accountability Level is required to provide to Kalshi's Compliance staff all information regarding its position that Kalshi's Compliance staff deems necessary.

(c) A Participant whose position exceeds the position accountability level must refrain from increasing the size of their position or reduce the size of their position in a timely fashion if instructed to do so by Kalshi. If a Participant fails to reduce a position as instructed by Kalshi's Compliance staff, Kalshi shall have the authority to liquidate the applicable position to a level below the Position Accountability Level or a limit imposed on the Participant under this paragraph.

(d) Violations of the requirements in this Rule, including the requirement to provide information to Kalshi's Compliance staff, may result in disciplinary action in accordance with Chapter 9 of these rules.

### RULE 5.19 POSITION LIMITS

(a) Kalshi may impose Position Limits on all Contracts, which will be specified in each contract's Terms and Conditions. Any Participant who exceeds a Position Limit shall be deemed in violation of this Rule. In addition, any Participant entering bids or offers, if accepted, which would cause that Participant to exceed the applicable Position Limit shall be in violation of this rule. As described in Chapter 4, a Market Maker is expressly excluded from this Rule with respect to contracts that are part of a market maker program and the market maker is subject to the obligations described in Chapter 4.

(b) If a Trader fails to reduce any position in a manner and time as directed by Kalshi, Kalshi shall have the authority to liquidate the applicable position to a level below the defined Position Limit stipulated under the relevant Contract in Chapter 13 of these Rules.

(c) In addition to the restrictions and requirements imposed in this Section, the first violation of a Position Limit by a Trader may result in a letter of warning to be issued by the Kalshi Compliance Department to the Trader or the initiation of proceedings in accordance with Chapter 9 of these rules.

(d) In addition to the restrictions and requirements placed in this Section, any subsequent violation of a Position Limit by a Trader within 12 months after a violation that resulted in a letter of warning, will result in the initiation of proceedings in accordance with Chapter 9 of these Rules.

(e) Kalshi has imposed Reportable Position Levels or Position Limits on each contract which will be communicated to FCMs. At a regular cadence, FCM Members must report the name, and any additional known KYC information requested by the Exchange, of all FCM Customers who hold any position which exceeds a Reportable Level. This information may be used by Kalshi's compliance staff to conduct surveillance.

(f) Position limits shall apply to

    a. All positions in accounts for which any Person by power of attorney or otherwise, directly or indirectly holds positions or controls trading; and

    b. Positions held by two or more Persons acting pursuant to an express or implied agreement or understanding the same as if the positions were held by, or the trading of the position were done by, a single Person.

(g) Kalshi may exempt an FCM from Position Limits set by the Exchange only to the extent necessary for the FCM's orderly carrying of its FCM Customers' accounts.

(h) In no instance may a Trader's position exceed any applicable limit established by the CFTC.

# CHAPTER 6 CLEARING AND SETTLING CONTRACT TRADES, SETTLEMENT, AND WITHDRAWAL REQUESTS

## RULE 6.1 CLEARANCE

(a) Clearing House shall serve as the clearing party to all orders matched pursuant to Chapter 5.

(b) All Trader positions are fully cash collateralized, and no Member can take positions that would lead to an exposure that exceeds the funds deposited in the relevant Member Account. For Traders that are FCM Customers, the relevant Member Account is the FCM's FCM Customer Account.

(c) Upon the successful matching of orders pursuant to Chapter 5, the Clearing House shall immediately, through the process of novation, be substituted as, and assume the position of, seller to the Trader buying and buyer to the Trader selling the relevant contract. Upon such substitution, the buying and selling Traders shall be released from their obligations to each other, and such Trader shall be deemed to have bought the contracts from or sold the contracts to Clearing House, as the case may be, and Clearing House shall have all the rights and be subject to all the liabilities of such Trader with respect to such transaction. Such substitution shall be effective in law for all purposes.

(d) If a trade is rejected for clearing by Clearing House for any reason, such trade is void *ab initio*.

(e) In the event of any conflict or inconsistency between these Rules and the Clearing House Rules with respect to any Participant's responsibilities or obligations under the Clearing House Rules, the Clearing House Rules shall prevail. As stated in Chapter 3 all Participants are bound by the Clearing House Rules.

### RULE 6.2 SETTLING CONTRACT TRADES

Kalshi will maintain, on its system, a record of Member balances and Contracts. The Clearing House, will also maintain a Member Account, which will reflect funds used by Members to buy and sell Contracts. Kalshi may also maintain a "proprietary account," which will be credited with all fees debited from Member Accounts due to trades and Settlements.

### RULE 6.3 SETTLEMENT

(a) For a Binary Contract, when a Contract expires and has a Payout Criterion that encompasses the Expiration Value of the Underlying, such Contract will pay the Settlement Value for such Contracts (e.g. $1.00) to the holders of long positions in such Contracts. Conversely, when a Contract expires and has a Payout Criterion that does NOT encompass the Expiration Value of the Underlying, such Contract will pay the Settlement Value for such Contracts (e.g. $1.00) to the holders of short positions in such Contracts. The terms and conditions of a Binary Contract may include specific settlement rules that will control the settlement of that Binary Contract.

(b) For a Scalar Contract, when a Contract expires, the Payout Criterion will determine the proportion of the Settlement Value to be distributed to holders of long and short positions. For example, if the Settlement Value is $1.00, and the Payout Criterion dictates that "Expiration Values below 25 will pay $0.10 to long positions and $0.90 to short positions," and the Expiration Value is 24, then long positionholders will receive $0.10 and short positionholders will receive $0.90. The terms and

conditions of a Scalar Contract may include specific settlement rules that will control the settlement of that Scalar Contract.

(c) To settle a Contract (or in anticipation of the settlement of a Contract), Kalshi has sole discretion to interpret a Contract's Terms and Conditions. If, when a Contract expires, it cannot be determined whether the Expiration Value of the Underlying is within the scope of the Payout Criterion, or if it cannot be determined from the Payout Criterion what proportion of the Settlement Value should be distributed to long and short positions, Kalshi will determine the payouts to the holders of long and short positions in such Contracts. This includes, but is not limited to, circumstances where the Underlying cannot be measured and this contingency is not explicitly addressed in the Contract terms. To determine the payouts in these circumstances, Kalshi may implement the following methodologies:

    a. If available, Kalshi may use the last traded price of the Contract to determine the payout (ex. a contract that last traded at $0.10 for the long side and $0.90 for the short side would pay out $0.10 to holders of long positions and $0.90 to the holders of short positions).

    b. If a last traded price is not available, or if Kalshi determines at its sole discretion that the most recent last traded price does not represent a fair settlement, the Outcome Review Committee will be responsible for making a binding determination of fair allocation. Determinations of the Outcome Review Committee are final and not subject to review.

(d) On the Settlement Date, Kalshi will cause and/or instruct Clearing House to:

    a. Notify all Members whether they or their FCM Customers will receive a Settlement Value (or proportion thereof) pursuant to Rule 6.3,

    b. Settle the Contracts by debiting the settlement account in an amount no less than the appropriate Settlement Value (or proportion thereof) for such Contracts multiplied by the total number of outstanding in-the-money Contract positions and credit those funds to the applicable Member Accounts of the Traders holding the in-the-money Contract positions following any applicable holding period. For Self-Clearing Members, that will be the Self-Clearing Member's Account. For FCM Customers, that will be the FCM's FCM Customer Account.

    c. Delete all Contracts from Members' accounts, as applicable.

(e) Before Settlement, Kalshi may, at its sole discretion initiate the Market Outcome Review Process as provided in Rule 7.1.

(f) Kalshi will distribute notification electronically at Settlement to all Members who hold the relevant Contract, and to FCMs with regard to FCM Customers who hold the relevant Contract.

**RULE 6.4 SETTLING MEMBER WITHDRAWAL REQUESTS**

(a) Within one business day of when a Member requests to withdraw funds from its Kalshi account, Kalshi will transmit such request to Clearing House in electronic batch mode transmission. Clearing House will then cause and/or instruct its settlement bank to process the request and distribute funds to the account at the U.S. Financial Institution or Foreign Bank in the case of a non-United States resident Member who does not have an account at a US Financial Institution, registered with Kalshi by the Member (unless the Member has unsatisfied outstanding obligations on Kalshi, in which case such balances may be retained as necessary to satisfy such obligations or until the Member otherwise satisfies such obligations, or unless such transfer would otherwise violate applicable law or regulation as determined by either Kalshi or Clearing House in its sole discretion). The Member should refer to Kalshi's website under the Fee Schedule for all fees and costs associated with withdrawal of funds from the Member's Kalshi account. The processing of a Member withdrawal request may be suspended or denied if circumstances, whether present or imminent, would make the request impossible or impractical to fulfill, cause a potential risk of harm to Kalshi, its Members, or Clearing House, violate applicable law or regulation as determined by either Kalshi or Clearing House in its sole discretion, or if, either Kalshi or Clearing House determine in its sole discretion that the funds are relevant to a pending investigation.

(b) Members are responsible for providing accurate account numbers to allow Kalshi and Clearing House to effect transfers to Members.

# CHAPTER 7 MARKET OUTCOME REVIEW AND ADJUSTMENTS NECESSITATED BY MATERIAL CHANGES IN THE UNDERLYING

## RULE 7.1 THE MARKET OUTCOME REVIEW PROCESS

(a) Before Settlement, Kalshi may initiate the Market Outcome Review Process, at its sole discretion and by taking into account several factors including any circumstances that may have a material impact on the reliability or transparency of the Underlying related to the Contract. Under this process, the Outcome Review Committee will determine the final Market Outcome. Settlement will occur on the date that the Outcome Review Committee reaches a determination on the Contract's final Market Outcome. If the Market Outcome Review Process is initiated, Kalshi will post on its website that the Contract's Market Outcome is under review.

(b) The Outcome Review Committee shall review all relevant evidence and determine a final Market Outcome within a 24 hour period after the Outcome Review Process is initiated.

(c) The Outcome Review Committee has full discretion in resolving the Market Outcome Review Process. The determinations made by the Outcome Review Committee are final.

**RULE 7.2 CONTRACT MODIFICATIONS**

(a) If any event or any circumstance which may have a material impact on the reliability or transparency of a Contract's Source Agency or the Underlying related to the Contract arises, including but not limited to if a Contract's Source Agency is unavailable or undergoes significant modifications, Kalshi retains the authority to designate a new Source Agency and Underlying for that Contract and to change any associated contract specifications after the first day of trading. That new Source Agency and Underlying would be objective and verifiable. Kalshi would announce any such decision on its website.

(b) If any circumstance arises which would prevent the Expiration Value from being determined accurately at Expiration, including but not limited to the rescheduling or cancellation of an event whose outcome governs a Contract's Underlying, or delayed data from a source, Kalshi shall have the power to adjust the Expiration Date and the timing of Expiration of the Contract, which will be announced on its website.

(c) If an Expiration Value that is included in the Payout Criterion of a Contract occurs prior to the Expiration Date of a Contract, Kalshi may adjust the Expiration Date and the timing of Expiration to be earlier, which will be announced on its website.

(d) If the Exchange modifies the Expiration Date in accordance with this Rule, the Contract's last trading date and time are adjusted accordingly to occur no later than Expiration.

# CHAPTER 8 INVESTMENT OF PARTICIPANT FUNDS

## RULE 8.1 INVESTMENT OF PARTICIPANT FUNDS

(a) Participant funds on deposit with Clearing House will be held in the manner set forth in Clearing House Rulebook.

(b) Participant funds may be invested by Clearing House to the extent allowed in the Clearing House Rulebook.

(c) Klear may pay interest to Members' accounts at a floating rate to be determined by Clearing House on funds in Participant's accounts in excess of an amount to be determined by Clearing House. For FCM Customer's funds, the distribution of such interest, if any, will be governed by the agreements between the clearinghouse and the FCM, and between the FCM and the FCM Customer.

(d) Clearing House will retain all profit from investment of Participant funds not paid to Members.

# CHAPTER 9 DISCIPLINE AND RULE ENFORCEMENT

## RULE 9.1 MONITORING THE MARKET

(a) Kalshi's trading system will record and store for a period of not less than 5 years in a searchable, read-only database a record of all data entered into the Kalshi trading system, including the Participant's identity and the information in Rule 5.4. Such records shall be maintained in a readily available manner during the first two years. Kalshi shall conduct market surveillance and trade practice surveillance using this data with programs designed to alert Kalshi when potentially unusual trading activity takes place. Kalshi, through the compliance department, will initiate review and, where appropriate, investigate such unusual trading activity. The compliance department will also investigate any time it has other reason to believe that inappropriate activity of any sort is taking place on the Kalshi Platform or its website.

(b) All Persons within Kalshi's jurisdiction are subject to this Chapter 9 if they are alleged to have violated, to have aided and abetted a violation, to be violating, or to be about to violate, any Rule or any provision of Applicable Law for which Kalshi possesses disciplinary jurisdiction.

## RULE 9.2 INVESTIGATIONS, HEARINGS, AND APPEALS

(a) The Compliance Department shall investigate unusual trading activity or other activity that the Compliance Department has reasonable cause to believe could constitute a violation of these Rules, or upon the receipt of a request from Commission staff. Kalshi's Disciplinary Panel adjudicates findings by the compliance department that are disputed by Participants. The Disciplinary Panel and the Compliance Department may not communicate regarding the merits of a matter brought before the hearing officer without informing the Participant who is the subject of the communication of its substance and allowing the Participant an opportunity to respond. The Compliance Department and Disciplinary Panel may compel testimony, subpoena documents, and require statements under oath from any Participant. Disciplinary Panel, Compliance Department staff and other employees or agents of Kalshi working under their supervision, may not be a Participant or trade, directly or indirectly, in any commodity interest traded on or subject to the rules of any registered contract market. Members of the Disciplinary Panel shall be individuals that do not have a direct interest (financial, personal or otherwise) in the matter, but in no event may be members of the Compliance Department or any Persons involved in adjudicating any other stage of the same proceeding. Likewise, members of the Disciplinary Panel may not operate under the direction or control of any person or persons with trading privileges on the Platform and may not include persons whose interests conflict with their enforcement duties.

(b) The Compliance Department shall investigate unusual trading activity or other activity that the Compliance Department has reasonable cause to believe could constitute a violation of these Rules, and shall enforce the Rules and prosecute possible Rule violations within Kalshi's disciplinary

jurisdiction. The Compliance Department will endeavor to complete any investigation within twelve months, unless there exists significant reason to extend it beyond such period. Upon the conclusion of a material investigation, the Compliance Department will draft a document detailing the facts that led to the opening of the investigation, the facts that were found during the investigation, and the Compliance Department's analysis and conclusion. If the Compliance Department concludes that there is reasonable cause to believe a Participant has materially violated Kalshi's Rules or other applicable statutes or regulations, the Compliance Department will submit to the Participant whose activity is the subject of the investigation a notice of charges, by electronic mail to that Participant's last known email address, that will include:

    a. The reason the investigation was initiated;
    b. The charges or a summary of the charges, including the rule or rules alleged to have been violated;
    c. The response, if any, or a summary of the response;
    d. A summary of the investigation conducted;
    e. Findings of fact and the Compliance Department's conclusions as to each charge, including which of these Rules the Participant or its authorized representative violated, if any;
    f. A summary of the Participant's, and any relevant authorized representative's, disciplinary history, if any;
    g. The period within which a hearing on the charges may be requested; and
    h. The penalty, if any, proposed by the Company.

(c) If the subject of any charge under this Chapter is an FCM Customer, the Compliance Department shall obtain the FCM Customer's email address from the FCM.

(d) If the subject of any charge under this Chapter is an IB Customer, the Compliance Department shall obtain the IB Customer's email address from the IB.

(e) If the Compliance Department initiates an investigation in which any Affiliate of Kalshi is a subject, the Chief Compliance Officer shall notify the Commission's Division of Market Oversight of that fact. At the conclusion of any such investigation, the Chief Compliance Officer shall provide the Commission's Division of Market Oversight with a copy of the documentation specified in paragraph (b) of this Rule.

(f) The Participant whose activity is the subject of the investigation may contest the Compliance Department's findings by forwarding a response to those findings by electronic mail to the Compliance Department within 15 days. The Participant has a right to examine all relevant books, documents, or other evidence in the possession or under the control of Kalshi, except that Kalshi may withhold from inspection any documents that:

      a. Are privileged or that constitute attorney work product;
      b. Were prepared by any employee of Kalshi but which will not be offered in evidence in the disciplinary proceedings;
      c. May disclose a technique or guideline used in examinations, investigations, or enforcement proceedings; or
      d. Disclose the identity of a confidential source.

The Participant's response must contain a detailed response to the findings and conclusions as to each charge and any other information the Participant thinks is relevant. The outcome of settlement negotiations between the Participant and the Compliance Department may include, but is not limited to, a letter of warning.

(g) The Participant whose activity is the subject of the investigation may request to enter settlement negotiations by forwarding a response to the Compliance Department's findings by electronic mail to the Compliance Department within 15 days. The Participant has a right to examine all relevant books, documents, or other evidence in the possession or under the control of Kalshi, except that Kalshi may withhold from inspection any documents that:

      a. Are privileged or that constitute attorney work product;
      b. Were prepared by any employee of Kalshi but which will not be offered in evidence in the disciplinary proceedings;
      c. May disclose a technique or guideline used in examinations, investigations, or enforcement proceedings; or
      d. Disclose the identity of a confidential source. The Participant's response must contain a response to each charge and the Participant may provide any other information the Participant thinks is relevant. The outcome of settlement negotiations between the Participant and the Compliance Department may include, but is not limited to, a letter of warning.

(h) If the findings of the Compliance Department are not contested by the Participant, Kalshi will deem those findings admitted by the Participant, the findings of fact and the Compliance Department's conclusions as to each charge shall become final and the Compliance Department shall impose the penalty (if any) proposed by the Compliance Department. The Participant will be notified of the imposition of any penalty and sent a copy of the notice of disciplinary action by electronic mail to that Participant's last known email address.

(i) If the findings of the Compliance Department are contested, the Compliance Department's report and the Participant's response will be submitted to the Disciplinary Panel. The hearing officer may not have a financial, personal or other direct interest in the matter under consideration.

a. The Disciplinary Panel will conduct a hearing with the Compliance Department and the Participant within 20 business days of receipt of the Participant's response contesting the compliance officer's finding and/or proposed sanction which the parties may attend telephonically. However, the Participant is entitled to appear personally at the hearing, to cross-examine any persons appearing as witnesses at the hearing, and to call witnesses and to present such evidence as may be relevant to the charges.

b. The formal rules of evidence shall not apply, but the hearing must be fair. The Compliance Department shall present its case on all charges and sanctions that are the subject of the hearing.

c. Prior to the hearing, the parties may (but need not) submit proposed findings, briefs, and exhibits (including affidavits), and during the hearing the parties may present witnesses. Persons within Kalshi's jurisdiction who are called as witnesses must participate in the hearing and produce evidence, as requested. Kalshi shall likewise make reasonable efforts to secure the presence of all other persons called as witnesses whose testimony would be relevant to the matter at hand.

d. Within 20 business days after that hearing, the hearing officer will issue findings, which will be delivered to the Participant by electronic mail to the Participant's last known email address. The findings of the hearing officer will contain the following information:

1. A summary of the charges and any answer to the charges;
2. A summary of the evidence received;
3. Findings and conclusions with respect to each charge;
4. An indication of each specific rule that the member was found to have violated;
5. A declaration of any penalty to be imposed on the Participant as the result of the findings and conclusions;
6. The effective date and duration of that penalty; and
7. A statement that the Participant has the right to appeal any adverse decision by the panel to the Appeals Committee and must do so within 15 days.

e. The panel's decision shall be final on the date it is signed by the hearing Disciplinary Panel. The hearing officer's decision shall become the final decision of Kalshi after the appeal period has lapsed.

f. The hearing will be recorded, and all information submitted by the parties (including the Compliance Department's report and the Participant's response) as well as the recording of the hearing, will be preserved by the Compliance Department, along with the hearing officer's findings, as the record of the proceedings (the "hearing record"). For the avoidance of doubt, if the Participant has requested a hearing, a copy of the hearing shall be made and become a part of the record of the proceeding. The record shall be one that is capable of being accurately transcribed; however, it need not be transcribed unless the transcript is requested by Commission staff or the Participant, the decision is appealed pursuant to the Rules of Kalshi, or is reviewed by the Commission pursuant to section 8c of the Act. In all other instances a summary record of a hearing is permitted.

(j) Either the Participant or the Compliance Department may appeal the decision of the panel within 15 days by filing an appeal by electronic mail with the Appeals Committee and forwarding a copy to the other parties to the appeal. Any penalties will be stayed pending appeal unless the hearing officer determines that a stay pending appeal would likely be detrimental to the Company, other Participants, or the public. The Appeals Committee will review the hearing record and any information submitted by the Compliance Department and the Participant on appeal and issue its decision, which shall be final on the date of such issuance. The Participant shall be notified of the decision by electronic mail to the Participant's last known email address. The hearing record, any information submitted on appeal, and the Appeals Committee's decision shall be preserved as the record on appeal. The decision will contain the information listed in paragraph (f) of this Rule, outside of (f)(5), as well as:

　　a. A statement that any person aggrieved by the action may have a right to appeal the action pursuant to Part 9 of the Commission's Regulations, within 30 days of service; and

　　b. A statement that any person aggrieved by the action may petition the Commission for a stay pursuant to Part 9 of the Commission's Regulations, within 10 days of service.

(k) No Kalshi officer or employee shall interfere with or attempt to influence the process or resolution of any disciplinary action, except to the extent provided under these Rules with respect to a proceeding in which a Person is a member of the relevant Disciplinary Panel or Appeals Committee.

### RULE 9.3 SETTLEMENT OF INVESTIGATIONS

(a) Kalshi may enter into settlements with any Participant who is the subject of an investigation. The Participant may initiate a settlement offer. Any settlement offer shall be forwarded to a Kalshi disciplinary panel with a recommendation by the Compliance Department that the proposed settlement be accepted, rejected, or modified. A settlement offer may be withdrawn at any time before it is accepted by the hearing officer.

(b) The panel may accept or reject a proposed settlement, and the decision of the relevant panel will be final. In addition, the panel may propose a modification to the proposed settlement for consideration by the Participant or its authorized representative and the Compliance Department.

(c) Any settlement under this Rule will be written and will state:

　　a. The charges or a summary of the charges;

　　b. The response, if any, or a summary of the response;

　　c. A summary of the investigation conducted;

　　d. Findings and conclusions as to each charge, including each act the person charged was found to have committed or omitted, be committing or omitting, or be about to commit or omit, and each of these Rules that such act or practice violated, is violating, or is about to violate; and

     e.   Any penalty imposed and the penalty's effective date.

(d) Failed settlement negotiations, or withdrawn settlement offers, will not prejudice a Member or otherwise affect subsequent procedures in the rule enforcement process.

### RULE 9.4 NOTICE AND PUBLICATION OF DISCIPLINARY ACTION

(a) Kalshi will provide to the Person charged, notice of the disciplinary action, appeal determination, or settlement in which sanctions are imposed, no later than two business days after it becomes final in accordance with the provisions of Commission Regulation 38.710.

(b) Kalshi will make public notice of the disciplinary action by posting on its website, in accordance with Commission Regulation 9.13, the information required by Commission Regulation 9.11. The disciplinary action will be considered final on the date the notice of the disciplinary action is published on the Kalshi website.

### RULE 9.5 PENALTIES

(a) As a result of a disciplinary proceeding or as part of a settlement, Kalshi may impose one or more of the following penalties, commensurate with the violation committed, in consideration of any relevant disciplinary history, and including full restitution where Participant harm is identified and where such restitution can be reasonably determined:

(b) A letter of warning, censure, or reprimand (although no more than one such letter may be issued to the same Person found to have committed the same rule violation within a rolling twelve-month period);

(c) A fine or penalty fee for each violation of any Rule or Applicable Law sufficient to deter recidivism, which Kalshi may cause and/or instruct Clearing House to deduct from the relevant Member Account balance (which, for FCM Customers, is the FCM's FCM Customer Account. In such an event, the FCM may debit the FCM Customer's account with the FCM a corresponding amount);

(d) Disgorgement of profits that resulted from the violation of any Rule, plus the cost of damages to any unoffending counterparties, which Kalshi may cause and/or instruct Clearing House to deduct from the relevant Member Account balance (which, for FCM Customers, is the FCM's FCM Customer Account. In such an event, the FCM may debit the FCM Customer's account with the FCM a corresponding amount);

(e) Suspension of Trading or Member status or privileges for a specified period, including partial suspension of such privileges (for example, suspension of trading privileges in particular types of Contracts or of placement of certain types of orders);

(f) Revocation of Trading or Member status or privileges, including partial revocation of such privileges (for example, revocation of trading privileges in particular types of Contracts or of placement of certain types of orders); and

(g) Interest, at the prime rate, as reported by the Wall Street Journal as of the date the amount becomes due, on any outstanding account balance, monetary fine, penalty fee, or disgorgement amount owed, compounded monthly and calculated from the date when the amount was first due and payable.

### RULE 9.6 SUMMARY SUSPENSION

(a) Kalshi may summarily suspend or restrict Trading or Member privileges if the Chief Compliance Officer believes suspension or restriction is necessary to protect the markets, Kalshi, the public, or other Members.

(b) Whenever practicable Kalshi will notify the Traders or Members whose privileges are to be summarily suspended by electronic mail before the action is taken. If prior notice is not practicable, the Member shall be served with notice by electronic mail at the earliest opportunity. This notice shall:

    a. State the action taken or to be taken;
    b. Briefly state the reasons for the action;
    c. State the time and date when the action became or becomes effective and its duration; and
    d. State that any Member aggrieved by the action may petition the Commission for a stay of the effective date of the action pending a hearing pursuant to Part 9 of the Commission's Regulations, within 10 days of service.

For FCM Customers, notice to the FCM Customer will be deemed given by sending notice to the FCM. For IB Customers, notice to the IB Customer will be deemed given by sending notice to the IB.

(c) The Traders or Member whose privileges are to be summarily suspended shall be given an opportunity for appeal under the procedures outlined in Rule 9.2(f) of these Rules. The decision affirming, modifying, or reversing the summary suspension shall be furnished by electronic mail to the suspended Trader or Member and the Commission no later than one business day after it is issued. The decision shall contain:

    a. A description of the action taken and the reasons for the action;
    b. A brief summary of the evidence received during the appeal process;
    c. Findings and conclusions;
    d. A determination as to whether the summary action that was taken should be affirmed, modified, or reversed;

    e.   A declaration of any action to be taken against the suspended Member as the result of that determination;

    f.   The effective date and duration of that action;

    g.   A determination of the appropriate relief based on the findings and conclusions;

    h.   A statement that any person aggrieved by the action may have a right to appeal the action pursuant to Part 9 of the Commission's Regulations, within 30 days of service; and

    i.   A statement that any person aggrieved by the action may petition the Commission for a stay pursuant to Part 9 of the Commission's Regulations, within 10 days of service.

For FCM Customers, notice to the FCM Customer will be deemed given by sending notice to the FCM. For IB Customers, notice to the IB Customer will be deemed given by sending notice to the IB.

### RULE 9.7 REPRESENTATION BY COUNSEL

A Trader or Member who is a subject of any proceedings under this Chapter has the right to retain and be represented by counsel or any other representative of its choosing in all succeeding stages of the disciplinary process, except any member of Kalshi's Board of Directors or Disciplinary Panel, any employee of Kalshi, or any person substantially related to the underlying investigations, such as material witness or respondent.

### RULE 9.8 REPORTING VIOLATIONS TO THE COMMISSION

(a)  Whenever Kalshi suspends, expels, fines or otherwise disciplines or denies any Person access to the Platform, Kalshi will make the disclosures required by Commission Regulations.

(b)  Kalshi will submit to the Commission a schedule listing all those Company Rule violations which constitute disciplinary offenses as defined in paragraph (a)(6)(i) of CFTC Regulation 1.63 and, to the extent necessary to reflect revisions, will submit an amended schedule within thirty days of the end of each calendar year. Kalshi will maintain the schedule required by this section and post the schedule on Kalshi's website.

(c)  Kalshi will submit to the Commission within thirty days of the end of each calendar year a certified list of any Persons who have been removed from any Disciplinary Panel, the Board or any Company committee pursuant to these Rules or Applicable Law during the prior year.

(d)  Whenever Kalshi finds by final decision that a Person has violated a Rule or otherwise committed a disciplinary offense and such finding makes such person ineligible to serve on Kalshi's Disciplinary Panels, Company committees, or the Board, Kalshi shall inform the Commission of such finding and the length of the ineligibility in a notice it is required to provide to the Commission pursuant to either CEA Section 17(h)(1) or CFTC Regulation 9.11.

# CHAPTER 10 - ARBITRATION

## RULE 10.1 GENERAL

(a) If so elected by a Participant, any Claim by the Participant against a Participant (including any related counterclaims) shall be settled by arbitration in accordance with this Chapter 10.

(b) A Claim brought pursuant to this Rule 10.1 shall be adjudicated by qualified arbitrators appointed in accordance with Rule 10.5 below.

(c) Persons to a dispute resolved in accordance with this Chapter 10 shall have the right to retain and be represented by legal counsel or any other representation of its choosing, except any Director or a member of the Disciplinary Panel or person substantially related to the underlying investigations, such as material witnesses or respondents during such proceedings. Persons to a dispute resolved in accordance with this Chapter 10 shall be responsible for their own costs, expenses and attorneys' fees incurred in connection with the dispute. Notwithstanding the foregoing, the Person that prevails shall be entitled to recover from the other party all costs, expenses and reasonable attorneys' fees incurred in any arbitration arising out of or relating to this Chapter 10, and in any legal action or administrative proceeding to enforce any arbitration award or relief.

(d) Any award or relief granted by the arbitrators hereunder shall be final and binding on the parties hereto and may be enforced by any court of competent jurisdiction.

(e) For purposes of this Chapter 10, the term "Claim" means any dispute which arises out of any Kalshi Contract, which dispute does not require for adjudication the presence of essential witnesses or third parties over whom Kalshi does not have jurisdiction or who are otherwise not available. The term "Claim" does not include disputes arising from underlying commodity transactions which are not a part of, or directly connected with, any Kalshi Contract.

## RULE 10.2 FAIR AND EQUITABLE ARBITRATION PROCEDURES

(a) A Participant desiring to initiate an arbitration as provided in Rule 10.1 shall file a notice of arbitration (a "Notice") within two years from the time the Claim arose. The Notice must set forth the name and address of the party or parties against whom the Claim is being asserted, the nature and substance of the Claim, the relief requested, and the factual and legal bases alleged to underlie such relief.

(b) The Notice shall be accompanied by a non-refundable check payable to Kalshi in payment of the arbitration fee. The amount of the fee shall be (i) $500 for a Claim requesting relief totaling less than $5,000 in the aggregate or (ii) $1,000 for a Claim requesting relief totaling $5,000 or more in the

aggregate.

(c) Upon receipt, Kalshi shall promptly convene an arbitration panel in accordance with Rule 10.5. Kalshi shall deliver a copy of the Notice to each other party and to the arbitration panel.

(d) Within 20 days following the delivery of the Notice, each respondent shall file a written response (a "Response") with Kalshi, with a copy to the claimant, setting forth its or his position and any counterclaims, as applicable. If the Response sets forth one or more counterclaims, the claimant shall file within 20 days a written reply to such counterclaims with the Company, with a copy to the claimant.

(e) Once each party has had an opportunity to respond to the Claim and all counterclaims, the arbitration panel shall promptly schedule a hearing. Notwithstanding, Claims requesting relief totaling less than $5,000 in the aggregate may, in the interests of efficiency and economy, be resolved without hearing.

(f) The chairman of the arbitration panel shall preside over the hearing and shall make such determinations on the relevancy and procedure as will promote a fair and expeditious adjudication.

(g) The arbitration panel shall consider all relevant, probative testimony and documents submitted by the parties. The arbitration panel shall not be bound by the formal rules of evidence.

(h) The final decision of the panel shall be by majority vote of the arbitrators, as applicable.

(i) Within 60 days after the termination of the hearing, the arbitration panel shall render its final decision in writing and deliver a copy thereof either in person or by first-class mail to each of the parties. The arbitration panel may grant any remedy or relief which it deems just and equitable, including, without limitation, the awarding of interest and the arbitration fee.

(j) The final decision of the arbitration panel shall not be subject to appeal within Kalshi.

(k) No verbatim record shall be made of the proceedings, unless requested by a party who shall bear the cost of such record.

### RULE 10.3 WITHDRAWAL OF ARBITRATION CLAIM

Any Notice may be withdrawn at any time before the Response is filed in accordance with this Chapter 10. If a Response has been filed, any withdrawal shall require consent of the party against which the Claim is asserted.

### RULE 10.4 PENALTIES

(a) Any failure on the part of a Participant to arbitrate a dispute subject to this Chapter 10, or the commencement by any such Participant of a suit in any court prior to arbitrating a case that is required to be arbitrated pursuant to this Chapter 10, violates these Rules and shall subject such Participant to disciplinary proceedings pursuant to Chapter 9.

(b) The Chief Compliance Officer, in consultation with the Regulatory Oversight Committee, may summarily suspend, pursuant to Rule 9.6, a Participant that fails to timely satisfy an arbitration award rendered in any arbitration pursuant to this Chapter 10.

### RULE 10.5 ARBITRATION PANEL

(a) On an as-needed basis, Kalshi shall convene an arbitration panel to adjudicate an arbitration claim under this Chapter 10. For a Claim requesting relief totaling less than $5,000 in the aggregate, the arbitration panel shall consist of one individual. For a Claim requesting relief totaling $5,000 or more in the aggregate, the arbitration panel shall consist of three individuals.

(b) Members of the arbitration panel shall be individuals that do not have a direct interest (financial, personal or otherwise) in the matter.

(c) Any member of the arbitration panel may disqualify himself for any reason he deems appropriate.

(d) Each member of the arbitration panel shall conduct himself in a manner consistent with the American Bar Association/American Arbitration Association's "Code of Ethics for Arbitrators in Commercial Disputes," which Kalshi hereby adopts as its own code of ethics for arbitrators.

(e) Each member of the arbitration panel must have no less than five years' experience in the financial services industry, and no less than one arbitrator must have no less than five years' experience in the commodity futures or swap industry.

(f) In the event that members of the arbitration panel do not satisfy the requirements of this Rule 10.5, then the Regulatory Oversight Committee may substitute a new member for the arbitration panel or act as the arbitration panel, to the extent that the substituted member or the Regulatory Oversight Committee, as the case may be, does not have a direct interest (financial, personal or otherwise) in the matter.

# CHAPTER 11 LIMITATION OF LIABILITY; TIME PERIOD IN WHICH TO BRING ACTIONS; GOVERNING LAW

### RULE 11.1 PROPERTY RIGHTS

(a) Each Participant hereby acknowledges and agrees that KalshiEX LLC owns and shall retain all right, title and interest in and to Kalshi, all components thereof, including, without limitation, all related applications, all application programming interfaces, user interface designs, software and source code and any and all intellectual property rights therein, including, without limitation, all registered or unregistered, as applicable, copyright, trademark, service mark, trade secret, trade name, data or database rights, design rights, moral rights, inventions, whether or not capable of protection by patent or registration, rights in commercial information or technical information, including know-how, research and development data and manufacturing methods, patent, and other intellectual property and ownership rights, including applications for the grant of any of the same, in or to Kalshi and all other related proprietary rights of Kalshi and/or any of its Affiliates (together, with any and all enhancements, corrections, bug fixes, updates and other modifications to any of the foregoing and any and all data or information of any kind, other than Proprietary Data and Personal Information, transmitted by means of any of the foregoing, including, without limitation, market data, the "Proprietary Information"). Each Participant further acknowledges and agrees that the Proprietary Information is the exclusive, valuable and confidential property of Kalshi. Each Participant acknowledges and agrees that it shall not reverse engineer, copy, bug fix, correct, update, transfer, reproduce, republish, broadcast, create derivative works based on or otherwise modify, in any manner, all or any part of Kalshi or the Proprietary Information. Each Participant further agrees to keep the Proprietary Information confidential and not to transfer, rent, lease, copy, loan, sell or distribute, directly or indirectly, all or any portion of the Company or any Proprietary Information.

(b) Subject to the provisions of this Rule 11.1, each Participant hereby acknowledges and agrees that Kalshi is the owner of all rights, title and interest in and to all intellectual property and other proprietary rights (including all copyright, patent, trademark or trade secret rights) in market data, and all derivative works based thereon, and further agree not to distribute, create derivative works based on, or otherwise use or commercially exploit market data and any such derivative works, provided that Participants may use market data for their own internal business purposes. Without limiting the generality of the foregoing, Participants may not distribute, sell or retransmit market data exchange to any third party.

(c) Notwithstanding any other provision of this Rule 11.1, each Participant retains such rights as it may enjoy under applicable law with respect to market data solely in the form such market data was submitted to Kalshi by such Participant.

(d) Transaction data shall not be disclosed publicly other than on an aggregated or anonymous basis, or in a manner that does not directly or indirectly identify any Participant who has submitted such data.

(e) Kalshi shall not condition access to the Company upon a Participant's consent to the use of Proprietary Data and Personal Information for business or marketing purposes. Proprietary Data and Personal Information may not be used by the Company for business and marketing purposes unless the Participant has clearly consented to the use of Proprietary Data and Personal Information in such manner. Kalshi, where necessary, for regulatory purposes, may share Proprietary Data and Personal Information with one or more Designated Contract Markets or Derivative Clearing Organizations. Nothing in this Rule shall preclude Kalshi from disclosing Proprietary Data and Personal Information:

    a.   As required by Applicable Law or legal process;

    b.   As Kalshi may deem necessary or appropriate in connection with any litigation affecting the Company;

    c.   To any Company Representative authorized to receive such information within the scope of his or her duties;

    d.   To a third party performing regulatory or operational services for the Company, provided that such party has executed a confidentiality and non-disclosure agreement in a form approved by Kalshi;

    e.   To a duly authorized representative of the CFTC lawfully requesting Proprietary Data and Personal Information;

    f.   In a manner in which a Participant consents to such disclosure;

    g.   Pursuant to the terms of an information-sharing agreement; or

    h.   As permitted by CFTC Regulations.

## RULE 11.2 SIGNATURES

Rather than rely on an original signature, Kalshi may elect to rely on a signature that is transmitted, recorded or stored by any electronic, optical, or similar means (including but not limited to telecopy, imaging, photocopying, electronic mail, electronic data interchange, telegram, or telex) as if it were (and the signature shall be considered and have the same effect as) a valid and binding original.

## RULE 11.3 LIMITATION OF LIABILITY

(a) EACH PARTICIPANT OF KALSHI AGREES THAT NEITHER KALSHI NOR ITS OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, AND/OR SOFTWARE, HARDWARE, AND SERVICE PROVIDERS (COLLECTIVELY REFERRED TO AS "KALSHI PARTIES") SHALL HAVE ANY RESPONSIBILITY FOR COMPLIANCE BY PARTICIPANT WITH ANY LAW OR REGULATION GOVERNING PARTICIPANT'S CONDUCT. MOREOVER, EACH PARTICIPANT OF KALSHI ALSO AGREES THAT NO KALSHI PARTY SHALL BE LIABLE IN ANY MANNER WHATSOEVER FOR ANY LOSS OR DAMAGE SUSTAINED BY PARTICIPANT,

INCLUDING ANY CONSEQUENTIAL LOSS, LOSS OF PROFIT OR LOSS OF TRADING OPPORTUNITY, AS A RESULT OF ANY ACTUAL OR PROPOSED TRANSACTIONS OR AS A DIRECT OR INDIRECT RESULT OF ANY SERVICES PROVIDED BY KALSHI PARTIES (INCLUDING, WITHOUT LIMITATION, ANY FAILURE IN KALSHI'S SYSTEMS OR ANY INACCURATE INFORMATION PROVIDED BY A KALSHI PARTY), UNLESS THE RELEVANT KALSHI PARTY IS DETERMINED BY FINAL RULING OF AN ARBITRATION PROCEEDING TO HAVE ACTED OR FAILED TO ACT IN A MANNER THAT IS GROSSLY NEGLIGENT, RECKLESS, OR FRAUDULENT. FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS RULE IS INTENDED TO LIMIT THE LIABILITY OF ANY PERSON AS MAY BE PROVIDED IN THE CEA, THE REGULATIONS OF THE COMMISSION, OR BY ACTS OF WILLFUL OR WANTON MISCONDUCT OR FRAUD.

(b) EACH PARTICIPANT OF KALSHI AGREES THAT IT MAY NOT BRING ANY ACTION AGAINST A KALSHI PARTY UNLESS IT BRINGS SUCH ACTION WITHIN 2 YEARS OF THE FIRST OCCURRENCE OR LACK OF OCCURRENCE OF THE ACT OR OMISSION COMPLAINED OF.

(c) EACH PARTICIPANT OF KALSHI AGREES THAT ANY ACTION IT BRINGS AGAINST A KALSHI PARTY WILL BE GOVERNED BY NEW YORK LAW, WITHOUT REGARD TO STATUTES, PRECEDENT, LEGAL DOCTRINE, OR CONTRACTUAL PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.

(d) EACH PARTICIPANT OF KALSHI AGREES THAT ANY ACTION IT BRINGS AGAINST A KALSHI PARTY OR AGAINST ANOTHER KALSHI MEMBER WILL BE RESOLVED BY BINDING ARBITRATION, IN ACCORDANCE WITH THE RULES OF THIS CHAPTER AND OTHER RULES OF KALSHI, IF APPLICABLE.

# CHAPTER 12 COMMISSION REGULATIONS THAT HAVE BEEN ADAPTED TO BE PART OF THE RULES

The following Rules are adaptations of regulations adopted by the Commission. They must be followed by Participants and Kalshi itself, and any violation of these regulations will be a punishable violation of the Rules.

### RULE 12.1 ACTIVITIES OF SELF-REGULATORY ORGANIZATION EMPLOYEES AND GOVERNING MEMBERS WHO POSSESS MATERIAL, NON-PUBLIC INFORMATION (ADAPTED FROM COMMISSION REGULATION 1.59)

(a) Employees of self-regulatory organizations; Self-regulatory organization rules.

    a. Employees of Kalshi are prohibited from:
       1. Trading, directly or indirectly, in any commodity interest traded on Kalshi;
       2. Trading directly or indirectly in any commodity interest traded on or cleared by a contract market, swap execution facility, or clearing organization other than Kalshi and in any commodity interest traded on or cleared by a linked exchange if the employee has access to material non-public information concerning such commodity interest.
    b. Employees of Kalshi are prohibited from disclosing to any other person any material, non-public information which such employee obtains as a result of his or her employment at Kalshi where such employee has or should have a reasonable expectation that the information disclosed may assist another person in trading any commodity interest; however, this Rule does not prohibit disclosures made in the course of an employee's duties, or disclosures made to another self-regulatory organization, linked exchange, court of competent jurisdiction or representative of any agency or department of the federal or state government acting in his or her official capacity.

(b) Members of Kalshi's governing boards and committees and Kalshi consultants; Kalshi's Rules. No member of Kalshi's governing board or of a committee of Kalshi and no Kalshi consultant shall use or disclose, for any purpose other than the performance of such person's official duties as a governing board or committee member or consultant, material, non-public information obtained as a result of such person's official duties.

(c) Prohibited conduct.

    a. No person who is an employee of, a member of the governing board of, or a member of any committee of, or a consultant of Kalshi shall:
       1. Trade for such person's own account, or for or on behalf of any other account, in any commodity interest on the basis of any material, non-public information obtained through special access related to the performance of such person's official duties as an employee, board or committee member, or consultant; or
       2. Disclose for any purpose inconsistent with the performance of such person's official duties as an employee, board or committee member, or consultant, any material, non-public information obtained through special access related to the performance of such duties.
    b. No person shall trade for such person's own account, or for or on behalf of any account, in any commodity interest, on the basis of any material, non-public information that such person knows was obtained in violation of paragraph (c)(1) from an employee of, a member of the governing board of, a member of any committee, or a consultant of a self-regulatory organization.

### RULE 12.2 SERVICE ON SELF-REGULATORY ORGANIZATION GOVERNING BOARDS OR COMMITTEES BY PERSONS WITH DISCIPLINARY HISTORIES (ADAPTED FROM COMMISSION REGULATION 1.63)

(a) A person is ineligible to serve on any Kalshi disciplinary committees, arbitration panels, oversight panels or governing board if that person:

    a. Was found within the prior three years by a final decision of a self-regulatory organization, an administrative law judge, a court of competent jurisdiction or the Commission to have committed a disciplinary offense;

    b. Entered into a settlement agreement within the prior three years in which any of the findings or, in the absence of such findings, any of the acts charged included a disciplinary offense;

    c. Currently is suspended from trading on any contract market, is suspended or expelled from membership with any self-regulatory organization, is serving any sentence of probation or owes any portion of a fine imposed pursuant to either:

        1. A finding by a final decision of a self-regulatory organization, an administrative law judge, a court of competent jurisdiction or the Commission that such person committed a disciplinary offense; or

        2. A settlement agreement in which any of the findings or, in the absence of such findings, any of the acts charged included a disciplinary offense.

    d. Currently is subject to an agreement with the Commission or any self-regulatory organization not to apply for registration with the Commission or membership in any self-regulatory organization;

    e. Currently is subject to or has had imposed on him within the prior three years a Commission registration revocation or suspension in any capacity for any reason, or has been convicted within the prior three years of any of the felonies listed in section 8a(2)(D) (ii) through (iv) of the Act; or

    f. Currently is subject to a denial, suspension or disqualification from serving on the disciplinary committee, arbitration panel or governing board of any self-regulatory organization as that term is defined in section 3(a)(26) of the Securities Exchange Act of 1934.

(b) No person may serve on a disciplinary committee, arbitration panel, oversight panel or governing board of Kalshi if such person is subject to any of the conditions listed in paragraphs (a)(1)-(6) of this Rule.

(c) Kalshi shall submit to the Commission a schedule listing all those rule violations which constitute disciplinary offenses and to the extent necessary to reflect revisions shall submit an amended schedule within 30 days of the end of each calendar year. Kalshi must maintain and keep current the schedule

required by this section, post the schedule in a public place designed to provide notice to members and otherwise ensure its availability to the general public.

(d) Kalshi shall submit to the Commission within 30 days of the end of each calendar year a certified list of any persons who have been removed from its disciplinary committees, arbitration panels, oversight panels or governing board pursuant to the requirements of this regulation during the prior year.

(e) Whenever Kalshi finds by final decision that a person has committed a disciplinary offense and such finding makes such person ineligible to serve on that self-regulatory organization's disciplinary committees, arbitration panels, oversight panels or governing board, Kalshi shall inform the Commission of that finding and the length of the ineligibility in any notice it is required to provide to the Commission pursuant to either section 17(h)(1) of the Act or Commission Regulation 9.11.

## RULE 12.3 VOTING BY INTERESTED MEMBERS OF SELF-REGULATORY ORGANIZATION GOVERNING BOARDS AND VARIOUS COMMITTEES (ADAPTED FROM COMMISSION REGULATION 1.69)

(a) Kalshi shall maintain in effect Rules that have been submitted to the Commission pursuant to Section 5c(c) of the Act and Part 40 of the Commission Regulations to address the avoidance of conflicts of interest in the execution of its self-regulatory functions. Such Rules provide for the following:

   a. Relationship with named party in interest —
   1. Nature of relationship. A member of Kalshi's governing board, disciplinary committee or oversight panel must abstain from such body's deliberations and voting on any matter involving a named party in interest where such member:
   (A Is a named party in interest;
   (B) Is an employer, employee, or fellow employee of a named party in interest;
   (C) Is associated with a named party in interest through a "broker association" as defined in Commission Regulation 156.1;
   (D) Has any other significant, ongoing business relationship with a named party in interest, not including relationships limited to executing futures or option transactions opposite of each other or to clearing futures or option transactions through the same clearing member; or
   (E) Has a family relationship with a named party in interest.
   2. Disclosure of relationship. Prior to the consideration of any matter involving a named party in interest, each member of a Kalshi governing board, disciplinary committee or oversight panel must disclose to the appropriate Kalshi staff whether he or she has one of the relationships listed in paragraph (a)(1)(i) of this Rule with a named party in interest.
   3. Procedure for determination. Kalshi must establish procedures for determining whether any member of its governing board, disciplinary committees or oversight committees is subject to a conflicts restriction in any matter involving a named party in interest. Taking into

consideration the exigency of the committee action, such determinations should be based upon:

b. Financial interest in a significant action —

    1. Nature of interest. A member of a Kalshi governing board, disciplinary committee or oversight panel must abstain from such body's deliberations and voting on any significant action if the member knowingly has a direct and substantial financial interest in the result of the vote based upon either exchange or non-exchange positions that could reasonably be expected to be affected by the action.

    2. Disclosure of interest. Prior to the consideration of any significant action, each member of a Kalshi governing board, disciplinary committee or oversight panel must disclose to the appropriate Kalshi staff the position information referred to in paragraph (a)(2)(iii) of this Rule that is known to him or her. This requirement does not apply to members who choose to abstain from deliberations and voting on the subject of significant action.

    3. Procedure for determination. Kalshi must establish procedures for determining whether any member of its governing board, disciplinary committees or oversight committees is subject to a conflict restriction under this section in any significant action. Such determination must include a review of:

        (A) Gross positions held at Kalshi in the member's personal accounts or "controlled accounts," as defined in Commission Regulation 1.3(j);

        (B) Gross positions held at Kalshi in proprietary accounts, as defined in Commission Regulation 1.17(b)(3), at the member's affiliated firm;

        (C) Gross positions held at Kalshi in accounts in which the member is a principal, as defined in Commission Regulation 3.1(a);

        (D) Net positions held at Kalshi in "customer" accounts, as defined in Commission Regulation 1.17(b)(2), at the member's affiliated firm; and

        (E) Any other types of positions, whether maintained at Kalshi or elsewhere, held in the member's personal accounts or the proprietary accounts of the member's affiliated firm that the self-regulatory organization reasonably expects could be affected by the significant action.

    4. Bases for determination. Taking into consideration the exigency of the significant action, such determinations should be based upon:

        (A) The most recent large trader reports and clearing records available to Kalshi;

        (B) Information provided by the member with respect to positions pursuant to paragraph (a)(2)(ii) of this Rule; and

        (C) Any other source of information that is held by and reasonably available to Kalshi.

c. Participation in deliberations.

    1. Under the Rules required by this section, a Kalshi governing board, disciplinary committee or oversight panel may permit a member to participate in deliberations prior to a vote on a significant action for which he or she otherwise would be required to abstain,

pursuant to paragraph (a)(2) of this Rule, if such participation would be consistent with the public interest and the member recuses himself or herself from voting on such action.

2. In making a determination as to whether to permit a member to participate in deliberations on a significant action for which he or she otherwise would be required to abstain, the deliberating body shall consider the following factors:
   (A) Whether the member's participation in deliberations is necessary for the deliberating body to achieve a quorum in the matter; and
   (B) Whether the member has unique or special expertise, knowledge or experience in the matter under consideration.

3. Prior to any determination pursuant to paragraph (a)(3)(i) of this Rule, the deliberating body must fully consider the position information which is the basis for the member's direct and substantial financial interest in the result of a vote on a significant action pursuant to paragraph (a)(2) of this Rule.

d. Documentation of determination. Kalshi's governing boards, disciplinary committees, and oversight panels must reflect in their minutes or otherwise document that the conflicts determination procedures required by this section have been followed. Such records also must include:

1. The names of all members who attended the meeting in person or who otherwise were present by electronic means;

2. The name of any member who voluntarily recused himself or herself or was required to abstain from deliberations and/or voting on a matter and the reason for the recusal or abstention, if stated; and

3. Information on the position information that was reviewed for each member.

# CHAPTER 13 TERMS OF CONTRACTS TRADED ON KALSHI

The following Rules set forth the terms of the Contracts traded on Kalshi. You should not trade any Contract unless you are certain that you completely understand and accept its terms. Additional information with respect to each Contract can be found on the homepage for the specific Contract.

## RULE 13.1 TERMS THAT ARE UNIFORM ACROSS CONTRACTS

There are certain terms that are uniform across Contracts.

(a) The minimum unit of trading is one Contract.

(b) All Contract prices are quoted in U.S. Dollars and cents per Contract.

(c) The minimum quote increment for each Contract is $0.01 per Contract unless otherwise specified in a Contract's terms and conditions.

(d) All Market Outcomes will be posted on Kalshi's website no later than 11:59 pm ET on the day that such Market Outcomes are determined. If the Market Outcome Review Process is initiated under Rule 7.1, the final Market Outcome will be posted on Kalshi's website no later than 11:59 pm ET on the day that the Outcome Review Committee reaches a determination on the Contract's final Market Outcome.

(e) Halted Markets – In the event that any market irregularities are declared by the Chief Regulatory Officer or Chief Executive Officer of Kalshi, or to prevent or reduce the potential risk of price distortions or market disruptions, a market may be paused or halted for trading, and the Commission will be notified, if required, pursuant to Commission Regulations. An explanation will be posted on the Kalshi Notices section of the website within a reasonable amount of time but no later than 24 hours after the initiation of the halt.

(f) Discretion to Refrain from Listing Contracts – Kalshi may, in its discretion, temporarily refrain from the listing of any Contract due to the unavailability of the Underlying upon which the Contract is based, or any other condition Kalshi determines may be detrimental to the listing of the Contract.

(g) Contract Modifications – Specifications shall be fixed as of the first day of trading of a Contract, except as provided in Rule 2.8 and Rule 7.2 of these Rules or as set forth in Rules specific to a Contract. If any U.S. governmental agency or body issues an order, ruling, directive or law that conflicts with the requirements of these Rules, such order, ruling, directive or law shall be construed to take precedence and become part of these Rules, and all open and new Contracts shall be subject to such government orders.

(h) Any change in instructions, order, ruling, directive, or law issued or enacted by any court or agency of the Federal Government of the United States that conflicts with the Rules contained in this Rulebook shall take precedence, immediately become a part of these Rules, and be effective for all currently traded and newly listed Contracts.

# EXHIBIT B

# ACHIEVEMENTS

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the official result of <achievement>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are the league or association governing <achievement>, the Associated Press, ESPN, The Wall Street Journal, and Fox Sports.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next time frame (e.g. year) that will have an official result of <achievement>.

**<participant>:** <participant> refers to a group, an entity, individuals, or individual participating in a sport.

**<achievement>:** <achievement> refers to a given sports achievement, and will include a specified year and/or other distinguishing information, e.g., "The 2025 winner of the French Open Men's Singles Championship".

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that it is reported that the first official final result of <achievement> event is <participant>.

- If the final event necessary for determining the result of <achievement> is postponed past its scheduled date (e.g. because of severe weather or other emergencies), then the market will remain open and will resolve after the sooner of (1) the results of <achievement> being reported or (2) two years following the originally scheduled date of the final event necessary for determining for the result of <achievement>.
- If the final event necessary for determining the result of <achievement> is suspended during, then the market will remain open and will resolve after the sooner of (1) the result of <achievement> being reported or (2) two years following the originally scheduled date of the final event necessary for determining the result of <achievement>.
- If the final event necessary for determining the result of <achievement> is moved to be earlier than its originally scheduled date, then the market will remain open and will resolve after the result is reported.
- If the final event necessary for determining the result of <achievement> is cancelled outright (or the <achievement> is canceled or will not have an official result, or will have an official result of nothing or no one) before the final event necessary for determining the result of <achievement> is concluded, then the markets for eligible participants (not disqualified or eliminated) will resolve so "Yes" holders receive $1/[the number of eligible participants (not disqualified or eliminated) remaining for which there is a strike listed] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout.
- If multiple participants are reported as the result of <achievement>, then the markets for those participants will resolve so "Yes" holders receive $1/[the number of participants declared as the result of <achievement>] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout. For example, if two participants are the reported result of <achievement> , both "Yes" and "No" holders for each of those participants shall receive $0.50 per share.
- If <participant> forfeits, withdraws from consideration, or takes any other official action

directly to be removed from being able to achieve <achievement>, such as withdrawing from the events that will determine the result of <achievement>,, the market will resolve to "No" for <participant>.

- If the official result of <achievement> is reported even though the event or events necessary for determining the result of <achievement> were truncated or ended early, the market will resolve based on that reported result.
- If <participant> is disqualified from consideration for <achievement> before the Contract expires – even if the final event necessary to determine the result for <achievement> has concluded– the market for <participant> will resolve to "No". If this causes another participant to be  reported as the official result of <achievement>, the contract will resolve on the basis of which participant is reported as the official result of <achievement>.
- Note that any revisions after Expiration will not be considered. Therefore if <participant> or any other participant is disqualified, removed, or the official result of <achievement> is reversed or changed in any way after the Contract expires, that will not impact the market's resolution.
- If <participant> was eliminated from contention for being the result of <achievement>, including by being eliminated from the event or events that are necessary to determine the official result of <achievement>, then the market will resolve "No". A <participant>is eliminated from contention when it is reported so by the Source Agency.
- If <participant> is eliminated from contention for being the result of <achievement>, including by being eliminated from the event or events that are necessary to determine the official result of <achievement>, and the market for <participant> resolved to No, but then <participant> is re-entered into contention (for example, because a team that was originally in contention was disqualified), then a new market with the same <participant> may be created. The original market will remain resolved to No.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after the day the achievement event has an official final result. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot

be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

## APPENDIX B  – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the league, association, or organization(s) governing <event>.
  - For college leagues/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current and former players/coaches/staff of the specific teams in <event> rather than the league/association as a whole (e.g., if the Division I Gonzaga Men's Basketball Team is playing in <event>, this prohibition will restrict trades by  current/former players of that team, rather than all current/former players/coaches/staff in any NCAA sport);
- Paid employees of the league and league participants;
- Ultimate beneficial owners of teams and the league; and
- household members and immediate family of all above.

These prohibitions apply to the appropriate values of <event>. For example, former players of the National Football League are not necessarily prohibited from trading on iterations of the Contract related to the National Basketball Association, unless they are part of any other group listed for that league.