**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 2:25-cv-1165 |
| *Plaintiff*, | |
| vs. | |
| MATTHEW T. SCHULER, in his official capacity as Executive Director of the Ohio Casino Control Commission; THOMAS J. STICKRATH, in his official capacity as Chair and Commissioner of the Ohio Casino Control Commission; SHEETAL BAJORIA, in her official capacity as Commissioner of the Ohio Casino Control Commission; SCOTT BORGEMENKE, in his official capacity as Commissioner of the Ohio Casino Control Commission; KEITH CHENEY, in his official capacity as Commissioner of the Ohio Casino Control Commission; PENELOPE CUNNINGHAM, in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission; CHRISTOPHER SMITHERMAN, in his official capacity as Commissioner of the Ohio Casino Control Commission; TRIFFON CALLOS, in his official capacity as Commissioner of the Ohio Casino Control Commission; OHIO CASINO CONTROL COMMISSION; and DAVE YOST, in his official capacity as Attorney General of Ohio, | **PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>**(ORAL ARGUMENT REQUESTED)** |
| *Defendant*s. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 3

    A.    The Exclusive Federal Scheme for Regulating Futures Markets on
Regulated Exchanges. .................................................................................. 3

    B.    Kalshi's Registration as a CFTC-Designated Contract Market Under
Federal Law. ................................................................................................. 6

    C.    The Ohio Regulatory Scheme for Gambling. ............................................. 7

    D.    The Casino Commission's Cease-and-Desist Letter to Kalshi and
Subsequent Threat to Kalshi's Business Partners. ..................................... 8

ARGUMENT ......................................................................................................... 9

    A.    Kalshi Is Likely to Succeed Because Ohio's Direct and Indirect Efforts to
Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its
Regulations. ............................................................................................... 10

        1.    Ohio Gambling Laws Are Field Preempted as Applied to Kalshi's
Event Contracts. ................................................................................ 10

        2.    Ohio Laws Are Conflict-Preempted as Applied to Kalshi. ..................... 15

        3.    Defendants May Not Punish Kalshi's Partners for Affiliating with
Kalshi. ............................................................................................... 18

    B.    Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction. ............ 21

    C.    The Balance of the Equities and Public Interest Favor a Preliminary
Injunction. .................................................................................................. 24

    D.    No Security—Or Only a *De Minimis* Security—Is Appropriate. ...................... 25

CONCLUSION ................................................................................................... 25

Plaintiff KalshiEX LLC ("Kalshi") moves this Court for a preliminary injunction against Defendants Matthew T. Schuler, Thomas J. Stickrath, Sheetal Bajoria, Scott Borgemenke, Keith Cheney, Penelope Cunningham, Triffon Callos, Ohio Casino Control Commission, and Dave Yost. This Motion is based upon the pleadings on file herein, including Plaintiff's Complaint, the memorandum of points and authorities contained in this document, all documents on file in this action including exhibits and declarations, and any further arguments presented.

## INTRODUCTION

The Ohio Casino Control Commission (the "Casino Commission") is unconstitutionally threatening to prohibit trading of event contracts on Kalshi's designated contract market, even though those contracts are federally authorized and Kalshi is overseen by the Commodity Futures Trading Commission ("CFTC")—the federal agency that Congress endowed with "exclusive jurisdiction" to regulate trading on exchanges like Kalshi. The Casino Commission's unlawful actions threaten irreparable harm to Kalshi in two respects: First, the Casino Commission has directly threatened Kalshi with criminal prosecution unless Kalshi accedes to the Casino Commission's unconstitutional demands. Second, the Casino Commission has attempted to cut off Kalshi's ability to operate by threatening to revoke the licenses of anyone who partners with Kalshi, even if the partnership occurs entirely in other states. Both threats violate the Commodity Exchange Act ("CEA") and subject Kalshi to irreparable harm that requires preliminary relief.

Federal district courts in two other states have already entered preliminary injunctions in Kalshi's favor based on similar—but less egregious—threats. *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). On April 9, 2025, the U.S. District Court for the District of Nevada granted Kalshi a preliminary injunction to prevent Nevada gaming authorities from enforcing state law against Kalshi's event contracts. Chief Judge Gordon found that the CEA establishes a comprehensive federal framework for regulating commodity futures trading, and because Kalshi is a CFTC-designated contract market, Kalshi "is subject to the CFTC's exclusive jurisdiction and state law is field preempted."

*Hendrick*, 2025 WL 1073495, at *6.  Chief Judge Gordon further noted that other States—like Ohio—have sent Kalshi cease-and-desist letters, which "highlights the problem of allowing the States to regulate a national exchange."  *Id.* at *7.  Preventing the "difficulties" that would arise from many different states subjecting Kalshi to conflicting rules "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges."  *Id.*  Several weeks later, the U.S. District Court for the District of New Jersey agreed, reasoning that "at the very least field preemption applies" to prevent states from regulating trading on designated contract markets like Kalshi.  *Flaherty*, 2025 WL 1218313, at *6.

Much like the Nevada and New Jersey authorities, the Casino Commission has threatened Kalshi with criminal and civil penalties unless Kalshi halts access to event contracts for users in Ohio.  *See* Ex. 1 at 2-3.  And just as in Nevada and New Jersey, the Casino Commission is preempted from attempting to regulate trading on a federally regulated exchange.  Kalshi's entitlement to relief from Defendants here is even clearer, because the Casino Commission has not only threatened Kalshi directly but has also threatened anyone who partners with Kalshi—a gambit that no other state has tried but that others will surely replicate if this Court allows it.

Immediate action is required to avoid irreparable harm to Kalshi, its representatives, and its users.  The Casino Commission's cease-and-desist letter confronts Kalshi with a "Hobson's choice"—either face "civil and criminal liability" in Ohio, or "incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles."  *Hendrick*, 2025 WL 1073495, at *7.  Furthermore, the separate threats by the Casino Commission against any company that partners with Kalshi are already subjecting Kalshi to immediate irreparable harm by thwarting Kalshi's partnership arrangements during a critical period for Kalshi's growth.  Kalshi respectfully requests that this Court issue a preliminary injunction enjoining Defendants from enforcing preempted state law against Kalshi—either by directly threatening Kalshi or by indirectly threatening Kalshi's business partners.

***

2

Kalshi has sought to reach an accommodation with the Casino Commission, but has no other option but to seek judicial relief. The Casino Commission's cease-and-desist letter demands that Kalshi cease operating in Ohio or face criminal liability. In a letter sent to Kalshi on October 6, 2025, the Casino Commission refused to withdraw its threats and demanded that Kalshi "comply with the Cease-and-Desist Letter and to notify the Commission in writing of such compliance by no later than October 20, 2025." Ex. 8 at 1. Thus, absent judicial relief, Kalshi faces the prospect of criminal enforcement in Ohio in less than two weeks from the date of this filing.

Counsel for Kalshi has informed counsel for the Casino Commission and the Ohio Attorney General's Office of Kalshi's intent to file this suit and to seek preliminary relief. Counsel for Kalshi also requested that counsel for the Casino Commission forbear any enforcement against Kalshi pending this Court's consideration of Kalshi's motion for a preliminary injunction. Counsel for the Casino Commission agreed, thus making it unnecessary for Kalshi to seek an emergency temporary restraining order. Kalshi thus respectfully requests that this Court enter a preliminary injunction.

## **BACKGROUND**

### A. The Exclusive Federal Scheme for Regulating Futures Markets on Regulated Exchanges.

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024) ("*KalshiEX*"). Event contracts are a type of derivative contract—they are financial instruments that identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *Id.* at *2. Event contracts are typically traded on an exchange, and their value is determined by market forces. *Id.* This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions. *Id.* During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract

and may trade her contract in accordance with her desire to hedge her economic risk.  Compl. ¶¶ 30, 33.  The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates.  *See KalshiEX*, 2024 WL 4164694, at *2.  For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the area around his property within the 2025 calendar year.  *Id.* If a hurricane strikes, the property owner will receive the ultimate value of the contract and can thereby hedge risk by offsetting losses incurred due to the hurricane.  *Id.*

Congress passed the CEA in 1936 to regulate derivatives exchanges, but chose not to preempt state regulation of those exchanges.  In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees.  These amendments were designed to "[b]ring[] all futures trading under federal regulation."  *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 848 (1974) (hereinafter "Senate Hearings").  Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction."  *Hearings Before the House Comm. on Agriculture*, 93d Cong., 1st Sess., at 128 (1973).  Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction.  After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974).  The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies."  *Id.* at 23.  The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Conf. Rep. No. 93-1383 at 35.  As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned."  *Id.*

4

The CFTC's regulatory framework is extensive, comprehensive, and exclusive.  To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.3(a).  The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits.  17 C.F.R. § 38.3(a)(2).  The CFTC then reviews the application and renders a decision on the exchange's designation.  *Id.*

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

DCMs are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations.  Together, these provisions establish a comprehensive scheme for regulating DCMs.  *See Hendrick*, 2025 WL 1073495, at *3-4 (summarizing CFTC's regulatory scheme).

The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs.  A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The contracts are immediately effective unless and until the CFTC initiates review of any contract.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

5

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts. The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*; *see also* 17 C.F.R. § 40.11(a) (implementing Special Rule). The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest." *See KalshiEX*, 2024 WL 4164694, at *3 ("the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories). The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

**B. Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law.**

In 2020, the CFTC unanimously certified Kalshi as a DCM that offers event contracts, affirming that its platform complies with the CEA's regulatory requirements. *See KalshiEX*, 2024 WL 4164694, at *4. Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity. An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, *v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1151 (7th Cir. 1992).

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto, popular culture, sports, politics, and economics. Compl. ¶ 48. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the

market share for electric vehicles will be above 50% in 2030.  As relevant here, Kalshi also offers sports-event contracts.  Kalshi self-certified and listed sports-related contracts on its exchange on January 24, 2025, allowing users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Tournament.  *Id.* ¶ 49.  Kalshi's sports-event contracts were immediately effective upon self-certification and the CFTC has declined to review them.  *Id.*  Thus, Kalshi's sports-event contracts are legal under federal law.  *Id.*  While federal law requires the CFTC to prohibit contracts it considers "gaming" if it concludes those contracts are contrary to the public interest, the CFTC has declined to prohibit Kalshi's contracts.

Kalshi's sports-related contracts involve sporting events, but there are crucial differences between Kalshi's exchange and a sportsbook that justify the different regulatory models under which they function.  A financial exchange is an investment marketplace where traders enter into contracts with other traders—not with a casino or "house" that stacks the odds in its own favor.  Ex. 6, Declaration of Xavier Sottile ¶¶ 26-27.  For that reason, federal law as enforced by the CFTC focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide.  *See* 17 C.F.R. §§ 38.250, 38.152; *see Am. Agric. Movement*, 977 F.2d at 1156.

### C.  The Ohio Regulatory Scheme for Gambling.

The Ohio Casino Control Commission regulates gambling in the state of Ohio through a licensing regime.  Compl. ¶ 26.  It oversees licensing, regulating, investigating, and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming related vendors in Ohio.  *Id.*  As the state's gaming regulator, the Casino Commission has jurisdiction over all persons that participate in casino gaming.  *Id.*  Particularly relevant to the present dispute are Ohio's laws on gambling enterprises.  Ohio requires that any gambling enterprise that offers sports gaming—including wagers on sporting events—seek a license from the Casino Commission.  R.C. 3775.03(A).  Under Ohio law, a wager is defined as "risk[ing] a sum of money or thing of value on an uncertain occurrence."  R.C. § 3775.01(DD).  Ohio law only permits wagers to be made by individuals physically in the state.  R.C. §§

7

3775.11(A), 3775.12(A). Offering sports gaming in Ohio in a manner that violates the state's gaming laws constitutes a felony, exposing any violators to civil and criminal penalties. R.C. §§ 3775.99(B)(9), 2915.02, 3775.02.

### D. The Casino Commission's Cease-and-Desist Letter to Kalshi and Subsequent Threat to Kalshi's Business Partners.

On March 31, 2025, the Casino Commission sent a cease-and-desist letter to Kalshi's counsel, claiming that "offering 'event contracts' on sporting events to citizens located within the State of Ohio, without a sports gaming license" violated Ohio law. Ex. 1 at 2. The Casino Commission demanded that Kalshi cease and desist its operations in Ohio by April 14, 2025, or else be subject to "administrative, civil, or criminal sanctions pursuant" to Ohio gambling laws. *See* Ex. 1 at 3; *see also* R.C. chs. 2915, 3775. The Casino Commission also claims that Kalshi's website "constitutes a nuisance under Ohio law that is subject to abatement." Ex. 1 at 3; *see also* R.C. ch. 3767; R.C. § 3775.99(B)(9).

Kalshi responded to the Casino Commission's cease-and-desist letter on May 15, 2025, explaining that Kalshi is a federally regulated DCM "no different from the Chicago Mercantile Exchange, the Intercontinental Exchange, or other more established derivatives markets" and that the event contracts it offers are "federally regulated derivatives contracts," not "wagers based on house odds." Ex. 2 at 2–4. As the letter explained, Kalshi is subject to the extensive, comprehensive, and exclusive jurisdiction of the CFTC, and individual states are preempted from regulating the operation of DCMs. *Id.* at 7–8; 7 U.S.C. § 2(a)(1)(A). The letter also highlighted the "fundamental mismatch between how Ohio regulates sports gaming and how federal law regulates Kalshi's exchange." *Id.* at 10.

On August 19, 2025, the Casino Commission replied to Kalshi's letter by asking for responses to specific factfinding demands. Ex. 3. Then, in an attempt to circumvent the CEA's exclusive jurisdiction, on August 25—six days after sending Kalshi its August 19 letter—the Casino Commission sent a letter to sports gaming licensees operating in Ohio (the "Sports Gaming Licensee Letter"). This letter threatened to "take administrative action against any licensee" that

"decides to associate, coordinate, or otherwise partner directly or indirectly with entities offering or facilitating the offering of sporting event contracts in Ohio." Ex. 5 at 4–5. The letter clarified that its threat applied "even if a sports-gaming licensee in Ohio geofences or takes other actions to restrict Ohioans from accessing sporting event contracts" offered entirely "outside Ohio." *Id.* Thus, any Ohio licensee that partners with Kalshi not just in Ohio, but in any other state, threatens to lose their license. The Sports Gaming Licensee Letter has chilled the licensees' interest in engaging in business with Kalshi out of fear of retaliation by the Casino Commission. Ex. 7, Declaration of Sara Slane ¶¶ 9-14.

On September 18, 2025, Kalshi responded to the Casino Commission's August 19 letter, *see* Ex. 4 at 2, addressing both the factfinding demands that the Commission had issued in that letter, and the Sports Gaming Licensee Letter. The Casino Commission responded with a letter of its own on October 6, 2025. In that letter, the Casino Commission stated that it "is unpersuaded that Ohio law is preempted by federal law as Kalshi contends," and that if "Kalshi chooses to continue to offer unlicensed and unregulated sports gaming in the form of sporting event contracts within Ohio, Kalshi will be violating Ohio law." Ex. 8 at 1. The letter also declined to withdraw the Sports Gaming Licensee Letter. *Id.* at 2. The letter demanded that Kalshi comply with the cease-and-desist latter "by no later than October 20, 2025," and threatened that if Kalshi declines "the Commission will be forced to address such violation of law directly." *Id.* at 1–2.

## ARGUMENT

Kalshi is entitled to a preliminary injunction. Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016). To obtain a preliminary injunction, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). For the same reasons the Districts of Nevada and New Jersey recently granted Kalshi a preliminary injunction in similar cases, Kalshi meets each element of the inquiry.

**A. Kalshi Is Likely to Succeed Because Ohio's Direct and Indirect Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). Ohio's gambling and nuisance laws are no exception.

1. Ohio Gambling Laws Are Field Preempted as Applied to Kalshi's Event Contracts.

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *de la Cuesta*, 458 U.S. at 153 (quotation omitted). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express, implied, or conflict preemption"). "[T]he ultimate touchstone of pre-emption analysis" is the "purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting

*Hines*, 312 U.S. at 72). "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible." *Id.* (emphasis added).

Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation. As federal courts in New Jersey and Nevada have already held, the CEA clearly evidences Congress's intent to occupy the field of futures trading on CFTC-regulated exchanges. *Hendrick*, 2025 WL 1073495, at *6; *Flaherty*, 2025 WL 1218313, at *6. Every marker of congressional intent confirms that Congress has preempted the field.

<u>*Statutory Text*</u>: The text of the 1974 amendments to the CEA could hardly be clearer. Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts. Instead, Congress cabined federal preemption to contracts traded *on DCMs*. The statute preserves concurrent state regulation for commodities and futures contracts traded *outside of DCMs*. 7 U.S.C. § 2(a); § 16(e); H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (acknowledging that federal and state agencies may police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC.") (emphasis added). Thus, federal preemption of the Ohio law as to Kalshi does not call into question the state's regulation of casinos or other gambling establishments, none of which are DCMs.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction." 7 U.S.C. 2(a)(1)(A). Courts have easily found that statutes containing similar language preempt parallel state law regulation. *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001). District courts in Nevada and New Jersey recently granted Kalshi a preliminary injunction on the ground that the statute's "plain and unambiguous language

grants the CFTC exclusive jurisdiction" over contracts and swaps "that are traded or executed on exchanges that the CFTC has designated." *Hendrick*, 2025 WL 1073495, at *5; *see also Flaherty*, 2025 WL 1218313 at *6 (agreeing that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction").[1]

*Statutory Purpose*:  Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next. One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974). The Conference Report confirmed Congress's intent to preempt the field:  "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*."  H.R. Conf. Rep. No. 93-1383 at 35 (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  Writing for the Second Circuit, for example, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive-jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"); *see, e.g.*, *Hendrick*, 2025 WL 1073495, at *6.  The Casino Commission's effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

---

[1] A district court in Maryland reached a different conclusion, but Kalshi has appealed that decision to the Fourth Circuit.  *See KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *1 (D. Md. Aug. 1, 2025), appeal docketed No. 25-1892 (4th Cir.).

*Drafting history*: The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi. To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading. 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statement of Sen. Curtis); *see Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). And after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-93 (1982). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is yet further proof of Congress's intent to preempt parallel state regulation.

*Comprehensive regulatory scheme*: The comprehensive nature of the regulatory scheme Congress created for CFTC-authorized exchanges is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See Arizona*, 567 U.S. at 401; *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368-69 (1986).

As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)). An exchange may only offer futures contracts after undergoing an extensive review process and receiving the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100. Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction"

over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.* pt. 38. And Congress elected to allow DCMs to list contracts—including event contracts—by self-certifying that they comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). Congress then gave the CFTC the back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). Failure to abide by the CFTC's contract determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the CEA specifically authorizes the CFTC to reject certain event contracts deemed to be "contrary to the public interest" ***and*** "involv[ing]" certain types of activities. 7 U.S.C. § 7a-2(c)(5)(C)(i). The statute is not mandatory—the CFTC "may" reject a contract involving a listed activity ***or*** it may determine that such a contract would not be contrary to the public interest. *Id.* Congress thus left the decision about the public interest to one federal authority—not 50 separate states and the District of Columbia.

Congress dictated an enforcement role for states—but that role expressly *excludes* the right to enforce state laws against DCMs. The CEA authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the [CFTC] thereunder"—but a proviso to this provision allows states to enforce the CEA against parties "*other than a [designated] contract market.*" 7 U.S.C. § 13a-2(1) (emphasis added). Congress added this proviso because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, supra, at 708. Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e). In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside*

14

those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (emphasis added). This comprehensive regulatory scheme for regulating trading on licensed exchanges evinces a strong congressional intent to preempt the field.

Indeed, the Ohio legislature itself has recognized that federal law preempts the field. Prior to 1972, Ohio had a "bucket shop" law that criminalized entry into contracts that were "closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange" that did not contemplate actual delivery of the subject of the contract. G.C. § 13079; R.C. §§ 2915.20, 21 (1958). Ohio repealed that law in 1972 and amended Section 2915.02 to make clear that it does not "prohibit conduct in connection with gambling expressly permitted by law." § 2915.02(C) (effective 1972); § 2915.20 (repealed in 1972). The clear import of these amendments is that Ohio has no authority to regulate trading that federal law expressly permits—even if the state considers the trading to be a form of gambling.

2. Ohio Laws Are Conflict-Preempted as Applied to Kalshi.

Ohio's gambling laws are also conflict-preempted as applied to Kalshi because it would be "impossible" for Kalshi "to comply with both state and federal law," and because Ohio's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73. In at least three respects, subjecting Kalshi's event contracts to Ohio law would conflict with the CEA.

*First*, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit has thus held that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

15

Defendants' actions clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes. Defendants intend to deploy state laws to regulate Kalshi's contract market—exactly what Congress did not want states to regulate. The conflict is even clearer when considering the possibility that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own state laws. This outcome would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67; *Hendrick, et al.*, 2025 WL 1073495 at *7 ("Preventing the difficulties" created by multiple state enforcement efforts "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges").

*Second*, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law hampers "the careful balance struck by Congress." *Arizona*, 567 U.S. at 406. Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law." *Id.* at 407-10. Otherwise, a state could bring charges against an individual "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is exactly the risk posed by Defendants' actions. Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contacts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. Compl. ¶ 49. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, chose not to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate.

16

Subjecting federally regulated exchanges to state laws like Ohio's would disrupt "the congressional calibration of force." *Crosby*, 530 U.S. at 380. Ohio criminal law imposes penalties that would substantially interfere with the CFTC's discretion. For example, Ohio authorities threatened Kalshi with violations of statutes that carry penalties of fines and *imprisonment*. *See e.g.,* R.C. 2929.14(A)(4). The cease-and-desist letter also asserted that Kalshi's event contracts constitute a nuisance under Ohio law and violate state statutory gambling age limits. *See* Ex. 1 at 3. Absent a finding of preemption, the carefully calibrated federal enforcement scheme would be displaced by a blunt application of mandatory state criminal penalties.

<u>*Third*</u>, it is impossible for Kalshi to comply with the Casino Commission's demands while continuing to adhere to the Core Principles on which Kalshi's designation as a CFTC-approved market depends. To secure a license in Ohio, Kalshi would need to limit access to the exchange solely to persons making trades in Ohio. *See* R.C. §§ 3775.11(A), 3775.12(A). But the requirement to accept trades only within one state would be impossible for a nationwide exchange like Kalshi required by federal law to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. § 38.151(b) (emphasis added); *see also* 17 C.F.R. § 38.150. Attempting to comply with Ohio's scheme would therefore present Kalshi with an impossible choice—either to accept trades exclusively from persons within Ohio or to close its exchange to Ohio in violation of its impartial access obligations. And subjecting Kalshi to state law would mean that 49 other states would be free to subject Kalshi to the same impossible choice, resulting in precisely the state-by-state patchwork that Congress in 1974 sought to avoid. This is a classic example of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).[2]

---

[2] Even if Kalshi could somehow exclude Ohio residents from participating in its exchange, CFTC's Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to anyone located in Ohio as a result

3. <u>Defendants May Not Punish Kalshi's Partners for Affiliating with Kalshi.</u>

Just as Defendants cannot punish Kalshi directly for offering sports-event contracts, they cannot make an end-run around preemption by punishing entities that partner with Kalshi.  It is well settled that "a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).  That prohibition extends to all regulation that threatens parties for "exercising their constitutional rights."  *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F.Supp.3d 584, 609 (D. Md. 2025).  Here, the Casino Commission's threat to revoke the license of any entity that partners with Kalshi is a transparent backdoor attempt to regulate Kalshi in defiance of the CEA.  By forcing Kalshi's partners to choose between protecting their Ohio licenses and working with Kalshi, the Casino Commission is punishing Kalshi for doing exactly what the CEA permits it to do.  The Casino Commission's threats against third parties are therefore just as unlawful as its threats against Kalshi itself.

Courts have easily invalidated similar efforts by state officials to do indirectly what the Constitution forbids them from doing directly.  In *Vullo*, for example, the Supreme Court unanimously held that a state official could not suppress the NRA's speech in violation of the First Amendment by threatening "to wield her power against those refusing to aid her campaign to punish the NRA's gun-promotion advocacy."  602 U.S. at 194.  The Seventh Circuit held similarly in a case where a sheriff threatened third parties unless they served ties with a disfavored website the sheriff could not regulate directly.  *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (Posner, J.).  Much like here, the sheriff sought to "suffocat[e]" the website, depriving it of revenue "by scaring off" its partners.  *Id.* at 231.  "The analogy," the Seventh Circuit explained, "is to kill[] a person by cutting off his oxygen supply rather than by shooting him."  *Id.* The court held that the sheriff could not "issue and publicize dire threats" against third parties "in an effort to throttle" an entity it had no right to regulate directly.  *Id.* at 235.

---

of the Casino Commission's threats of criminal liability would constitute exactly that sort of market disruption.

The Supreme Court has reached the same conclusion in the preemption context, forbidding state officials from making an end-run around federal law by creative attempts to avoid preemption. In *Engine Manufacturers Ass'n v. South Coast Air Quality Management. Dist*., 541 U.S. 246 (2004), for example, to circumvent a federal law prohibiting localities from adopting motor vehicle emissions standards, a locality sought to restrict *purchases* of motor vehicles that did not satisfy certain standards rather than restricting *sales* of those vehicles. The Court held that "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense" because a manufacturer's "right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.* at 255. In *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 371 (2008), the Court held that a federal statute preempting state laws governing motor *carriers* similarly prevented states from imposing delivery standards for *shippers*, reasoning that while the state regulation "is less 'direct' than it might be . . . [n]onetheless, the effect of the regulation is that carriers will have to offer . . . delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate." *Id.* In *North Natural Gas Co. v. State Corp. Commission of Kansas*, 372 U.S. 84, 86 (1963), the Court found that a state agency "encroach[ed] upon the exclusive regulatory jurisdiction of the Federal Power Commission" conferred by federal law when the agency directed a pipeline company to purchase gas from certain wells in Kansas, which made it impossible for the company to comply with federal law. *Id.* at 86–87. The Court explained that "[t]he federal regulatory scheme leaves no room either for direct state regulation of . . . wholesales of natural gas *or for state regulations which would indirectly achieve the same result*." *Id.* at 91 (emphasis added) (citation omitted).

The Sixth Circuit has ruled similarly. In *City of Eugene, Oregon v. FCC*, 998 F.3d 701, 715 (6th Cir. 2021), a city sought to circumvent the cap the Federal Communications Act imposes on "franchise fees" by invoking its police power to instead levy a higher "license fee." The Court held that the city's "license fee" was merely "the exercise of its franchise power by another name" and that such local regulation circumvents federal regulation by trying "to accomplish indirectly what franchising authorities are prohibited from doing directly." *Id.*

Similarly, here, just as the CEA prohibits the Casino Commission from regulating Kalshi directly for offering sports-event contracts, the CEA likewise prohibits the Casino Commission from targeting Kalshi by threatening to revoke the license of any entity that partners with Kalshi. The threat operates as an indirect means to achieve what the Casino Commission is preempted from doing directly to Kalshi.

Two features of the threats against Kalshi's partners are especially troubling.  First, by targeting Ohio gaming-license holders rather than Kalshi itself, Defendants have adopted an "intermediary strategy" that would allow them "to expand their regulatory jurisdiction" over an entity "that they have no direct control over."  *Vullo*, 602 U.S. at 197-98.  Ohio licensees have strong incentives to comply with Defendants' threats for fear of losing their licenses in Ohio, and they have little incentive to fight these threats and risk the retribution of their regulator.  The fact that these threats are aimed at third parties therefore makes them more problematic, not less.  And second, Defendants' threats have the effect of operating extraterritorially.  The Casino Commission has made clear that a licensee who partners with Kalshi in offering sports-event contracts *outside of Ohio* will face punishment "*even if*" the licensee "geofences or takes other actions to restrict Ohioans from accessing sporting event contracts in the prediction markets that are otherwise offered to their patrons *outside Ohio*."  Ex. 5 at 4 (emphasis added).  Thus, Defendants' threats prohibit Ohio licensees from partnering with Kalshi even in states that deem Kalshi's sports-event contracts entirely lawful.  Indeed, these threats prohibit Ohio licensees from partnering with Kalshi in Nevada and New Jersey, where Kalshi has obtained preliminary injunctions on the ground that its sports-event contracts are lawful.  The extraterritorial reach of Defendants' threats raises serious additional concerns under the dormant Commerce Clause.  *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (a state "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority").

**B. Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction.**

The Casino Commission's cease-and-desist letter threatens Kalshi with a classic "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the district courts in Nevada and New Jersey recognized in similar circumstances, Kalshi suffers irreparable harm along several dimensions.

*First*, if Kalshi chooses not to comply with the Casino Commission's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and criminal prosecution. The Supreme Court has recognized that a party facing the threat of imminent enforcement under a preempted state statute suffers "irreparable injury." *Id.* The Sixth Circuit agrees that "a finding of irreparable injury is mandated" when a court finds that a "constitutional right is being threatened or impaired." *ACLU v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (plaintiff establishes a likelihood of irreparable harm when it demonstrates a "credible threat of prosecution" under a preempted state statute). The Casino Commission expressly threatened Kalshi with "pursuing all legal remedies and actions," including prosecution, if it failed to cease "offering, participating in offering, or facilitating those who offer" event contracts in Ohio, making clear that the threat of enforcement is imminent. Ex. 1 at 3. One other state recently commenced enforcement proceedings against Kalshi under state gaming laws, confirming that the threat of enforcement here is not speculative. *See Commonwealth of Mass. v. KalshiEX LLC*, No. 2584-cv-02525 (Mass. Sup. Ct.).

*Second*, attempting to comply with the Casino Commission's unconstitutional threat would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has almost 35,000 users in Ohio, many of whom have open investments on the platform. Ex. 6, Declaration of Xavier Sottile ¶ 47. If Kalshi complied with the Casino Commission's unconstitutional threat during the pendency of this litigation, it would forego

21

business in this market, with no prospect of recouping its losses even if it ultimately prevails. Moreover, it is not at all clear that Kalshi has the capacity to comply with the threat to cease "immediately" as the Casino Commission demands, and any attempt at complying would subject Kalshi to extraordinary technological challenges and costs. Kalshi has no need currently to comprehensively geolocate its users on a state-by-state basis because it is regulated federally. *Id.* ¶ 19. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually. *Id.* ¶¶ 21-22. And because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155 (1908); *Zielasko v. Ohio*, 873 F.2d 957, 959 (6th Cir. 1989), Kalshi would have no clear way of seeking damages if it ultimately prevailed. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (monetary harm "is irreparable here because the states will not be able to recover monetary damages" due to damages immunity).

*Third*, a preliminary injunction is needed not just to protect Kalshi, but also Kalshi's users. Users who trade on Kalshi's platform enter into contracts with other users. Immediately shuttering access to these contracts for Ohio users could require Kalshi unilaterally to terminate users' contracts and liquidate their positions, or to pause trading on these contracts pending the outcome of litigation months or more in the future. Ex. 6, Declaration of Xavier Sottile ¶ 29. Under either scenario, this would be an extraordinary and disruptive act, harming users not just in Ohio but nationwide, because cutting off access to users in one state would substantially distort the markets even for users in other states. Such an impairment of existing contractual obligations for Kalshi's users easily constitutes irreparable harm. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("likely interference with customer relationships" resulting from breach of contract constitutes irreparable harm.).

*Fourth*, Kalshi will face irreparable reputational harm if no injunction is granted. If Kalshi chooses not to comply on the ground that Ohio law is preempted, the threat of prosecution—not to mention being labelled a willful violator of Ohio law—would undermine the reputation that Kalshi has cultivated over many years and that resulted in Kalshi being the first event market

designated by the CFTC. But bowing to the Casino Commission's threat by abruptly ending its business in Ohio would undermine users' confidence in Kalshi's exchange and make them fear that their own investments are at risk. *See* Ex. 6, Declaration of Xavier Sottile ¶¶ 12, 30-32, 37, 47; Ex. 7, Declaration of Sara Slane ¶¶ 14-15. This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails and constitutes a distinct form of irreparable harm. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). Moreover, the Casino Commission's demands jeopardize Kalshi's status as a CFTC-designated contract market—and thus pose an existential threat to Kalshi. Abruptly terminating its event-based contracts in Ohio would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. Should the CFTC conclude that closing Kalshi's markets in Ohio violates federal law, it could respond by seeking to revoke Kalshi's designation. 7 U.S.C. § 8(b). A preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

*Fifth*, the Casino Commission's threats to revoke the licenses of Kalshi's partners further exacerbate Kalshi's harm. These threats are suffocating Kalshi's growth by impeding its ability to enter into critical partnerships and turning Kalshi into a business pariah. Worse, these threats have the effect of operating extraterritorially, because the Casino Commission has threatened to revoke the license of any entity that partners with Kalshi *even if that partnership occurs entirely out of state*. This harm is not speculative: certain prospective Kalshi partners have already expressed grave concerns to Kalshi about Ohio's threats, with a very real prospect of scuttling partnership agreements that were long in the works. And Kalshi's partners cannot avoid the problem by declining to offer event contracts in Ohio, because the Casino Commission has made clear that entities that partner with Kalshi elsewhere will face retribution in Ohio. Even if Kalshi ultimately prevails in this litigation, its growth will be irreparably hampered if it is treated like a business pariah for the many months or longer it could take this case to proceed to final judgment.

*See* Ex. 7, Declaration of Sara Slane ¶¶ 14-16. In the absence of an injunction, Kalshi could not remedy those nationwide harms, even if it were to ultimately prevail in Ohio.

**C. The Balance of the Equities and Public Interest Favor a Preliminary Injunction.**

The public has a first-order interest in ensuring that preempted Ohio laws are not enforced against federally regulated entities. "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). By the same token, if "the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). Both courts to have addressed the question in the related litigations have accordingly found that enjoining a preempted law comports with the public interest. *Hendrick,* 2025 WL 1073495, at *8; *Flaherty*, 2025 WL 1218313, at *7. Ohio retains no reciprocal interest because it lacks any interest in enforcing a state law that is preempted. *See Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction here would "reach beyond the parties involved directly in the suit and impact the public's right[s]." *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008) (citation and internal quotation marks omitted). Immediate compliance with Ohio law to avoid criminal penalties will harm Kalshi's users in Ohio and impose intractable technological difficulties on a very short timeframe. Ex. 6, Declaration of Xavier Sottile ¶¶ 12-28. Abrupt cessation would make it difficult to inform users in Ohio of their rights and obligations regarding ongoing event contracts and would risk cutting off users' access to their investments on Kalshi's exchange. *Id.* ¶¶ 29-37. Given that the Ohio laws are clearly preempted by federal law as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.

The issuance of a preliminary injunction would also serve the public interest of ensuring regulators cannot "do indirectly what [they are] barred from doing directly." *Vullo*, 602 U.S. at 190. As detailed *supra* in Section (A)(3), not only are Defendants preempted from directly

punishing Kalshi for offering sports-events contracts, they also cannot make an end-run around preemption by indirectly punishing Kalshi through acting against Kalshi's partners.  Yet, that threat alone is enough for Kalshi's partners to fear losing their licenses in Ohio and therefore opt to comply with the Casino Commission's demands even if they are unlawful.  Granting injunctive relief would serve the public interest by preventing regulators from unilaterally and impermissibly expanding their jurisdictional authority, and also by allowing businesses to operate freely without having to hedge against a threat of unlawful enforcement.

### D.  No Security—Or Only a *De Minimis* Security—Is Appropriate.

Federal Rule of Civil Procedure 65(c) requires a party seeking a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "[T]he amount of an injunction bond is within the sound discretion of the district court." *Aluminum Workers Int'l Union v. Consol. Aluminum Corp.,* 696 F.2d 437, 446 (6th Cir. 1982).  Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation.  Accordingly, no security is needed.  *See Doctor's Assocs., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996) (affirming decision not to require bond).  Alternatively, should the Court require a security, only a de minimis security is warranted.  The District of Nevada, for example, ordered Kalshi to provide "a de minimis $10,000 bond." *Hendrick*, 2025 WL 1073495, at *8.

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction.

Dated this 7th day of October, 2025.

                                        Respectfully submitted,

                                      */s/ Shawn J. Organ*
                                      Shawn J. Organ, Esq. (0042052)
                                           *Trial Attorney*
                                      Connor A. Organ, Esq. (0097995)
                                      **ORGAN LAW LLP**
                                      1330 Dublin Road
                                      Columbus, OH 43215
                                      614.481.0900 (T)
                                      614.481.0904 (F)
                                      sjorgan@organlegal.com
                                      corgan@organlegal.com

                                      and

                                      Neal Katyal (pro hac vice pending)
                                      Joshua B. Sterling (pro hac vice pending)
                                      William E. Havemann (pro hac vice pending)
                                      **Milbank LLP**
                                      1101 New York Avenue NW
                                      Washington D.C. 20005
                                      Telephone: 202-835-7500
                                      Facsimile: 202-263-7586

                                      Grant R. Mainland (pro hac vice pending)
                                      Andrew L. Porter (pro hac vice pending)
                                      **Milbank LLP**
                                      55 Hudson Yards
                                      New York, NY 10001
                                      Telephone: 212-530-5000
                                      Facsimile: 212-530-5219

                                      *Attorneys for Plaintiff*

26