# Exhibit 3

**Ohio Casino Control Commission**

CasinoControl.Ohio.gov

Mike DeWine, *Governor*   Jim Tressel, *Lt. Governor*   Thomas J. Stickrath, *Chair*

August 19, 2025

Mr. Joshua B. Sterling
Milbank
1850 K Street, NW, Suite 1100
Washington DC 20006
**Sent via Email to:** jsterling@milbank.com

Re: Reply to Response of Kalshi EX LLC to Cease-and-Desist Letter

Dear Mr. Sterling:

The Ohio Casino Control Commission ("Commission") has reviewed the response (the "Response") of Kalshi EX LLC ("Kalshi"), dated May 15, 2025, to the Commission's Cease-and-Desist Letter. The Commission appreciates the Response and recognizes the present split among the federal courts concerning Kalshi's position that state sports gaming and gambling laws are preempted by the Commodity Exchange Act ("CEA").

It is the Commission's understanding that following the Response, in *Kalshiex LLC v. Martin*, D. Md. Case No. 1:25-cv-01283, Judge Abelson determined that Kalshi is unlikely to succeed on the merits of its argument that the Commodities Exchange Act preempts Maryland's gaming laws and denied Kalshi's request for injunctive relief. The Commission requests that Kalshi address the *Martin* decision and provide documents and information responsive to the following:

(1) **Communications with the CFTC**

On January 14, 2025, the CFTC notified Crypto.com that it intended to initiate a review of two sports contracts that Crypto.com earlier self-certified and submitted to the CFTC. Given that Kalshi asserts that the CFTC has "sanctioned" Kalshi's sporting event contracts by not presumably taking any action, the Commission requests Kalshi provide any communications it has had with the CFTC after Kalshi placed sporting event contracts on its DCM on January 24, 2025.

(2) **Self-Certification**

Kalshi is able to place sporting events contracts on its DCM using the self-certification process. However, Kalshi has not provided the Commission with any information on how Kalshi is able to attest to the necessary items in the self-certification for the hundreds of thousands of sporting events contracts on its DCM. The Commission requests that Kalshi please provide it with the processes, policies, and procedures Kalshi has in place related to the self-certification of sports-events contracts listed on Kalshi's DCM, which are referenced on page seven of its Response letter.

(3) **Hedging**

The Response notes that traders on Kalshi's platform have the "ability to hedge or profit from the outcome" of sporting events or "manage and profit from the risk of an event occurring." Response at 1. Yet Kalshi prevents participants – the only persons acknowledged by Kalshi to have a hedging interest – from wagering on their own contests. *Kalshi Ex LLC v. Martin*, Doc. 37 at 10-11. Kalshi's most recent Rulebook sets forth prohibited trades by those with "access to material non-public information" or the "ability to exert any influence" on the outcome at the center of an event contract. *See* Exchange Rulebook IB Update.pdf ("Rulebook"), Rule 5.17(x), (y).

Given these restrictions, the Commission requests that Kalshi provide the percentage of the sporting event contracts entered on Kalshi's DCM, measured in both raw numbers and dollar values, that have been executed for hedging purposes since the DCM's inception.

Furthermore, does Kalshi require its traders to disclose their intended purpose in executing a sporting event contract (hedging versus profiting) or whether the outcome of the underlying sporting event will have any "financial, economic, or commercial consequence" on a trader, aside from profiting on the outcome of the contract? If so, please provide substantiation of the same. Also, the Commission requests that Kalshi please identify the risks that traders in Ohio are seeking to mitigate by entering sporting events contracts that are referenced in the Response. Response at 3 ("events contracts…that traders use to mitigate risk").

**(4)** **<u>Voluntary Exclusion</u>**

Ohio has a robust, nationally recognized responsible gaming program called "TimeOut Ohio" that enables individuals to ban themselves from Ohio casinos, Ohio racinos and Ohio sports gaming for one year, five years or their lifetime. *See* TimeOut Ohio. Once the request is validated, an individual is not permitted access to any Ohio casino or racino properties, or participate in Ohio sports gaming during the length of the self-imposed ban. *See id*.

The Response notes that Kalshi has adopted some "user safeguards, like exclusion." Response at 2. The Commission is aware of reports that Kalshi has debuted a "Consumer Protection Hub" featuring deposit caps, trading breaks, and voluntary opt-outs. *See* Kalshi rolls out RG tools, partners with monitor IC360. The Commission requests Kalshi provide further information on the components of its "user safeguards," including the length of voluntary opt-outs and how a trader on Kalshi can terminate any self-imposed ban they institute through Kalshi.

As it relates to its responsible gaming program and weighing Kalshi's preemption arguments, the Commission requests that Kalshi provide the total number of trades of sporting event contracts that involve at least one party from Ohio measured in raw numbers and total dollar values from the date Kalshi self-certified these offerings earlier this year.

**(5)** **<u>Market Makers</u>**

The Response states that Kalshi "is not a sportsbook or a casino; neither are its contracts wagers based on house odds." Response at 2. In contrast to a sportsbook, the Response further

states it operates an "exchange" on its DCM that "match[e]s one trader's bid to enter an event contract with another trader's offer." *Id*. at 3; *see Kalshi EX, LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev.), Doc. 18 at 10 ("For sportsbooks, by contrast, gamblers take a position against the house, and the house sets the line with the odds in its own favor."); Who are you trading with? | Kalshi Help Center ("[o]n Kalshi, you are always trading against another member of the platform, not the exchange itself."). The Response also refers to a trading affiliate, Kalshi Trading LLC, as follows:

> Kalshi's trading affiliate participates in some markets, often as a market maker. However, unlike a house where there is 100% participation by the house, and no competition, *Kalshi's affiliate trader only takes a minority of trades*, all trading is competitive, and the CFTC is aware of the affiliate's activities.

Response at 3, n.2(emphasis added); *see also* Rulebook, Rule 2.12. The Commission requests Kalshi to elaborate on the percentage of total trades of sporting events contracts that Kalshi Trading "takes," including the percentage of trades measured in raw numbers and total dollar values, from the date Kalshi self-certified these offerings. Additionally, and under the same parameters, please provide the percentage of sporting events contracts Kalshi Trading has been a party to at the "Expiration" of these contracts. *See* Rulebook, Chapter 1 Definitions at 8. If Kalshi has any other "affiliates," as defined in the Rulebook that "participate in markets," the Commission asks that Kalshi identify those affiliates and include their market activity in the calculations requested above.

Regarding "Market Makers," whether affiliated or unaffiliated with Kalshi, as further described in Chapter 4 of the Rulebook, the Commission requests that Kalshi provide the percentage of total trades of sporting event contracts for each Market Maker measured in raw numbers and total dollar values, from the date Kalshi self-certified these offerings. And similarly, please provide the percentage of sporting events contracts wherein each Market Maker been a party to at the "Expiration" of these contracts.

The Rulebook spells out that to be considered for "Market Marker" status "a member must complete and file a market member agreement." *Id*., Rule 4.1(d). The Commission requests that Kalshi provide copies of these agreements for market makers in sporting event contracts it has "on file," including but not limited to the one for Susquehanna International Group of Companies or Susquehanna Government Products, LLP ("Susquehanna"). The Kalshi Member Agreement discloses the benefits that a market maker can receive for fulfilling its obligations to Kalshi that include "monetary benefits, such as discounts on fees, rebates on fees, revenue share from fees, and other monetary benefits." *Id*., Member Acknowledgements, VII(T) and Rulebook, Rule 4.3. The Commission requests that Kalshi provide documentation that sets forth the benefits that each of its market markers in sporting event contracts have received thus far this year.

Additionally, the Commission understands that in Buying Yes vs Selling No | Kalshi Help Center, Kalshi explains that "[e]ach Kalshi market is designed to maintain a state of equilibrium. This means that the combined value of all Yes and No contracts for a given market always equals $1." The Commission has attached an example of the market for a tennis match on July 8, 2024 at Wimbledon between Taylor Fritz and Karen Khachanov. In this example, a "Yes" contract for Taylor Fritz to advance costs 75 cents, while a "No" contract costs 27 cents, for an apparent combined value of $1.02. Numerous other sporting event contracts seem to have a combined value

3

of $1.00.  *See* Kalshi - Prediction Market for Trading the Future.  Please provide an explanation to the Commission of how a real world trade on both "Yes" and "No" sides of a sporting event contract would be processed at contract execution and expiration, when the combined value of the "Yes" and "No" contracts is greater than $1.00.

**(6)     Licensure to Offer Sports Gaming in Ohio**

Kalshi's stated business model appears to constitute "exchange wagering," which is a form of "sports gaming" that requires licensure here in Ohio. *See* R.C. 3775.01(O)(2) and 3775.03.  Assuming that Kalshi can establish its suitability for licensure under R.C. 3775.041 and 3775.09 as either a "Type A sports gaming proprietor" under R.C. 3775.01(Y) or a "Mobile management services provider" under R.C. 3775.01(G)(1), please identify any obstacles or impediments under the CEA (including its implementing regulations and the 23 Core Principles) that would prevent Kalshi from offering sporting event contracts under the Commission's regulatory regime in Ohio in tandem with CFTC oversight.

The Response points to Ohio's age restriction prohibiting those individuals under 21 years of age from engaging in sports gaming, and contends that this restriction would "interfere[] with traders' *impartial access* to Kalshi's platform, in contravention of the CFTC's core principles." Response at 10 (citing R.C. 3775.99(A)(2)).  The Response further states that "federal law allows adults [those individuals over the age of majority (usually 18)] to place trades on DCMs[.]" *Id*. As a part of Core Principle 2, a DCM "must provide its members [and] persons with trading privileges…*with impartial access* to its markets and services, including: *[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner*[.]" 17 C.F.R. § 38.151(b)(1) (emphasis added).

The Commission, however, is not aware of any legal authority that has meaningfully interpreted this provision.  Please provide any legal authority that Kalshi is relying upon to support its contention that a requirement limiting contract participants to individuals 21 years of age or older would somehow be biased, unclear, or discriminatory.

**(7)     Integrity Concerns**

The Commission understands that Kalshi may implement trading prohibitions for those who have insider information or can unduly influence a sporting event, *see supra*, and has announced a partnership with IC360, an integrity monitor.

The Commission requires its licensed sports gaming proprietors to employ "commercially reasonable methods to prevent any person involved in a sporting event with respect to which sports gaming is permitted from engaging in any sports gaming with the sports gaming proprietor[.]" R.C. 3775.13(F)(1). Those "involved in a sporting event" are defined in R.C. 3775.13(F)(3).  By rule, sports governing bodies must provide the Commission with a list of persons "involved in sporting events" that the Commission relays to sports gaming proprietors. Ohio Admin. Code 3775-16-12.

4

Among other requirements, sport gaming proprietors must also immediately report to the Commission any information in their possession, that relates to any wager in violation of Ohio or Federal law and any conduct that corrupts a betting outcome of a sporting event for purposes of financial gain. *See* Ohio Admin. Code 3775-16-17. The Commission also has an *involuntary* sports gaming exclusion list under R.C. 3772.031, which sets forth the basis and process for excluding an individual from sporting gaming in Ohio under R.C. 3772.13(A).

Please provide information to substantiate the claim in its Response that Kalshi (as an operator) has in place processes and procedures to "prevent market manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement." Response at 6. Please also provide documentation of the implementation and audit of such processes and procedures.

**(8)** **Parlay Betting**

It has been reported that Kalshi will begin offering parlay bets, albeit under a different name, such as "Sequential Event Contracts," as soon as the upcoming NFL season. *See e.g.*, Fact Check Friday: Is Kalshi Allowing Parlays? In fact, Kalshi's website includes a blank page with a title "Parlay 2025 · Oscar Winners" that seems to portend the arrival of parlays. *See* Kalshi - Prediction Market for Trading the Future. Has Kalshi taken any action to expand its offering of binary Yes/No prediction contracts for singular sporting events to include prediction contracts consisting of multiple underlying sporting events in one contract? In the event Kalshi seeks to offer to Ohio residents contracts of this nature for the upcoming NFL or NCAA football seasons, please provide documents sufficient to show how Kalshi will offer a contract that involves multiple sporting events.

* * *

**In lieu of setting a new deadline for Kalshi to comply with the Commission's Cease and Desist Letter, the Commission requests Kalshi to provide written responses to the foregoing inquires no later than 30 days from the date of this letter.**

Sincerely,

Matthew T. Schuler
Executive Director

5