# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| KALSHIEX LLC, | Case No. 2:25-cv-1165 |
| *Plaintiff*, | Chief Judge Sarah D. Morrison |
| v. | Magistrate Judge Chelsey M. Vascura |
| MATTHEW T. SCHULER, *et al.*, | ORAL ARGUMENT REQUESTED |
| *Defendants*. | |

## DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO PLAINTIFF KALSHIEX LLC'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff KalshiEX LLC's ("Kalshi") Motion for Preliminary Injunction ("Motion") seeks to prevent the Commission from enforcing Ohio's sports-gaming laws.[1] Kalshi's Motion should be denied for several reasons. First, Kalshi is unlikely to succeed on the merits of its claim. Kalshi's sports-gaming products are not "swaps" under the Commodity Exchange Act ("CEA") and are therefore not even subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC") as Kalshi contends. Even if Kalshi's sports-gaming products were swaps, Kalshi fails to demonstrate Congress's clear and manifest purpose for the CEA to preempt Ohio's sports-gaming laws. Kalshi likewise fails to show that it is impossible for it to continue operating its business—as it had for years—without violating Ohio's sports-gaming laws. Second, the speculative and avoidable concerns raised in Kalshi's Motion do not constitute irreparable harm. Third, Kalshi's recent, sudden shift in its business model does not outweigh the strong public interest in preserving Ohio's sports-gaming laws and the Commission's ability to enforce

---

[1] Defendants include Matthew T. Schuler, Thomas J. Stickrath, Sheetal Bajoria, Scott Borgemenke, Keith Cheney, Penelope Cunningham, Christopher Smitherman, Triffon Callos, the Ohio Casino Control Commission (collectively, the "Commission"), and the Ohio Attorney General Dave Yost (the "Attorney General") (together, the Commission and Attorney General are the "Defendants").

DRAFT – ATTORNEY WORK PRODUCT – PRIVILEGED & CONFIDENTIAL

those laws. This Court should therefore deny Kalshi's Motion. A memorandum of opposition to the Motion is attached.

DATE: November 7, 2025

Respectfully Submitted,

DAVE YOST
OHIO ATTORNEY GENERAL

/s/ Mark N. Kittel
Dave Yost
Attorney General of Ohio

Mark N. Kittel (0095323)
Rachel V. Clark (0103746)
Neema Ashou (0104198)
Office of Ohio Attorney General Dave Yost
30 East Broad Street, 26th Floor
Columbus, Ohio 43215
Phone: (614) 466-4328
mark.kittel@OhioAGO.gov
rachel.clark@OhioAGO.gov
neema.ashou@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General, Dave Yost*

/s/ Christopher L. Ingram
Rajeev K. Adlakha (0087096)
VORYS, SATER, SEYMOUR AND PEASE LLP
200 Public Square, Suite 1400
Cleveland, Ohio 44114-2327
Phone/Fax: (216) 479-6175
rkadlakha@vorys.com
Christopher L. Ingram (0086325), *Trial Attorney*

Kara M. Mundy (0091146)
Garrett M. Anderson (0100121)
Celina J. Needle (0104831)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone/Fax: (614) 464-5480
clingram@vorys.com
kmmundy@vorys.com
gmanderson@vorys.com
cjneedle@vorys.com

*Special Counsel for Defendants Matthew T. Schuler, Thomas J. Stickrath, Sheetal Bajoria, Scott Borgemenke, Keith Cheney, Penelope Cunningham, Christopher Smitherman, Triffon Callos, and the Ohio Casino Control Commission*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................. 1

BACKGROUND ..................................................................................................... 3

    I.     Ohio Has Regulated Gaming for Almost Two Centuries........................................ 3

    II.    Kalshi Markets Itself as a Sports Betting Platform................................................. 5

    III.   The Commodity Exchange Act Regulates Commodity Futures Markets.............. 6

STANDARD OF REVIEW ...................................................................................... 10

LAW AND ARGUMENT ........................................................................................11

    I.     Kalshi Is Not Likely to Succeed on the Merits ......................................................11

         A.    Kalshi's Sports-Gaming Products Fall Outside the CEA's Purview.........11

Kalshi's sports-gaming products are not swaps under the CFTC's exclusive jurisdiction because they are not associated with a financial, commercial, or economic consequence and are not based on the occurrence, nonoccurence or the extent of an occurrence of an event.  Adopting Kalshi's broad definition of swaps produces absurd results, overriding federal and state gaming statutes by rendering all off-exchange gaming in violation of the CEA. The CEA's purpose is to address market manipulation, not regulate sports gaming.

*Dole v. U.S. Steelworkers of Am.*, 494 U.S. 26, 36 (1990); *N. Am. Derivatives Exch. v. Nev. Gaming Control Bd.*, 2025 U.S. Dist. LEXIS 202104 (D. Nev. Oct. 14, 2025); *Griffin v. Oceanic Contractors, Inc*, 458 U.S. 564 (1982); *KalshiEX LLC v. Marin*, 2025 U.S. Dist. LEXIS 147815 (D. Md. Aug. 1, 2025); *West Virginia v. EPA*, 597 U.S. 697 (2022); *David v. Mic. Dep't of Treasury*, 489 U.S. 803 (1989).

         B.    The CEA Does Not Preempt Ohio's Sports-Gaming Laws ...................... 17

            1.    This Court Should Presume that Ohio's Sports-Gaming Laws Are Not Preempted by the CEA and May Only Find Preemption if it Was Congress's Clear and Manifest Purpose to Preempt Those Laws................................................................ 17

When analyzing a preemption claim, there is a presumption that Congress did not intend to displace state law.  In addition, a federal law cannot preempt state laws involving

the States' historic police powers unless doing so was the clear and manifest purpose of Congress.

*Maryland v. Louisiana*, 451 U.S. 725 (1981); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947); *United States v. King*, 834 F.2d 109 (6th Cir. 1987); *Murphy v. NCAA*, 584 U.S. 453 (2018).

2. Ohio's Sports-Gaming Laws Are Not Expressly Preempted by the CEA......................................................................... 19

The CEA does not contain, and Kalshi cannot identify, any language expressly preempting state gaming laws.

*Cipollone v. Liggett Group*, 505 U.S. 504 (1992); *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144 (3d Cir. 2024); *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882 (7th Cir. 2019).

3. Ohio's Sports-Gaming Laws Are Not Field Preempted by the CEA......................................................................... 19

The CEA's text, structure, and legislative history confirm that Congress preserved room for state regulation, expressly limited federal preemption, and never targeted state gaming laws for displacement. Ohio's sports-gaming laws neither intrude into the exclusive jurisdiction of the CEA nor conflict with the CEA's purpose.

*Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959); *De Canas v. Bica*, 424 U.S. 351 (1976); *KalshiEX LLC v. Martin*, 2025 U.S. Dist. LEXIS 147815 (D. Md. Aug. 1, 2025); *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882 (7th Cir. 2019); *Am. Agric. Movement v. Bd. of Trade*, 977 F.2d 1147 (7th Cir. 1992); *Pa. R.R. Co. v. Puritan Coal Mining Co.*, 237 U.S. 121 (1915).

4. Ohio's Sports-Gaming Laws Are Not Conflict Preempted by the CEA......................................................................... 24

    i. Ohio's Sports-Gaming Laws Do Not Stand as an Obstacle to Congress's Purposes and Objectives of the CEA......................................................................... 25

Ohio's enforcement of its sports-gaming laws pose no obstacle to Congress's objectives under the CEA because they do not directly regulate futures markets

within the CEA's domain. The CEA establishes a floor rather than a ceiling, and leaves ample room for states to exercise their traditional police powers in areas like gaming.

*Hines v. Davidowitz*, 312 U.S. 52 (1941); *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985); *H. P. Welch Co. v. New Hampshire*, 306 U.S. 79 (1939); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963); *KalshiEX LLC v. Martin*, 2025 U.S. Dist. LEXIS 147815 (D. Md. Aug. 1, 2025).

ii.    It Is Not Impossible for Kalshi to Comply with Ohio and Federal Law ................................................................. 28

Kalshi cannot meet the demanding standard for impossibility preemption because nothing in federal law prevents it from complying with Ohio's sports gaming regulations. Kalshi could simply refrain from offering sports-gaming products in Ohio as it did for years, it could become licensed to offer sports gaming in Ohio, or it could implement geofencing technology. Prior to January of this year, Kalshi has operated without providing its so-called sports-event contracts. In sum, it is not impossible for Kalshi to operate legally under both Ohio and federal law.

*Wyeth v. Levine*, 555 U.S. 555 (2009); *Yates v. Ortho-Mcneil-Janssen Pharm., Inc.*, 808 F.3d 281 (6th Cir. 2015).

C.    CFTC Rule 40.11 Bars Kalshi's Sports-Gaming Products from DCM Listing ........................................................................................ 29

CFTC Rule 40.11 explicitly bans DCMs from listing events contract involving gaming. Because Kalshi unlawfully listed its sports-gaming products on a DCM in direct defiance of Rule 40.11, those products are outside the reach of any purported federal preemption.

*Nichols v. United States*, 260 F.3d 637 (6th Cir. 2001); *Cyber Solutions Internat'l., LLC v. Pro Marketing Sales*, 634 F. App'x 557 (6th Cir. 2016).

D.    Kalshi's "Indirect Regulation" Argument Fails ......................................... 30

Kalshi's claim that the Commission's Advisory is an end-run around preemption is baseless, as the Advisory simply reflects the

Commission's statutory duty to regulate licensee suitability under Ohio law. The argument fails because the CEA does not preempt Ohio's sports-gaming laws and the Commission's actions are a legitimate exercise of state authority, not an indirect attempt to punish Kalshi's partners.

*Texas v. United States*, 523 U.S. 296 (1998); *English v. General Electric Co.*, 496 U.S. 72 (1990); *Maine v. Taylor*, 477 U.S. 131 (1986).

II.     Kalshi Fails to Make a Clear Showing That It Will Suffer Irreparable Harm Absent a Preliminary Injunction ........................................................................ 32

None of Kalshi's alleged harms are certain and immediate. Instead, Kalshi alleges speculative and theoretical harms based entirely on Kalshi's choice not to comply with Ohio law. Likewise, Kalshi's allegations regarding speculative concerns of prospective business partnerships do not establish clear and immediate harm.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir. 1991); *Wis. Gas Co. v. Fed. Energy Regul. Com.*, 758 F.2d 669 (D.C. Cir. 1985); *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324 (6th Cir. 2019).

III.    The Balance of Equities Favor the Commission's and the State of Ohio's Ability to Enforce Its Gambling Laws and Protecting Ohioans Is in the Public's Best Interest ............................................................................................ 34

Equities and public interest compel denial of Kalshi's injunction request, as the alleged harms are speculative and outweighed by the irreparable injury to Ohio's ability to enforce its laws. Preserving Ohio's regulatory authority serves the public far more than Kalshi's claimed interests. In addition, denial of Kalshi's Motion aligns with the CEA's public-interest mandate under the Special Rule and Rule 40.11.

*Nken v. Holder*, 556 U.S. 418 (2009); *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

CONCLUSION ........................................................................................................................ 35

# TABLE OF AUTHORITIES

## Cases

*Am. Agric. Movement v. Bd. of Trade*, 977 F.2d 1147 (7th Cir. 1992) ................................... 21, 25

*Arizona v. United States*, 567 U.S. 387 (2012) ....................................................... 19, 27

*Bartenwerfer v. Buckley*, 598 U.S. 69 (2023) ................................................................. 12

*Bond v. United States*, 572 U.S. 844 (2014) ................................................................. 18

*CFTC v. Erskine*, 512 F.3d 309 (6th Cir. 2008) ............................................................. 6

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002) ................................... 16

*Corely v. United States*, 556 U.S. 303 (2009) ............................................................. 13

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ......................... 19, 25, 27

*Cyber Solutions Internat'l., LLC v. Pro Marketing Sales*, 634 F. App'x 557 (6th Cir. 2016) ................................................................................................................. 30

*D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324 (6th Cir. 2019) ...................................... 33

*David v. Mic. Dep't of Treasury*, 489 U.S. 803 (1989) ............................................. 15

*De Canas v. Bica*, 424 U.S. 351 (1976) .................................................... 20, 21, 24

*Dole v. U. S. Steelworkers of Am.*, 494 U.S. 26 (1990) .......................................... 12

*Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882 (7th Cir. 2019) .............. 19, 21

*English v. General Electric Co.*, 496 U.S. 72 (1990) ............................................ 20, 31

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) .................... 26

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (2001) ................................................. 21, 24

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ................................... 14

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ................................................... 12

*H. P. Welch Co. v. New Hampshire*, 306 U.S. 79 (1939) .................................... 26

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) .............. 25

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ..................................................... 25, 27

*Hughes v. Talen Energy Marketing*, 578 U.S. 150 (2016) ................................... 20

*Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960) ...................................................... 18

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) ...................................................... 22

*Jones v. Hendrix*, 599 U.S. 465 (2023) ...................................................... 15

*KalshiEX LLC v. CFTC*, No. 24-5205 (D.C.C. Nov. 15, 2024) .................................. 17, 24

*KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893 (D.N.J. Apr. 28, 2025) .................................. 2, 21

*KalshiEX LLC v. Martin*, 2025 U.S. Dist. LEXIS 147815 (D. Md. Aug. 1, 2025) ............... passim

*KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 67832 (D. Nev. Apr. 9, 2025) .................................. 2, 21

*Kansas v. Garcia*, 589 U.S. 191, 213 (2020) (Thomas, J., concurring) ...................................... 26

*Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204 (9th Cir. 1982) ................................. 22

*Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000) ................................................... 10

*Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966) ........................................... 20

*Maine v. Taylor*, 477 U.S. 131 (1986) ...................................................... 31

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ...................................................... 17

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ...................................................... 10

*Medtronic Inc. v. Lohr*, 518 U.S. 470 (1996) ...................................................... 18

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ........................ 7

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir. 1991) ...................................................... 32, 33

*Mitchell v. City of Cincinnati*, 2022 U.S. App. LEXIS 27444 (6th Cir. Sep. 29, 2022) ...................................................... 33

*Murphy v. NCAA*, 584 U.S. 453 (2018) .................................................. passim

*N. Am. Derivatives Exch. v. Nev. Gaming Control Bd.*, 2025 U.S. Dist. LEXIS 202104 (D. Nev. Oct. 14, 2025) .................................. 2, 13, 14, 21

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ...................................................... 31

*Nichols v. United States*, 260 F.3d 637 (6th Cir. 2001) ...................................................... 29

*Nken v. Holder*, 556 U.S. 418, 435 (2009) ................................................................. 34

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) ....................................................... 20

*Pa. R.R. Co. v. Puritan Coal Mining Co.*, 237 U.S. 121 (1915) .......................... 22, 23

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) ....................................................................................................... 19

*Patry v. Rosenthal & Co.*, 534 F. Supp. 545 (D. Kan. 1982) ...................................... 22

*Pennsylvania v. Navient Corp.*, 967 F.3d 273 (3d Cir. 2020) ...................................... 19

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .......................................... 18, 20

*Sall v. G.H. Miller & Co.*, 612 F. Supp. 1499 (D. Colo. 1985) ................................... 22

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959) ............................ 20

*Silkwood v. Kerr-Mcgee Corp.*, 464 U.S. 238 (1984) ........................................... 21, 24

*Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667 (N.D. Ga. 1983) ............................... 22

*Texas v. United States*, 523 U.S. 296 (1998) ............................................................... 31

*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144 (3d Cir. 2024) ............................................................................................................... 19

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ................................................................. 34

*United States v. Azko Coatings of Am.*, 949 F.2d 1409 (6th Cir. 1991) ...................... 26

*United States v. King*, 834 F.2d 109 (6th Cir. 1987) ................................................... 18

*Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019) ............................................ 26

*Warner v. Goltra*, 293 U.S. 155 (1934) ....................................................................... 15

*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................................................ 15

*Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457 (2001) ................................. 14, 15

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) .........................................................11, 32

*Wis. Gas Co. v. Fed. Energy Regul. Com.*, 758 F.2d 669 (D.C. Cir. 1985) ................. 32

*Wyeth v. Levine*, 555 U.S. 555 (2009) ......................................................................... 28

*Yates v. Ortho-Mcneil-Janssen Pharm., Inc.*, 808 F.3d 281 (6th Cir. 2015) ............... 28

**Statutes**

15 U.S.C. § 3001(a)(1) ................................................................................................ 18

18 U.S.C. § 1084(a) ............................................................................................. 14, 30

31 U.S.C. § 5361(a)(3) ........................................................................................... 4, 16

42 U.S.C. §§ 2011 et seq. ............................................................................................ 21

7 U.S.C. § 16(e)(1)(B)(i) ............................................................................................ 30

7 U.S.C. § 16(e)(2) ............................................................................................. 19, 22

7 U.S.C. § 16(h) ................................................................................................. 19, 22

7 U.S.C. § 1a(18) ....................................................................................................... 14

7 U.S.C. § 1a(47)(A)(i) .............................................................................................. 12

7 U.S.C. § 1a(47)(A)(i)-(vi) ........................................................................................ 8

7 U.S.C. § 1a(47)(A)(ii) ......................................................................................... 11, 12

7 U.S.C. § 1a(47)(A)(iii) ............................................................................................ 12

7 U.S.C. § 1a(9) ..................................................................................................... 11

7 U.S.C. § 2 ............................................................................................................. 7

7 U.S.C. § 2(a)(1)(A) ................................................................................... 11, 22, 23, 30

7 U.S.C. § 2(e) .................................................................................................. 14, 15

7 U.S.C. § 5(a) ......................................................................................................... 15

7 U.S.C. § 5(b) ......................................................................................................... 15

7 U.S.C. § 7a-2(C)(5) ................................................................................................ 25

7 U.S.C. § 7a-2(c)(5)(C)(i) .................................................................................. 8, 16, 29

7 U.S.C. § 7a-2(c)(5)(C)(v) .......................................................................................... 8

7 U.S.C. §§ 1 et seq. ........................................................................................... passim

7 U.S.C. §§ 1 et seq. .................................................................................................. 6

Ohio Rev. Code § 2915.02 ............................................................................................ 4

Ohio Rev. Code § 3772.01(K) ................................................................. 16

Ohio Rev. Code § 3772.03(F) ................................................................. 16

Ohio Rev. Code § 3775 et seq ................................................................. 18

Ohio Rev. Code § 3775.01(DD) ................................................................ 4

Ohio Rev. Code § 3775.02 ....................................................................... 4

Ohio Rev. Code § 3775.03(A) ................................................................... 3

Ohio Rev. Code § 3775.03(N)(1) .............................................................. 3

Ohio Rev. Code § 3775.03(O)(1) .............................................................. 3

Ohio Rev. Code § 3775.04 ..................................................................... 28

Ohio Rev. Code § 3775.09 ..................................................................... 30

Ohio Rev. Code § 3775.10(C) ................................................................ 28

Ohio Rev. Code § 3775.10(D) ................................................................ 28

Ohio Rev. Code § 3775.99 ....................................................................... 4

Ohio Rev. Code § 5753.021 ...................................................................... 4

Ohio Rev. Code § 5753.031 ...................................................................... 4

**Other Authorities**

124 Cong. Rec. S5904 (daily ed. July 15, 2010) ................................... 8, 16

126 Cong. Rec. S5906-07 (July 15, 2010) ............................................... 24

156 Cong. Rec. S5906 (July 15, 2010) ..................................................... 24

77 Fed. Reg. 48,208 (Aug. 13, 2012) ................................................... 9, 17

Bet Types and Market Rules, DRAFTKINGS,
https://sportsbook.draftkings.com/help/general-betting-rules/market-rules (last
visited Nov. 7, 2025) ............................................................................ 5

CME Rulebook, CHICAGO MERCANTILE EXCHANGE,
https://www.cmegroup.com/rulebook/CME/I/5/5.pdf (last accessed Oct. 27,
2025) ................................................................................................. 29

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, pmbl., 124 Stat. 1376 (2010) ............................................................ 7

Eric Ramsey, *Kalshi Squeezing More From Football Games with Prop, Parlay Markets*, LEGAL SPORTS REPORT (Oct. 10, 2025), https://www.legalsportsreport.com/243581/kalshi-props-parlays-volume-update ................... 5

Event Contracts, 89 Fed. Reg. 48,968 (proposed June 10, 2024) ................................. 1, 10, 16, 17

*Examining the Impact of the Dodd–Frank Act on Markets, Entities, and Investors*, Before the Subcomm. on Capital Mkts. & Gov't Sponsored Enters. of the H. Comm. on Fin. Servs., 112th Cong. (Dec. 12, 2012) ................................................. 7

Kalshi (@kalshi) INSTAGRAM, *BREAKING: Kalshi has lapped FanDuel in the App Store top 100* (Oct. 23, 2024), https://www.instagram.com/kalshi_official/p/DBfQOyZyw2W ................................. 6

Kalshi (@kalshi), INSTAGRAM, *How Kalshi is legal in all 50 states* (Sept. 5, 2025), https://www.instagram.com/kalshi/p/DOOgGVzAE31 ................................. 6

*New Oxford American Dictionary* 97 (3d ed. 2010) ........................................... 12

Provisions Common to Registered Entities, 76 Fed. Reg. 44,799 (July 27, 2011) ................ 9, 24

Pub. L. No. 74-675, § 3, 49 Stat. 1491, 1491 (1936) ........................................ 6

Report No. 421, U.S. House of Representatives 74th Cong, Accompanying the Commodity Exchange Act (Mar. 18, 1935) ........................................... 23

*Sports Betting 101*, FANDUEL, https://www.fanduel.com/sports-betting-strategy (last visited Nov. 7, 2025) ................................................................. 5

*Ten Times Kalshi Said People Could Bet on Things*, Dustin Gouker, EVENT HORIZON (Apr. 3, 2025), https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could ........................................................ 6

**Regulations**

17 CFR § 40.11 .......................................................................... passim

Ohio Adm. Code § 3775-4-01 ............................................................. 31

**Constitutional Provisions**

1851 Ohio Const., Art. XV, § 6 ........................................................ 3, 18

## PRELIMINARY STATEMENT

This case is striking—not just for its subject matter, but also for the audacity of the relief Kalshi seeks. Kalshi asks this Court to accept the breathtaking proposition that when Congress adopted the Dodd-Frank reforms in 2010 to address the causes of the 2008 financial crisis, Congress silently (1) transformed federal gambling law by legalizing sports gaming nationwide for the first time, (2) stripped every state of its police power to prohibit or regulate sports gaming, (3) required that all sports gaming in the country take place on federally designated commodities exchanges, and (4) made the Commodity Futures Trading Commission ("CFTC") the nation's exclusive regulator of sports gaming.

All of that happened, according to Kalshi, because Congress added "swaps" to the CFTC's exclusive jurisdiction under the Commodity Exchange Act ("CEA") as part of Dodd-Frank. Remarkably, Kalshi suggests that no one noticed this sea change for nearly fifteen years—not the Supreme Court, which discerned a "coherent federal policy" embodied in federal gambling statutes that "respect the policy choices of the people of each State on the controversial issue of gambling" and did not even identify the CEA as a federal statute affecting sports gaming, *Murphy v. NCAA*, 584 U.S. 453, 484 (2018); not the dozens of states that have enacted comprehensive sports gaming regulatory regimes; and not even the CFTC itself, which observed just last year that "in the United States, gambling is overseen by state regulators . . . and governed by state gambling laws aimed at addressing particular risks and concerns associated with gambling" and explained that the CFTC "is not a gaming regulator" and lacks "specialized experience to oversee it," Event Contracts, 89 Fed. Reg. 48,968, 48,982–83 (proposed June 10, 2024) (to be codified at 17 CFR pt. 40).

Kalshi operated its exchange for years without listing sports-gaming contracts. Only in January of this year did it begin self-certifying sports-related contracts, and it then commenced a litigation campaign asserting its novel preemption theory against multiple states that sought to

require Kalshi to comply with their sports-gaming laws. In April, two courts acting on emergency motions entered preliminary injunctions in favor of Kalshi. *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 67832, at *25 (D. Nev. Apr. 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893, at *24 (D.N.J. Apr. 28, 2025). But with the benefit of more time, further development of the record, and thorough statutory analysis, a federal court in Maryland rejected Kalshi's preemption argument. *KalshiEX LLC v. Martin*, 2025 U.S. Dist. LEXIS 147815, at *42 (D. Md. Aug. 1, 2025). And more recently, Chief Judge Gordon—whose earlier preliminary ruling Kalshi relies heavily on—held that sports-event contracts like Kalshi's are not "swaps" and are not within the scope of the CEA provision on which Kalshi's preemption theory relies. *N. Am. Derivatives Exch. v. Nev. Gaming Control Bd.*, 2025 U.S. Dist. LEXIS 202104, at *23 (D. Nev. Oct. 14, 2025). As these recent decisions recognize, Kalshi's preemption theory has multiple fatal flaws.

First, Kalshi's sports-gaming products are not "swaps" under the CEA. Kalshi's sports-gaming products do not involve commodities and are not financial risk-transfer instruments. They are instead wagers on who wins a game or achieves some stat line—quintessential sports gaming. Interpreting "swaps" as broadly as Kalshi urges would have the absurd effect of requiring all sports gaming—and many other common transactions—to be conducted on CFTC-regulated commodity exchanges. Second, nothing in the CEA's text, purpose, or legislative history commands or even authorizes such sweeping, preemptive regulatory effect against states' sports-gaming laws. Kalshi falls well short of showing, as it must, that Congress had a clear and manifest purpose to preempt this area of the law that has long been reserved to the states. Third, Kalshi's prior actions, and its competitors' actions, undercut Kalshi's contentions that it is somehow not possible to operate its exchange in a manner that complies with the CEA and Ohio's sports-gaming laws. Rather, Kalshi

has simply declined the opportunity to do so. Fourth, Kalshi's contracts cannot in any event enjoy any preemptive effect because they are, by CFTC rule, prohibited from being listed on CFTC-designated exchanges, and even Kalshi acknowledges that there is no preemption against contracts not listed on CFTC exchanges. Kalshi is thus unlikely to succeed on its preemption theory.

Nor can Kalshi satisfy the other factors to obtain an injunction. Kalshi's alleged harms are speculative and avoidable: criminal exposure is contingent on Kalshi's choice not to comply; geofencing and engineering changes are business decisions; user and reputational impacts are conjectural; and partnership effects rest on vague hearsay of third parties "expressing concerns" and "reconsidering" potential unspecified deals. By contrast, enjoining Ohio law inflicts sovereign injury and undermines consumer protections, market integrity, and public programs funded by regulated sports gaming. The equities and public interest favor allowing Ohio to enforce licensure, age limits, suitability, and integrity safeguards that are rooted in Ohio's historic police powers and consistent with the CEA and the CFTC regulations barring gaming contracts. Kalshi has not sustained its heavy burden to obtain the drastic relief it seeks. Kalshi's Motion must be denied.

## **BACKGROUND**

### I. **Ohio Has Regulated Gaming for Almost Two Centuries.**

Ohio has regulated gaming since 1851. *See* 1851 Ohio Const., Art. XV, § 6. Modern regulation involves, among others, oversight by the Commission over in-person and online sports gaming, which first became available in Ohio in 2023. (Declaration of Matthew T. Schuler (the "Schuler Decl."), attached hereto as Exhibit 1, ¶¶ 4–6.) Under Ohio law, no one can operate and offer sports gaming without a license issued by the Commission. Ohio Rev. Code § 3775.03(A). A business entity offers sports gaming when it accepts "wagers" or "bets" on sporting events, including both professional and collegiate athletic events. *Id.* §§ 3775.01(N)(1), 3775.01(O)(1).

Ohio defines "wager" or "bet" as "risk[ing] a sum of money or thing of value on an uncertain occurrence." *Id.* § 3775.01(DD) . Violations include civil and criminal penalties. *Id.* §§ 2915.02, 3775.02, 3775.99.

Ohio's regulation of sports gaming is necessary to protect Ohioans. Gaming, especially fast, mobile sports betting, can drive addiction, financial harm, youth exposure, and integrity risks. (Schuler Decl. at ¶¶ 15–16, 27.) Sports gaming is "particularly addictive and especially attractive to young people with strong interest in sports, and in the past gamblers corrupted and seriously damaged the reputation of professional and amateur sports." *Murphy*, 584 U.S. at 460. Congress likewise acknowledged that "[i]nternet gambling is a growing cause of debt collection problems for insured depository institutions and the consumer credit industry." 31 U.S.C. § 5361(a)(3). Core regulatory safeguards, such as licensing, age/ID verification, integrity monitoring, and self-exclusion, are critical protection measures. (Schuler Decl. at ¶¶ 12–14, 16)

Further, gaming regulation in Ohio supports various state-funded programs that benefit Ohioans. Ohio distributes revenues from licensed sports gaming proprietors to support K-12 education and to combat sports gaming addiction. Ohio Rev. Code §§ 5753.021, 5753.031. Likewise, the Commission operates the Time Out Ohio program, enabling individuals to voluntarily ban themselves from gambling activities and offering online services to address gambling addiction. (Schuler Decl. at ¶ 13.) As of November 7, 2025, over 10,000 Ohioans had enrolled in the Time Out Ohio program. (*Id.*)

On March 31, 2025, the Commission sent its initial cease and desist letter to Kalshi based upon information that Kalshi was illegally offering sports gaming in Ohio. (Complaint, ECF No. 1, Ex. 1.) Over several months, the Commission corresponded and met with Kalshi's representatives. (*E.g.*, *id.* at Ex. 3.) The information Kalshi provided did nothing to dispel—but

4

rather validated—the Commission's initial determination that Kalshi offers unlawful and unlicensed sports gaming in Ohio. (*See, e.g.*, *id.* at Ex. 8.) Kalshi does not contest that it is violating Ohio law. (*See generally* ECF No. 1; Motion for Preliminary Injunction, ECF No. 11.)

## II.    Kalshi Markets Itself as a Sports Betting Platform.

Kalshi is a CFTC-registered Designated Contract Market ("DCM") that offers sports-gaming products dressed up as so-called "sports-event contracts" or "sports-related contracts." (ECF No. 1, ¶¶ 1, 34, 49.) These "contracts" let users wager on outcome of sporting events like the NCAA Basketball Championship and the U.S. Open Golf Championship via "yes" or "no" positions, with pricing and payout based on perceived probabilities. (*Id.* ¶¶ 29–32, 34, 46–49; *see also* Declaration of Jessica Lake (the "Lake Decl."), attached hereto as Exhibit 2, at Exs. A–D.) Kalshi has also begun offering parlays for sports games and proposition bets on players' performance during a game. *See* Eric Ramsey, *Kalshi Squeezing More From Football Games With Prop, Parlay Markets*, LEGAL SPORTS REPORT (Oct. 10, 2025), https://www.legalsportsreport.com/243581/kalshi-props-parlays-volume-update.

Kalshi's sports-gaming products are just like those offered by sportsbooks. (*See* Lake Decl. at ¶ 9 and Exs. B–D.) Popular sports gaming platforms like FanDuel and DraftKings—both licensed in Ohio—offer identical "futures" sports gaming on outcomes of professional and collegiate sporting events. *See id*; *Sports Betting 101*, FANDUEL, https://www.fanduel.com/sports-betting-strategy (last visited Nov. 7, 2025) (explaining "futures" as "bets on future [sports] events that generally won't occur for weeks or months"); *Bet Types and Market Rules*, DRAFTKINGS, https://sportsbook.draftkings.com/help/general-betting-rules/market-rules (last visited Nov. 7, 2025) (describing multiple types of "Futures Markets").

While Kalshi's lawyers characterize its products as "sports-event contracts," Kalshi concedes that its products are sports-gaming products in its marketing materials, where it routinely

describes its products as "sports betting" and compares them to major sportsbooks:

 

*Ten Times Kalshi Said People Could Bet on Things*, Dustin Gouker, EVENT HORIZON (Apr. 3, 2025), https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could; Image posted by Kalshi (@kalshi), INSTAGRAM, *BREAKING: Kalshi has lapped FanDuel in the App Store top 100* (Oct. 23, 2024), https://www.instagram.com/kalshi_official/p/DBfQOyZyw2W.  Even after multiple lawsuits involving various state gambling authorities, Kalshi continues to market itself as a "legal" loophole "disrupting sports betting."  Image posted by Kalshi (@kalshi), INSTAGRAM, *How Kalshi is legal in all 50 states* (Sept. 5, 2025), https://www.instagram.com/kalshi/p/DOOgG VzAE31; (*See* Lake Decl. at Ex. A.)  And, despite Kalshi's claims of being a neutral exchange, its market maker—through its subsidiary, Kalshi Trading—acts as the house by setting prices and taking the opposite side of customer positions, effectively setting the odds like a sportsbook.  (*See* ECF No. 11-3 at PageID #260-62; Lake Decl. at ¶ 9 and Exs. B–D.)

## III.    The Commodity Exchange Act Regulates Commodity Futures Markets.

The CEA regulates commodity futures markets.  7 U.S.C. §§ 1, *et seq.*  In 1936, Congress enacted the CEA to regulate grains and other commodities, as well as futures contracts based on those commodities.  Pub. L. No. 74-675, § 3, 49 Stat. 1491, 1491 (1936).  A "futures contract is a contract for a future transaction . . . ."  *CFTC v. Erskine*, 512 F.3d 309, 322 (6th Cir. 2008).

In 1974, Congress amended the CEA to create the CFTC, granting it "exclusive jurisdiction" over commodity futures contracts. 7 U.S.C. § 2. This "exclusive jurisdiction" was "intended only to consolidate federal regulation of commodity futures trading in the [CFTC]" and to "separate the functions of the [CFTC] from those of the Securities and Exchange Commission and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982).

In response to the 2008 financial crisis, Congress enacted Dodd-Frank in 2010. Dodd-Frank's purpose was to "promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to protect the American taxpayer by ending bailouts, [and] to protect consumers from abusive financial services practices." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, pmbl., 124 Stat. 1376 (2010). With transparency and consumer protection in mind, Dodd-Frank amended the CEA to place "swaps" under the CFTC's jurisdiction—bringing the "opaque swaps market . . . into the light through transparency and oversight." *Examining the Impact of the Dodd– Frank Act on Markets, Entities, and Investors*, Before the Subcomm. on Capital Mkts. & Gov't Sponsored Enters. of the H. Comm. on Fin. Servs., 112th Cong. (Dec. 12, 2012) (statement of Gary Gensler, Chairman, CFTC) (hereinafter "Gensler Testimony"). Under the CEA, a "swap" means any agreement, contract, or transaction:

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;
>
> (ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—(I) an interest rate swap; . . . (XV) a credit default swap; (XVI) a credit swap; (XVII) a weather swap; . . . (XX) an agricultural swap . . . and (XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

7 U.S.C. § 1a(47)(A)(i)–(vi). This addition enabled the CFTC to "focus on risk factors that contributed to the recent financial crisis, such as excessive leverage, under-collaterization of swap positions, and a lack of information about the aggregate size of positions." 124 Cong. Rec. S5904 (daily ed. July 15, 2010).

In 2010, Congress also enacted a "Special Rule," giving the CFTC authority to prohibit transactions on a DCM that "are contrary to the public interest," such as those involving "gaming" and "activity that is unlawful under any Federal or State law." 7 U.S.C. §§ 7a-2(c)(5)(C)(i), (v). Among other things, the Special Rule sought to prevent contracts on DCMs that "enable gambling through supposed 'event contracts.'" 124 Cong. Rec. S5904 (daily ed. July 15, 2010).

Implementing the authority granted by the Special Rule, the CFTC promulgated Rule 40.11

the following year, prohibiting a registered entity from "list[ing] for trading or accept[ing] for clearing" an event contract "that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal law[.]"  17 CFR § 40.11.  The CFTC explained that the gaming prohibition "is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'"  Provisions Common to Registered Entities, 76 Fed. Reg. 44,799, 44,785 (July 27, 2011).

A year later, the CFTC issued a rule "to assist consumers and commercial and non-profit entities in evaluating whether certain arrangements they enter into will be regulated as" a swap. 77 Fed. Reg. 48,208, 48,319 (Aug. 13, 2012).  The agency observed that the definition of swap "could be read to include certain types of agreements, contracts, and transactions that previously have not been considered swaps," but that "nothing in legislative history of the Dodd-Frank Act appears to suggest that Congress intended such agreements, contracts, or transactions to be regulated as swaps." *Id.* at 48,211.  Recognizing the drastic consequences of such an expansive interpretation, the CFTC issued a final rule interpreting the definition of swap to exclude various types of customary consumer and commercial agreements—including contracts to purchase products at a fixed or capped price, loans with variable interest rates, extended-service plans for appliances, employment contracts, and merger agreements, among many others—from being considered swaps even though they "may have attributes that could be viewed as falling within" the swap definition. *Id. at* 48,246.

Just last year, the CFTC instructed that it lacks statutory authority and experience to regulate gambling-related transactions:

> [T]he [CFTC] notes that in the United States, gambling is overseen by state regulators with particular expertise, and governed by state gaming laws aimed at addressing particular risks and concerns associated with gambling. The [CFTC] is not a gaming regulator. ***The CEA and [CFTC] regulations are focused on***

> *regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns*, including customer protection concerns inherent to gambling. Permitting event contracts involving gaming . . . to trade on CFTC-regulated markets would in effect permit instruments commonly understood as bets or wagers on contests or games to avoid these legal regimes and protections. *Gambling is a rapidly evolving field, and the [CFTC] does not believe that it has the statutory mandate nor specialized experience appropriate to oversee it, or that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources in this manner*.

Event Contracts, 89 Fed. Reg. 48,968, 48,982–83 (proposed June 10, 2024) (to be codified at 17 CFR pt. 40) (emphasis added). More recently, the CFTC cautioned DCMs like Kalshi about the risks of offering sports-event contracts, including state enforcement actions and potential litigation. (Sept. 30, 2025, CFTC Staff Advisory Statement ("Advisory Statement"), a true and accurate copy of which is attached as Exhibit 3, at 2.) Contrary to Kalshi's suggestion that the agency's silence on its event contracts should be taken as approval (ECF No. 11, PageID #223, 230, 232), the Advisory Statement cautioned that the agency has not "taken any official action to approve the listing or trading of sports-related event contracts on any DCM," nor has it "made a determination [as to the self-certified contracts] whether any such contracts involve an activity enumerated or prohibited under" the Special Rule. (Ex. 3 at 2, n.4.)

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy" that cannot be granted without "*clear showing*" that the movant satisfied the heavy "burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citation omitted). "[P]roof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). A movant "must establish" that: (1) "he is likely to succeed on the merits;" (2) "he is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of the equities tips in his favor;" and (4) "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7,

20 (2008).

## LAW AND ARGUMENT

### I.     Kalshi Is Not Likely to Succeed on the Merits.

Kalshi is unlikely to succeed on the merits of its claim to enjoin the State of Ohio and the Commission from regulating sports gaming and enforcing its lawfully enacted gaming laws for two reasons.  First, Kalshi's sports-gaming products are not "swaps" under the CEA.  Second, even if such products were swaps, the CEA does not preempt Ohio's sports-gaming laws.  Kalshi's preemption theory therefore fails and it cannot succeed on its claim.

### A.     Kalshi's Sports-Gaming Products Fall Outside the CEA's Purview.

Kalshi's case depends on the contention that its sports-gaming products are "swaps" within the CEA's "exclusive jurisdiction" under 7 U.S.C. § 2(a)(1)(A).  But the CEA's text, structure, context, and legislative history all demonstrate that Kalshi's sports-gaming products are not swaps.

The "exclusive jurisdiction" provision on which Kalshi relies applies only to transactions involving "swaps" or "contracts for the sale of a commodity for future delivery."[2]  7 U.S.C. § 2(a)(1)(A).  Kalshi's contention is that these contracts are swaps.  (*See* ECF No. 11-2, PageID #248.)  Kalshi relies on the second subpart of the "swap" definition: "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii); (*See* Brief of Appellee at 34–37, *KalshiEX LLC v. Flaherty, et al.*, No. 25-1922 (3d Cir. 2025).)  However, Kalshi's attempt to shield its sports-gaming products through the CEA distorts not only

---

[2] The "sale of a commodity" refers to goods, articles, services, rights, and interests for future delivery, which is not at issue here.  *See* 7 U.S.C. § 1a(9).

the CEA's text and context but ignores the absurd consequences of accepting such an argument.

*First*, Kalshi's sports-gaming products are not swaps because the sports outcomes to which they relate are not "associated with" a financial, commercial, or economic consequence in any ordinary sense of the term. 7 U.S.C. § 1a(47)(A)(ii); *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) (noting that all statutory analysis begins with the text). "Associate" means to "connect (someone or something) with something else in one's mind." *New Oxford American Dictionary* 97 (3d ed. 2010). But sporting events typically have few, if any, commercial, financial, or economic consequences. To the extent that they may have some such consequences, they are not typically "associated with"—in the sense of being connected in the mind with—those consequences.

This conclusion is confirmed by application of standard canons of statutory construction. "The traditional canon of construction, *noscitur a sociis* [known by its associates], dictates that 'words grouped in a list should be given related meaning.'" *Dole v. U.S. Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (cleaned up). Courts rely on this canon to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Here, the clauses surrounding the subpart on which Kalshi relies define swaps as agreements that directly relate to "1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property." 7 U.S.C. § 1a(47)(A)(i), (iii). It follows that the "event or contingency associated with a potential financial, economic, or commercial consequence" used in subpart (ii) refers to events and contingencies that have a similarly direct and inherent association with matters of financial, economic, or commercial consequence. Indeed, were "event or contingency associated with a

potential financial, economic, or commercial consequence" so broad as to cover all events that merely *have* any attenuated financial, economic, or commercial effects (rather than being limited to those ordinarily *"associated with"* such effects), the swap definition's other subparts would be rendered superfluous. But a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corely v. United States*, 556 U.S. 303, 314 (2009) (cleaned up).

*Second*, as one court has already determined regarding similar contracts, Kalshi's sports-outcome contracts are not dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency. *See N. Am. Derivatives Exch.*, 2025 U.S. Dist. LEXIS 202104, at *22. The ordinary meaning of "occurrence" refers to "something happened," and the ordinary meaning of "event" is "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time." *Id.* at *19–22 (collecting dictionary definitions). Because the "ordinary meaning of event in terms of sports would be the sporting event itself, not who wins it[,]" Kalshi's sports-gaming products are not swaps because they "turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event." *Id.* at *22. Nor are these sports-outcome contracts dependent on a contingency as they focus on the outcome of a certain event, not the occurrence of a contingent event. *Id.*, n.9; (*See also* Lake Decl. at Ex. A (Kalshi describing itself as an exchange "where you can buy and sell contracts on the outcome of events.").) Here, Kalshi's sports-outcome contracts are based on the "outcome" of sporting events. (ECF No. 1, ¶¶ 46–47.) They are not swaps, and thus not subject to the CEA's jurisdiction.[3]

---

[3] Construing "event" broadly to encompass outcomes likewise renders other definitions of "swap" superfluous. *See N. Am. Derivatives Exch.*, 2025 U.S. Dist. LEXIS 202104, at *23–24.

***Third***, accepting Kalshi's broad view of "swaps" would produce absurd results: it would render almost every sports betting transaction conducted outside of a DCM to violate the CEA and impliedly override various federal gambling regulations, working a dramatic change in the legal framework for gambling nationwide. But "Congress does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001). "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purposes are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Under Kalshi's interpretation, Congress—by amending the CEA through Dodd-Frank to add swaps in the exclusive jurisdiction provision—intended to upend the entire federal and state gambling regulatory framework. (ECF No. 11, PageID #227–28.)

If the CEA's definition of "swaps" includes sports-gaming products as Kalshi insists, then almost all sports betting occurring outside of a DCM would be violations—indeed crimes—under the CEA, the CEA prohibits "any person" to enter into a swap unless (1) the person is an "eligible contract participant" ("ECP") or (2) the swap was "entered into, on, or subject to the rules" of a DCM. 7 U.S.C. § 2(e). The CEA's ECP definition encompasses only sophisticated parties like financial institutions, investment companies, or individuals with invested amounts on a discretionary basis exceeding $10,000,000.00. 7 U.S.C. § 1a(18). Therefore, "if the statutory definition of swaps covers contracts on the outcome of sporting events that have a potential financial or economic consequence, and all swaps must be done on a DCM absent exceptions not applicable to casinos and the average sports bettor, then all sports betting must be done on a DCM." *N. Am. Derivatives Exch.*, 2025 U.S. Dist. LEXIS 202104, at *25–26. "The CEA's language and legislative history show that Congress did not intend such a change." *Id.* at *26. Further, Kalshi's interpretation conflicts with federal laws such as the Wire Act, 18 U.S.C. § 1084(a), which makes

14

"betting" over "wire communication" illegal except when permitted by state law. *See Martin*, 2025 U.S. Dist. LEXIS 147815, at *33.

For these reasons, Kalshi's interpretation also runs afoul of the major questions doctrine, under which Congress must speak clearly to give a federal agency authority over matters of great economic and political importance. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Kalshi's incredibly broad reading of "swap" (any occurrence with any degree of economic ramification) would give the CFTC a tremendous amount of power and discretion, particularly because (as noted above) the CEA would largely make it unlawful to conduct transactions tied to such occurrences any other way. *See* 7 U.S.C. § 2(e). Congress would not have been so subtle in hiding this "elephant" if it truly meant to give the CFTC such vast power. *See Whitman*, 531 U.S. at 468.

***Fourth***, the CEA's statutory context further highlights that sports gaming is not the type of "mischief" Congress sought to address through the CEA and providing the CFTC with jurisdiction over swaps. Courts interpret provisions "with a view to their place in the overall statutory scheme." *David v. Mic. Dep't of Treasury*, 489 U.S. 803, 809 (1989). And statutory components should be construed to work "in harmony" rather than "at cross-purposes." *Jones v. Hendrix*, 599 U.S. 465, 478 (2023). Statutes "must be read in the light of the mischief" Congress wanted to "correct[] and the end to be attained." *Warner v. Goltra*, 293 U.S. 155, 158 (1934).

In 2010, when Congress added swaps to the CEA through Dodd-Frank, it did so in furtherance of the CEA's purpose to regulate economic risks in derivatives markets by curbing market manipulation, fraud, and excessive speculation. *See* 7 U.S.C. §§ 5(a)–(b). This addition brought the "opaque swaps market . . . into the light through transparency and oversight" so that the CFTC could "focus on risk factors that contributed to the recent financial crisis, such as excessive leverage, under-collaterization of swap positions, and a lack of information about the

aggregate size of positions." Gensler Testimony; 124 Cong. Rec. S5904 (daily ed. July 15, 2010).

Kalshi misconstrues the CEA's purpose to sidestep state gambling laws. Yet, the CEA's purpose was not to regulate sports gaming. *See id.*; Event Contracts, 89 Fed. Reg. 48,968, 48,982–83 (June 10, 2024). Nor does the CEA address the problems typically regulated by gambling laws. The CEA is a "remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002). This is in stark contrast to state gambling laws, which, among other things, regulate social problems often associated with gambling's inherent addictive nature. *See Murphy*, 584 U.S. at 460; 31 U.S.C. § 5361(a)(3). The CFTC itself acknowledges its lack of "statutory mandate or specialized experience" to address such social problems like crimes associated with gambling.[4] Event Contracts, 89 Fed. Reg. 48,968, 48,982–83 (June 10, 2024). Kalshi's proposed interpretation of the CEA ignores the reality that the CEA does not address the problems often associated with sports gaming, because the CEA was never meant to. That responsibility has always been primarily reserved to the states.

*Fifth*, the CFTC has expressly declined to interpret the term "swap" so broadly as to encompass gaming activities. Under the authority granted by Congress, the CFTC instead promulgated Rule 40.11 to prohibit events contracts based on "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 CFR § 40.11. The CFTC has also rejected an expansive interpretation of swap that would encompass "arrangements that historically have not been considered swaps," even though they "may have attributes that could be viewed as falling within" the swap definition,

---

[4] In contrast, the Commission is a "law enforcement agency" with "gaming agents" who serve as "peace officers" tasked with enforcement of sports gaming criminal violations. Ohio Rev. Code §§ 3772.03(F), 3772.01(K); 3775.99.

recognizing the severe consequences of a contract being deemed a swap and the lack of any indication that Congress intended such agreements to be treated as swaps. 77 Fed. Reg. 48,208, 48,246 (Aug. 13, 2012). Further, the CFTC has explained that it "is not a gaming regulator." Event Contracts, 89 Fed. Reg. 48,968, 48,982–83 (June 10, 2024). It appears from the CFTC's prohibition on gaming and its narrowing of the swaps over which it has jurisdiction that even the CFTC does not believe these so-called "sports-event contracts" are swaps. Kalshi agreed as much last year, admitting that "contracts on the outcome of the Super Bowl, the Kentucky Derby, and the Masters golf tournaments" are gaming or games "staged for entertainment" with "no economic risks." (Brief of Appellee at 58, 68, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C.C. Nov. 15, 2024).)

Because Kalshi is unlikely to succeed in showing that its sports-gaming products are "swaps" under the CEA, its Motion should be denied.

### B. The CEA Does Not Preempt Ohio's Sports-Gaming Laws.

Even if the CEA could be applicable to Kalshi's sports-gaming products, the CEA does not preempt Ohio's sports-gaming laws. Kalshi cannot overcome the presumption against preemption, nor can it demonstrate that it was Congress's clear and manifest purpose to preempt state sports-gaming laws through the enactment of the provisions of the CEA at issue. Under any theory of preemption—express, field, or conflict—Kalshi cannot prevail.

### 1. This Court Should Presume that Ohio's Sports-Gaming Laws Are Not Preempted by the CEA and May Only Find Preemption if it Was Congress's Clear and Manifest Purpose to Preempt Those Laws.

Federal law requires that the Court start with the presumption that the CEA does not preempt Ohio's sports-gaming laws. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). The presumption against preemption applies in "all pre-emption cases"

17

because "States are independent sovereigns in our federal system" of government. *Medtronic Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The Court should therefore begin its analysis by presuming that the CEA does not preempt Ohio's sports-gaming laws.

That presumption applies even greater force here since the regulation of gambling has long been within Ohio's police powers. If Congress legislates "in a field which the States have traditionally occupied," courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the ***clear and manifest purpose*** of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (emphasis added); *see also Bond v. United States*, 572 U.S. 844, 857–59 (2014) (observing that, under the federalism doctrine, Congress writes against the backdrop of our federalist structure and must speak clearly in making significant changes to the traditional balance of state and federal power). When a state exercises its police power, it "may act[] in many [federally occupied] areas . . . concurrently with the federal government." *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960).

Gambling regulation has long been within a state's police powers. *E.g.*, *United States v. King*, 834 F.2d 109, 111 (6th Cir. 1987) ("Throughout our history, the regulation of gambling has been largely left to the state legislatures . . . ."). "States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). The Supreme Court concluded the same: "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Murphy*, 584 U.S. at 486.

For over 170 years, Ohio has exercised its inherent police power over gaming. *See* 1851 Ohio Const., Art. XV, Sec. 6. Ohio, through the Commission, has continued to exercise that power by regulating bets on sporting events. *See* Ohio Rev. Code § 3775 *et seq.* Because gambling

regulation has historically been within States' police powers, Kalshi must satisfy the "clear and manifest purpose" test to establish preemption. Kalshi fails to do so here.

### 2. Ohio's Sports-Gaming Laws Are Not Expressly Preempted by the CEA.

The CEA lacks language that explicitly preempts Ohio's gaming laws. Although Kalshi does not argue under the rubric of express preemption, it attempts to shoehorn such an argument into its field preemption analysis by asserting that "Congress has preempted the field of regulating trading on DCMs . . . expressly in the text of the CEA." (ECF No. 11, PageID #227.) "Express preemption requires an explicit statement of federal law that announces and defines the scope of displaced state regulation." *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151 (3d Cir. 2024). While Congress did include explicit preemption provisions in the CEA that Kalshi does not contend are applicable here, 7 U.S.C. §§ 16(h) and (e)(2), Kalshi has identified no such explicit language preempting state sports-gaming laws. Therefore, the CEA "does not expressly preempt state law." *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019).

### 3. Ohio's Sports-Gaming Laws Are Not Field Preempted by the CEA.

Nor does the CEA impliedly preempt Ohio's sports gaming regulations through field preemption. Field preemption "focuses on when Congress does not expressly preempt state law but where federal law leaves no room for state regulation . . . ." *Pennsylvania v. Navient Corp*., 967 F.3d 273, 287 (3d Cir. 2020) (internal quotation marks and citation omitted); *see Murphy*, 584 U.S. at 479. And when the federal government has occupied a field, that field is usually rooted in some sort of *policy*. *See, e.g*., *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) (nuclear safety); *Arizona v. United States*, 567 U.S. 387 (2012) (immigration); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (foreign affairs). In

performing a field preemption inquiry, courts often look to "the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (emphasis in original).

State law is not automatically preempted simply because it concerns a federally regulated field. "States need not yield jurisdiction 'where the activity regulated was a merely peripheral concern of the [federal law] . . . or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.'" *Linn v. United Plant Guard Workers*, 383 U.S. 53, 59 (1966) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 243–44 (1959)); *see also De Canas v. Bica*, 424 U.S. 351, 355 (1976) (explaining not "every state enactment" related to a field occupied by the federal government is "*per se* preempted").

Nor can preemption be inferred "where the regulated conduct touche[s] interest[s] so deeply rooted in local feeling and responsibility" without "compelling congressional direction[.]" *Garmon* at 243–44 (cautioning courts from finding preemption when the state regulations is "merely peripheral concern" of the federal regulation). States may also regulate within their own domain "even when their laws incidentally affect areas within [the federal government]'s domain." *Hughes v. Talen Energy Mktg.*, 578 U.S. 150, 164 (2016); *see English v. Gen. Elec. Co.*, 496 U.S. 72, 85 (1990) (explaining there must be "some direct and substantial effect" on the occupied field). When there is no "clearly expressed congressional direction" to override the "compelling state interest, in the scheme of our federalism" and for "the maintenance of domestic peace," State jurisdiction must prevail. *Garmon* at 247. Likewise, if a court encounters any ambiguity in this assessment, it should "refuse[] to hold that state regulation was superseded by federal law." *Rice*,

331 U.S. at 237.

Put simply, field preemption is inappropriate when "there is no indication that Congress intended to preclude state law" in the "specific field which the States were attempting to regulate." *De Canas*, 424 U.S. at 351; *see Silkwood v. Kerr-Mcgee Corp.*, 464 U.S. 238, 251 (1984) (finding "no indication that Congress even seriously considered precluding the use of" state law remedies when it enacted or amended the Atomic Energy Act.) Against this standard, Kalshi's field preemption argument fails for several reasons.

**First**, even if Congress may have had *some* intent to preempt *some* state law, the crucial issue is defining the scope of the field that Congress had a clear and manifest purpose to preempt. "[T]he fact that the CEA has some field-preemptive effect does not mean that the 'field' Congress intended for the CEA to occupy includes state gambling laws and specifically sports wagering laws." *Martin*, 2025 U.S. Dist. LEXIS 147815, at *22–23. The important inquiry here is not the discernment of some preemptive intent, but identification of the scope of any clearly manifested preemptive intent. *Id.* at *22. Indeed, failing to identify the CEA's preemptive scope, *i.e.*, to define the field, is where the first two courts that have reviewed this issue erred. *Id.*; *see Hendrick*, 2025 U.S. Dist. LEXIS 67832, at *6;[5] *Flaherty*, 2025 U.S. Dist. LEXIS 79893, at *5–6.

**Second**, the CEA's exclusive jurisdiction is limited and has been held not to preempt laws of general application. Various courts have recognized that in enacting and amending the CEA, Congress "did not manifest an intent to occupy completely the entire field of commodity futures regulation." *Effex Cap., LLC*, 933 F.3d at 894; *Am. Agric. Movement v. Bd. of Trade*, 977 F.2d 1147, 1155–56 (7th Cir. 1992) (same); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 589 (D.C.C. 2001)

---

[5] Notably, the same judge in *Hendrick* recently found that Nevada's sports-gaming laws in fact were not preempted by the CEA since so-called event contracts similar to those at issue here were not swaps. *See N. Am. Derivatives Exch.*, 2025 U.S. Dist. LEXIS 202104, at *22.

(determining that Section 2 "confers exclusive jurisdiction to the CFTC over a limited, discrete set of items related to the making of futures contracts"). The CEA's "limited" and "discrete" jurisdiction does not preempt laws of general application, such as state laws on negligence, fraud, and breach of contract. *See, e.g.*, *Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207–08 (9th Cir. 1982) (finding laws of general application not preempted by the CEA); *Sall v. G.H. Miller & Co.*, 612 F. Supp. 1499, 1504–05 (D. Colo. 1985) (same); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 674 (N.D. Ga. 1983) (same); *Patry v. Rosenthal & Co.*, 534 F. Supp. 545, 549 (D. Kan. 1982) (same). Likewise, the CEA does not preempt Ohio's sports-gaming laws.

**Third**, the CEA's express preemption provisions further support the absence of field preemption in this case. Under 7 U.S.C. § 16(e)(2), the CEA expressly preempts any state law "that prohibits or regulates gaming" in very specific instances, which Kalshi does not contend to be applicable here. "Congress directly considered the scope of the field it considered itself to be occupying for preemption purposes when it comes to 'gaming.'" *Martin*, 2025 U.S. Dist. LEXIS 147815, at *26. Section 16(h) further preempts state insurance laws to the extent they govern swaps. 7 U.S.C. § 16(h). Together, these preemption provisions lead to one logical conclusion: "Congress's decision to expressly preempt state gaming laws for certain transactions and state-insurance laws for swaps—compared to its silence as to all others—is strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law." *Martin* at *27.

**Fourth**, the CEA's savings clauses demonstrate the CFTC's limited exclusive jurisdiction. Savings clauses "preserve all existing rights which were not inconsistent with those created by the statute." *Pa. R.R. Co. v. Puritan Coal Mining Co.*, 237 U.S. 121, 129 (1915). They also "negate[] the inference that Congress 'left no room' for state causes of action." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). The CEA includes two savings clauses. *See* 7 U.S.C. § 2(a)(1)(A).

22

Even if there could be some preemptive intent, *see infra*, the existence of these savings clauses alone "negates the inference that Congress 'left no room' for state causes of action," *id.*, and demonstrates that Congress intended to "preserve all existing rights [of the States] which were not inconsistent with those created by" the CEA, *Pa. R.R. Co.*, 237 U.S. at 129.

**Fifth**, the CEA's Special Rule "confirms that Congress intended for at least some state laws to operate alongside the CEA, not to be preempted by it." *Martin* at *24. By permitting the CFTC to prohibit event contracts that are unlawful under state law, there is an "affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful," which "undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA." *Id.* (emphasis in original).

**Sixth**, interpreting the CEA to field preempt sports-gaming laws produces absurd results. For example, accepting Kalshi's argument would mean that by enacting and amending the CEA, Congress: (1) legalized sports and other types of gambling nationwide; (2) impliedly preempted state laws regulating sports gaming; and (3) required all sports gaming to occur on CFTC regulated exchanges. *Supra* § I.A. Common sense dictates that cannot be what Congress intended.

**Seventh**, the CEA's legislative history demonstrates that Ohio's sports-gaming laws are not field preempted. Since its enactment, the CEA has been focused on controlling the "forms of *speculative activity*" that "demoralize(s)" markets and "injur[es]" producers and consumers and the exchanges themselves." Report No. 421, U.S. House of Representatives 74th Cong, Accompanying the Commodity Exchange Act (Mar. 18, 1935) (emphasis added). This focus on speculation is evident from Congress's 2010 amendment adding the Special Rule. By allowing the CFTC to prohibit event contracts contrary to the public interest, specifically those involving "gaming," Congress demonstrated that DCMs were not the appropriate venue for sports gaming.

*See* 126 Cong. Rec. S5906-07 (July 15, 2010) (colloquy between Senators Dodd and Lincoln regarding sports gaming); Provisions Common to Registered Entities, 76 Fed. Reg. 44,799, 44,785 (July 27, 2011) (The CFTC explaining that "its prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" (quoting 156 Cong. Rec. S5906 (July 15, 2010)).  As Kalshi admitted elsewhere, the Special Rule's use of "gaming," "on its face," and "based on the [CEA's] legislative history . . . appears to be concerned with casinos and sports." (*KalshiEX LLC v. CFTC*, D.D.C. Case No. 1:23-cv-03257, Motion for Summary Judgment, ECF No. 17-1, at 38.)  As such, "there is no indication that Congress even seriously considered precluding" states from exercising its authority over sports gaming "when it enacted the [CEA] or when it amended it."  *Silkwood v. Kerr-Mcgee Corp.*, 464 U.S. 238, 251 (1984).

*Eighth*, Ohio's sports-gaming laws do not intrude into the CEA's limited field of regulation. Ohio's sports-gaming laws do not regulate commodities trading and in turn, the CEA is not regulating sports gaming.  *See Pac. Gas & Elec.*, 461 U.S. at 213, 216; *De Canas*, 424 U.S. at 362. Because "[b]oth the text and purpose of the [CEA] contemplate a regime in which other [governmental entities] share power with the CFTC over activities that lie outside the scope of [the CFTC's exclusive jurisdiction]," *Ken Roberts Co.* at 591.

For these reasons, Kalshi cannot overcome the presumption against preemption and has not shown a clear and manifest purpose by Congress for the CEA to preempt Ohio's sports gaming laws.

### 4.    Ohio's Sports-Gaming Laws Are Not Conflict Preempted by the CEA.

For many of the same reasons explained above, Ohio's sports-gaming laws are not conflict preempted by the CEA.  Of the two types of conflict preemption—obstacle and impossibility—

Kalshi cannot demonstrate either.

> **i. Ohio's Sports-Gaming Laws Do Not Stand as an Obstacle to Congress's Purposes and Objectives of the CEA.**

Ohio's sports-gaming laws do not create a preemptive obstacle to Congress's purposes and objectives for the CEA. Obstacle preemption occurs when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. Mere speculation that laws pose a serious obstacle to the goals of federal law do not support conflict preemption. *See Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 720 (1985). No obstacle preemption exists here.

*First*, Ohio's exercise of police power to enforce its sports-gaming laws does not create an obstacle to Congress's purposes and objectives of the CEA. As explained above, *supra* § I.B.3, the CEA's text and legislative history show that states that use their police power to enforce gambling laws do not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* at 67. Ohio's sports-gaming laws are not regulating or "directly affect[ing] trading on or the operation of a futures market." *Am. Agric. Movement*, 977 F.2d at 1156. If there is any "effect" on futures or commodities markets from Ohio using its police power to enforce its sports-gaming laws, it is indirect at best.

In addition, the Special Rule indicates that it was "the purpose[] and objective[] of Congress" to avoid harm to the public by setting out a special procedure for the CFTC to review "gaming" related events contracts and swaps. 7 U.S.C. § 7a-2(C)(5). Congress made clear that gaming contracts were red flags for futures markets and commodity exchanges. The CEA's legislative history, including its continued concern over speculative gambling activity, only

25

bolsters this conclusion. *Supra* § I.B.3. Ohio's exercise of its police power to enforce sports-gaming laws—laws crafted to serve the public interest—cannot conflict with Congress's objectives under the Special Rule, when Congress's own intent was to protect the public interest in the context of gaming contracts.

Further, as explained above, Ohio's sports-gaming laws fall squarely within its police powers. *See supra* Part I.B.1. "Plainly, Congress by mere grant of power to the [CFTC] did not intend to supersede state police regulations established for the protection of" Ohioans engaging in sports gaming. *H. P. Welch Co. v. New Hampshire*, 306 U.S. 79, 85 (1939). Because Ohio is enforcing its sports-gaming laws as an arrow in its police-power quiver, Ohio is not directly regulating futures markets or commodity exchanges and is not interfering with the "purposes and objectives" of Congress.[6]

***Second***, federal regulation operates as a floor rather than a ceiling in public-interest considerations, especially in areas of regulation that fall within the traditional role of the states. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963); *United States v. Azko Coatings of Am.*, 949 F.2d 1409, 1451 (6th Cir. 1991). Here, the CEA's text and legislative history lack any indication that Congress intended for the CFTC to be the sole arbiter over what is and is not in the public interest. Instead, Ohio sports-gaming laws are complementary to this public interest determination and do not create a preemptive obstacle to Congress's purposes and objectives of the CEA.

Kalshi's arguments to the contrary lack merit. Kalshi argues that Ohio's sports-gaming

---

[6] Regardless, this Court should decline to find obstacle preemption here because obstacle preemption does not comport with the text and original public meaning of the Supremacy Clause. *See Kansas v. Garcia*, 589 U.S. 191, 213 (2020) (Thomas, J., concurring) (The Court should "explicitly abandon [its] 'purposes and objectives' pre-emption jurisprudence."); *see also Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead opinion).

laws "conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting regimes." (ECF No. 11, PageID# 232.) But as explained above, Ohio's laws are complementary to the goals of the CEA and do not hinder its purposes or objectives. *Supra* § I.B.2; *Martin*, 2025 U.S. Dist. LEXIS 147815, at *24-25, 37.

Kalshi also argues that Ohio's gambling laws would displace the CEA's "carefully calibrated federal enforcement scheme . . . by a blunt application of mandatory state criminal penalties." (ECF No. 11, PageID #233.) Kalshi cites to *Arizona*, 567 U.S. 387, and *Crosby*, 530 U.S. at 363, as support. (*Id.* at PageID #232–33.) But those cases are inapposite because they deal with matters "to which there is a uniquely federal interest," *Martin* at *38, namely, immigration and foreign affairs. *See Arizona* at 359; *Crosby* at 375-77. Neither case involved state statutes that have historically been under the province of the states' police powers like here.

Kalshi further argues that because it self-certified its sports-gaming contracts and the CFTC did not act on those contracts, such contracts "comported with federal law." (ECF No. 11, PageID #232.) Accepting this argument would imply (1) Congress's intent to preempt all state sports-gaming laws, (2) Congress's legalization of sports gaming nationwide, and (3) Congress's intent to strip states of any authority to make public interest determinations for sports gaming within their borders. But if this Court were to adopt Kalshi's logic that mere inaction by the CFTC indicates authorization, then no one can enforce the public interest, not even states who have inherent police power to do so. As shown by the statutory text and legislative history of the CEA, that is not what Congress intended and goes against Congress's "purposes and objectives." *Hines* at 67.

Regardless, as the CFTC explained in its Advisory Statement, Kalshi's self-certification has no bearing on the lawfulness of its sports-gaming contracts. (Ex. 3 at 2, n.4 ("The Commission has not, to date . . . taken any official action to approve the listing or trading of sports-related event

contracts on any DCM," nor has it "made a determination whether any such contracts involve an activity enumerated or prohibited under" the Special Rule.).) Therefore, Ohio's gambling laws do not create a preemptive obstacle to Congress's purposes and objectives for the CEA.

      **ii.    It Is Not Impossible for Kalshi to Comply with Ohio and Federal Law.**

Kalshi also cannot demonstrate impossibility preemption. Impossibility preemption arises only when it is legally or physically impossible to comply with both the federal and state sovereigns' commands; it is a "demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). Without a federal law expressly prohibiting a person from complying with state law, a court must "determine whether the [person] has presented 'clear evidence'" that the federal government "would have prohibited the [person] from taking the necessary steps under state law." *Yates v. Ortho-Mcneil-Janssen Pharm., Inc.*, 808 F.3d 281, 294 (6th Cir. 2015) (quoting *Wyeth* at 571).

Kalshi's "impossibility" argument fails for several reasons. ***First***, Kalshi could comply with Ohio law by simply not offering sports-gaming contracts, as it did for the first five years Kalshi was designated as a contract market. (ECF No. 1, ¶¶ 46, 49.) Nothing in the CEA obligates Kalshi to offer sports-gaming contracts that would violate Ohio law. ***Second***, contrary to Kalshi's assertion, obtaining an Ohio license would not bar it from accepting trades from users outside of Ohio. *See* Ohio Rev. Code § 3775.04 (operation as sports gaming proprietor); 3775.05 (operation as management services provider). Ohio's sports-gaming laws apply to conduct within the state—not nationwide—and Kalshi can even work with certain licensed entities to pool or lay off bets inside and outside of Ohio. *See* Ohio Rev. Code §§ 3775.10(C); 3775.10(D). Kalshi's own in-house subsidiary market maker, Kalshi Trading, and others that receive "benefits," already accept these wagers under Kalshi's business model. (See ECF No. 1, Exs. 3, 6.) ***Third***, Kalshi's concern over the CFTC's "impartial-access" rule is flawed. *See* 17 C.F.R. § 38.151(b). That rule ensures fair treatment among eligible participants, not compulsory service in jurisdictions where the

underlying activity is illegal. Exchanges routinely restrict access to comply with sanctions, age, or anti-fraud laws without violating the CEA. *See, e.g.*, CME Rulebook, CHICAGO MERCANTILE EXCHANGE, https://www.cmegroup.com/rulebook/CME/I/5/5.pdf (last accessed Oct. 27, 2025) (restricting access for certain individuals including those located in restricted countries or territories). For example, Crypto.com, a DCM, will no longer be offering sports-gaming products to Nevada citizens. (*See* Oct. 24, 2025, Nevada Crypto.com Notice at 1, a true and accurate copy of which is attached as Exhibit 4.) **Fourth**, Kalshi could utilize the data it collects pursuant to "Know Your Customer" rules and decline to offer services to Ohioans. Thus, there is no conflict preemption because Kalshi has not provided clear evidence that it is impossible to comply with both federal and Ohio law.

To summarize, Kalshi cannot overcome the presumption against preemption or demonstrate Congress's clear and manifest intent to preempt Ohio's sports-gaming laws. As such, Kalshi has not made a clear showing that it is likely to succeed on the merits of its claim. Therefore, this Court should deny Kalshi's request for injunctive relief.

### C. CFTC Rule 40.11 Bars Kalshi's Sports-Gaming Products from DCM Listing.

Even if Kalshi's sports-gaming products were "swaps" under the CEA (they are not) and the CEA did preempt the application of state gambling laws as to such swaps (it does not), Ohio's laws still would not be preempted in this case because Kalshi's sports-gaming products cannot be lawfully listed or traded on a DCM. Congress empowered the CFTC, via the Special Rule, to prohibit swaps involving "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), and the CFTC did so by promulgating Rule 40.11, which bars any registered entity from listing such swaps on a DCM. 17 C.F.R. § 40.11(a)(1). Rule 40.11 carries the full force and effect of federal law. *See Nichols v. United States*, 260 F.3d 637, 648 (6th Cir. 2001). Kalshi's sports-gaming products thus cannot be

traded or executed on a DCM; they are consequently outside the reach of any purported federal preemption under 7 U.S.C. § 2(a)(1)(A), since the CEA, by its express terms, does not preempt the application of any state statute to transactions that are not conducted on or subject to the rules of a registered entity or exempt board of trade.  7 U.S.C. § 16(e)(1)(B)(i).  In other words, the CEA has no preemptive effect over swaps that are off a DCM—including those that cannot be listed due to federal prohibition, such as Kalshi's sports-gaming products.  The Court should find that Kalshi's sports-gaming products are not lawfully listed given Rule 40.11 and therefore not afforded preemptive protection.  Further, Kalshi is not entitled to injunctive relief due to its unclean hands— having improperly self-certified its sports-gaming contracts in violation of Rule 40.11 and offering of bets over wire communications in contravention of the Wire Act, 18 U.S.C. § 1084(a).  *See Cyber Solutions Internat'l., LLC v. Pro Marketing Sales*, 634 F. App'x 557, 567 (6th Cir. 2016) (explaining that courts may deny injunctive relief to parties with unclean hands).  For these reasons, the Court should deny Kalshi's motion for preliminary injunction.

> ### D. Kalshi's "Indirect Regulation" Argument Fails.

In a final attempt to avoid complying with Ohio's sports-gaming laws, Kalshi argues that the Commission's August 25, 2025 advisory letter concerning licensee suitability (the "Advisory") (*see* Schuler Decl. at Ex. A) is an "end-run around preemption" because it "punish[es] entities that partner with Kalshi."  (ECF No. 11, PageID #234.)  This argument ignores the Commission's statutory responsibility to regulate licensees and their suitability for licensure.  *See* Ohio Rev. Code § 3775.09.  In addition to mischaracterizing the Advisory as anything other than an appropriate exercise of the Commission's responsibility, Kalshi's argument lacks merit.

*First*, this argument relies fundamentally on the premise that the CEA preempts Ohio's sports-gaming laws.  But as shown above, that is not the case.  *Supra* § I.

**Second**, even if Kalshi's premise were true, the argument is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). The Advisory did not suggest the Commission would take any enforcement action against lawful action. (*See* ECF No. 1-5.) Even so, the Commission may consider actions that are entirely legal in determining licensee suitability. For example, the Commission may consider whether sports gaming license applicants have filed for bankruptcy. *See* Ohio Adm. Code § 3775-4-01.

**Third**, Kalshi relies on *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024), and other cases for its "indirect regulation" argument. But *Vullo* is inapposite. It is a free speech coercion case that has no relevance to the statutory boundaries of preemption. Nor are Kalshi's remaining cases applicable, as they all concerned express preemption or offered no substantive field preemption analysis. Regardless, and contrary to Kalshi's assertion, the Advisory did not threaten entities "that partner[] with Kalshi," but instead, it advised licensees of their obligations to maintain their licensure under Ohio law, which the Commission is empowered to do. (*See* ECF No. 11, PageID #218.)

**Fourth**, Kalshi's potential concern regarding the Dormant Commerce Clause is irrelevant to the merits because preemption turns on the statute's text, structure, and purpose—not on other constitutional concerns. *See English*, 496 U.S. at 78–79 ("Pre-emption fundamentally is a question of congressional intent . . . ."). Even so, there is no Dormant Commerce Clause issue because the Commission's Advisory serves a legitimate local purpose by protecting Ohio consumers from unlicensed and unregulated sports gaming, does not discriminate against or burden out-of-state economic interests, and imposes only incidental effects, if any, on interstate commerce. *See, e.g.*, *Maine v. Taylor*, 477 U.S. 131 (1986). Kalshi's argument therefore lacks merit.

31

## II.    Kalshi Fails to Make a Clear Showing That It Will Suffer Irreparable Harm Absent a Preliminary Injunction.

In addition to the fact that Kalshi's claim is unlikely to succeed on its merits, Kalshi has not made clear showing that it will suffer irreparable harm absent a preliminary injunction. To be entitled to a preliminary injunction, a movant must make a "clear showing" that he or she will suffer irreparable harm without an injunction. *Winter*, 555 U.S. at 20, 22. Such alleged harm "must be both certain and immediate, rather than speculative or theoretical." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Kalshi alleges five reasons why it would be irreparably harmed absent an injunction. None succeed.

*First*, Kalshi argues that "***if*** [it] chooses not to comply" with the Commission's directives to follow Ohio law, Kalshi and its officers face harms derived from the threat of civil liability and criminal prosecution. (ECF No. 11, PageID #237 (emphasis added).) But such harm is not "both certain and immediate." *Griepentrog* at 154. As Kalshi admits, its alleged harm rests on "if" Kalshi chooses not to comply with Ohio law.

*Second*, Kalshi argues that "attempting to comply with" the Commission's directives would subject Kalshi to monetary losses and technological challenges, such as geofencing. (ECF No. 11, PageID# 237–38.) But these are speculative and conditional challenges—not the type of "loss [that] threatens the very existence of [Kalshi]'s business." *Wis. Gas Co. v. Fed. Energy Regul. Com.*, 758 F.2d 669, 674 (D.C. Cir. 1985). The Commission is not regulating every product Kalshi offers but only those involving sports gaming that violate Ohio law. (*E.g.*, ECF No. 1, Ex. 1.)

*Third*, Kalshi argues that enforcing Ohio's laws would impair existing contractual obligations for its users (ECF No. 11, PageID #238), but this alleged harm to third parties—rather than to Kalshi itself—is not relevant to the irreparable harm analysis and is entirely speculative. No record evidence shows any imminent forced closure. Kalshi's own representations confirm it

can manage or restructure user positions through ordinary market mechanisms, making this contingent, internally mitigable concern insufficient to establish irreparable injury.  (ECF No. 1, Ex. 6, ¶ 28 (explaining that Kalshi "would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose").)  *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit.") (emphasis in original).

*Fourth*, Kalshi's assertion that it will suffer reputational harm and loss of goodwill if it chooses not to comply with Ohio law is speculative at best.  (ECF No 11, PageID #238.)  Any such harm depends entirely on Kalshi's decisions and amounts to generalized fears rather than "certain and immediate" injury.  *Griepentrog*, 945 F.2d at 154.  Any concerns about user or CFTC reactions, or purported risks of violating "Core Principles" if event contracts are terminated, are conjectural and do not constitute irreparable harm—especially when the CFTC's own guidance expressly advises on such risks from lawful state gambling oversight.  (*See* Ex. 3 at 2.)

*Fifth*, Kalshi contends that the Commission's advisement in its Advisory has impeded its growth and scared business partners.  (ECF No. 11, PageID #239–40.)  But as the hearsay Kalshi put forward demonstrates, these alleged harms are not certain or immediate.  ***Prospective*** partners have merely "expressed concerns" about partnering with Kalshi, are "reconsidering" whether to move forward with Kalshi and are "***likely*** to abandon these partnerships."  (ECF No. 11, Ex. 7, Slane Decl. ¶¶ 9-10, 12, 14.) (emphasis added).   This argument depends entirely on the independent decisions of third parties, requiring a "speculative chain of events" that must occur before any such future injury.  *Mitchell v. City of Cincinnati*, 2022 U.S. App. LEXIS 27444, at *8 (6th Cir. Sep. 29, 2022).  Regardless, if Kalshi is correct that its prospective business partners are reconsidering whether to partner with Kalshi, it is just as likely they are doing so because ***Kalshi***

*is violating Ohio's gambling laws*. Kalshi has therefore failed to meet its burden to make a clear showing that it will suffer certain and immediate irreparable harm absent an injunction.

### III. The Balance of Equities Favor the Commission's and the State of Ohio's Ability to Enforce Its Gambling Laws and Protecting Ohioans Is in the Public's Best Interest.

Both equities and public interest weigh against granting Kalshi's request for injunctive relief. When a party seeks injunctive relief against the government, the balance-of-equities and public-interest factors merge, and courts consider the public consequences of granting or denying relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, those considerations favor Ohio.

Equities and public interest favor denying Kalshi's request for injunctive relief because an injunction would irreparably harm Ohio and its citizens. A glaring irreparable injury would be preventing the Commission from enforcing Ohio's sports-gaming laws, as "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted). Kalshi's alleged temporary financial injury pales in comparison to the effect that Ohio's gambling regulatory framework has on millions of Ohioans.

In addition, denying Kalshi's request aligns with the CEA's public interest mandate, as both the Special Rule and Rule 40.11 recognize the vital role of state law in determining the legality of sports-event contracts—a cooperative approach reinforced by the CFTC's Advisory Statement. Granting an injunction would disrupt this federal-state balance and override Ohio's police powers. Further, Kalshi's assertion that an injunction would further federal preemption and prevent "unconstitutional" enforcement (ECF No. 11, PageID #240) depends entirely on its merits theory, which, as explained above, must fail. *Supra* § I. The recent federal court decisions highlight that Kalshi's preemption theory lacks merit and that this is not a case of a state enforcing a plainly unconstitutional statute.

In sum, the harms Kalshi alleges are speculative, self-inflicted, and a foreseeable consequence of offering unlicensed sports-gaming products to Ohioans. Therefore, both the equities and public interest compel denial of Kalshi's motion, preserving Ohio's laws and regulatory authority.

## **CONCLUSION**

For the reasons set forth above, the Defendants respectfully request that the Court deny Kalshi's Motion for Preliminary Injunction.


DATE: November 7, 2025

Respectfully Submitted,

DAVE YOST
ATTORNEY GENERAL OF OHIO

| | |
|---|---|
| */s/ Mark N. Kittel* | */s/ Christopher L. Ingram* |
| Dave Yost | Rajeev K. Adlakha (0087096) |
| Attorney General of Ohio | VORYS, SATER, SEYMOUR AND PEASE LLP |
| | 200 Public Square, Suite 1400 |
| Mark N. Kittel (0095323) | Cleveland, Ohio 44114-2327 |
| Rachel V. Clark (0103746) | Phone/Fax: (216) 479-6175 |
| Neema Ashou (0104198) | rkadlakha@vorys.com |
| Office of Ohio Attorney General Dave Yost | |
| 30 East Broad Street, 26th Floor | Christopher L. Ingram (0086325), *Trial Attorney* |
| Columbus, Ohio 43215 | Kara M. Mundy (0091146) |
| Phone: (614) 466-4328 | Garrett M. Anderson (0100121) |
| mark.kittel@OhioAGO.gov | Celina J. Needle (0104831) |
| rachel.clark@OhioAGO.gov | VORYS, SATER, SEYMOUR AND PEASE LLP |
| neema.ashou@OhioAGO.gov | 52 East Gay Street, P.O. Box 1008 |
| | Columbus, Ohio 43216-1008 |
| *Counsel for Defendant Ohio Attorney* | Phone/Fax: (614) 464-5480 |
| *General, Dave Yost* | clingram@vorys.com |
| | kmmundy@vorys.com |
| | gmanderson@vorys.com |
| | cjneedle@vorys.com |
| | |
| | *Special Counsel for Defendants Matthew T.* |
| | *Schuler, Thomas J. Stickrath, Sheetal Bajoria,* |
| | *Scott Borgemenke, Keith Cheney, Penelope* |
| | *Cunningham, Christopher Smitherman, Triffon* |
| | *Callos, and the Ohio Casino Control Commission* |

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the U.S. District Court, Southern District of Ohio, on November 7, 2025, and served upon all parties of record via the court's electronic filing system.

*/s/ Celina J. Needle*
Celina J. Needle (0104831)