**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **KALSHIEX LLC,** | |
| **Plaintiff,** | **Case No. 2:25-cv-1165** |
| **v.** | **Chief Judge Sarah D. Morrison** |
| **MATTHEW T. SCHULER,** *et al.*, | **Magistrate Judge Chelsey M. Vascura** |
| **Defendants.** | |

---

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.     KALSHI IS LIKELY TO SUCCEED ON THE MERITS. .................................................. 3

    A.     Kalshi's Contracts Are Swaps Within the CFTC's Exclusive Jurisdiction. ............. 3

        1.     Defendants' Swaps Argument Is an Improper Collateral Attack on the CFTC's Oversight of Kalshi. ......................................................................... 3

        2.     Kalshi's Contracts Are Swaps or Other CFTC-Regulated Derivatives. ....... 5

        3.     Treating Sports-Event Contracts as Swaps Would Not Make All Sports Wagering Unlawful. ....................................................................................... 8

    B.     The CEA Preempts Ohio's Gaming Laws as Applied to Kalshi. ........................... 10

        1.     The Presumption Against Preemption Does Not Apply. ............................ 10

        2.     Ohio's Gambling Laws Are Expressly Preempted as Applied to Kalshi.... 10

        4.     Ohio's Gambling Laws Are Conflict Preempted as Applied to Kalshi. ..... 14

        5.     Rule 40.11 Reinforces the CFTC's Exclusive Jurisdiction. ........................ 16

        6.     Defendants Fail to Justify the Commission's Indirect Regulation of Kalshi. ........................................................................................................ 18

II.    KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION. ..................................................................................... 18

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI. ............. 20

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
  977 F.2d 1147 (7th Cir. 1992) ..................................................................................2, 12, 14

*Armour & Co. v. Ball*,
  468 F.2d 76 (6th Cir. 1972) ......................................................................................15

*Basicomputer Corp. v. Scott*,
  973 F.2d 507 (6th Cir. 1992) ....................................................................................20

*Big Lagoon Rancheria v. California*,
  789 F.3d 947 (9th Cir. 2015) ......................................................................................4

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ....................................................................................19

*CFTC v. Trade Exch. Network Ltd.*,
  117 F. Supp. 3d 29 (D.D.C. 2015) ........................................................................7, 8

*Chi. Mercantile Exch. v. SEC*,
  883 F.2d 537 (7th Cir. 1989) ................................................................................2, 14

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002)..................................................................................................14

*Cothran v. Ellis*,
  16 N.E. 646 (Ill. 1888) ..........................................................................................2, 12

*DeCanas v. Bica*,
  424 U.S. 351 (1976)..................................................................................................11

*Dickson v. Uhlmann Grain Co.*,
  288 U.S. 188 (1933)..................................................................................................12

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
  565 U.S. 606 (2012)....................................................................................................4

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
  933 F.3d 882 (7th Cir. 2019) ....................................................................................12

*Free v. Bland*,
  369 U.S. 663 (1962)..................................................................................................15

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) ..................................................................................13

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)................................................................18

*Hughes v. Talen Energy Mktg., LLC*,
    578 U.S. 150 (2016)................................................................10

*KalshiEX LLC v. CFTC*,
    2024 WL 4164694 (D.D.C. Sept. 12, 2024) ....................7, 8

*KalshiEX LLC v. Flaherty*,
    2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...........11, 18, 20

*KalshiEX, LLC v. Hendrick*,
    2025 WL 3286282 (D. Nev. Nov. 24, 2025) ....................9

*Keen v. Helson*,
    930 F.3d 799 (6th Cir. 2019) ...........................................11

*League of Women Voters of Ohio v. LaRose*,
    741 F. Supp. 3d 694 (N.D. Ohio 2024)............................10

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980)..........................................1, 10

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)................................................................10

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)................................................................19

*Mut. Pharm. Co., Inc. v. Bartlett*,
    570 U.S. 472 (2013)..........................................................2, 16

*N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.*,
    2025 WL 2916151 (D. Nev. Oct. 14, 2025) ....................6

*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986)................................................................11

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022)................................................................2

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ...........................................19

*Polyweave Packaging, Inc. v. Buttigieg*,
    51 F.4th 675 (6th Cir. 2022) .............................................4

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*,
    26 F.3d 1508 (10th Cir. 1994) ...............................................................7

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
    579 U.S. 115 (2016)............................................................................10

*Ritchie v. Williams*,
    395 F.3d 283 (6th Cir. 2005) ........................................................10, 11

*Savel v. MetroHealth Sys.*,
    96 F.4th 932 (6th Cir. 2024) ..............................................................18

*Transcont'l Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
    108 F.4th 144 (3d Cir. 2024) ..............................................................11

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ..............................................................20

*United States v. Locke*,
    529 U.S. 89 (2000)..............................................................................10

*United States v. Szoka*,
    260 F.3d 516 (6th Cir. 2001) ..............................................................20

*Valle del Sol v. Whiting, Inc.*,
    732 F.3d 1006 (9th Cir. 2013) ............................................................19

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...........................................................19

*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*,
    808 F.3d 281 (6th Cir. 2015) ..............................................................16

**Statutes**

5 U.S.C. § 551......................................................................................3

5 U.S.C. § 702......................................................................................4

5 U.S.C. § 706......................................................................................4

7 U.S.C. § 1a.....................................................................................6, 8

7 U.S.C. § 2 ................................................................................. *passim*

7 U.S.C. § 6......................................................................................13

7 U.S.C. § 7a-2 ............................................................................ *passim*

iv

7 U.S.C. § 13a-2 ................................................................................................12, 14

7 U.S.C. § 16 .........................................................................................9, 12, 13, 14

31 U.S.C. § 5362 ............................................................................................................9

R.C. 3775.04 ................................................................................................................16

R.C. 3775.05 ................................................................................................................16

R.C. 3775.10 ................................................................................................................16

R.C. 3775.11 ................................................................................................................16

**Other Authorities**

17 C.F.R. § 38.5 ............................................................................................................4

17 C.F.R. § 40.11 ..................................................................................................16, 17

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..................................................................................................................6

*Associated*, *Oxford English Dictionary* (3d ed. 2011) .................................................5

Concept Release, 73 Fed. Reg. 25,669 (May 7, 2008) ...............................................9

*Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)....................7

*Event*, Black's Law Dictionary (9th ed. 2009) .............................................................7

*Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) ...............................................................................6

*Event*, Webster's II New College Dictionary (3d ed. 2005) ........................................6

Event Contracts, 89 Fed. Reg. 48,968 (June 10, 2010) .....................................4, 7, 17

Further Definition of "Swap," 77 Fed. Reg. 48,208 (Aug. 13, 2012).........................8, 9

H.R. Rep. 106-711, pt. 2 (2000) .................................................................................13

H.R. Rep. No. 93-975 (1974).......................................................................................6

H.R. Rep. No. 93-1383 (1974)................................................................................1, 13

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1 (1977)...................................................................................................12

*KalshiEX LLC v. CFTC*, Appellant Br..
    2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) ...................................................................13, 17

*KalshiEX LLC v. Martin*, Kalshi Br.
    No. 25-1892 (4th Cir. Oct. 15, 2025).........................................................................................12

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
    L. Rev. 657 (1982) ....................................................................................................................10

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption
    as Public Policy*, 29 Vand. L. Rev. 1 (1976) .............................................................................1

Provisions Common to Registered Entities, 76 Fed. Reg. 44,786 (July 27, 2011).......................17

S. Rep. No. 93-1131 (1974) ............................................................................................................14

## INTRODUCTION

Ever since Congress granted the CFTC "exclusive jurisdiction" to regulate trading on federal exchanges in 1974, it has been settled that the Commodity Exchange Act ("CEA") "preempts the application of state law" to trading on those exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). Defendants' contrary arguments boil down to policy disagreements with the CFTC's oversight of Kalshi, but such policy arguments cannot defeat preemption.

Defendants' argument that Kalshi's contracts are not "swaps" is incorrect many times over. The CFTC regulates Kalshi's event contracts as swaps or other tradable derivatives, and the proper vehicle to challenge that regulation is an action under the Administrative Procedure Act ("APA") against the CFTC—not a collateral attack against Kalshi for offering contracts that its exclusive federal regulator has permitted. If the Court reaches that question, however, Congress intentionally and broadly defined "swaps" to include event contracts, and even if Kalshi's contracts were not swaps, they would be futures or options also subject to the CFTC's exclusive jurisdiction. Defendants' contrary argument—that treating Kalshi's contracts as swaps would federalize all sports betting—is emphatically incorrect. The CEA preempts state law as to *on-DCM* transactions while leaving states entirely free to regulate *off-DCM* transactions like sports bets.

As to preemption, overwhelming evidence starting with the CEA's text confirms that Congress intended to preempt state efforts to regulate trading on DCMs. Defendants do not address Congress's intentional decision to "preempt the field," H.R. Rep. No. 93-1383 at 35 (1974), and they ignore that, for many decades, the CFTC, along with every court and commentator to consider the question, concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). Defendants instead ask this Court to superimpose a "gambling" exception onto the CEA's

unequivocal text, but courts cannot "replace the actual text with speculation as to Congress' intent." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). Defendants' speculation is doubly misplaced given that states' practice of prohibiting futures as "gambling in grain," *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888), is precisely what Congress in 1974 intended to preempt.

Nor can Defendants overcome conflict preemption. Subjecting exchanges to 50 different state schemes would "frustrate Congress' intent to bring the markets under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). Defendants never explain how Kalshi could operate a nationwide exchange while complying with Ohio law requiring trades only from within Ohio. Defendants posit (at 28) that Kalshi could comply by "not offering sports-gaming contracts." But "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be 'all but meaningless.'" *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 488 (2013). Defendants also claim Kalshi's contracts violate a CFTC regulation. That argument is wrong (the regulation is not a categorical ban), but even if it were right, it is a fatal concession. It concedes Kalshi's event contracts fall within the CFTC's jurisdiction. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).

The equitable factors decisively favor a stay. Defendants threaten Kalshi with criminal penalties if it continues to offer sports-event contracts in Ohio, a clear irreparable harm. But succumbing to the threat would require Kalshi to forgo its federal right to offer contracts nationwide, subject Kalshi to the irreparable cost of geofencing, harm Kalshi users in Ohio and across the country, and force Kalshi out of compliance with its CFTC-imposed obligation to offer impartial access. That harm is compounded by Defendants' unlawful threats against companies that partner with Kalshi—even if that partnership occurs entirely outside of Ohio. And the public

interest weighs against allowing Defendants to enforce preempted state laws.  While Defendants warn about the harms of unregulated conduct, Kalshi is subject to extensive regulation by the CFTC, and provides many of the same consumer protections that Defendants tout as distinguishing features of Ohio's regulatory regime.  The question is not whether Kalshi should be regulated, but by whom.  Congress's clear answer is the CFTC.

**ARGUMENT**

I.     **KALSHI IS LIKELY TO SUCCEED ON THE MERITS.**

     **A. Kalshi's Contracts Are Swaps Within the CFTC's Exclusive Jurisdiction.**

Defendants argue (at 11-17) that Kalshi's sports-event contracts are not swaps and thus are not subject to the CFTC's exclusive jurisdiction.  That argument is mistaken on many grounds.

     1.    Defendants' Swaps Argument Is an Improper Collateral Attack on the CFTC's Oversight of Kalshi.

Congress has delegated to the CFTC the authority to oversee the listing of contracts for trading on DCMs.  Compl. ¶¶ 36-49.  The CFTC "*shall* approve a new contract" unless it finds that the contract "would violate" the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B) (emphasis added).  If the CFTC determines that a contract is inconsistent with the regulations— including because it does not meet the definition of a "swap" or other derivative—the CFTC may notify the DCM that it objects to the listing.  *Id.* § 7a-2(c)(3)(B)(ii).  Thus, each time the self-certification process for a contract closes, the CFTC has decided either to object to the contract or to permit it.  *Id.* § 7a-2(c)(2), (3)(B).  When the CFTC does not block a contract, that itself constitutes agency action.  *See* 5 U.S.C. § 551(13) ("agency action" includes "failure to act").

The CFTC unquestionably understands itself to possess jurisdiction over Kalshi's sports-event contracts.  In 2024, the CFTC issued a proposed rule that rested critically on the premise that event contracts involving "the outcome" of a "sports game" qualify as "agreements, contracts,

3

transactions, or swaps in excluded commodities" subject to the CFTC's exclusive jurisdiction. *Event Contracts*, 89 Fed. Reg. 48,968, 48,973-76 (June 10, 2024). Shortly after Kalshi self-certified its first sports-event contracts, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA pursuant to 17 C.F.R. § 38.5(b). *See* **Ex. 1** at 1. Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations and the CFTC's jurisdiction over sports-event contracts traded on DCMs. **Exs. 1-2**. The CFTC took no further action and has since allowed thousands of Kalshi's sports-event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction. Had the CFTC deemed Kalshi's contracts impermissible, it would have had the responsibility to "object[]" to the contracts. 7 U.S.C. § 7a-2(c)(3)(B)(ii). But it did not.

Much of Defendants' opposition reflects dissatisfaction with how the CFTC has regulated Kalshi. But where, as here, a federal agency has authorized certain conduct, the APA provides the proper channel for the complaint. *See* 5 U.S.C. §§ 702, 706(2). Allowing parties to circumvent the APA subjects parties "to conflicting interpretations of federal law by several different courts (and the agency), thereby threatening to defeat the uniformity that Congress intended." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 615 (2012). If Defendants could bring charges directly against Kalshi for offering contracts the CFTC has allowed, it would "circumvent an exclusive-jurisdiction provision applicable to agency action." *Polyweave Packaging, Inc. v. Buttigieg*, 51 F.4th 675, 684 (6th Cir. 2022); *see Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc) (defendants may not "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions" (citation modified)).

Allowing states to use collateral proceedings to second-guess the CFTC's determination that a contract is a derivative properly traded on a DCM would allow them to exercise jurisdiction

over the exact same contracts as the CFTC—in clear conflict with Congress's grant to the CFTC of "exclusive jurisdiction" in this field. 7 U.S.C. § 2(a)(1)(A). That difficulty would be compounded 50-fold if each state could regulate DCMs based on their own definitions of "swap." And the difficulty would be compounded exponentially if states could scrutinize each of the tens of thousands of contracts traded on a DCM to decide whether each constituted a tradable swap— all subject to the threat of criminal prosecution if the state disagreed with the CFTC.

2. Kalshi's Contracts Are Swaps or Other CFTC-Regulated Derivatives.

*First*, Defendants err in contending (at 12) that sporting events are not "associated with" potential financial consequences. "Associated" commonly means "connect[ed]." *See Associated*, *Oxford English Dictionary* (3d ed. 2011). A swap thus requires an event connected to a potential financial, economic, or commercial consequence. Sports events have *actual* and *significant* financial consequences for a host of stakeholders—team sponsors, advertisers, television networks, local communities, and more. They readily meet the swap definition, which requires only a *potential* financial consequence. Defendants' argument is especially untenable given that they claim the authority to prohibit *all* Kalshi's sports-event contracts, which would require showing that *no* sports events are associated with even *potential* financial consequences.

Defendants maintain (at 12) that the event or contingency underlying a swap must have a "direct and inherent" association with financial consequences. But these words appear nowhere in the statute. Defendants argue that subpart (ii) of the swap definition must be construed in accordance with surrounding subparts, but this argument undercuts their position. Subpart (iii), for example, refers to a "weather swap" or "metal swap" even though neither the weather nor metal is "inherently" financial. And Defendants' proposed rewriting is irreconcilable with the Special Rule, which refers to "swap[s]" involving "terrorism," "war," and "gaming"—none of which are

*inherently* financial.  7 U.S.C. § 7a-2(c)(5)(C)(i).  The enumeration of these categories would make no sense if they did not encompass swaps or derivatives subject to CFTC jurisdiction.

Defendants argue (at 13) that a contrary reading of subpart (ii) would render "superfluous" other subparts of the swap definition, but overlap is not the same as superfluity, and overlap is equally inevitable under Defendants' proposed reading.  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012) (noting that legislatures commonly use a "belt-and-suspenders approach").  Many (if not all) of the swaps listed in subpart (iii), for example, would meet Defendants' "inherently" financial definition.  Subpart (iv) eliminates all doubt that Congress intended the definitions of swap to overlap, because it defines "swap" to include any agreement "that is, or in the future becomes, commonly known to the trade as a swap"—a category that encompasses most or all swaps listed in other subparts.  *See* 7 U.S.C. § 1a(47)(A)(iv); *see* H.R. Rep. No. 93-975, at 55 (1974) (noting congressional purpose to ensure the CEA would cover "all futures trading that might now exist or might develop in the future").

*Second*, Defendants are mistaken that an event contract turning on an "outcome" cannot be the subject of a swap.  A swap must be based on the occurrence or nonoccurrence of an "event" or "contingency."  7 U.S.C. § 1a(47)(A)(ii).  Both terms comfortably encompass outcomes.

Dictionaries expressly define an "event" to include "outcome."  *Event*, *Webster's II New College Dictionary* (3d ed. 2005) ("[t]he actual outcome or final result").  The District of Nevada concluded that "outcome" is an archaic definition, *N. Am. Derivatives Exch., Inc. v. Nev. Gaming Control Bd.*, 2025 WL 2916151, at *7 (D. Nev. Oct. 14, 2025), but many or most dictionaries do not treat this definition as archaic.  *See, e.g.*, *Event*, *Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition* (1st ed. 2001) ("the outcome, issue, or result of anything").  Dictionaries also define "event" to mean "[s]omething that happens."  *Event*,

6

*Black's Law Dictionary* (9th ed. 2009). An outcome is naturally understood to be "something that happens." For example, the 2024 Presidential Election was an event, but the outcome—President Trump's win—was also an event. Courts have thus recognized that an "event" is "the outcome or consequence of anything." *Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514-15 (10th Cir. 1994). Similarly, "contingency" includes "something liable to happen as . . . [a] result of something else." *Contingency*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).

Courts and the CFTC agree that contracts turning on outcomes are subject to the CFTC's jurisdiction. "[E]vent contracts" are "a type of derivative contract whose payoff is based on the outcome of a contingent event." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024); *see CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 32 (D.D.C. 2015) (CEA applies to contracts tied to "the outcome of real-world events"). In 2024, the CFTC noted "event contracts are generally understood to be a type of derivative contract . . . based on the *outcome* of an underlying occurrence or event." 89 Fed. Reg. at 48,969 (emphasis added). Defendants' argument that a contract turning on an outcome cannot be a swap conflicts with the CFTC's view. And a rule providing that event contracts cannot be based on outcomes would pose intractable interpretive difficulties, because almost any event can be framed as the outcome of another event.

*Third*, Defendants err in claiming (at 16-17) that "the CFTC does not believe" sports-event contracts are "swaps." To the contrary, the CFTC has repeatedly recognized that contracts involving the "outcome" of a "sports game" are "agreements, contracts, transactions, or swaps in excluded commodities" subject to CFTC jurisdiction. 89 Fed. Reg. at 48,972, 48,976. Defendants refer to a proposed rulemaking that would have determined that sports-event contracts are contrary to the public interest, but the very premise of that proposal was that the Special Rule's reference to "swap[s]" involving "gaming" *included* sports-event contracts. *Id.* at 48,975. The proposed

rulemaking would be nonsensical if the CFTC did not believe sports-event contracts were swaps. And while the CFTC's *proposal* would have deemed sports-event contracts contrary to the public interest, Defendants neglect to note that the CFTC never *adopted* that rule. Defendants point (at 16-17) to a CFTC regulation noting that certain consumer "arrangements that historically have not been considered swaps" are not covered by the CEA. Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,246-48 (Aug. 13, 2012). But they omit key language distinguishing non-swap consumer transactions from swaps based in part on whether they are "traded on an organized market." *Id.* at 48,247. Kalshi's contracts are so traded.

Finally, even if the Court accepts Defendants' reading of "swap," the CFTC's exclusive jurisdiction also extends to "future[s]" and "option[s]" on DCMs. 7 U.S.C. § 2(a)(1)(A). Among the commodities subject to the CFTC's jurisdiction are "excluded commodities." *See id.* § 1a(19); *id*. § 7a-2(c)(5)(C)(i). The events underlying Kalshi's contracts are excluded commodities, which include any "occurrence, extent of an occurrence, or contingency . . . that is . . . beyond the control of the parties to the relevant contract, agreement, or transaction; and . . . associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). Event contracts like Kalshi's are therefore futures or options in excluded commodities. *KalshiEX*, 2024 WL 4164694, at *2 ("Event contracts are subject to regulation under the CEA as 'excluded commodities.'"); *Trade Exch.*, 117 F. Supp. 3d at 37-38 (rejecting claim that event contracts "did not involve a 'commodity' regulated under the CEA"). The CFTC recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." Concept Release, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008).

### 3. Treating Sports-Event Contracts as Swaps Would Not Make All Sports Wagering Unlawful.

Defendants argue (at 14, 23) that Kalshi's position would require all sports betting to occur

on CFTC-regulated exchanges.  Although that argument was largely the basis for the District of Nevada's recent ruling, *see KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025), it is mistaken.  As Defendants concede (at 22-23), the CEA contains a savings clause clarifying that, except as provided by the grant of exclusive jurisdiction to the CFTC over *on-DCM* trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws."  7 U.S.C. § 2(a); *see id.* § 16(e)(1)(B)(i) ("Nothing" in the CEA "shall supersede or preempt" the application of state law to a transaction "that is not conducted on or subject to the rules of a registered entity").  States remain free to apply state laws to *off-DCM* transactions offered by traditional sportsbooks.

If there were any doubt, CFTC regulations would dispel it.  The CFTC has explained that swaps are instruments "*traded* on organized markets and over the counter." 77 Fed. Reg. at 48,217 (emphasis added).  But sports bets between a gambler and a sportsbook are *not* traded, i.e., parties to a sports bet cannot transfer their rights and obligations to a third party on an organized exchange. The CFTC has further noted that consumers enter transactions in their "personal lives that may have attributes that could be viewed as falling within the swap" definition, but that these arrangements are not swaps if "[t]hey are *not traded* on an organized market."  *Id.* at 48,246-47 (emphasis added).  Accordingly, treating *on-DCM* sports-event contracts as swaps would not require treating *off-DCM* sports bets as swaps.[1]

---

[1] Congress, too, has recognized that derivatives traded on DCMs may resemble gambling, and it intended the CFTC to regulate them on DCMs while allowing the states to regulate them off DCMs.  In the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), Congress generally adopted state-law definitions of "bet or wager" but provided that "bet or wager" "does not include" "any transaction conducted on or subject to the rules of a" DCM.  31 U.S.C. § 5362(1)(E)(ii).  UIGEA reflects Congress's judgment that on-DCM transactions should be regulated by the CFTC, regardless of whether states view these transactions as gambling.

**B. The CEA Preempts Ohio's Gaming Laws as Applied to Kalshi.**

None of Defendants' arguments call into doubt the overwhelming evidence that "the CEA preempts state bucket-shop laws and other anti-gambling legislation."  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).

1. <u>The Presumption Against Preemption Does Not Apply.</u>

Defendants (at 17-18) cite *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), to argue that a presumption against preemption applies.  But, following *Medtronic*, the Supreme Court has held that the presumption does *not* apply in cases like this:  Where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption" because "the plain wording of the clause" "necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (citation modified).

Defendants argue (at 18) that the "presumption applies [with] even greater force" because "regulation of gambling has long been within Ohio's police powers."  But the determinative question is not whether *gambling* is traditionally regulated by states, but whether *trading on DCMs* is.  No presumption applies "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000).  Here, the "federal government has been vitally concerned with [derivatives] trading" for over a century. *Leist*, 638 F.2d at 322.  In any event, a presumption "can be overcome by the facts of the case." *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 718 (N.D. Ohio 2024).  Just so here.

2. <u>Ohio's Gambling Laws Are Expressly Preempted as Applied to Kalshi.</u>

The CEA grants the CFTC "exclusive jurisdiction" to regulate derivatives trading on DCMs.  Myriad cases recognize that the grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *see Ritchie v. Williams*, 395 F.3d 283, 286 (6th Cir. 2005)

("exclusive jurisdiction" of federal authority preempts state law). Defendants cite *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.* for the proposition that a grant of exclusive jurisdiction does not amount to express preemption, but that case holds the opposite: "The explicit statutory conferral of exclusive jurisdiction" to a federal authority "is a form of express preemption because it withdraws any concurrent jurisdiction" to state authorities over the same field. 108 F.4th 144, 151-52 (3d Cir. 2024). The same reasoning applies here.

### 3. Ohio's Gambling Laws Are Field Preempted as Applied to Kalshi.

The CEA "supersedes" "state regulatory authorities' jurisdiction for contracts on a CFTC-designated exchange." *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *5 (D.N.J. Apr. 28, 2025). Defendants' contrary arguments fail.

*First*, Defendants concede (at 21) that "Congress may have had *some* intent to preempt *some* state law," but they argue that this field does not include "gambling." But Section 2(a)'s text sets out the field Congress occupied: The CFTC has "exclusive jurisdiction" over "transactions involving swaps" and "future[s]" contracts "traded or executed on a" DCM. 7 U.S.C. § 2(a)(1)(A). Defendants essentially ask this Court to rewrite the CEA to make the CFTC's jurisdiction exclusive *except for state gambling laws*. But "courts are not at liberty to rewrite a statute just because they believe that doing so would better effectuate Congress's purposes." *Keen v. Helson*, 930 F.3d 799, 806 (6th Cir. 2019). Where field preemption applies, it forbids a "case-by-case analysis" of which state laws Congress may have silently wished to preserve. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986). None of the cases Defendants cite supports their assertion that courts may create exceptions to field preemption based on extratextual speculation about congressional intent. *E.g.*, *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) (state law not preempted only because it fell outside preempted field).

History refutes Defendants' claim (at 24) that "there is no indication that Congress" intended to preempt state gambling laws. Before the CEA, many states regulated futures trading as unlawful "gambling in grain." *Cothran v. Ellis*, 16 N.E. at 647; *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling); Kalshi Br. at A1-16, *KalshiEX LLC v. Martin,* No. 25-1892 (4th Cir. Oct. 15, 2025) (listing dozens of pre-CEA state laws regulating futures trading as a type of "gambling" or "bucket shop"). These laws repeatedly reached the U.S. Supreme Court. *E.g.*, *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933) (CEA's predecessor "did not supersede . . . Missouri law making gambling in grain futures illegal"). Against that backdrop, Congress in 1974 unquestionably intended to preempt gambling laws when it granted the CFTC exclusive jurisdiction to regulate trading on federal exchanges. It is inconceivable that, despite having "*some* intent" to preempt state law in 1974 (at 21), Congress silently intended to allow states to apply their gambling laws.

*Second*, Defendants argue (at 21-22) that "the CEA's exclusive jurisdiction is limited" and not intended to "occupy completely the entire field of commodity futures regulation." That is correct. The CEA does not preempt state regulation of most *off-exchange* trading, 7 U.S.C. § 16(e)(1)(B), or prevent states from enforcing their own "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7). But those limitations on the scope of field preemption are found in the CEA's text—clear evidence that when Congress intends to allow state law to operate in this space, it says so expressly. These provisions certainly do not suggest that states may apply their gambling laws to ban trading on DCMs—the heart of the preempted field. *Am. Agric.*, 977 F.2d at 1156-57 (any state law that "would directly affect trading on or the operation of a futures market" "is preempted"); *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (same);

*FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (the "CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*'"). The conference report to the 1974 amendments unambiguously states Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the CFTC has stated that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).

*Third*, contrary to Defendants' suggestion (at 22), Section 16 strongly supports Kalshi. Section 16(e)(2) was added to the CEA alongside amendments allowing for "exempt" transactions that need not be traded on-exchange, 7 U.S.C. § 6(c), and that therefore fall outside the CFTC's exclusive jurisdiction. Congress enacted Section 16(e)(2) to prevent states from applying their gaming laws to these *off-DCM* transactions, just as states already could not apply their gaming laws to *on-DCM* transactions. *See* H.R. Rep. 106-711, pt. 2, at 71 (2000) (noting that "the current" CEA already "supersedes and preempts" state laws as to on-DCM transactions and what is now Section 16(e)(2) clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempt transactions as well). Each of the transactions cross-referenced in Section 16(e)(2) *need not occur on DCMs*—that is why Congress had to specify that state laws are preempted. It would have been redundant and confusing to specify preemption as to transactions on DCMs; Section 2(a) already accomplished that. And Section 16(h) is not a preemption provision at all. It prohibits states from regulating swaps "as an insurance contract" even if the swap is traded over-the-counter rather than on an exchange. 7 U.S.C. § 16(h).

*Fourth*, Defendants argue (at 22-23) that Section 2(a)'s savings clause supports their view, but, crucially, it only applies "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). That language enables a logical

inference of preemption as to matters within the CFTC's jurisdiction. *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 429 (2002) (interpreting savings clause with "[e]xcept as provided" proviso). Congress added the proviso specifically to foreclose Defendants' interpretation, making clear that "the [CFTC's] jurisdiction, where applicable supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6 (1974).

*Fifth*, Defendants make a dispositive concession. They agree (at 23) that Congress "allow[ed] the CFTC to prohibit event contracts contrary to the public interest, specifically those involving 'gaming.'" Thus, even under Defendants' theory, the CEA allows—*but does not require*—the CFTC to bar Kalshi's sports-event contracts. Where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch.*, 883 F.2d at 548.

### 4. Ohio's Gambling Laws Are Conflict Preempted as Applied to Kalshi.

Even if field preemption did not apply, conflict preemption would, for numerous reasons.

*First*, Defendants do not dispute that state law conflicts with—and is preempted by—the CEA if it "would directly affect trading on or the operation of a futures market." *Am. Agric. Movement*, 977 F.2d at 1156-57. They instead argue (at 25) that "Ohio's sports-gaming laws are not regulating or directly affect[ing] trading on" a futures market because their effort to regulate derivatives is "indirect at best." But Defendants seek to use Ohio law to outright ban the trading of instruments on a DCM; it would be impossible for a state law to more directly affect trading on a DCM. The CEA expressly spells out states' authority to apply state law in the derivatives space, but that authority excludes the right to dictate what contracts a DCM may offer. *See* 7 U.S.C. § 13a-2(1) (permitting states to enforce the CEA against parties "other than a [designated] contract market"); *id*. § 16(e)(1) (permitting application of state law to off-exchange transactions or to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so). And while Defendants invoke state police power to justify application of their gambling laws,

14

state law must yield to conflicting federal law no matter how "clearly within a State's acknowledged power" the state's law resides. *Free v. Bland*, 369 U.S. 663, 666 (1962).

*Second*, complying with the Defendants' demands concerning Kalshi's event contracts would conflict with the CFTC's oversight of the very same contracts. Defendants contend (at 14, 26) that enforcement of Ohio law would "complement" rather than conflict with federal law because the CEA "operates as a floor" that state law can surpass. But a federal law does not provide a "floor" where, as here, the "Act itself manifests a congressional intent to prescribe uniform standards." *Armour & Co. v. Ball*, 468 F.2d 76, 83 (6th Cir. 1972). Defendants invoke the Special Rule (at 25-30) to argue that Congress intended to prohibit contracts involving gaming, but even if Kalshi's contracts qualified, the key point is that Congress gave *the CFTC* discretion to determine whether such contracts are contrary to the public interest. The CFTC has made no such determination here. Allowing 50 different states to subject Kalshi to *criminal penalties* for offering contracts that the CFTC has allowed would render the CFTC's judgment utterly meaningless. And while Defendants assert (at 26) that Congress did not intend the CFTC to be the "sole arbiter" of whether particular contracts may be listed on DCMs, the CEA's grant of "exclusive jurisdiction" to the CFTC is irrefutable evidence that Congress intended exactly that.

Defendants cite (at 27-28) a CFTC advisory issued before the government shutdown noting that the CFTC has not yet affirmatively approved "the listing or trading of" sports-event contracts or subjected such contracts to review under the Special Rule. This is true, and shows that the CFTC has reserved its authority to subject sports-event contracts to public-interest review. But it also underscores that the CFTC understands these contracts to fall within its exclusive jurisdiction.

*Third*, Defendants argue (at 28) that it is not impossible for Kalshi to comply with both the CEA and Ohio law because Kalshi can "simply not offer[] sports-gaming contracts." The Supreme

Court has rejected an identical argument. The preemption analysis "presume[s] that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Bartlett*, 570 U.S. at 488. "Indeed, if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be all but meaningless." *Id*. The Sixth Circuit has reached the same conclusion. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) ("We reject this never-start selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale.").

*Fourth*, Defendants suggest that Kalshi can get an Ohio gaming license, but have no answer to the fact that doing so would require Kalshi to limit access to its exchange solely to those making trades in Ohio. *See* R.C. 3775.11. Kalshi could not comply with that Ohio-only requirement because CFTC regulations require Kalshi to provide impartial access to users nationwide. Defendants declare (at 28) that "obtaining an Ohio license would not bar [Kalshi] from accepting trades from users outside of Ohio," but they fail to explain how that assertion can be reconciled with Ohio law. Instead, they cite (at 28) to other sections of the Ohio Code that have no bearing on the Ohio-only requirement. *See* R.C. 3775.04, 05, 10. Defendants interpret (at 28-29) impartial access as requiring "fair treatment among eligible participants," rather than nationwide availability "where the underlying activity is illegal," but that argument presumes that Kalshi's operations are illegal, which is the issue in dispute before the Court. And while Defendants point to (at 29) an agreement reached by a different DCM not to offer event contracts to Nevada residents, that agreement offers them no support. There can be no reasonable dispute that a nationwide DCM could not restrict access to *only* persons located in one state.

### 5. Rule 40.11 Reinforces the CFTC's Exclusive Jurisdiction.

Defendants argue (at 29-30) that the CFTC has already banned sports-event contracts in 17 C.F.R. § 40.11. This argument concedes that sports-event contracts are within the CFTC's

exclusive jurisdiction.  But Defendants are wrong in any event.  While Defendants isolate language

in subsection (a), subsection (c) provides for the CFTC's public-interest review process, which

applies to all contracts in the enumerated categories, including those involving "gaming."  *See*

Appellant Br. at *14, *KalshiEX LLC*, 2024 WL 4512583.  Unless the CFTC has initiated public-

interest review of a contract, a DCM may list it under Section 40.11.

The adopting release for Section 40.11 makes clear that rule is not a categorical ban.

"[R]egistered entities *may always* certify products pursuant to the procedures in § 40.2," and if the

CFTC determines "that the submission may violate the prohibitions in § 40.11(a)(1)-(2)," the

CFTC "may" subject the contract to a 90-day review.  *Provisions Common to Registered Entities*,

76 Fed. Reg. 44776, 44,786 (July 27, 2011) (emphasis added).  The CFTC's proposed 2024

rulemaking (which was never adopted) confirmed that the CFTC "interprets [the Special Rule] to

contemplate that the Commission engage in a two-step inquiry" rather than a categorical ban.  89

Fed. Reg. at 48,970-71.  In its since-overturned order seeking to ban Kalshi's elections contracts,

the CFTC conducted this two-step inquiry and found: (1) the contracts involved "unlawful

activity" and "gaming"; and (2) the contracts were "contrary to the public interest."  Appellant Br.

at *11-12, *KalshiEX LLC*, 2024 WL 4512583.  The CFTC has followed this same two-step process

in other reviews undertaken under 40.11, including a recent review involving sports-event

contracts offered by a Kalshi competitor.[2]  The second step of the process would be wholly

---

[2] *See, e.g.*, CFTC Release 8345-20, *CFTC Announces Review of RSBIX NFL Futures Contracts Proposed by Eris Exchange, LLC* (Dec. 23, 2020), available at https://www.cftc.gov/PressRoom/PressReleases/8345-20; CFTC Release 8345-20, *CFTC Announces Review and Public Comment Period of KalshiEx Proposed Congressional Control Contracts Under CFTC Regulation 40.11* (Aug. 26, 2022), available at https://www.cftc.gov/PressRoom/PressReleases/8578-22; CFTC Release 9033-25, *CFTC's Review of Nadex Sports Contract Submissions* (Jan. 14, 2025), available at https://www.cftc.gov/PressRoom/PressReleases/9033-25.

unnecessary if Section 40.11 were a categorical ban. Moreover, the CEA permits the CFTC to bar contracts only if the CFTC "determine[s]" they are "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C), but the CFTC has made no such determination on a categorical basis in Section 40.11.

### 6. Defendants Fail to Justify the Commission's Indirect Regulation of Kalshi.

Defendants fail to justify their extraterritorial threats against Kalshi's partners. Defendants offer no basis to question the cases Kalshi cites, which hold that state officials may not achieve by indirect threats what the Constitution prevents them from doing directly. Nor do Defendants answer the Dormant Commerce Clause problems with these threats. Defendants claim (at 31) that the threats protect Ohio consumers from "unregulated sports gaming," but fail to explain how that purpose is served by punishing Kalshi's partners for *conduct undertaken entirely outside of Ohio*. If Defendants were right, states could punish their residents for any conduct they undertake outside of the state, even where that conduct is lawful—a quintessential Dormant Commerce Clause violation. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 343 (1989) (invalidating law with the "inherent practical extraterritorial effect of regulating" conduct entirely in other states). And the Court can readily reject Defendants' claim (at 31) that this argument is not ripe. Where, as here, a party "stops exercising their rights because they reasonably fear" retaliation, "the government has already injured them." *Savel v. MetroHealth Sys.*, 96 F.4th 932, 940 (6th Cir. 2024).

## II. KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

As the District of New Jersey found, "Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial." *Flaherty*, 2025 WL 1218313, at *7. Defendants' arguments do not call that harm into doubt.

Defendants claim (at 32) that Kalshi's harm is "speculative" because Kalshi will face enforcement only if it chooses not to comply with the cease-and-desist letter. But Kalshi will be

harmed no matter how it responds. If it does not comply, it will "expose [itself] to potentially huge liability." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The cease-and-desist letter threatens Kalshi with "civil, or *criminal* sanctions," Compl. Ex. 1 (emphasis added), and Defendants conspicuously do not rescind that threat. By contrast, if Kalshi complies, it will "suffer the injury of obeying [state] law during the pendency of the proceedings" even though state law is preempted. *Morales*, 504 U.S. at 381. Such a "Hobson's choice" is quintessential irreparable harm. *Id.*; *see Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution under" preempted statute "establishe[s] a likelihood of irreparable harm").

Defendants claim (at 32) that the costs to Kalshi of geofencing are "speculative and conditional." But Defendants do not dispute that geofencing would cost Kalshi tens of millions of dollars, and they offer no contrary evidence. *See* Decl. of Xavier Sottile ¶¶ 14-28, ECF No. 11-6. Defendants note (at 32) that—for now[3]—they do not seek to regulate "every product Kalshi offers," but they cannot dispute that geofencing sports-event contracts would be costly. Because this is an *Ex parte Young* suit, immunity would bar Kalshi from recouping damages. Harm is irreparable where, as here, it "is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). While Defendants cite *Wisconsin Gas Co. v. FERC* to argue that monetary loss is not irreparable unless it threatens Kalshi's "very business" (at 32), Defendants truncate the relevant quote stating "*[r]ecoverable* monetary loss" is irreparable "only where the loss threatens the very existence of the movant's business." 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis added). Kalshi's monetary loss is unrecoverable.

---

[3] Asked at the Rule 65.1 Conference whether Kalshi's non-sports contracts are permissible in Ohio, counsel for Defendants responded: "We're going to say no." L.R. 65.1 Conf. Tr. 16:16-19.

Defendants argue (at 32-33) that harm that would befall Kalshi's users is "not relevant." The Sixth Circuit disagrees—it requires that "harm to others" be considered in a preliminary injunction analysis. *United States v. Szoka*, 260 F.3d 516, 523 (6th Cir. 2001). Defendants' contention that "[n]o record evidence shows any imminent forced closure" of contracts for Kalshi's users contradicts Defendants' *own demand* that Kalshi "immediately" close all contracts in Ohio. Compl. Ex. 1. That Kalshi has emergency mechanisms for unwinding trades—generally reserved for serious cybersecurity incidents or physical disasters—does not undermine the fact that deploying those mechanisms for all users in Ohio would be catastrophically harmful both for Kalshi's users and Kalshi, which would suffer a loss of goodwill if it forced users to liquidate their positions. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("loss of customer goodwill often amounts to irreparable injury"). Similarly, Defendants' threats to Kalshi's business partners are not a "speculative chain of events" (at 33), but rather impose harms that are occurring in real time by deterring prospective partners from working with Kalshi for fear of retaliation.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR KALSHI.

Defendants claim (at 34-35) that enjoining the enforcement of preempted state laws would undermine the public interest. But "the interests favor injunction" because "the public interest is not served by the enforcement of an unconstitutional law." *Flaherty*, 2025 WL 1218313, at *7 (citation modified); *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) ("[P]reventing a violation of the Supremacy Clause serves the public interest."). And granting an injunction would not allow unregulated gaming. The question is not whether Kalshi should be regulated, but rather by whom. The answer is clear: The CFTC has "exclusive jurisdiction."

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction.

Dated this 1st day of December 2025.

Respectfully submitted,

*/s/ Michael J. Hunter*
Michael J. Hunter (0076815)
   *Trial Attorney*
Matthew L. Jalandoni (0087074)
**Flannery | Georgalis, LLC**
175 S. Third Street, Suite 285
Columbus, OH 43215
T: (614) 324-4139 (Michael)
T: (614) 324-1329 (Matthew)
F: (614) 526-0601
mhunter@flannerygeorgalis.com
mjalandoni@flannerygeorgalis.com

Neal Katyal, Esq. (*pro hac vice*)
Joshua B. Sterling, Esq. (*pro hac vice*)
William E. Havemann, Esq. (*pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington, DC 20005
T: (202) 835-7500
F: (202) 263-7586
nkatyal@milbank.com
jsterling@milbank.com
whavemann@milbank.com

Grant R. Mainland, Esq. (*pro hac vice*)
Andrew L. Porter, Esq. (*pro hac vice*)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
T: (212) 530-5361
F: (212) 530-5219
gmainland@milbank.com
aporter@milbank.com

*Attorneys for Plaintiff*

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 1, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties via the Court's CM/ECF electronic filing system.  I further certify that a copy of the Exhibits in support of this Reply filed under seal in accordance with the Court's Order, ECF No. 47, will be served on counsel for the defendants via electronic mail.

*/s/ Michael J. Hunter*
Michael J. Hunter (0076815)

*Trial Attorney for Plaintiff*