# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KALSHIEX, LLC, | Case No.: 2:25-cv-1165 |
| Plaintiff, | |
| vs. | Chief District Judge Sarah D. Morrison |
| MATTHEW T. SCHULER, et al., | Magistrate Judge Chelsey M. Vascura |
| Defendants. | |

*AMICUS CURIAE* **BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL
CONGRESS OF AMERICAN INDIANS, WASHINGTON INDIAN GAMING
ASSOCIATION, ARIZONA INDIAN GAMING ASSOCIATION, CALIFORNIA
NATIONS INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING
ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, UNITED SOUTH
AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, SAN MANUEL
GAMING AND HOSPITALITY AUTHORITY, AND 22 FEDERALLY RECOGNIZED
INDIAN TRIBES IN SUPPORT OF DEFENDANTS' COMBINED RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**STATEMENT OF INTEREST**

As described more fully in their Motion for Leave to File Amicus Brief, the Indian

Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), Washington

Indian Gaming Association ("WIGA"), Arizona Indian Gaming Association ("AIGA"),

California Nations Indian Gaming Association ("CNIGA"), Oklahoma Indian Gaming

Association ("OIGA"), Minnesota Indian Gaming Association ("MIGA"), United South and

Eastern Tribes Sovereignty Protection Fund ("USET SPF"), San Manuel Gaming and Hospitality

Authority ("SMGHA"), and 22 federally recognized Indian Tribes ("Amici Tribes")[1]

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Augustine Band of
Cahuilla Indians; Bay Mills Indian Community; Cahto Tribe of the Laytonville Rancheria; Elk
Valley Rancheria; Jamul Indian Village of California; Karuk Tribe; Lytton Rancheria of
California; Mashantucket Pequot Tribal Nation; Pechanga Band of Indians; Picayune Rancheria

(collectively, "Tribal Amici") all have a shared, strong interest in this case because of its potential to have a significant impact on tribal sovereign rights regarding gaming on Indian lands. Such vital gaming revenue provides funding for essential government services, tribal programs, and economic development.

## ARGUMENT

The Tribal Amici respectfully submit this brief in support of the Defendants' combined response to KalshiEX, LLC's ("Kalshi") motion for preliminary injunction.

Indian tribes are sovereign nations with primary jurisdiction over their lands and the activities occurring on their lands. In accordance with this principle, both the United States Supreme Court and Congress have recognized tribes' inherent and exclusive sovereign right to conduct and regulate gaming on their Indian lands. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987); 25 U.S.C. § 2701(5). Congress enacted the Indian Gaming Regulatory Act ("IGRA") to provide a comprehensive federal regulatory framework for tribal gaming, including a mechanism for tribes and states to negotiate compacts governing Class III gaming, such as sports betting, subject to federal approval. *See* 25 U.S.C. §§ 2702, 2703(8), 2710(d)(3). Some states have negotiated compacts wherein tribes are the exclusive operators of certain types of gaming within the state. *E.g.*, *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 718 (9th Cir. 2003).

KalshiEX, LLC ("Kalshi") unlawfully and unfairly entered into the gaming market, which adversely impacts tribal gaming revenue and infringes upon the benefit of tribes'

of Chukchansi Indians; Pokagon Band of Potawatomi Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract); Sycuan Band of the Kumeyaay Nation; Table Mountain Rancheria; Tulalip Tribes of Washington; and Yuhaaviatam of San Manuel Nation.

bargained-for compacts.  Additionally, by offering sports-event contracts to people on Indian lands under the guise of commodity trading pursuant to the Commodity Exchange Act ("CEA"), Kalshi impedes tribes' inherent sovereign right to regulate gaming activity on those lands. Kalshi's arguments justifying this infringement—that the CEA gives the Commodity Futures Trading Commission ("CFTC") exclusive jurisdiction over these sports event contracts on Indian lands—are not only an incorrect reading of the CEA, but would also effectively repeal IGRA.

Contrary to Kalshi's arguments: (1) the CEA does not exclusively govern its gaming-related sports-event contracts; (2) such contracts are expressly prohibited by the CEA and CFTC regulations; (3) the CEA does not impliedly repeal IGRA; and (4) federal, state, and tribal gaming laws (including IGRA), therefore, apply to and govern its sports wagering activity.

Because Kalshi has failed to establish a likelihood of success on the merits, this Court should deny its motion for preliminary injunction.

## I.     IGRA Governs Kalshi's Sports Betting Conduct on Indian Lands

### A.     The CEA does not exclusively govern gaming-related sports-event contracts

Congress has been regulating commodity futures for more than a century, historically focusing on agricultural commodities.  *See Merrill Lynch v. Curran*, 456 U.S. 353, 357–63 (1982).  In 2010, Congress amended the CEA, in part, to allow for "event contracts" through the "Special Rule."  *See* 7 U.S.C. § 7a-2(c)(5)(C).  Recognizing that some might try to exploit these newly created registrants to offer dangerous contracts disguised as "swaps," Congress included the Special Rule to prevent this end run.  Among the categories of dangerous contracts that Congress wanted to keep off of these exchanges were those related to gaming and those that contravened state law.  *Id.*

Shortly after Congress enacted the Special Rule, the CFTC adopted implementing regulations, whereby it exercised such discretion and explicitly prohibited any event contract that "involves, relates to, or references … gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1); *see also* 76 Fed. Reg. 44,776 (July 27, 2011).  Thus, in promulgating § 40.11(a)(1), the CFTC made the categorical determination that event contracts involving these specific activities are contrary to the public interest.

Kalshi's sports betting operation rests entirely on an assumption that Kalshi, by self-certifying its gaming activities as legitimate swaps, can preemptively decide that its gaming activities do not violate the CEA, CFTC regulations, IGRA, or other federal statutes.  *See* Pl.'s Mot. Supp. Prelim. Inj., ECF No. 11 at PageID 230.  But it is inconceivable that Congress would have granted a private, for-profit entity the power to authorize and conduct nationwide sports betting—including on Indian lands—without explicitly stating as much, especially in the face of comprehensive statutes and regulations governing gaming on Indian lands.[2]  It is axiomatic that "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or

---

[2] The prohibition of sports betting in the CFTC regulations is more than sufficient reason for this Court to deny Kalshi's motion.  Being stopped by state authorities from doing something that is also contrary to federal law is not an irreparable injury to Kalshi, and there is no principle of equity that would require this Court to lend its imprimatur to illegal gambling.  But Kalshi is wrong on the merits as well.  Kalshi's position would mean that when it amended the CEA in 2010, Congress authorized the nationwide sports betting Kalshi now advertises, displacing IGRA and the prohibitions of sports betting Congress had imposed in the Professional and Amateur Sports Protection Act ("PASPA"), along with preempting all state regulation.  Congress, of course, did no such thing.  Neither the CEA nor the CFTC's lengthy explication of swaps in the Federal Register provides any framework for regulating sports betting; the CFTC swaps regulations do not even mention sports, making it implausible to read the 2010 amendment as turning the CFTC into the one-and-only regulator of sports betting.  *See Crypto.com*, 2025 WL 2916151, at *9 (holding that wagering on the outcome of sporting events was the proper subject of an event contract "cannot be a proper reading of the [CEA] because that would mean that all sports wagering must be done on a DCM, and not at casinos, as the CEA forbids nearly all swap dealing and trading unless done on a DCM").

ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, <u>531 U.S. 457, 468</u> (2001).

Ignoring this history and longstanding principles of federal statutory interpretation, Kalshi now presents an alternate reality—one in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* <u>7 U.S.C. § 5(a)–(b)</u>—exclusively governs nationwide sports betting, including that which occurs on Indian lands, thereby repealing the comprehensive regulatory scheme set forth in IGRA. This cannot be the case. Any preemptive effect that the CEA has only applies to lawful transactions that fall under the CFTC's exclusive jurisdiction. *See* <u>7 U.S.C. § 2(a)(1)(A)</u>. Kalshi's sports-event contracts are neither.

1. *The CEA does not give CFTC exclusive jurisdiction over gaming-related sports-event contracts*

Kalshi rests its case on the argument that the CEA grants "exclusive jurisdiction" to the CFTC over its sports-event contracts, and therefore preempts state law and, in effect, repeals IGRA. *See* Pl.'s Mot. Supp. Prelim. Inj., <u>ECF No. 11 at</u> <u>PageID 217</u>. However, Kalshi's sports-events contracts are not valid "swaps" and the CFTC therefore does not have exclusive jurisdiction over them. Moreover, this exclusive jurisdiction is not universal; <u>7 U.S.C. § 2(a)(1)(A)</u> also provides a savings clause, which states, "[e]xcept as hereinabove provided, nothing contained in this section shall … supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission *or other regulatory authorities under the laws of the United States* or of any State …." *Id.* (emphasis added).

The CEA neither supersedes IGRA nor limits the jurisdiction of tribes or the National Indian Gaming Commission ("NIGC") on Indian lands. Rather, the CEA's savings clause expressly reserves the authority of the NIGC and Tribal gaming authorities over gaming on

Indian lands, in accordance with IGRA. *See KalshiEX, LLC v. Martin*, No. 25-cv-1283, 2025 WL 2194908 at *9 (D. Md. Aug. 1, 2025) ("Although the savings clause in the [CEA's] exclusive jurisdiction provision cuts both ways …, given the presumption against preemption, its ambiguity means that on balance it cuts against a finding of field preemption.").[3]

> 2. *Kalshi's sports-event contracts are not valid "swaps"*

Kalshi argues that its sports-event contracts are subject to the CFTC's exclusive jurisdiction because they are "swaps" traded on a DCM. *See* Pl.'s Mot. Supp. Prelim. Inj., ECF No. 11 at PageID 227–28. But Kalshi's sports-event contracts are not valid "swaps" and, therefore, are not subject to the CFTC's exclusive jurisdiction.

To constitute a valid "swap," an event contract must be "dependent on the *occurrence, nonoccurrence, or the extent of the occurrence* of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Here, Kalshi's sports-event contracts do not meet this definition because they are not dependent on the *occurrence*, *nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs or the extent to which it occurs[4]—but rather on the *outcome* of the sports event—i.e., which team wins. This is precisely what the Nevada District Court held in a recent decision. *Crypto.com*, 2025 WL 2916151, at *9 (holding sports-event contracts are not

---

[3] In addition to IGRA, Kalshi's sports-event contracts violate other federal laws, including the Wire Act, 18 U.S.C. § 1084. *See Martin*, 2025 WL 2194908, at *10 (holding that Kalshi's proposed interpretation of the CEA "would necessarily entail at least a partial implied repeal of the IGRA and the Wire Act").

[4] For example, whether "a boxing match … take[s] place (occurrence), [does] not take place (nonoccurrence), or go[es] only three rounds (extent of the occurrence)" could arguably be the subject of a valid sports-event contract. *See Crypto.com*, 2025 WL 2916151, at *8.

"swaps" because they "turn on the *outcome* of the live event, … not on the '*occurrence, nonoccurrence, or the extent of the occurrence*' of a live event" (emphasis added)).

Moreover, any "financial, commercial, or economic consequence" that may potentially be associated with Kalshi's sports-event contracts is related to the *outcome* of the games, not the *occurrence*, *nonoccurrence*, or *extent of the occurrence* of the games.[5] Kalshi's sports-event contracts are not hedging opportunities for interested parties to supplement the risk of a cancelled sporting event; instead, they are merely speculative wagers on the outcome of that sporting event or parts thereof. They are, therefore, not dependent upon, or otherwise related to, any potential "financial, commercial, or economic consequence."

>             3.      *The CFTC expressly prohibits Kalshi's sports-event contracts*

Kalshi's sports bets are not swaps under the CEA's definition, but even if they were, Kalshi's sports-event contracts are categorically prohibited by the CFTC as contrary to the public interest. *See* 17 C.F.R. § 40.11(a)(1). Kalshi is not authorized to offer such contracts under the CEA, and its sports-event contracts are therefore invalid and outside the scope of the CFTC's "exclusive" jurisdiction.

The Special Rule grants the CFTC discretion to determine whether event contracts are "contrary to the public interest" if they involve gaming, unlawful activity under federal or state law, or certain other activities contrary to the public interest, like political assassinations. 7 U.S.C. § 7a-2(c)(5)(C)(i). When the CFTC makes such a determination, the CEA expressly

---

[5] Kalshi does not limit their sports-event contracts to simply who wins a particular sporting event, it also offers what are effectively "prop bets." *See, e.g.*, Daniel O'Boyle, *Off And Running: Kalshi Lists Its First Player Prop Bets*, INGAME (Sept. 4, 2025), https://www.ingame.com/kalshi-lists-player-prop-bets/. Even if this Court believes that, for example Jared Goff completing a touchdown constitutes an "occurrence," there is no "financial, commercial, or economic consequence" associated with that particular touchdown.

prohibits those categories of contracts. *Id.* § 7a-2(c)(5)(C)(ii). Here, as noted above, "[t]he CFTC made that public interest determination on a blanket basis when it promulgated § 40.11(a)," which prohibits event contracts related to gaming or unlawful activity under federal or state law. *See N. Am. Derivatives Exch., Inc. v. Nevada* (*Crypto.com*), No. 2:25-cv-978, 2025 WL 2916151, *10 (D. Nev. Oct. 14, 2025).

Further, in promulgating this blanket prohibition, the CFTC acted consistently with Congress's intent that the Special Rule prevent the usage of event contracts "to enable gambling," particularly sports betting.[6] In fact, as Senator Lincoln—one of the principal architects of the Special Rule—explained:

> [It] is our intent … [that the Special Rule] prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

156 Cong. Rec. S5906–07 (daily ed. July 15, 2010). The CFTC's announcement of § 40.11 reinforces its rationale for the blanket prohibition:

> [I]ts prohibition of … "gaming" contracts is consistent with Congress's intent [for the CEA's Special Rule] to "prevent gambling through the futures markets" and to "protect the public interest from gaming and other events contracts."

---

[6] To the extent that Kalshi argues that its sports-event contracts are not gaming or "sports betting" because there is no betting against the "house," that point must fail. A "house" participant is not a necessary element of gambling. Pari-mutuel wagering—which is a type of betting system in which all bets or wagers are placed together in a "pool" and players are betting against each other rather than a "house"—is generally considered gaming and directly mirrors what Kalshi is offering. *See* Ohio Rev. Code § 3775.01(O)(2) (defining "sports gaming" to include "pari-mutuel sports wagering pools").

76 Fed. Reg. at 44,786 (citations omitted).

Kalshi's sports-event contracts involve both gaming and are unlawful activity under federal law.  As such, they expressly violate § 40.11(a)(1) and fall outside the scope of the CFTC's exclusive jurisdiction.  First, because Kalshi's sports-event contracts constitute sports betting, they necessarily involve gaming in violation of § 40.11(a)(1).  Kalshi even conceded as much in a prior case before the D.C. Circuit.  *See* Brief of Appellee at 17, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024), Doc. No. 2085055 ("An event contract … involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament, all of which were mentioned in the provision's only legislative history

Thus, Kalshi's sports-event contracts are not lawful transactions under the exclusive jurisdiction of the CFTC.  Therefore, the CEA does not preempt or otherwise conflict with IGRA, and IGRA governs all sports-event contracts offered on Indian lands.

4.    *The self-certification provisions of the CEA and CFTC regulations do not grant Kalshi authority to decide that its sports-event contracts are lawful swaps*

Kalshi argues that, in the absence of CFTC action, Kalshi's own decision to self-certify its gaming contracts as lawful swaps unilaterally establishes these products are *bona fide* financial instruments under the CEA, and preempts longstanding federal and state law and regulation to the contrary.  This is wrong as a matter of statutory and regulatory law, but even if it were correct, this would be an unconstitutional violation of the private nondelegation doctrine, which guards against precisely the type of unchecked, privately exercised powers that Kalshi relies upon to list and trade its event contracts.  While the Supreme Court routinely upholds congressional delegations of power to federal agencies, it pays particular attention when those

delegations are to private entities. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025) (finding that the permissibility of a private delegation depends upon whether the federal agency retains oversight and ultimate decision-making authority over the private entity's actions).

Here, according to Kalshi, the self-certification provisions empower Kalshi—a private, for-profit entity—to define, structure, and launch its own event contracts, and simultaneously fail to provide any mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC may implement its discretion whether to stay a self-certification. *See* Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sept. 3, 2025), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25?utm_source=substack&utm_medium=email (warning that CFTC "[has] too few guardrails and too little visibility into the prediction market landscape").

## B. The CEA does not impliedly repeal IGRA

By asserting that the CFTC has exclusive jurisdiction over sports betting (including that which occurs on Indian lands), Kalshi effectively contends that the CEA impliedly repealed IGRA. Kalshi recently attempted to make this argument before the Maryland District Court, stating that even if "IGRA's definition of 'gaming'" encompassed sports event contracts, "the CEA's exclusive jurisdiction provision would displace any attempt by tribes to regulate those contracts." Pl. Reply Supp. Prelim. Inj. at 8, *Martin*, No. 1:25-cv-01283, ECF No. 29. Ultimately, the court disagreed with Kalshi and denied its motion for preliminary injunction. *Martin*, 2025 WL 2194908, at *13. Kalshi may also assert, as it has in its Fourth Circuit appeal of that decision, that the CFTC's alleged exclusive jurisdiction over its sports event contracts does not impliedly repeal IGRA because "IGRA gives Native American tribes the authority to

regulate gaming 'on Indian lands,' … but does not authorize tribes to regulate gaming available over the internet." Br. of Appellant Supp. Prelim. Inj. at 70, *KalshiEx, LLC v. Martin*, No. 25-1892 (4th Cir. Oct. 15, 2025), ECF No. 16 (quoting 25 U.S.C § 2701).

The Court should reject these arguments because IGRA authorizes tribes to regulate gaming activities on Indian lands, including the placement of wagers from Indian lands over the internet; and the presumption against implied repeals applies here, where the CEA does not authorize DCMs to offer sports betting.

1.    *IGRA protects tribes' authority to regulate online gaming on Indian lands*

Ironically, in the very same paragraph that Kalshi makes the argument that IGRA cannot authorize tribes to regulate online gaming, Kalshi cites the *West Flagler Associates, Ltd. v. Haaland* decision, in which the D.C. Circuit held that IGRA allows states and tribes to "allocate jurisdiction" over the regulation of internet gaming conducted by a tribe throughout the state, including on its Indian lands.  71 F.4th 1059, 1065–66 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024).  IGRA's implementing regulations also expressly prescribe the bounds for when tribes can regulate online gaming pursuant to the terms of their IGRA compacts.  *See* 25 C.F.R. § 293.26.

Moreover, the Unlawful Internet Gambling Enforcement Act ("UIGEA") comports with IGRA, in that under both statutes, when an individual physically located on Indian lands places or initiates a bet or wager, that bet or wager takes place on Indian lands, even if it is placed online.[7]  *See e.g.*, 31 U.S.C. § 5362(10)(A) ("The term 'unlawful internet gambling' means to

---

[7] It is, of course, possible for online wagers to be treated as occurring somewhere other than the player's physical location, but such treatment requires statutory authorization.  *See, e.g.*, *W. Flagler*, 71 F.4th at 1065–66 (holding IGRA compacts may include provisions deeming tribes' statewide mobile wagering to occur on its Indian lands for the purpose of being subject to tribal regulation, where state law deems such activity to occur on Indian lands); 25 C.F.R. § 293.26

place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made."); *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) (rejecting argument that "patron's action in selecting a wager" constitutes a "pre-gaming communication, … not gaming activity" under the UIGEA because "[t]hat conduct is … subject to the provisions of the UIGEA as a 'bet or wager' that is initiated through the internet." (quoting 31 U.S.C. § 5362(1))).

Further, IGRA facilitates a comprehensive federal scheme for the regulation of online class III gaming by way of compacting. *See, e.g.*, *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996). A decision in Kalshi's favor would upend IGRA's inter-jurisdictional framework for class III gaming by allowing DCMs unilaterally—i.e., without the consent of tribes or states, or approval by the Secretary of the Interior—to offer sports betting on Indian lands.

### 2. Kalshi cannot overcome the presumption against implied repeal

The Supreme Court applies the "'strong presumption' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citing *United States v. Fausto*, 584 U.S. 439, 452, 453 (1988)). Congress's intent to repeal must be "clear and manifest." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503

(same); *Harrop v. R.I. Div. of Lotteries*, No. PC-2019-5273, 2020 WL 3033494, at *13 (R.I. Super. Ct. June 1, 2020) (upholding legality of online wagering because state statute deemed casinos' offering of statewide online wagers to occur where received at hosting casino facility), *appeal dismissed*, No. SU-2020-0183-A (R.I. Dec. 9, 2022). Neither the CEA nor its implementing regulations provide such deeming authority for Kalshi's sports bets.

(1936). The Indian canons of construction[8] also require courts to resolve statutory ambiguities in favor of tribes. *Bryan v. Itasca Cnty.*, <u>426 U.S. 373, 392</u> (1976); *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Atty. W. Div. of Michigan*, <u>369 F.3d 960, 971</u> (6th Cir. 2004).

Here, Congress did not express the requisite intent for implied repeal. If the Court accepts Kalshi's position that its sports-event contracts—which constitute sports betting and Class III gaming under IGRA—are swaps subject to the CFTC's exclusive jurisdiction, then it must also accept the underlying assumption that Congress intended to upend the entire federal framework for Indian gaming and repeal key provisions of IGRA. *See, e.g.*, <u>25 U.S.C. § 2710(d)(1)</u>. Additionally, IGRA's criminal provisions provide the United States Department of Justice ("DOJ") with "exclusive jurisdiction" over criminal prosecutions of applicable gambling laws in Indian country, unless a tribe agrees to transfer jurisdiction to the state. <u>18 U.S.C. § 1166(d)</u>. Under Kalshi's theory, the CEA likewise impliedly repealed DOJ's jurisdiction over such criminal prosecutions (which it did not) because it is impossible for the CFTC to exercise exclusive jurisdiction over sports-event contracts while the DOJ exercises its exclusive jurisdiction over IGRA-related gaming prosecutions. Further, the CEA explicitly disclaims the

---

[8] As Justice Blackmun has explained:

> Because Congress' authority to legislate unilaterally on behalf of the Indians derives from the presumption that Congress will act with benevolence, courts "have developed canons of construction that treaties and other federal action should when possible be read as protecting Indian rights and in a manner favorable to Indians."

*Hagen v. Utah*, <u>510 U.S. 399, 442</u> n.1 (1994) (Blackmun, J., dissenting) (quoting Felix Cohen, Handbook of Federal Indian Law 221 (1982 ed.)).

CFTC's jurisdiction over such DOJ prosecutions. *See* 7 U.S.C. § 16(e)(1)(A) ("Nothing in this chapter shall supersede or preempt … criminal prosecution under any Federal criminal statute.").

Further, federal courts have established that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with Indians, without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142 (9th Cir. 2020); *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*, 153 F.4th 748 (9th Cir. 2025). These cases further establish that when there is ambiguity as to whether a later-enacted statute of general applicability repeals an earlier-enacted statute applied specifically for the benefit of tribes, the question of repeal "must be resolved by the Indian canons of construction"—i.e., in tribes' favor. *See Shoshone-Bannock*, 153 F.4th at 765–766 (holding the Federal Land Policy and Management Act did not impliedly repeal a 1900 law specifically protecting a tribe's usufructuary rights to ceded lands).

Here, Congress passed legislation—IGRA—specifically to protect tribes' ability to regulate class III gaming on Indian lands.[9] Congress did not explicitly reference IGRA nor class III gaming on Indian lands when it amended the CEA in 2010; nor did Congress expressly exempt wagering on the outcome of sporting events from existing federal laws regulating sports betting. Rather, by the plain language of the CEA, it applies to the commodities trading market (focusing on the risk, discovery, and dissemination of commodity pricing information), *not* Indian gaming. *See* 7 U.S.C. § 5(a)–(b). Indeed, Congress went so far as to enact the Special Rule, which shows a clear Congressional intent to *disallow* any "gaming" activity on DCMs at

---

[9] In its regulations, the NIGC defined "class III gaming" to include "*sports betting*." 25 C.F.R. § 502.4(c) (first published at 57 Fed. Reg. 12392 (April 9, 1992)) (emphasis added).

all, *see* 7 U.S.C. § 7a-2(c)(5)(C), and the CFTC acted consistently with Congress's intent by

promulgating the blanket prohibition of event contracts involving gaming and illicit activities,

*see* 17 C.F.R. § 40.11(a)(1).  That the CEA and IGRA only overlap here due to Kalshi's

backdoor attempt to evade comprehensive gaming regulations emphasizes this point.[10]

Further, Kalshi cannot meet the "heavy burden" of proving Congress intended to repeal

IGRA because there is a reasonable interpretation of the CEA that gives full effect to both

statutes: the CFTC's exclusive jurisdiction does not extend to sports-event contracts, as the CEA

and its implementing regulations do not permit DCMs to engage in sports betting.  *See Epic Sys.*

*Corp.*, 584 U.S. at 510.  Instead, compliance with both statutory regimes is entirely possible, and

nothing within IGRA's restraints on class III gaming on Indian lands obstructs or invalidates the

provisions of the CEA. Kalshi can still allow users located on Indian lands to trade on

permissible event contracts under the CEA, such as the future prices of commodities like wheat

or corn.  They can even engage in class III gaming on Indian lands, including sports wagering, so

long as they do so in compliance with IGRA.

---

[10] Further, under Kalshi's theory, simply calling a sports wager a "swap"—regardless of whether
it is actually a valid "swap"—and listing it for trade on a DCM automatically grants the CFTC
exclusive jurisdiction, to the detriment of all other regulatory authorities.  *See* Pl.'s Mot. Supp.
Prelim. Inj., ECF No. 11 at PageID 221; Compl., ECF No. 1 at Page ID 13.  What, then, would
prevent Kalshi from calling "contracts" on other traditional forms of gaming—such as roulette
and lotteries—"swaps" and subjecting them to the exclusive jurisdiction of the CFTC?
According to Kalshi, CFTC inaction—despite the CFTC categorically banning "gaming"
contracts via 17 C.F.R. § 40.11(a)—is all that is required to bless contracts blatantly designed for
no other purpose than to enable gambling.

Kalshi's theory would likewise strip this Court of its own authority to interpret the law and
determine what, under the terms of the CEA, constitutes a "swap" because, as Kalshi argues, that
determination is exclusively up to the CFTC.  But, as the Nevada District Court recently held,
"the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap
… [and] [n]othing in the CEA takes statutory interpretation away from courts."  *Crypto.com*,
2025 WL 2916151, at *6.

Finally, even if there were a conflict (there is not), the CEA's silence as to class III gaming on Indian lands and its effect on IGRA means it is, at most, ambiguous as to whether the CEA repealed IGRA, and that ambiguity must be resolved in tribes' favor under the Indian canons of construction.

### C. Kalshi's sports-event contracts constitute "Class III Gaming" under IGRA

IGRA's regulatory regime is comprehensive, and occupies the entire field of gaming on Indian lands. *See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, <u>63 F.3d 1030, 1033</u> (11th Cir. 1995) (IGRA was "intended to expressly preempt the field in the governance of gaming activities on Indian lands" (quoting S. Rep. No. 100-446, at 6 (1988))); *Gaming Corp.*, <u>88 F.3d at 544</u>.

IGRA's implementing regulations define "Class III Gaming" to expressly include "sports betting." <u>25 C.F.R. § 502.4(c)</u>. The term "sports betting" is generally understood to mean:

> [T]he staking or risking by any person of something of value upon the outcome of … a sporting event … upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome.

<u>31 U.S.C. § 5362(1)(A)</u> (defining "bet or wager" under the UIGEA). Specifically, regarding what "sports betting" means under IGRA, the Department of the Interior has affirmatively approved compacts that define "sports betting" to include exactly the type of betting that Kalshi offers.[11]

---

[11] *See, e.g.*, 2024 Amendments to the Lac du Flambeau Band of Lake Superior Chippewa Indians and State of Wisconsin Gaming Compact of 1992, Part IV.A.12 (Mar. 29, 2024) (defining "event wagering" as "accepting wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches") Agreement Between the Mohegan Tribe of Indians of Connecticut and the State of Connecticut, Section 1(nn) (Sept. 10, 2021) (defining "sports wagering" as "risking or accepting any money … or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, … and (B) based on (1) a live sporting event or a portion or portions of a live sporting event, including future or propositional

Kalshi very clearly offers sports betting: contracts that stake or risk something of value upon the outcome of a sporting event based on the understanding that the person will receive something of value based on that outcome. Kalshi does not deny this. Instead, Kalshi ignores that its sports-event contracts are sports bets by another name, and maintains the CFTC has exclusive jurisdiction over its sports-event contracts as "swaps." Pl.'s Mot. Supp. Prelim. Inj., ECF No. 11 at PageID 227–28, 323–33. As discussed above, this argument fails.

Instead, Kalshi offers class III gaming (sports betting) in violation of IGRA—Kalshi has not obtained a license to offer its sports betting pursuant to tribal ordinance or resolution; nor has Kalshi been authorized to conduct its sports betting pursuant to any tribal-state compact. *See* 25 U.S.C. § 2710(d)(1) (class III gaming on Indian lands is only lawful if it is: (1) authorized by tribal ordinance or resolution; (2) located in a state that permits such gaming; and (3) conducted in accordance with a tribal-state gaming compact). Across the board, Kalshi does not geographically restrict its sports-event contracts and, therefore, offers such sports betting on Indian lands in violation of IGRA.

Kalshi may argue, as it did in the Fourth Circuit, that UIGEA's definition of "bet or wager" excludes transactions on DCMs, and that this exclusion should be read into IGRA to avoid a conflict between the two statutes . *See* Opening Brief for Appellant at 69, *Martin*, No. 25-1892, ECF No. 16. But while UIGEA may provide insight as to what the term "sports betting" generally means, the exceptions to such definition from UIGEA should not be read into IGRA. As Kalshi points out, UIGEA exempts trading on DCMs when "conducted … under the [CEA]." *See* 31 U.S.C. § 5362(1)(E)(ii). However, that exclusion not only requires such trading

events during such an event, or (2) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events").

to be lawful—which, as established, Kalshi's is not—but is also specific only to the applicability of the UIGEA and does not change the core understanding of what "sports betting" means. Moreover, IGRA contains no similar exclusion for class III gaming, which expressly includes "sports betting." *See* 25 C.F.R. § 502.4(c).

Additionally, while gaming under IGRA can involve bets or wagers as the words are commonly used, *see* 25 C.F.R. § 502.4(c), there is no indication, let alone clear intent, that Congress meant for IGRA to be limited to the technical definition—including all the exceptions—provided in the words of an entirely separate statute. Further, UIGEA and IGRA are not in conflict. In *Iipay*, the Ninth Circuit emphasized that "the UIGEA does not make gambling legal or illegal directly." 898 F.3d at 965. Instead, UIGEA merely ensures that the entire process of placing and accepting wagers is lawful in the jurisdictions where the wagers are placed and accepted. *See id*. In contrast, under IGRA, no one may engage in class III gaming activities—including offering, placing, and accepting sports bets—on Indian lands unless authorized to do so under an IGRA compact. *See* 25 U.S.C. § 2710(d)(1). As explained above, neither the CEA nor UIGEA has repealed this pillar of IGRA.

Thus, each bet Kalshi offers on Indian lands violates IGRA, undermines tribal sovereignty, and reduces tribal gaming revenue and government funding.

## II. Ignoring the Applicability of IGRA Raises Serious Policy Concerns and Violates Federal Indian Policy

Kalshi's sports-event contracts violate well-established federal Indian policy. The Supreme Court has "consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory.'" *Cabazon*, 480 U.S. at 207 (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)). While "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes," *United States v. Lara*, 541 U.S. 193, 200 (2004),

"[Indian tribes] remain 'separate sovereigns pre-existing the Constitution,'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).

Congress has expressly declared its commitment to supporting Tribal self-determination and self-governance. 25 U.S.C. § 5302(b). And the Executive Branch has consistently affirmed this policy. *See e.g.*, Exec. Order No. 13175, § 2(c), 65 Fed. Reg. 67,249 (Nov. 6, 2000); Exec. Order No. 13647, § 1(a), 78 Fed. Reg. 39,539 (June 26, 2013).

In *Cabazon*, the Supreme Court recognized the importance of "the congressional goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development[,]" and noted that federal agencies "ha[ve] sought to implement these policies by promoting tribal bingo enterprises." 480 U.S. at 216–17 (internal quotations omitted). Additionally, tribal casinos often provide "the sole source of revenues for the operation of the tribal governments and the provision of tribal services" and that, in some instances, tribal casinos "are also the major sources of employment on the reservations." *Id.* at 218–19. Following *Cabazon*, Congress declared in IGRA that "[t]he purpose of [IGRA] is … to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments …." 25 U.S.C. § 2702(1).[12]

---

[12] To the extent Kalshi argues, as others have, that the policy concerns raised by Tribal Amici are for Congress to decide, *see* Pl.'s Resp. Amici Curiae Brief at 5, *Crypto.com*, No. 2:25-cv-00978, (D. Nev. Sept. 29, 2025) ECF No. 92; Pl.'s Resp. to Brief of Amici Curiae at 6, *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541 (D. Nev. Oct. 14, 2025) ECF No. 49, Congress has already done so through IGRA, which was not repealed by the CEA.

Kalshi tramples upon established federal Indian policy by usurping the rights of tribes to regulate gaming on Indian land and benefit from such gaming. IGRA mandates that tribes "have the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. §§ 2701(5), 2710(d)(1)(C). Kalshi violates this exclusive right, which is particularly dangerous because it does not comply with any gaming regulations that protect consumers, ensure fairness, or mitigate negative gaming impacts.[13]

Finally, Kalshi is siphoning revenue from tribal governments in violation of federal Indian policy. IGRA requires all revenues from tribal gaming be used for governmental or charitable purposes. 25 U.S.C. § 2710(b)(2)(B). As Justice Sotomayor explained in *Bay Mills*: "[T]ribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions." 572 U.S. at 810 (Sotomayor, J., concurring). Many tribes have come to rely on gaming revenue because destructive former federal policies "left a devastating legacy" on tribes that are "largely unable to obtain substantial revenue by taxing tribal members … [because] there is very little income, property, or sales [that tribal governments] could tax." *Id.* at 812–13 (quoting Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 774 (2004)). In this regard, IGRA has been incredibly successful.[14] The revenue generated

---

[13] This lack of responsible gaming measures and consumer protections, which are required by *legal* gaming operations, is dangerous and contrary to the public interest. Recently, Josh Sterling (a former CFTC employee and the lawyer representing Kalshi) dismissed such responsible gaming concerns, stating: "People are adults, and they're allowed to spend their money however they want it, and if they lose their shirt, that's on them." Jessica Welman, *Kalshi's lawyer goes hard at state-regulated gambling*, SBCAmericas, (July 11, 2025), available at https://sbcamericas.com/2025/07/11/kalshi-nclgs-sports-contract-debate/?amp.

[14] *See, e.g.*, NIGC, FY 2023 Gross Gaming Revenue Report 4–5 (July 2024), available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

by tribal gaming supports thousands of jobs in hundreds of communities and provides critical

funding to state and local governments through revenue-sharing agreements, tax revenue, and

economic stimulus.  If Kalshi continues to offer illegal nationwide online sports betting, the

impact on tribal governments will be devastating.

**CONCLUSION**

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny

Kalshi's motion for preliminary injunction.

Dated this 14th day of November, 2025.

/s/ Ronald Kozar
Ronald Kozar (0041903)
Stratacache Tower, Suite 2830
40 North Main Street
Dayton, OH 45423
Telephone: (937) 222-6764
ronald.kozar@gmail.com

/s/ Joseph H. Webster
Joseph H. Webster (*pro hac vice* pending)
Elizabeth Bower (*pro hac vice* pending)
Jens W. Camp (*pro hac vice* pending)
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Ste. 1200
Washington, DC 20036
Telephone: (202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com

/s/ Scott Crowell
Scott Crowell (*pro hac vice* pending)
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
scottcrowell@clotag.net

/s/ Bryan Newland
Bryan Newland (*pro hac vice* pending)
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Bryan.Newland@Powerslaw.com

*Attorneys for Tribal Amici*

/s/ Michael Hoenig
Michael Hoenig (*pro hac vice* pending)
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Attorney for Yuhaaviatam of San Manuel Nation*