**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| KALSHIEX LLC, <br><br> *Plaintiff,* <br><br> *v.* <br><br> MATTHEW T. SCHULER, *et al.*, <br><br> *Defendants.* | Case No. 2:25-cv-1165 <br><br> Chief Judge Sarah D. Morrison <br><br> Magistrate Judge Chelsey M. Vascura |

### PLAINTIFF'S MOTION FOR AN
### IMMEDIATE INJUNCTION PENDING APPEAL

Plaintiff KalshiEX LLC respectfully moves under Federal Rule of Civil Procedure 62(d) for an injunction against Defendants Matthew T. Schuler, Thomas J. Stickrath, Sheetal Bajoria, Scott Borgemenke, Keith Cheney, Penelope Cunningham, Triffon Callos, Christopher Smitherman, Ohio Casino Control Commission, and Dave Yost pending appeal of this Court's March 9, 2026, Opinion and Order denying Kalshi's motion for preliminary injunction (Dkt. No. 69, "Op."). This Motion is supported by the memorandum of law below, as well as all documents, exhibits, and affidavits on file in this action.[1]

Given the risk that Kalshi will be subject to civil and criminal liability absent relief, Kalshi respectfully informs the Court that, in the absence of relief from this Court, Kalshi intends to seek relief from the U.S. Court of Appeals for the Sixth Circuit on March 24, 2026. If the Court declines to grant an injunction pending appeal, Kalshi alternatively requests an interim injunction preserving the status quo while it applies for relief from the Sixth Circuit.

---

[1] Capitalized terms have the meaning given to them in Dkt. No. 11.

## MEMORANDUM OF LAW IN SUPPORT

## INTRODUCTION

This case presents complex legal issues that have divided courts across the country, including district courts within this Circuit. As this Court recognized, multiple appeals concerning these issues are already pending across the Third, Fourth, and Ninth Circuits. *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir.); *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir.); *KalshiEX, LLC v. Assad*, No. 25-7516 (9th Cir.). Significantly, after Kalshi filed this suit, the CFTC itself has weighed in, making clear that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM," that its "jurisdiction supersedes State as well as Federal agencies," and that "uniform" federal regulation of prediction markets is necessary "to prevent the type of fragmented oversight" that would result from state enforcement. (CFTC Amicus Br., *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2, at 1, 21) ("CFTC Amicus Br."). And just a few weeks before this Court denied Kalshi a preliminary injunction, the U.S. District Court for the Middle District of Tennessee granted Kalshi a preliminary injunction in a materially identical case, holding that "Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies." *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026).

An injunction pending appeal is warranted given the disagreement among federal courts on the merits of the preemption question, and it is especially warranted given that this Court lacked the benefit of the CFTC's views on the preemption question when the case was initially briefed. Without interim relief, Kalshi faces the Hobson's choice it described to the Court in its request for a preliminary injunction. Defendants have demanded that Kalshi "immediately" cease offering sports event contracts in Ohio or face criminal liability. (Dkt. No. 11-1 at 1). Kalshi does not

2

currently geolocate users, and implementing geolocation would be exceptionally costly and could not be done "immediately" as Defendants have demanded. Even if Kalshi were to attempt to geolocate users, it still would be unable to obtain a license in Ohio, because Ohio law requires licensees to accept wagers exclusively from users within the state—a requirement that would be impossible for a nationwide exchange like Kalshi to satisfy. As the CFTC has confirmed, "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide," and a DCM "cannot fulfill its federal mandate" if it complies with such state-by-state restrictions. (CFTC Amicus Br. at 26-27). Given the substantial questions raised by the merits and the irreparable harm Kalshi would face absent relief, this is a quintessential case for an injunction pending appeal.

Should the Court decline to issue a full injunction pending appeal, Kalshi intends to seek an injunction pending appeal from the Sixth Circuit. Kalshi requests that if the Court denies a full injunction pending appeal, the Court issue a shorter-term "administrative" injunction pending the Sixth Circuit's resolution of Kalshi's request for an injunction pending appeal. *See United States v. Texas*, 144 S. Ct. 797, 798-99 (2024) (Barrett, J., concurring) (describing this type of "administrative" relief as a "flexible, short-term tool" designed "to minimize harm while an appellate court deliberates"); *cf.* 11 Wright & Miller's Federal Practice & Procedure § 2904 (3d ed. Sep. 2025) ("[m]any courts also take into account that the case raises substantial difficult or novel legal issues meriting a stay").

Kalshi informed counsel for Defendants of Kalshi's intent to file this motion. Kalshi respectfully requested that Defendants either agree not to initiate an enforcement action against Kalshi pending Kalshi's appeal to the Sixth Circuit (which would avoid the need to seek an injunction pending appeal), or agree not to initiate an enforcement action against Kalshi pending

3

the resolution of a motion for an injunction pending appeal (which would avoid the need to seek expedited relief). At 12:53 PM today, Defendants informed Kalshi that Defendants would not agree to forbear from enforcement pending either an expedited appeal or resolution of a motion for an injunction pending appeal. Kalshi files this motion for an injunction pending appeal as soon as practicable after learning of Defendants' position. Defendants oppose this relief.

Given that Kalshi faces a risk of criminal and civil liability, Kalshi respectfully informs the Court that, absent relief from this Court, Kalshi intends to seek relief from the Sixth Circuit on Tuesday, March 24, 2026.

## **LEGAL STANDARD**

On review of a motion for an injunction pending appeal, courts consider: (1) whether the movant is "likely to succeed on the merits," (2) whether they are "likely to suffer irreparable harm" absent an injunction; (3) whether the "balance of equities tips in [their] favor," and (4) whether "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[A]ll four factors are not prerequisites but are interconnected considerations that must be balanced together." *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (citations omitted). The first two factors "hold the most importance" in determining whether to grant relief. *Elliot v. First Fed. Cmty. Bank of Bucyrus*, 2019 WL 2590572, at *2 (S.D. Ohio June 25, 2019). Courts in this district require the "strength of the likelihood of success on the merits" to be "inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue." *In re FirstEnergy Corp. Sec. Litig.*, 751 F. Supp. 3d 853, 856 (S.D. Ohio 2024) (citations omitted). The movant must demonstrate "at least serious questions going to the merits" and "irreparable harm that decidedly outweighs the harm that will be inflicted on others if a stay is granted." *Id*. at 857. But even where likelihood of success is uncertain, an injunction

pending appeal may be appropriate to avoid an irreparable injury or irreversible action if the remaining three factors weigh strongly in the movant's favor. *Dayton Christian Schs. v. Ohio C.R. Comm'n*, 604 F. Supp. 101, 103-104 (S.D. Ohio 1984). Kalshi meets these requirements.

## ARGUMENT

### I.  Kalshi's Appeal Raises Serious Questions That Have Divided the Courts.

Kalshi has established a sufficient likelihood of success to warrant an injunction pending appeal. An injunction is proper where an appeal presents "at least serious" appellate issues. *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 929 (6th Cir. 2002). Kalshi's appeal meets that standard.

The question whether the Commodity Exchange Act ("CEA") preempts state regulation of prediction markets is a question of first impression in the Sixth Circuit and has divided federal courts. The Middle District of Tennessee and the District of New Jersey each concluded that the CEA preempts state regulation of Kalshi's event contracts in materially identical cases. *Orgel*, 2026 WL 474869, at *7-10; *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *5-6 (D.N.J. Apr. 28, 2025). And while two federal courts in addition to this one have denied Kalshi a preliminary injunction, even those courts have adopted different rationales. The District of Maryland concluded that the CEA does not preempt state gambling laws even assuming Kalshi's contracts are swaps. By contrast, the District of Nevada concluded that the CEA does preempt state gambling laws as to swaps traded on DCMs, but held that certain of Kalshi's contracts are not swaps. In reaching that holding, the District of Nevada emphasized repeatedly that Kalshi's argument on the merits raised "serious" questions. *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *3, 12 (D. Nev. Nov. 24, 2025). The judicial divergence on these questions provides a strong basis for a stay,

5

and it is particularly significant given that courts within the Sixth Circuit have now disagreed. *Orgel*, 2026 WL 474869, at *7-10; (Op. at 2).

Multiple features of this Court's ruling present close questions with which the Sixth Circuit may disagree on appeal. *Dayton Christian Schs.*, 604 F. Supp. at 104 (granting injunction pending appeal where "the Sixth Circuit has not ruled on the precise questions presented by this case").

***Presumption Against Preemption***. A core premise of the Court's opinion is that the "presumption" against preemption applies here. (Op. at 16). But Kalshi respectfully submits that the Court's application of this presumption is contrary to Supreme Court and Sixth Circuit precedent and is vulnerable on appeal.

*First*, the Court held that Kalshi "waived" its argument that CEA expressly preempts Ohio's sports gambling laws. But Kalshi was clear in its opening papers that "[f]ield preemption can be either express or implied" and "***Congress has preempted the field of regulating trading on DCMs***, both ***expressly in the text of the CEA*** and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation." (Dkt. No. 11 at 10, 11-12) (emphasis added). And as Kalshi explained in its reply after Defendants invoked the presumption, where, as here, a statute "contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption" because "the plain wording of the clause" "necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (citation modified); (Dkt. No. 49 at 10).

*Second*, the Sixth Circuit could conclude that this Court (at 16) misapplied *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631 (6th Cir. 2025). The Sixth Circuit in *Churchill Downs* declined to apply the presumption against preemption in a case much like this one, explaining that "the presumption against preemption doesn't apply" because the

6

"plain text" of the federal law at issue "forecloses Michigan's interpretation" and because "the regulation of *interstate* gambling isn't a traditional area of state regulation." *Id*. at 641 n.5. Just so here, the plain text of the CEA forecloses Ohio's interpretation, and Ohio seeks to regulate what it views as *interstate* gambling. The Sixth Circuit could therefore conclude that the presumption against preemption does not apply.

**Swaps**. The Court's holding (at 13) that Kalshi is unlikely to succeed on whether its contracts are swaps is also vulnerable on appeal.

*First*, the Sixth Circuit is likely to find that Kalshi's event contracts satisfy the CEA's requirement that swaps be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The Court's contrary focus (at 11) on the "purpose of the statute" is vulnerable on appeal given the CEA's unambiguous text. As the *Orgel* court explained, "aside from how many games a team wins during a season, individual player performance, and how a team performs, can have financial consequences, even if not right away." *Orgel*, 2026 WL 474869, at *8. In addition, "the statute uses the term potential financial, economic, or commercial consequence. Congress could have imposed a more stringent requirement. Or it could have omitted a qualifier altogether. Congress chose to use 'potential,' which is broad." *Id*. The CFTC has echoed this point, explaining that "sporting events are economic enterprises that generate billions of dollars in economic activity and materially affect both regional and national markets." (CFTC Amicus Br. at 19).

*Second*, the Court reasoned (at 11-12) that the CEA's "goals are better achieved" by interpreting "swap" to be "a transaction involving financial instruments and measures that traditionally and directly *affect commodity prices*." But the CEA makes clear that events *are* commodities. Under CEA amendments Congress adopted in 2000, an "occurrence" or

"contingency" that is "beyond the control of the parties" to a "transaction" and "associated with a financial, commercial, or economic consequence," is one type of intangible "commodity" (which are known as "excluded commodit[ies]" because contracts involving these commodities were initially excluded from the on-DCM requirement). 7 U.S.C. § 1a(19)(iv). Indeed, the CEA elsewhere describes "[e]vent contracts" as "agreements, contracts, transactions, or swaps in *excluded commodities* that are based upon the occurrence, extent of an occurrence, or contingency." 7 U.S.C. § 7a-2(c)(5)(C)(i). Thus, even accepting this Court's understanding of the CEA's purposes, the Sixth Circuit could well conclude that Kalshi's contracts are swaps. And, as the *Orgel* court noted, Kalshi's contracts are structured in the same way as other quintessential swaps like "one-touch barrier option[s]." *Orgel*, 2026 WL 474869, at *8 (citing *United States v. Phillips*, 155 F.4th 102, 108, 113 (2d Cir. 2025)).

*Third*, the Court adopted (at 12) a narrow definition of "swap" to avoid the "absurd" result it understood to follow from preemption—that "all sports bets[ ] would be forced onto DCMs like Kalshi and every sportsbook in the country would be put out of business." But both Kalshi and the CFTC emphatically dispute that this result would follow from preemption, and the Sixth Circuit could agree for numerous reasons.

For one, the CEA contains a savings clause clarifying that, except as provided by the CFTC's exclusive jurisdiction over *on-DCM* trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws." 7 U.S.C. § 2(a); *see id.* § 16(e)(1)(B)(i).

Further, acting pursuant to an express congressional delegation to define "swap," 15 U.S.C. § 8302(d)(1), the CFTC and SEC have explained that some "customary consumer . . . arrangements" may resemble swaps, but that consumers may engage in them "without concern

8

that such arrangements would be considered swaps." *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012). One of the factors used to evaluate whether transactions are swaps is whether "[t]hey are not traded on an organized market." *Id.* Sports event contracts are swaps under this framework because they are undisputedly traded on an organized market, whereas traditional sports bets are not. While the Court criticized this reasoning as circular, the CFTC and Sixth Circuit follow the same approach to distinguish swaps from other products regulated by states, including insurance products. *See* 77 Fed. Reg. at 48,214-15 (insurance products are not swaps because they are "not traded on an organized market or over the counter"); *accord CFTC v. Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) (noting that the distinguishing feature of derivatives is that they are "traded on an exchange" and "fungible"). The CFTC has echoed this reasoning, noting that "other laws that would ordinarily apply outside" the preempted field "still apply, just not to transactions that are trading on CEA-governed markets." (CFTC Amicus Br. at 25).

*Exclusive Jurisdiction*. Kalshi has also raised serious questions about the proper interpretation of the CEA's "exclusive jurisdiction" provision. (Op. at 17-18) (quoting 7 U.S.C. § 2(a)(1)(A)). Congress granted the CFTC "exclusive jurisdiction" over "future[s]" and "swaps" transacted on DCMs. 7 U.S.C. § 2(a)(1)(A). The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). The Sixth Circuit recently affirmed that where federal jurisdiction over a subject is "exclusive," states lack jurisdiction over the same subject—even where state regulation would otherwise apply. *Churchill Downs*, 162 F.4th at 638-642; *see Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980) (the CEA's exclusive-jurisdiction provision sought "to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation."). The Court acknowledged

(at 17) that it was "beyond dispute that the CEA has, and was intended to have, some preemptive effect," but concluded that the provision nonetheless permits states to ban trading on DCMs under state gambling laws. The Court's grounds for reaching that conclusion will be vulnerable on appeal.

*First,* the Court cited (at 17) the savings clause in Section 2(a), which preserves some state authority. But Congress limited that savings clause with the proviso "[e]xcept as hereinabove provided" by the grant of "exclusive jurisdiction" to the CFTC over on-DCM transactions. *See id.* § 2(a)(1)(A). Congress added that proviso for the specific purpose of "clarifying" that "where applicable," the jurisdiction of the CFTC "supersedes State as well as Federal agencies." H.R. Conf. Rep. No. 93-1383, at 35 (1974); *see also* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-93 (1982) (Congress's inclusion of the proviso "wholly and unequivocally eliminated" each of the grounds on which the CEA had been found not to preempt state law before the 1974 amendments). The savings clause thus strongly supports the conclusion that the CFTC's exclusive jurisdiction "supersede[s]" state authorities from regulating on-DCM transactions. As the CFTC recently confirmed, a contrary interpretation would present "a seismic shift in the longstanding status quo between CFTC and state authority." (CFTC Amicus Br. at 2).

*Second,* the Court cited (at 17-18) the preemption clause in 7 U.S.C. § 16(e)(2), but the Sixth Circuit could conclude that this provision supports Kalshi. It was added to the CEA along with the amendments allowing for "exempt" transactions. *See id.* § 6(c). Because exempt transactions are not traded on DCMs, they fall outside the exclusive-jurisdiction provision. Congress enacted Section 16(e)(2) to "preempt" states from applying their gaming laws to exempted off-DCM transactions, just as states were already prevented from applying their gaming

laws to on-DCM transactions. As Congress noted in 2000, "the current" CEA already "supersedes and preempts" state laws "in the case of transactions conducted *on a registered entity*," and the new provision clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempt transactions. H.R. Rep. 106-711, pt. 2, at 71 (2000) (emphasis added). Each of the cross-referenced transactions in Section 16(e)(2) *need not occur on DCMs*—which is why Congress needed to specify that state laws are preempted. It would have been redundant to specify preemption as to transactions on DCMs; Section 2(a) already accomplished that.

*Third*, the Court noted (at 17) that the CFTC's exclusive jurisdiction does not "cover the waterfront of DCM-related activity." That is true, but it follows from clear limits on preemption imposed by the CEA's text, not implicit carveouts. The CEA does not preempt state regulation of most off-exchange trading, 7 U.S.C. § 16(e)(1)(B), nor does it prevent states from enforcing their "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7). Those limitations on the scope of preemption derive from the CEA's text and do not suggest states may apply gambling laws to ban trading on DCMs—the heart of the preempted field.

*Special Rule and UIGEA*. The Court concluded (at 16) there was "no evidence that Congress intended to preempt state sports gambling laws." But the Sixth Circuit could conclude that the Special Rule's reference to "[e]vent contracts" involving "gaming" as one type of "swap" is compelling textual evidence that Congress understood that sports event contracts like Kalshi's would be subject to the CFTC's exclusive jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). And while Defendants have claimed that the Special Rule is a categorical ban on gaming contracts, that is incorrect: The Special Rule instead provides that the CFTC "may" in its discretion prohibit gaming-related contracts if, but only if, it concludes they are "contrary to the public interest." *Id.*; *see* 156 Cong. Rec. S5902, S5906 (July 15, 2010) (purpose of the Special Rule was to "restore

11

*CFTC's authority* to prevent trading that is contrary to the public interest" (emphasis added)). The CFTC has made no such determination, meaning that Kalshi's contracts are federally authorized.

The federal Unlawful Internet Gambling Enforcement Act ("UIGEA") also reflects this understanding. UIGEA generally prohibits the use of the internet to transmit wagers, including wagers on "a sporting event," between states "where such bet or wager is unlawful," 31 U.S.C. §§ 5362(1)(A), (10)(A), but provides that the term "bet or wager" "*does not include*" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E) (emphasis added). UIGEA shows that Congress understood that state gambling laws might otherwise apply to trading on DCMs, but that Congress nonetheless did not intend for state gambling laws to reach trading on DCMs. *See Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).

***Conflict Preemption***. The Sixth Circuit could disagree with the Court's view (at 20) that Kalshi could "comply with the CEA's core principles and Ohio's sports gambling laws at the same time." (*See* Op. at 20). Ohio requires any licensed entity offering "sports wagers" to "ensure that all of its sports wagers are initiated, received, and completed within the State." Ohio Rev. Code §§ 3775.03(A); 3775.11(A), 3775.12(A). Defendants have offered no plausible way for Kalshi to run a nationwide exchange while complying with Ohio's law requiring all transactions to come from within Ohio—to say nothing of compliance with 49 other state laws. To the contrary, the CFTC's Core Principle 2 requires Kalshi to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b). The Court observed (at 20) that there was no evidence "that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial,' " but the

CFTC has now confirmed that Kalshi's interpretation is correct. As the CFTC recently informed the Ninth Circuit, "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide," and a DCM "cannot fulfill its federal mandate" if it imposes geographical state-by-state restrictions. (CFTC Amicus Br. at 26-27). The CFTC's clarification of its position regarding impartial access is a materially new development since this case was briefed, and it strongly favors short-term relief pending appeal.

## II.  Kalshi Faces Irreparable Harm Absent an Injunction Pending Appeal.

Absent injunctive relief, Kalshi faces "irreparable harm that decidedly outweighs the harm that will be inflicted on others if a stay is granted." *In re FirstEnergy Corp. Sec. Litig.*, 751 F. Supp. 3d at 857. Unless the Court enjoins the application of Ohio gaming law as to Kalshi, it would again face a "Hobson's choice" of "violat[ing]" state law and "expos[ing] [itself] to potentially huge liability," or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The *Orgel* court recognized that this type of dilemma constitutes irreparable harm, holding that "Kalshi faces substantial expenses and reputational harm if it complies with [state] demands, or civil and criminal enforcement if it does not." *Orgel*, 2026 WL 474869, at *11. Kalshi faces irreparable harm absent relief along several dimensions.

*First*, "immediate[]" compliance with Ohio law, as Defendants have demanded (*see* Dkt. No. 11-1 at 2), is not possible. Defendants did not meaningfully dispute that Kalshi could not *immediately* obtain an Ohio gaming license. (*See* Dkt. No. 31 at 28-29). Kalshi has no current geolocation capacity, as geolocation is not required by CFTC regulations. (*See* Decl. of Xavier Sottile ¶¶ 14-28, Dkt. No. 11-6). Developing that capability would, at minimum, take months and cost tens of millions of dollars (*id*. ¶ 21), a "difficult and costly" concern. *Orgel*, 2026 WL 474869

13

at *11. Kalshi's only option to comply during the appeal would be to terminate trading for its 35,000-plus users in Ohio, many of whom have open investments on the platform. (Sottile Decl. ¶ 47). But, as the CFTC has emphasized, a DCM "cannot fulfill its federal mandate" if it complies with such state-by-state restrictions. (CFTC Amicus Br. at 26-27). The *Orgel* court recognized these harms, noting that "discontinuing access to the nationwide exchange for its [users] would cause lost profits and reputational harm," and that "determining which contracts to void would be logistically difficult, and Kalshi would lose money by refunding some deposits because of the way the trading on Kalshi is collateralized." *Orgel*, 2026 WL 474869, at *10-11.

*Second*, even if Kalshi were eventually able to comply with Ohio's demands, it would face a separate set of irreparable harms. Obtaining an Ohio gaming license would require Kalshi to accept *only* in-state trades, *see* Ohio Rev. Code §§ 3775.11(A), 3775.12(A)—flatly impossible for a nationwide exchange. Kalshi therefore could not possibly obtain a gaming license in Ohio. Without the prospect of a gaming license, Kalshi would either have to cease offering its contracts in Ohio while continuing to offer them elsewhere, in violation of the CEA's impartial-access obligations, or else cease offering these contracts *nationwide* as it seeks to vindicate its rights on appeal. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 839-40 (2025). That result would interfere with the preliminary injunctions Kalshi obtained in the District of New Jersey and the Middle District of Tennessee, which found that federal law entitled Kalshi to offer these very same contracts.

*Third*, Kalshi would face a distinct set of harms should it choose not to comply with Defendants' cease-and-desist letter during the pendency of an appeal. Defendants agreed to forgo enforcement against Kalshi pending this Court's ruling on a preliminary injunction. (Dkt. No. 11-9 at ¶ 5). With the issuance of the Court's decision, however, that stipulation no longer governs. If Defendants were to commence enforcement proceedings in Ohio state court, they could subject

14

Kalshi to civil and criminal penalties under state laws even as the Sixth Circuit is evaluating whether these same state laws are preempted. And if Ohio were to secure a state-court liability judgment during the pendency of Kalshi's appeal, that judgment could raise a host of nettlesome complications if Kalshi prevails in the Sixth Circuit. *See Tri Cnty. Wholesale Distribs., Inc. v. Labatt USA Operating Co., LLC*, 311 F.R.D. 166, 177 (S.D. Ohio 2015) (granting stay where it would be "difficult" for plaintiffs "to recover" from the harm absent a stay).

**III.     The Remaining Equitable Factors Favor An Injunction Pending Appeal.**

The remaining equitable factors favor an injunction pending appeal. As the *Orgel* court explained, "[e]njoining the enforcement of a law that violates constitutional rights is always in the public interest," and the state "is likely to face no harm because the court finds its enforcement in this case is likely preempted." *Orgel*, 2026 WL 474869, at *11 (citing *Churchill Downs*, 162 F.4th at 643; *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (per curiam)).

The Sixth Circuit could conclude that the countervailing interests this Court relied on in denying a preliminary injunction are misplaced. This Court invoked (at 21) the state's interest in enforcing its laws and regulating sports gambling to promote the public welfare. But the Sixth Circuit in *Churchill Downs* rejected the argument that the state's "interest in regulating gambling and its residents' interest in the protections of Michigan law" rendered an injunction improper. 162 F.4th at 643. As the Court explained, "when constitutional rights are threatened or impaired, irreparable injury is presumed, no cognizable harm results from stopping the conduct, and it's always in the public interest to prevent constitutional violations." *Id.* at 642 (quotation marks omitted). The Court further noted that, under the injunction, the state "didn't lose its ability to regulate gambling" by virtue of the preliminary injunction, just merely the ability to regulate activity that was federally preempted. *Id*. at 643. The same is true here. And Defendants have not

15

provided any evidence that a brief injunction pending appeal, which would be subject to an expedited schedule, *see* 28 U.S.C. § 1657; 6th Cir. R. 31(c)(2)(A), would have irreparable consequences on Ohio's gaming industry or the public.

Kalshi agrees that DCMs should be subject to responsible regulation—but that regulation comes from the CFTC, not 50 different states. The CEA contains a range of regulations to ensure market stability, and to ensure that users are free from "abusive," "fraudulent," and "unfair" practices. *See, e.g.*, 17 C.F.R. §§ 38.152, 38.651. The CFTC has many mechanisms to ensure that DCMs are acting in compliance with federal law and regulations. 7 U.S.C. §§ 9(4), 12c, 13; 17 C.F.R. § 40.11(c). Within this framework, Kalshi offers responsible-trading tools that aid in avoiding compulsive behavior,[2] including tools to allow users to set a personalized maximum amount that can be deposited to Kalshi in each calendar month,[3] tools that allow users to self-exclude from trading activities on Kalshi for a specific term of time,[4] and tools to self-restrict from parts of Kalshi's markets.[5] Kalshi also provides education guides informing traders of the risks of trading event contracts[6] and partners with Birches Health to offer Kalshi users access to specialized treatment for modern digital addictions and compulsive behaviors.[7] The question in this case is not whether Kalshi should be regulated, but by whom. Congress's judgment was that this regulation should come from the CFTC rather than from a patchwork of states.

---

[2] *Responsible Trading*, Kalshi (Mar. 17, 2026), https://perma.cc/9F92-Y5MU.
[3] *Personalized Funding Cap*, Kalshi, (Mar. 11, 2026), https://perma.cc/RKH5-ZN8U.
[4] *Trading Break*, Kalshi, (Mar. 11, 2026), https://perma.cc/8CZZ-RQV6.
[5] *Voluntary Self-Exclusion*, Kalshi, (Mar. 11, 2026), https://perma.cc/QY8W-TG2Y.
[6] *Responsible Trading*, Kalshi (Mar. 17, 2026), https://perma.cc/9F92-Y5MU.
[7] *Support and Resources for the Kalshi Community*, Kalshi, (Mar. 11, 2026), https://perma.cc/2T8H-92PQ.

**CONCLUSION**

This Court should grant the motion for an injunction pending appeal. If the Court denies an injunction pending appeal, Kalshi respectfully requests an interim injunction for the period needed for the Sixth Circuit to rule on Kalshi's motion for an injunction pending appeal.

DATE: March 19, 2026                        Respectfully submitted,

                                            /s/ Michael J. Hunter
                                            Michael J. Hunter (0076815)
                                            Matthew L. Jalandoni (0087074)
                                            *Trial Attorney*
                                            **Flannery | Georgalis, LLC**
                                            175 S. Third Street, Suite 285
                                            Columbus, OH 43215
                                            T: (614) 324-4139
                                            F: (614) 526-0601
                                            mjalandoni@flannerygeorgalis.com
                                            mhunter@flannerygeorgalis.com

                                            Neal Katyal (*pro hac vice*)
                                            Joshua B. Sterling (*pro hac vice*)
                                            William E. Havemann (*pro hac vice*)
                                            **Milbank LLP**
                                            1101 New York Avenue NW
                                            Washington, DC 20005
                                            T: (202) 835-7500
                                            F: (202) 263-7586
                                            nkatyal@milbank.com
                                            jsterling@milbank.com
                                            whavemann@milbank.com

                                            Grant R. Mainland (*pro hac vice*)
                                            Andrew L. Porter (*pro hac vice*)
                                            **Milbank LLP**
                                            55 Hudson Yards
                                            New York, NY 10001
                                            T: (212) 530-5000
                                            F: (212) 530-5219
                                            gmainland@milbank.com
                                            aporter@milbank.com

                                            *Attorneys for Plaintiff*

17

## CERTIFICATE OF SERVICE

I certify that on March 19, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties via the Court's CM/ECF electronic filing system.

/s/ *Michael J. Hunter*
Michael J. Hunter (0076815)

*Attorney for Plaintiff*